# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | No. 08 CR 888-4 |
| v. | Judge James B. Zagel |
| WILLIAM F. CELLINI, SR., | |
| Defendant. | |

## MEMORANDUM OPINION AND ORDER

The defendant William F. Cellini, Sr. seeks suppression of evidence acquired under Title III warrants. The motion is directed to the manner in which the statutory requirement of minimization was met and the period of time the overhearing continued in effect.

The warrant was applied for in April 2004. There was a showing of probable cause (not challenged here) to find that Stuart Levine, Peter Hurtgen and Jacob Kiferbaum were engaged in an ongoing scheme to ensure that Kiferbaum's construction company would become the builder of a hospital and medical structure for Edward Hospital ("Edward"). Building the structure required approval for a certificate of need by the Illinois Health Facilities Planning Board, of which Levine was an influential member. In December 2003, Edward's application to build was denied because it had not hired Kiferbaum.[1]

The warrant was signed on April 7, in advance of the scheduled April 21 meeting of the Planning Board.

---

[1] The Government analyzed records to identify the proper means to overhear. It also knew of a prior conversation between two other persons whose conversations were part of what might be overheard under the proposed order. That prior conversation concerned what had to be done to secure approval of construction in light of Levine's influence over the Planning Board.

There were overhears of three interceptees discussing the specifics of the plan to ensure that Kiferbaum got the contract. There were other conversations, as well, alluding to the details of the Edward application for a certificate of need. The application for a certificate was denied in part and continued in part. Edward Hospital was upset.

The Government sought an extension of the warrant to cover the June meeting. The number of interceptees grew significantly but did not include the defendant Cellini. Judge Kocoras granted the extension on May 6. During this extension period there were five calls between Levine and Cellini intercepted under the warrant. The content of the calls did not include discussion of Edward or Mercy.

### A. Failure to Minimize

The minimization provisions, commonly appearing in Title III warrants, are required by the statute authorizing these interceptions. The court orders required that "all monitoring of wire communications shall be conducted in such a way as to minimize the interception and disclosure of the communications intercepted to those communications relevant to the pending investigation . . . as further described in the attached affidavit."

The standard minimization language is terse, so the prevailing practice has been to issue minimization instructions to the agents who will monitor the interceptions and who sign acknowledgment of the instructions. The instructions here said: "If [a] conversation is unclear but may relate to other criminal activities, interception should cease after [a short period of minutes] unless it can be determined within that time that the conversation does in fact relate to other criminal activities, in which case interception may continue." Moreover, later in the instructions, the agents were told:

> We do not have authorization to overhear evidence concerning the
> commission or planning of crimes other than those defined above
> as illegal activities. Our authorization is limited to the interception
> of conversations between our named subjects and co-conspirators,
> accomplices, aiders and abettors, or participants concerning the
> illegal activities. In the event, however, that while you are
> attempting to determine whether a given conversation is pertinent,
> you intercept a conversation involving another serious crime–for
> example, assault, robbery, homicide or hijacking–listen to and
> record that conversation. Then notify the Supervising Agent and
> Supervising Attorney immediately.

The defendant Cellini asserts, and I assume to be true, that his recorded conversations with Levine concerned only the Teachers Retirement System ("TRS") and efforts by an investment manager to receive an allocation of TRS funds to invest for TRS.[2] These recordings were the result of instructions that told the agents to listen and record all calls that agents believed may have related to criminal activity unrelated to the investigation.

The minimization instruction, argues the Government, did not permit overhearing conversation of any crime. Rather it permitted agents who were properly overhearing a conversation to continue (past the time limit for non-pertinent calls) to monitor conversations that involved a crime, even one that was not part of the subject offenses. What is not permitted is to monitor a call beyond the permitted 'test period' when it appears during the 'test period' not to concern criminal matters. The agents have authority to do periodic spot checks to see if the conversation has turned to the criminal matters which are the subject of the Title III warrant.

The instruction permits agents to monitor all conversations for a reasonable period not to exceed two minutes to determine whether one of the subject persons is present and participating

---

[2] Defendant Cellini does not concede that the intercepts concerned criminal activity and he has plead not guilty. One aspect of his argument here is that even if they did concern criminal activity, the conversations were unlawfully overheard and recorded.

3

in the conversation and whether the conversation concerns criminal activities. If the conversation does not concern criminal activities or is otherwise privileged, the overhear must stop. Listening and recording devices must be turned off. The two-minute period is a maximum limit. If it becomes clear, in less than two minutes, that the conversation is not about criminal acts, then the devices must be turned off.

The instruction permits spot checking, that is, after the devices are turned off the agents may periodically turn them back on "every so often, but leaving at least one minute between checks, [to] determine if the nature of the conversation has changed to a criminal conversation." The time limit here remains at two minutes but the tenor of the instruction is a bit different from that pertaining to the initial phase of overhearing; the words are "[l]isten and record for a few seconds, but no longer than two minutes." If the conversation has turned to matters criminal and not privileged, the agents are instructed to keep listening and recording.

Because I am not asked to decide whether the conversations concerned criminal activity or even whether there was reason to think they did, I read only those initial portions of the transcripts tendered to me to determine whether monitoring was improperly extended before the participants reached the subject of the TRS and the investment manager. It appears that the subject came up very quickly, probably within a few seconds of the initiation of the call. It appears too that the conversations were not overheard because of spot checks after recording was initiated and stopped.

The motion is not directed to the proposition that the agents listened for too long. It is directed at the meaning of two sentences in the instruction considered together as follows:

> We do not have authorization to overhear evidence concerning . . . crimes other than those defined above as illegal activities . . . however . . . [if] while you are listening [and] attempting to determine whether a given conversation is pertinent, you intercept a conversation involving another serious crime . . . listen to and record that conversation.

An instruction that allowed agents to take their two minutes or so to listen to a conversation in order to find evidence of some crime might well run afoul of dicta in *United States v. Mansoori,* 304 F.3d 635, 645-46 (7th Cir. 2002). The Government's response is that, even if this were so, the language of the instruction as a whole would, in this case, be understood by the agents to mean: (1) if while listening briefly to a conversation for the purpose of determining if it was pertinent to the alleged scheme to award certificates of need only to hospitals which employed Kiferbaum (2) the agents heard a conversation involving another serious crime, then (3) the agents should listen and record that conversation.

The Government is correct in this. It is possible to construe the instruction as Cellini does, but, as nearly all experienced lawyers recognize, there is almost always more than one way to read any document more than a few words in length. The reading offered by the Government is far more plausible than the reading offered by the defendant. Read in context, as *Mansoori* requires, the instruction is proper. The order as a whole did restrict agents' actions to the limits authorized by Title III.[3]

The defendant argues that the instructions are flawed because they tell the agents to look for other crimes while listening in. The phrase "look for" is used often by Defendant, particularly

---

[3] In light of my reading of the instructions, I do not pause to consider the plain view analogy which the Government argues would allow the admissibility of the evidence even if the instructions were not adequate so long as the overhearing occurred within the time allowed to determine whether conversations were pertinent.

5

in his reply brief. And it is a good argument because, if the agents were being told to look for other crimes in the time allowed, minimization is compromised. What the Government contends is that the instructions say, instead, that if the agent "happens upon"[4] a conversation involving a serious crime, then that conversation should be listened to and recorded.

There is a real world difference between happening upon something and looking for it. Much of the law of "plain view" seizure is founded on the difference between these two things. *See, e.g., United States v. Ramirez*, 112 F.3d 849, 851-52 (7th Cir. 1997). The difference sometimes matters in civil cases too. Also, many parents have been known to discipline their children depending on whether the child went looking for trouble or simply happened upon it.

I construe the instruction to authorize overhearing of conversations about a serious crime when the agents happen upon them when listening to determine if a conversation is pertinent to the defined offenses. I do not find that agents are instructed to look for such conversations. Given the tenor of the instructions as a whole, a reasonable agent, intending to abide by the law and the instructions, would not believe he or she was free to use the time allowed to determine relevance to defined crime for the purpose of looking for evidence of other serious crimes. That an agent could disobey the instructions is possible but not a claim made in this motion.

If the Government (and I) are incorrect in this view of the meaning of the instructions, the Government argues, in any event, that evidence of the subject offenses in the May 6 application included activity that related to Levine's position on the TRS Board, and therefore the defined offenses in the May 6 Order included the TRS charges. At best this is a close call for the

---

[4] I am not certain the Government uses this phrase, and I have no desire to parse its brief a second time to see if it did, but I think "happens upon" encapsulates the point of the argument it makes.

Government. In any event, I need not and do not decide whether the May 6 application encompassed the TRS-related aspects of the scheme since I have decided that the Cellini calls were permissibly recorded under the authorization to intercept conversations involving other serious crimes overheard while the agents were determining whether the conversation was pertinent to one of the defined offenses.

The Government alternatively offers the claim that the conversations were pertinent to the crimes "defined above" in the order and the instructions. The indictment in this case rests, in part, on the premise that Levine and Antoin Rezko acted together to exercise influence over both the hospital board and TRS to enrich themselves. The Government, recognizing this overlap, has charged here and elsewhere that there was a "group" who acted across a range of state boards and offices for the purpose of enriching themselves in illicit ways. The statutory citations include mail and wire fraud involving theft of honest services, which cover the alleged TRS dealings. There was conversation, known to the Government, of soliciting a kickback in exchange for an investment from TRS to another investment manager, and there was also a belief by the Government that illegal activities included a TRS component.

What is being argued is that other offenses, and the manner in which they were discussed and dealt with, are pertinent to the defined offenses because they were evidence which illuminated the scheme and methods used by Levine and others to use the hospital board. The Government's brief summarizes, "the TRS-related aspects of the fraud and extortion scheme were interwoven with the Planning Board aspects in virtually every way," and relies on *United States v. Homick,* 964 F.2d 899 (9th Cir. 1992), for the proposition that Title III permits such overhears as pertinent to the defined offenses. The court in *Homick* reasoned that "[b]ecause the attempt to

obtain the ring arose out of and was closely related to one of the original crimes specified in the wiretap application, we are not convinced that the wire fraud offense falls within the 'other offenses' provision of the statute." *Id.* at 904. That is, the court found that the wire fraud offense related to the ring was close enough to the offenses specified in the wiretap authorization so as to not constitute an "other offense" for purposes of 18 U.S.C. § 2517(5), which requires a subsequent application for interceptions relating to "offenses other than those specified in the order of authorization." However, that particular language from *Homick* has rarely been cited or followed, in part, I presume, because in the following sentence the court acknowledged that "[i]n any event, in its application for extension of the wiretap authorization, the government included information relating to the scheme to recover the ring from the police." *Id.* The *Homick* court concluded that it was not error for the court to allow the Government to bring charges on the basis of the information gathered with respect to the ring "[b]ecause the government kept the court apprised of that information." *Id.* In light of the lack of clarity in the law on the issue and my conclusion that the motion to suppress should be denied on other grounds, I decline to decide whether the Cellini conversations ought not to be suppressed because they are interwoven with, and thus pertinent to, the defined offenses.

    **B. Unwarranted Extension of Interceptions**

The conversations between Levine and Cellini occurred during the second month of Title III authorization. Title III generally requires that interceptions must cease once the objective of the warrant has been achieved, even if the objective is achieved before the 30-day period of the warrant has passed. The judicial order was signed on May 6. The intercepted conversation occurred on the 7th, 8th, 10th and 12th of May.

Defendant Cellini notes that the investigative purpose that motivated the warrant was fully served well before the expiration of the initial warrant. The attempt to extort business from Edward had been made and failed when Edward refused to go along with the illegal proposal. Edward would get nothing in June, and communications with Edward were to be terminated.

This argument suffers from the implicit premise that the Government was somehow bound to accept the idea that the Edward deal was fully deceased. Yet there was profit to be had and no one is obliged to accept those statements for their truth. Levine was a man who was willing to do something illegal for the right price. It was reasonable to continue overhears, perhaps even through the June meeting (which would have required another extension), or until there was some stronger indication that Levine would not change his stance in response to something better on offer.

Even if the Edward Hospital deal was over, the Mercy Hospital deal, so far as the agents knew, was not consummated because further actions with Levine vis-a-vis Kiferbaum were possible and, probably, required. Payments might be made and boasting about success might continue. It is true that Levine and others could have been subject to an effective prosecution by then, but there is no requirement to cut short an investigation that might well turn up more persuasive evidence and more bad actors. *Hoffa v. United States*, 385 U.S. 293, 309-10 (1966). Levine and others might discuss what they did with Edward Hospital at least to consider its value as a tactic of intimidation or even to boast about their power. It is true that further investigation to improve prosecution evidence is too broad a standard to be consistent with the objectives of Title III, but here a 30-day follow up was permissible under Title III. The period of the extension would include (1) further events before the planned denial of Edward's final request, (2) the

Mercy Hospital project sequelae, and (3) the way the subjects would cope with continuing fall out over the Edward denial. Edward might make a fuss over the denial. Edward staff might act in anger against Levine. Levine's influence over the Planning Board might be exposed more fully in public hearings.

There was sufficient cause to believe that the subjects would have discussions or take actions in response to one or more of these circumstances.

I conclude that minimization procedures were consistent with Title III and that extension of the Title III authorization was proper.

The motion to suppress is denied.

ENTER:

*James B. Zagel*
James B. Zagel
United States District Judge

DATE: August 21, 2009