**American Bar Association**
**www.supremecourtpreview.org**

No. 08-1196

IN THE

## Supreme Court of the United States

BRUCE WEYHRAUCH,

*Petitioner,*

v.

UNITED STATES OF AMERICA,

*Respondent.*

On Writ Of Certiorari
To The United States Court Of Appeals
For The Ninth Circuit

### BRIEF FOR PETITIONER

DOUGLAS POPE
POPE & KATCHER
421 W. First Avenue
Suite 220
Anchorage, AK 99501
Telephone: (907) 272-8577

DONALD B. AYER
 *Counsel of Record*
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Telephone: (202) 879-3939

BRIAN J. MURRAY
NICOLE C. H. MASSEY
JONES DAY
77 West Wacker
Chicago, IL 60601
Telephone: (312) 782-3939

NATHANIEL P. GARRETT
JONES DAY
555 California Street
26th Floor
San Francisco, CA 94104
Telephone: (415) 626-3939

*Counsel for Petitioner*

i

## QUESTION PRESENTED

Whether, to convict a state official for depriving the public of its right to the defendant's honest services through the nondisclosure of material information, in violation of the mail-fraud statute (18 U.S.C. §§ 1341 and 1346), the government must prove that the defendant violated a disclosure duty imposed by state law.

ii

## TABLE OF CONTENTS

**Page**

QUESTION PRESENTED ........................................... i

OPINIONS BELOW ................................................... 1

JURISDICTION ........................................................ 1

STATUTORY PROVISIONS INVOLVED ................ 1

STATEMENT ............................................................ 2

SUMMARY OF ARGUMENT ................................. 18

ARGUMENT ........................................................... 22

I. THE LANGUAGE OF 18 U.S.C. § 1346 DOES NOT AUTHORIZE PROSECU-TIONS OF STATE OFFICIALS WHERE THE WRONG ALLEGED IS SIMPLY A FAILURE TO DISCLOSE PERCEIVED CONFLICTS OF INTEREST AND THE NONDISCLOSURE VIOLATES NO EXISTING LEGAL DUTY TO DISCLOSE SEPARATE AND APART FROM § 1346 ........ 22

II. THE NINTH CIRCUIT'S READING OF § 1346 TO MANDATE A FEDERAL COMMON LAW OF STATE OFFICIALS' DISCLOSURE DUTIES VIOLATES SEVERAL ESTABLISHED CANONS OF CONSTRUCTION ........................................... 29

iii

## TABLE OF CONTENTS
(continued)

Page

A. Reversal Of The Decision Below Is
Compelled By The Well-Established
Principle That Congress Must Speak
Clearly When It Acts In A Way That
Invades The Usual Prerogatives Of
The States ................................................. 30

B. It Is Further Compelled By The
Principle Of Constitutional Avoid-
ance, So That The Statute Is Not
Rendered Void For Vagueness .................. 34

C. If The Court Finds The Statute
Ambiguous, The Rule Of Lenity Also
Requires That Violations Based On
Nondisclosure Rest On A Preexisting
Duty To Disclose Separate From
§ 1346............................................................ 37

III. THE NINTH CIRCUIT'S RECOGNITION
OF A FEDERAL COMMON LAW
GOVERNING STATE OFFICIALS'
DISCLOSURE DUTIES IS WRONG
UNDER THIS COURT'S MANY CASES
ADDRESSING THE RULE OF
FEDERAL COMMON LAW............................ 39

IV. THE LEGISLATIVE HISTORY LENDS
NO SUPPORT TO THE DECISION
BELOW.............................................................. 44

iv

## TABLE OF CONTENTS
(continued)

Page

    A. The Sparse Legislative History Of § 1346 Provides No Useful Guidance For The Proper Interpretation Of The Statute ......................................................... 44

    B. Any Effort To Implement A Statutory Intent To "Reinstate All Of The Pre-McNally Case Law" Would Render The Statute Incoherent ............................... 47

V. REQUIRING HONEST SERVICES PROSECUTIONS OF STATE OFFICIALS FOR NONDISCLOSURE TO REST ON BREACH OF A PREEXISTING DUTY TO DISCLOSE IN NO WAY IMPEDES THE VIGOROUS PROSECUTION OF FRAUD AND BRIBERY ................................... 50

CONCLUSION ......................................................... 53

v

# TABLE OF AUTHORITIES

**Page**

CASES

*Atherton v. F.D.I.C.,*
    519 U.S. 213 (1997)................................................ 42

*Blum v. Stenson,*
    465 U.S. 886 (1984)................................................ 44

*Bouie v. City of Columbia,*
    378 U.S. 347 (1964)................................................ 34

*Boyle v. United Tech. Corp.,*
    487 U.S. 500 (1988)................................................ 40

*Butner v. United States,*
    440 U.S. 48 (1979)................................................. 29

*Carpenter v. United States,*
    484 U.S. 19 (1987)................................................. 24

*Central Bank of Denver, N.A. v. First
    Interstate Bank of Denver, N.A.,*
    511 U.S. 164 (1994)................................................ 43

*Chiarella v. United States,*
    445 U.S. 222 (1980)............................................ 25, 26

*Circuit City Stores, Inc. v. Adams,*
    532 U.S. 105 (2001)................................................ 44

*City of Chicago v. Morales,*
    527 U.S. 41 (1999)................................................. 35

*City of Milwaukee v. Illinois,*
    451 U.S. 304 (1981)................................................ 40

*Cleveland v. United States,*
    531 U.S. 12 (2000)............................................. 24, 33

vi

# TABLE OF AUTHORITIES
## (continued)

Page

*Croll v. Croll,*
   229 F.3d 133 (2d Cir. 2000) .................................. 23

*Dean v. United States,*
   129 S. Ct. 1849 (2009) .......................................... 22

*DeSylva v. Ballentine,*
   351 U.S. 570 (1956) ............................................... 29

*Dolan v. U.S. Postal Serv.,*
   546 U.S. 481 (2006) ............................................... 24

*Engine Mfrs. Assn. v. S. Coast Air Quality*
   *Mgmt. Dist.,*
   541 U.S. 246 (2004) ............................................... 23

*Evans v. United States,*
   504 U.S. 255 (1992) ............................................... 31

*Exxon Mobil Corp. v. Allapattah Services, Inc.,*
   545 U.S. 546 (2005) ............................................... 49

*Florida Lime & Avocado Growers v. Paul,*
   373 U.S. 132 (1963) ............................................... 41

*Gregory v. Ashcroft,*
   501 U.S. 452 (1991) .................................. 30, 31, 33

*McNally v. United States,*
   483 U.S. 350 (1987) ......................................passim

*Miree v. DeKalb County,*
   433 U.S. 25 ............................................. 40, 42, 43

*Neder v. United States,*
   527 U.S. 1 (1999) .................................................. 24

*New State Ice Co. v. Liebmann,*
   285 U.S. 262 (1932) ............................................... 42

vii

### TABLE OF AUTHORITIES
(continued)

Page

*O'Melveny & Meyers v. F.D.I.C.,*
 512 U.S. 79 (1994)..........................................40, 41

*Papachristou v. City of Jacksonville,*
 405 U.S. 156 (1972)..............................................36

*Pilot Life Ins. Co. v. Dedeaux,*
 481 U.S. 41 (1987)..........................................40, 41

*Piper v. Chris-Craft Indus., Inc.,*
 430 U.S. 1 (1977)...................................................44

*Rice v. Santa Fe Elevator Corp.,*
 331 U.S. 218 (1947)..............................................42

*Sorich v. United States,*
 129 S. Ct. 1308 (2009)...................................37, 52

*Ullmann v. United States,*
 350 U.S. 422 (1956)..............................................27

*United States v. Bass,*
 404 U.S. 336 (1971)...................................30, 31, 38

*United States v. Bloom,*
 149 F.3d 649 (7th Cir. 1998) ...............................36

*United States v. Brumley,*
 116 F.3d 728 (5th Cir. 1997) ........................passim

*United States v. Capital Tax Corp.,*
 545 F.3d 525 (7th Cir. 2008) ...............................29

*United States v. Czubinski,*
 106 F.3d 1069 (1st Cir. 1999) ..............................51

*United States v. Dixon,*
 536 F.2d 1388 (2d Cir. 1976) ...............................51

viii

## TABLE OF AUTHORITIES
(continued)

**Page**

*United States v. Holzer,*
  816 F.2d 304 (7th Cir. 1987) ................................ 48

*United States v. Hudson,*
  11 U.S. (7 Cranch) 32 (1812) ........................ 39, 44

*United States v. Kimbell Foods, Inc.,*
  440 U.S. 715 (1979)............................................. 28

*United States v. Lanier,*
  520 U.S. 259 (1997)............................................. 43

*United States v. Lopez,*
  541 U.S. 549 (1995) ....................................... 31, 42

*United States v. Mandel,*
  591 F.2d 1347 (4th Cir. 1979)............................. 48

*United States v. McNeive,*
  536 F.2d 1245 (8th Cir. 1976)............................. 48

*United States v. Oakland Cannabis Buyer's
  Co-op.,*
  532 U.S. 483 (2001)............................................. 43

*United States v. Rabbitt,*
  583 F.2d 1014 (8th Cir. 1978)................. 24, 48, 51

*United States v. Reese,*
  92 U.S. 214 (1926)............................................... 34

*United States v. Rybicki,*
  354 F.3d 124 (2d Cir. 2003) ............... 47, 48, 49, 50

*United States v. Santos,*
  128 S. Ct. 2020 (2008)......................................... 38

*United States v. Shabani,*
  513 U.S. 10 (1994)............................................... 38

ix

## TABLE OF AUTHORITIES
(continued)

**Page**

*United States v. Urciuoli,*
  513 F.3d 290 (1st Cir. 2008) ................................ 36

*United States v. Williams,*
  128 S. Ct. 1830 (2008) .................................... 35, 36

*Wallis v. Pan American Petroleum Corp.,*
  384 U.S. 63 (1966) .................................... 41, 42, 43

*Weinberger v. Rossi,*
  456 U.S. 25 (1982) ................................................ 46

*Wheeldin v. Wheeler,*
  373 U.S. 647 (1963) .............................................. 40

*Williams v. United States,*
  458 U.S. 279 (1982) .............................................. 29

*Wilson v. Garcia,*
  471 U.S. 261 (1985) .............................................. 29

STATUTES AND LEGISLATIVE MATERIALS

17 U.S.C. § 1 ....................................................... 29

18 U.S.C. § 225 ....................................................... 5

18 U.S.C. § 371 ..................................................... 10

18 U.S.C. § 666 ..................................................... 10

18 U.S.C. § 1341 .............................................. passim

18 U.S.C. § 1346 .............................................. passim

18 U.S.C. § 1951 ................................................... 10

133 Cong. Rec. H6798 (daily ed. July 29, 1987) ... 3, 4

133 Cong. Rec. S16742-03 (daily ed. Nov. 30,
  1987) .................................................................. 23

x

## TABLE OF AUTHORITIES
(continued)

**Page**

134 Cong. Rec. H11108-01 (daily ed. Oct. 21, 1988) ................................................................ 6, 45

134 Cong. Rec. S15640 (daily ed. Oct. 12, 1988) ...... 6

134 Cong. Rec. S16315-17 (daily ed. Oct. 14, 1988) ........................................................................ 6

134 Cong. Rec. S17360-02 (daily ed. Nov. 10, 2008) .................................................................... 46

ALASKA CONST. art. II, § 8 ....................................... 32

ALASKA STAT. § 24.60.010 .................................. 13, 14

ALASKA STAT. § 24.60.200 ........................................ 32

ALASKA STAT. § 26.60.040 ........................................ 14

ALASKA STAT. § 26.60.050 ........................................ 14

ALASKA STAT. § 26.60.070 ........................................ 14

ALASKA STAT. § 26.60.100 ........................................ 14

ALASKA STAT. § 26.60.200 ........................................ 14

ALASKA STAT. § 26.60.30 ........................................... 14

Anti-Corruption Act of 1988, H.R. 5498, S. 2793, 100th Cong. (2d Sess. 1988) ........................ 5

Anti-Public Corruption Act of 1988, H.R. 4871, S. 2531, 100th Cong. (2d Sess. 1988) ................... 4

Fraud Amendments Act of 1987, H.R. 3089, S. 1898, 100th Cong. (1st Sess. 1987) ............. 4, 23

Mail Fraud Amendments Act of 1987, H.R. 3050,100th Cong. (1st Sess. 1987) ........................ 4

OTHER AUTHORITIES

17 C.F.R. § 240.10.................................................. 25

xi

## TABLE OF AUTHORITIES
### (continuéd)

Page

BALLANTINE'S LAW DICTIONARY (3d ed. 1969)......... 26

Black, Henry Campbell, A DICTIONARY OF LAW (1891).................................................................. 27

Brown, George D., *Should Federalism Shield Corruption?*, 82 CORNELL L. REV. 225 (1996) ................................................................. 27, 31, 51

Gray, John Chipman, THE NATURE AND SOURCES OF THE LAW (2d ed. 1921) ..................... 27

*How They Voted: Oil and Gas Tax Law Rewrite*, ANCHORAGE DAILY NEWS, Aug. 13, 2006 ........................................................................ 9

Kurland, Adam H., *The Guarantee Clause as a Basis for Federal Prosecutions of State and Local Officials*, 62 S. CAL. L. REV. 367, 488-90 (1989)................................................................. 6

Lewis, Neil A., *Justice Dept. Moves to Void Stevens Case*, N.Y. TIMES, Apr. 1, 2009.............. 37

Mohr, Charles, *Drug Bill Passes, Finishing Business of 100th Congress*, N.Y. TIMES, Oct. 23, 1998 ................................................................ 6

Moohr, Geraldine Szott, *Mail Fraud Meets Criminal Theory*, 67 U. CIN. L. REV. 1 (1998) ..... 47

Moohr, Geraldine Szott, *Mail Fraud and the Intangible Rights Doctrine: Someone to Watch Over Us,* HARV. J. LEGIS. 153 (1994)........ 35

xii

## TABLE OF AUTHORITIES
(continued)

**Page**

Murkowski, Frank, *Executive Proclamation*
(June 26, 2006), available at
http://w3.legis.state.ak.us/docs/pdf/24special/
Proclamation3rdSpecialSession2006.pdf.............. 9

Murkowski, Frank, *Executive Proclamation*
(May 9, 2006), available at
http://w3.legis.state.ak.us/docs/pdf/24special/
ProclamationSpecialSession2006.pdf ................... 8

OXFORD ENGLISH DICTIONARY (2d ed. 1989) ........... 26

Ruff, Charles F.C., *Federal Prosecution of
Local Corruption*, 65 GEO. L.J. 1171 (1977)........ 30

WEBSTER'S II NEW COLLEGE DICTIONARY (3d
ed. 2005) ............................................................ 27

WEBSTER'S THIRD NEW INTERNATIONAL
DICTIONARY (1986) .............................................. 26

## OPINIONS BELOW

The opinion of the United States Court of Appeals for the Ninth Circuit (Pet. App. 1a-21a) is reported at 548 F.3d 1237. The district court's order granting petitioner's motion in limine (*id.* at 22a-36a) is unreported.

## JURISDICTION

The Court of Appeals issued its decision on November 26, 2008. The Petition for Rehearing *En Banc* was denied on January 7, 2009 (Pet. App. 37a). The petition for a writ of certiorari was filed on March 25, 2009, and granted on June 29, 2009. The jurisdiction of this Court is invoked under 28 U.S.C. § 1254(1).

## STATUTORY PROVISIONS INVOLVED

Section 1341 of Title 18, United States Code, provides:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the

2

Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than five years, or both. If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

Section 1346 of Title 18, United States Code, provides:

For the purposes of this chapter, the term "scheme or artifice to defraud" includes a scheme or artifice to deprive another of the intangible right of honest services.

## STATEMENT

Following this Court's decision in *McNally v. United States,* 483 U.S. 350 (1987), Congress adopted 18 U.S.C. § 1346, which extended the federal mail, wire, and related fraud statutes to schemes to defraud by "depriving another of the intangible right of honest services." This case presents the question whether those fraud provisions, thus extended, may encompass a state official's simple failure to disclose an employment solicitation—with no proof his conduct was compromised in some way—on the theory that the nondisclosure, though otherwise consistent with state and federal law, violated a

3

federal common law disclosure duty arising under § 1346.

1. Beginning in the 1970s, federal prosecutors began to prosecute state and local officials under the theory that the mail and wire fraud statutes proscribed schemes to defraud citizens of intangible rights, most often on facts involving the acceptance of bribes or the use of a defendant's official position to advantage himself or his friends in some way. This theory of liability under the federal fraud statutes achieved wide acceptance in the courts of appeals.

In *McNally v. United States*, 483 U.S. 350 (1987), this Court rejected the view that the mail and wire fraud statutes criminalized schemes to defraud another of intangible rights. "Rather than construe the statute in a manner that leaves its outer boundaries ambiguous and involves the Federal Government in setting standards of disclosure and good government for local and state officials," the Court read "§ 1341 as limited in scope to the protection of property rights." *Id.* at 360. In order to criminalize the act of defrauding another of an intangible right of honest services, the Court concluded, a much clearer statement of purpose would be required from Congress. *Id.*

Four different attempts to legislatively overturn *McNally* failed before Congress settled upon the language that now composes § 1346.

a. In July of 1987, little more than one month after this Court decided *McNally*, Representatives Kweisi Mfume and Michael Synar introduced a bill "to restore the full force of the mail fraud statute." 133 Cong. Rec. H6798 (daily ed. July 29, 1987) (statement of Rep. Synar). Under this proposal, entitled the

4

Mail Fraud Amendment Act of 1987, "defraud" would be defined to include "the defrauding of the citizens of a body politic—(1) of their right to the conscientious, loyal, faithful, disinterested, and unbiased performance of official duties by a public official thereof; or (2) of their right to have the public business conducted honestly, impartially, free from bribery, corruption, bias, dishonesty, deceit, official misconduct, and fraud." *See* H.R. 3050, 100th Cong. (1st Sess. 1987). The purpose of the bill, according to Rep. Synar, was to overrule *McNally*'s conclusion that a public official can be prosecuted under the mail fraud statute for accepting kickbacks only where the fraud deprives another of money or property. *See* 133 Cong. Rec. H6798 (daily ed. July 29, 1987) (statement of Rep. Synar). The bill, however, never progressed beyond hearings held by the House Judiciary's Subcommittee on Criminal Justice.

b. Approximately two months after *McNally*, Sen. Arlen Specter and Rep. John Conyers introduced the Fraud Amendments Act of 1987, H.R. 3089, S. 1898, 100th Cong. (1st Sess. 1987). In relevant part, this far-sweeping legislation would have defined fraud to include the defrauding another "of intangible rights of any kind whatsoever in any manner or for any purpose whatsoever." The Fraud Amendments Act likewise died in committee.

c. In June of 1988, Sen. Mitch McConnell and Rep. George Gekas proposed the Anti-Public Corruption Act of 1988, H.R. 4871, S. 2531, 100th Cong. (2d Sess. 1988). The Anti-Public Corruption Act would have made it a crime for any person to endeavor by scheme or artifice corruptly to deprive or defraud the inhabitants of a State or political subdivision of the

5

honest services of a State or local official or employee or to deprive inhabitants of a fair and impartially conducted election through fraudulent ballots or voter registration forms. This bill likewise proceeded no further than referral to the House's Subcommittee on Criminal Justice and the Senate Judiciary Committee.

d. Finally, in September of 1988, Sen. Joseph Biden and Rep. Gekas introduced the Anti-Corruption Act of 1988, H.R. 5498, S. 2793, 100th Cong. (2d Sess. 1988). The Act proposed the addition of two new statutes: one to combat public corruption to be codified at 18 U.S.C. § 225, and another to address private corruption to be codified at 18 U.S.C. § 1346. The language addressing private corruption provided:

> For the purposes of this chapter, the term "scheme or artifice to defraud" includes a scheme or artifice to deprive an organization of the intangible right of honest services in which the defendant received or attempted to receive, for the defendant or another person, anything of value or in which the defendant intended or contemplated loss or harm to the organization.

The section addressed to public corruption provided, in relevant part, that "[w]hoever * * * deprives or defrauds, or attempts to deprive or defraud, by any scheme or artifice, the inhabitants of a State or political subdivision of a State of the honest services of an employee or official of such State or subdivision" shall be fined and imprisoned no more than ten years.

6

The Anti-Corruption Act was reported favorably by the Judiciary Committee, and passed the Senate by voice vote on October 14, 1988 as part of a package of forty-seven amendments to a highly publicized drug bill. See 134 Cong. Rec. S15640 (daily ed. Oct. 12, 1988) (list of amendments to drug bill, including S. 2793); 134 Cong. Rec. S16315-17 (daily ed. Oct. 14, 1988) (passing S. 2793).

The election year drug bill, with S. 2793 included, was then sent to the House. *See* Adam H. Kurland, *The Guarantee Clause as a Basis for Federal Prosecutions of State and Local Officials*, 62 S. CAL. L. REV. 367, 488-90 (1989) (detailed legislative history of § 1346). The House leadership "apparently balked" at the far-reaching language proposed by the Senate, and hammered out the language now composing § 1346 in "eleventh hour reconciliation deliberations" with Senate leaders. *Id.* at 488 n.450.

The House passed the amended omnibus drug bill, with the language of § 1346 included, by a vote of 346-11 on October 22, 1997, the last day of the 100th Congress. The Senate agreed to the amended drug bill by voice vote on the same day. *See* H.R. 5210, 100th Cong. § 7603 (2d Sess. 1988); 134 Cong. Rec. H11108-01, S17301-01 (daily ed. Oct. 21, 1988); *see also* Charles Mohr, *Drug Bill Passes, Finishing Business of 100th Congress*, N.Y. TIMES, Oct. 23, 1998, at A11 (noting that drug bill cleared Senate at 3:16 a.m.). Congress enacted § 1346 without referring the language to any committee and without any floor debate. *See United States v. Brumley*, 116 F.3d 728, 739 (5th Cir. 1997) (en banc) (Jolly & DeMoss, JJ., dissenting).

7

2. Petitioner Bruce Weyhrauch, a licensed attorney, was first elected to represent Juneau in the Alaska House of Representatives in 2002. J.A. 14. Petitioner represented Juneau in February 2006, when Governor Frank Murkowski proposed that the legislature adopt legislation altering the state's oil production taxation scheme. Pet. App. 2a. According to Gov. Murkowski's proposal, the new tax system—referred to as a "petroleum production tax" or "PPT"—would tie the State's tax on oil producers to a percentage of the producer's net profits. J.A. 16-17. The government alleges that VECO Corporation, an oil field services company, supported the proposed legislation but opposed any bill that taxed oil producers' profit at a rate greater than twenty percent. *Id.*

On May 4, 2006, five days before the legislature's scheduled adjournment, petitioner—who had concluded that he would not run for reelection—drafted a letter to Bill J. Allen, CEO of VECO, soliciting future employment. The letter, which included a header stating "Advertising Materials," as required by the Alaska Rules of Professional Conduct, stated:

> I have long admired the role that VECO has played in our State's resource and economic development. I have practiced law and government relations since 1986, first clerking for the Alaska Superior Court, working as a shareholder in the firm of Faulkner, Banfield, Doogan & Holmes, and opening my own law office in 1998. I write to have a further conversation with you about my law office representing VECO.

8

I have represented fishing organizations, corporations, non-profits, individuals, associations, and plaintiffs and defendants in the areas of collections, administrative law and appeals, natural resources development, construction, labor, litigation, and government affairs. While my responsibilities as a member of the Alaska House of Representatives present new challenges, that will not detract from my ability to meet your needs.

Thanks for everything you and the VECO teams has [sic] done for me. I look forward to assisting you professionally if that is possible. Please call me at your convenience. My resume is enclosed.

J.A. 53-54. The indictment alleges that petitioner mailed the letter and enclosed resume through the United States mails. *Id.* at 23.

On May 9, 2006, when it appeared that the legislature would adjourn without acting on his taxation proposal, Gov. Murkowski called a 30-day "special joint session." *See* Gov. Frank Murkowski, *Executive Proclamation* (May 9, 2006), *available at* http://w3.legis.state.ak.us/docs/pdf/24special/Proclam ationSpecialSession2006.pdf. The indictment alleges that on May 16, Bill Allen sent petitioner and other members of the Alaska legislature an e-mail asking them to vote for the twenty percent PPT bill. J.A. 26. The indictment further alleges that on or about May 19, 2006, petitioner e-mailed Allen stating, "I will be arriving in Anchorage on Wednesday May 24 and would like to meet with you at 4 pm to discuss a mutually beneficial relationship." *Id.* On or about

9

May 24, 2006, Allen met petitioner at a restaurant in Anchorage and allegedly discussed his employment solicitation and support for the twenty percent PPT legislation. *Id.* Six days later, petitioner allegedly mailed Allen a hand-written note on Alaska State Legislature letterhead, stating, "It was great to finally spend some time with you * * * last week. Call anytime. I look forward to working with you and [VECO] in the future." *Id.* at 27. The government further charges that on June 4, petitioner proposed that the House adjourn sine die before a vote could be taken on an amendment to the PPT bill that would have lowered the price threshold triggering an additional tax on oil producers. *Id.* at 28.

On June 26, 2006, Gov. Murkowski called for an additional 30-day special session because the legislature had still not passed his taxation proposal. *See* Gov. Frank Murkowski, *Executive Proclamation* (June 26, 2006), *available at* http://w3.legis.state.ak. us/docs/pdf/24special/Proclamation3rdSpecialSession 2006.pdf. On or about July 19, 2006, petitioner allegedly told a VECO official that he intended to "shoe-horn[]" himself into a meeting of legislators that were studying a new proposal for the PPT bill, learn about the details of the new PPT proposal, and then report those details to VECO. J.A. 29-30. On the last day of the special session, the House approved a PPT bill that taxed oil producers at 22.5 percent, above the rate supported by VECO. *See How They Voted: Oil and Gas Tax Law Rewrite*, ANCHORAGE DAILY NEWS, Aug. 13, 2006, at B3. Petitioner voted in favor of the legislation. *Id.*

3. Petitioner's indictment resulted from a large-scale investigation conducted by the FBI into

10

financial ties between VECO and several Alaskan legislators. In total, the VECO investigation resulted in either the indictment or guilty plea of twelve individuals, including Senator Ted Stevens and VECO CEO Bill Allen.

The government charged petitioner and former House Speaker Pete Kott in the same indictment on May 3, 2007. The indictment charged petitioner and Rep. Kott with conspiracy to commit extortion under color of official right, bribery, and honest services fraud, all in violation of 18 U.S.C. § 371; attempted interference with commerce by extortion induced under color of official right in violation of 18 U.S.C. § 1951; bribery concerning programs receiving federal funds in violation of 18 U.S.C. § 666; and honest services fraud in violation of 18 U.S.C. §§ 1341 and 1346.

In the honest services fraud charge, the government alleged that petitioner and Rep. Kott, along with VECO officials, "aided and abetted by one another, devised, attempted to devise, and intended to devise a scheme and artifice to defraud and deprive the State of Alaska of its intangible right to the honest services of KOTT and [WEYHRAUCH], performed free from deceit, self-dealing, bias, and concealment." J.A. 35. The indictment alleged, *inter alia*, a scheme in which VECO was "to provide, or agree to provide things of value to * * * WEYHRAUCH to cause [Weyhrauch] to abuse his position and office as a member of the Alaska State Legislature, and to misuse his official authority for the benefit of [VECO]." *Id.* at 35-36. The government predicated federal jurisdiction over petitioner's allegedly fraudulent scheme on

11

petitioner's act of placing his resume and solicitation letter to VECO in the United States mails. *Id.* at 36-37.

4. Shortly before trial, the government indicated for the first time its intention to prove its allegation of honest services fraud not only under a quid pro quo theory, resting on proof of actual or promised compensation for misuse of official position, but under the distinct theory that a failure to disclose a conflict of interest, without more, could itself constitute a violation of § 1346. In a motion in limine filed a few days before the scheduled trial date, the government alleged that, without any showing of "an illegal financial transaction," *e.g.*, a bribe, "honest services fraud charges may be proven in at least two additional ways: (1) through proof that the public official knowingly concealed the existence of a conflict of interest or (2) through proof that the public official knowingly violated a state law." J.A. 41. According to the government:

> When a public official fails to disclose the existence of a conflict of interest or violates a state law in connection thereto, that public official can be found guilty of honest services fraud irrespective of whether the public official took any act thereafter, much less a fraudulent or harmful act.

*Id.* at 42. To prove up this nondisclosure theory, the government sought a ruling allowing the introduction of evidence to show that both defendants "violated their respective duties of honest services by knowingly concealing their respective conflicts of interest from the Alaska State Legislature and from the citizens of the State of Alaska, and by voting on

12

legislation that impacted the company with whom they were negotiating employment."[1] *Id.* at 39. To establish that the nondisclosure of the employment solicitation violated Alaska law, the government sought to offer four categories of evidence which it itemized in detail.[2] *Id.* at 39-40.

The government argued that the proposed evidence was relevant because petitioner was under a duty to disclose that he was "soliciting and negotiating for a job" with VECO, but failed to do so. J.A. 46. The government located petitioner's disclosure duty in Alaska Statute § 24.60.030(e)(3), which provides that a legislator may not "take or withhold official action or exert official influence that could substantially benefit or harm the financial interest of another

---

[1] More specifically, the government sought an order "allowing [it] to present evidence of * * * defendant Weyhrauch's negotiation of future employment with 'Company A,' [his] duty (both express and implied) * * * to disclose such negotiations, [his] failure to disclose such negotiations, and [his] failure to cease voting on particular legislation as required under Alaska state law." J.A. 39. Neither a bribe nor any promise of favorable treatment played any part in the government's proposed proof under this nondisclosure theory.

[2] The proposed state law evidence included: (1) ethics publications produced and distributed by the legislature addressing conflict of interest and disclosure requirements; (2) testimonial evidence from a state employee who would testify that "members of the Alaska State Legislature customarily acknowledge the existence of conflicts of interests on the floor of the Legislature," and that such conflicts are recorded by the legislative body's clerk; (3) testimonial evidence from a state employee describing the "ethics training" that petitioner received; and (4) testimonial evidence that petitioner served on the legislature's Select Committee on Ethics. J.A. 39-40.

13

person with whom the legislator is negotiating for employment." *Id.*

On the same day that the government filed its motion in limine seeking admission of this evidence to prove its nondisclosure theory, petitioner filed his own motion in limine opposing the admission of the evidence on the dual grounds that the nondisclosure theory was a new one on which petitioner had not received prior notice, and that in any event it was foreclosed because the provisions of Alaska law relied upon did not give rise to any duty to disclose under the circumstances. J.A. 57-60.

5. The district court denied the government's motion in limine and granted petitioner's motion. *See* Pet. App. 22a. As a threshold matter, the court found that the government's indictment adequately alerted petitioner to the government's "alternative" nondisclosure theory of liability by alleging that petitioner deprived the State of Alaska of its right to honest services "free from deceit, self-dealing, bias and *concealment.*" *Id.* at 29a-30a (quoting J.A. 35) (emphasis in original).

Nonetheless, the court agreed with petitioner that the government's nondisclosure theory was not tenable under the circumstances. The court stated that the government's theory supporting admission of the evidence depended "upon the existence of a legally recognized duty to disclose the alleged conflict of interest." Pet. App. 25a. The court disagreed with the government, however, that any such duty could be located in state law. Examining Alaska's legislative "Standards of Conduct" provisions, ALASKA STAT. § 24.60.010 *et al.,* the district court concluded that none of the disclosure obligations established by

14

state law "would apply to the circumstances here." *Id.* at 26a-27a.

With respect to the government's purported source of petitioner's disclosure duty, Alaska Statute § 24.60.030(e)(3), the court found that although the statute prohibits certain conduct, it contains no disclosure requirement. Pet. App. 25a. The court held that in light of numerous statutes with express disclosure requirements—which demonstrate that the legislature "knows how to establish a duty to disclose"—it would be inappropriate to imply a disclosure duty in Section 24.60.030 when none expressly exists. *Id.* at 26a. The court ruled that of the six provisions governing a legislator's standard of conduct that mandate disclosure, none applied under the facts of the case. *See id.*[3]

The district court also rejected the government's position that every legislator is subject to "an inherent fiduciary duty" to avoid conflicts of interest and to disclose such conflicts. Pet. App. 28a. The court held that even if such "salutary propositions" were recognized in state common law, Alaska's "Standards of Conduct" provisions expressly

---

[3] The six provisions specifically addressed by the district court include: ALASKA STAT. § 26.60.30(f) (duty to disclose membership on certain boards); *id.* § 26.60.040 (duty to disclose participation in certain state contracts or leases); *id.* § 26.60.050 (duty to disclose participation in non-exempt state programs and receipt of non-exempt state loans); *id.* § 26.60.070 (duty to disclose formation of close economic association involving a substantial financial matter with another legislator, legislative employee, or registered lobbyist); *id.* § 26.60.100 (duty to disclose information regarding legislator's representation of another before state entities); *id.* § 26.60.200 (comprehensive scheme for reporting certain financial transactions).

15

"supersede the provisions of the common law relating to legislative conflict of interest that may apply to a member of the legislature." *Id.* (quoting ALASKA STAT. § 24.060.020(b)).

The district court noted that "[n]o federal statute [was] cited" by the government as a source of petitioner's disclosure duty, and on that basis concluded that any claimed violation of the right of honest services "turns on whether federal common law may be used to provide the requisite duty to disclose." Pet. App. 30a. The district court answered this question in the negative, following the reasoning of the Fifth Circuit's en banc opinion in *United States v. Brumley*, 116 F.3d 728 (5th Cir. 1997), and holding on the present facts that "any duty to disclose sufficient to support the mail and wire fraud charges here must be a duty imposed by state law." *Id.* at 35a-36a. There being no such duty, the court concluded that its order left "the United States to prove up the honest services fraud charges in this case based [upon] violations of the law other than a duty to disclose [petitioner's] dealing with VECO." *Id.* at 36a.

6. Deeming the excluded evidence of "more critical relevance to defendant Weyhrauch than it is to defendant Kott," the government endorsed petitioner's motion to sever and appealed the district court's order as to petitioner.[4] Pet. App. 40a. Though

_____

[4] During the pendency of petitioner's appeal, a jury acquitted Rep. Kott on the government's honest services charge, but convicted him of conspiracy, Hobbs Act extortion, and bribery concerning programs receiving federal funds. Rep. Kott appealed and two months after oral argument, but before the issuance of an opinion from the Ninth Circuit, the government

16

expressly declining to dispute the "district court's analysis of Alaska state law," the government argued on appeal that the district court's exclusion of its proposed evidence as proof of its new nondisclosure theory of honest services fraud "radically circumscribed the concept of honest services mail fraud." Brief of Appellant at 14-15, 16, *United States v. Weyhrauch*, No. 07-30339 (9th Cir. Feb. 1, 2008). While informing the Ninth Circuit that "[a]t trial, the United States also intends to prove * * * the attempted honest services count * * * on a bribery theory," *id.* at 12 n.4, the government argued that the district court's ruling improperly precluded it from proving that "Weyhrauch violated his duties of honest services by knowingly concealing his conflict of interest from the Alaska State Legislature and from the citizens of the State of Alaska," while "voting on legislation that impacted the company with whom he was negotiation for employment," *id.* at 13.

The government took the position that "the public is entitled not just to the right *decisions* by its elected officials, but also to a free and uncorrupted *process* by which those public officials take official actions. When a public official fails to disclose the existence of a conflict of interest, and takes action in his official

---

(continued...)

moved to release Rep. Kott and to remand the case back to the district court because review of the government's files "uncovered material that, at this stage, appears to be information that should have been, but was not, disclosed to [Kott] before his trial." *United States v. Kott*, No. 07-30496, Motion to Remand (9th Cir. June 4, 2009).

17

capacity that relate to his conflict of interest, that public official has breached his duty to the public" in violation of § 1346. *Id.* at 24 (emphasis in original).

The United States Court of Appeals for the Ninth Circuit reversed and remanded the district court's exclusion order. The court acknowledged that "a literal reading of § 1346 might give federal prosecutors *unwarranted influence* over state and local public ethics standards," Pet. App. 13a (emphasis in original), and that an interpretation "requir[ing] the government to prove that a public official violated an independent state law" would address federalism concerns. *Id.* at 14a. But the Ninth Circuit nonetheless rejected the district court's conclusion that a § 1346 violation on the government's nondisclosure theory depends, in this case, on a violation of a state law disclosure duty. *Id.* at 12a, 14a.

In so ruling, the court stated that there is no indication that Congress intended "to condition the meaning of 'honest services' on state law," since doing so would mean "that conduct in one state might violate the mail fraud statute, whereas identical conduct in a neighboring state would not." Pet. App. 16a. Additionally, the court dismissed the district court's federalism concerns as unpersuasive, holding that the federal government has both the power to regulate use of the mails, and a legitimate "interest in establishing a uniform standard of conduct for public officials" and "in ensuring that state action affecting federal priorities is not improperly influenced by personal motivations of state policymakers and regulators." *Id.* at 21a. The Ninth Circuit thus concluded that § 1346 "establishes a

18

uniform standard for 'honest services' that governs *every* public official * * * and the government does not need to prove an independent violation of state law to sustain an honest services fraud conviction." *Id.* (emphasis in original).

Without defining the outer boundaries of the federal standard, the court held that Congress intended, at the least, to proscribe "(1) taking a bribe or otherwise being paid for a decision while purporting to [exercise] independent discretion and (2) nondisclosure of material information." Pet. App. 19a. The court concluded that petitioner's "alleged conduct falls comfortably within the two categories" and reversed the district court's exclusion order. *Id.* at 20a. The Ninth Circuit expressed no opinion on whether the proffered evidence is "relevant" to proving the government's § 1346 charge under the court's announced standard, however, and left that determination "to the district court's sound judgment." *Id.* at 21a.

## SUMMARY OF ARGUMENT

The decision of the court below held that 18 U.S.C. § 1346, which extends the coverage of the federal mail and wire fraud statutes to schemes to defraud involving the intangible right of honest services, mandates a "uniform federal" common law of the disclosure duties of state officials. That ruling is incorrect for numerous reasons. Instead, this Court should hold that a state official's failure to disclose a conflict of interest can never, standing alone, constitute a violation of the right of honest services, if it does not violate a clear legal duty separate and apart from § 1346.

19

The decision of the Ninth Circuit embodies a very implausible reading of the statute's words. Taking § 1346's critical words in order, the statute reaches only "schemes to defraud" of a right of honest services, and this Court has made abundantly clear that there can be no fraud resulting from a nondisclosure absent a duty to disclose. The statute further refers to a "right" of honest services that is being denied, and any legal right likewise depends on a duty to be borne by another. Additionally, the intangible right at issue is one related to "services," which is itself a reference to obligations arising from, and most commonly defined by, an employment relationship. The statute thus appears to require fraudulent activity aimed at denying an existing legal right to the performance of duties to provide defined services. It is not enough that an official's conduct, though otherwise entirely legal, falls short of requirements of forthrightness and transparency propounded by the federal courts on a case-by-case basis.

Where, as here, the particular position of a state legislator is at issue, the principal duties whose fraudulent denial might present a case under § 1346 will likely be duties defined by state law. As the district court held, and the government did not challenge on appeal, nondisclosure of the employment discussions at issue here violated no requirement of Alaska law. And the government has never suggested any violation of federal law distinct from § 1346. Thus the only possible source of a relevant disclosure duty is the "uniform" body of federal common law recognized by the court below.

20

In addition to the statute's words, the court of appeals' invocation of federal common law offends several well-established canons of construction.

First, it violates this Court's clear statement rule. Reading the single sentence of § 1346 as a delegation to federal prosecutors and federal judges of the task of defining conflict of interest disclosure duties of state officials would substantially impact each state's ability to establish its own governing framework. These are important policy judgments for the state itself to make. The notion that Congress, by implication from the words of § 1346, intruded itself into this area is directly at odds with this Court's requirement that Congress must speak in unmistakable terms when it wishes to legislate in sensitive areas in ways that affect the federal-state balance.

Second, the Ninth Circuit's ruling offends the principle that a criminal statute must give fair warning of the conduct to which it applies. Allowing federal courts to levy criminal penalties for a state official's nondisclosures based on a developing common law, in the absence of any preexisting legal duty, denies any reasonable notice of what the law requires, and invites arbitrary and abusive enforcement practices.

Finally, should the Court find the statute ambiguous even after applying the clear statement rule and the doctrine of avoidance, as petitioner submits it is not, the rule of lenity requires this Court to read the statute narrowly. A reading that allows prosecutions based on disclosure duties formulated by federal courts, without a basis in any clear

21

preexisting legal requirement, would offend this principle of narrow construction.

Apart from the statute's language and these three canons of construction, the Ninth Circuit's recognition of a federal common law of state officials' disclosure duties is sharply at odds with this Court's cases on the role of federal common law. Apart from the rare case where Congress expressly mandates that a given area of law be placed in the hands of the federal courts, recognition of federal common law is only appropriate in those instances where a failure to do so would undermine an important federal policy. No such federal interest is remotely at stake where the issue is the types of perceived conflicts of interest that a state official should be required to disclose. Indeed, it is completely at odds with the oft-stated principle that there is no federal common law of crimes.

Nothing in the nearly nonexistent legislative history of § 1346 lends any support to the decision below. While there is a single statement by one senator, made after the statute was enacted, suggesting that § 1346 was intended to "reinstate all of the pre-*McNally*" case law, that statement deserves little weight, and in any event would lead to an incoherent reading of the statute. As the court below, among many others, has noted, the pre-*McNally* case law is inconsistent. Any notion that its incorporation by reference offers a reasonable basis on which to rest future application of § 1346 is thus wholly without merit.

Finally, the proper, vigorous enforcement of the statute is not at all threatened by the rejection of a federal common law of state officials' disclosure

duties, and the concomitant recognition that honest services nondisclosure prosecutions depend on the fraudulent breach of clear legal duties separate from § 1346. It is fully consistent, for example, with prosecuting public officials for taking a bribe or self-dealing. Such action may deny honest services when it involves a departure from identifiable duties owed in the course of one's job, such as the duty to let a contract to the lowest bidder or on an impartial assessment of qualifications to perform the work. And when that misfeasance is pursued surreptitiously to conceal the wrongdoing, it can fairly be regarded as fraudulent.

## ARGUMENT

I.  **THE LANGUAGE OF 18 U.S.C. § 1346 DOES NOT AUTHORIZE PROSECUTIONS OF STATE OFFICIALS WHERE THE WRONG ALLEGED IS SIMPLY A FAILURE TO DISCLOSE PERCEIVED CONFLICTS OF INTEREST AND THE NONDISCLOSURE VIOLATES NO EXISTING LEGAL DUTY TO DISCLOSE SEPARATE AND APART FROM § 1346**

Section 1341 of Title 18 makes it a criminal offense for a person to utilize the mails in furtherance of a "scheme or artifice to defraud." Under § 1346, "scheme or artifice to defraud" includes a "scheme * * * to deprive another of the intangible right of honest services."

Analysis of any statutory provision of course begins with an examination of its words.[5]  *See Dean v.*

---

[5] The petitioners in *Black v. United States*, contend that by using the phrase "right of"—rather than "right to"—"honest services," Congress signaled its intent to codify a term of art, not

23

*United States*, 129 S. Ct. 1849, 1853 (2009). In general, where those words have an ordinary meaning, that meaning will be viewed as expressing the legislative purpose. *See Engine Mfrs. Assn. v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 252 (2004). Interpretation of a word or phrase depends

---

(continued...)

subject to analysis by deconstruction of its separate words. Brief of Petitioners at 24 n.9, *Black v. United States*, No. 08-876 (July 30, 2009). But Congress's use of the preposition "of" is a weak justification to abandon traditional methods of statutory interpretation. Legislative bodies routinely confer rights on recipients using the formulation "right of [noun]" without intending to signal the use of a term of art. Thus, when the Court confronts the scope of the phrase "rights of custody," as used in the Hague Convention on the Civil Aspects of International Child Abduction, next Term in *Abbott v. Abbott*, No. 08-645, *cert. granted*, 129 S. Ct. 2859 (2009), it will not be precluded from analyzing the meaning of the word "custody" in isolation. *See Croll v. Croll*, 229 F.3d 133, 138 (2d Cir. 2000) ("We open the dictionary to find the ordinary meaning or meanings of 'custody.'").

Given that a computer search reveals that before *McNally* no court had used the formulation "intangible right of honest services," the *Black* petitioners' view that Congress intended it to be interpreted as an inseverable phrase is particularly unpersuasive. The more plausible explanation for Congress's rather unusual verbiage is that § 1346 evolved from a precursor statute, the Fraud Amendments Act of 1987, that proposed criminalizing the defrauding of another "of intangible rights *of* any kind whatsoever in any manner or for any purpose whatsoever." *See* 133 Cong. Rec. S16742-03 (daily ed. Nov. 30, 1987) (statement of Sen. Specter) (emphasis added). In all likelihood, subsequent proposals kept the Fraud Amendments Act's grammatical structure, but lessened its scope from schemes depriving another of intangible rights "of any kind," to schemes that deprive another of the right "of honest services."

24

upon reading the whole statutory text, including its purpose, and consulting any precedents or authorities that inform the analysis. *See Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006).

Congress enacted § 1346 in direct response to this Court's holding in *McNally* that § 1341 extends only to fraud involving property "to cover [the intangible right to honest services] that lower courts had protected under [18 U.S.C.] § 1341 prior to *McNally*." *Cleveland v. United States*, 531 U.S. 12, 19-20 (2000). While that general intention does not illuminate the character or extent of the "schemes to defraud" of "intangible rights" that the statute encompasses, a careful reading of the statute's words lends weight to petitioner's reading.

First and foremost, § 1346 did not eliminate the requirement of a "scheme * * * to defraud." Thus, to prosecute a state public official for honest services fraud under a nondisclosure theory, the government must prove not only that the official violated some disclosure obligation, but also that the defendant acted with an intent to defraud, *Carpenter v. United States*, 484 U.S. 19, 28 (1987), that the nondisclosure was material, *Neder v. United States*, 527 U.S. 1, 20 (1999), and, arguably, that the victim suffered pecuniary harm, *United States v. Rabbitt*, 583 F.2d 1014, 1026 (8th Cir. 1978). It appears, for example, that a federal judge does not defraud the public of its right to honest services merely because, in objection to the burden of filling out his statutorily-required

25

financial disclosure form, he refuses to comply and mails in a blank form in protest.[6]

The requirement to prove fraud is of particular relevance where the alleged misconduct is a failure to disclose. As this Court stated in *Chiarella v. United States*, 445 U.S. 222, 227-28 (1980), "[a]t common law * * * one who fails to disclose material information * * * commits fraud only when he is under a duty to do so."[7] Such a duty to disclose may arise in a

---

[6] The question whether a knowing act of nondisclosure by a person required to disclose, standing alone, can constitute a "scheme to defraud" of the "right of honest services," is not encompassed within the Question Presented, but is closely related to the issue in this case. Petitioner submits that where the government is unable to show that an act of concealment, however improper, is itself a means of facilitating some other improper end—the securing of bribes, acts of self-dealing, or the outright misappropriation of another's assets—the acts of nondisclosure themselves are simply violations of disclosure duties and not part of any scheme to defraud. Since the government's allegation against petitioner in its alternative theory at issue here involves nothing more than failing to make a certain public disclosure while he went about the performance of his legislative duties, petitioner submits that the honest services fraud charge could have been dismissed because the government has failed to allege fraud.

[7] In *Chiarella*, a printer traded securities based on material, non-public information he had learned in the course of his job. *Chiarella v. United States*, 445 U.S. 222, 224 (1980). He was convicted under SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) of "employ[ing] [a] device, scheme, or artifice to defraud" in connection with the sale of a security, on the theory that trading on non-public information is *per se* fraudulent. *Id.* at 225-26. In reversing, this Court pointed out that "not every instance of financial unfairness constitutes fraudulent activity," and that silence cannot create fraud absent a duty to disclose. *Id.* at 232. Because the jury had not been presented with a theory

26

number of ways, but the Court's reasoning in *Chiarella*, refusing to imply a general duty to disclose material non-public information in an area governed by "detailed and sophisticated regulation," *id.* at 232, is instructive here. Where Alaska itself has enacted detailed provisions on the ethical and disclosure duties of its officials, the violation of some as yet unidentified and broader federal common law duty can hardly be deemed fraudulent. The requirement of a "scheme to defraud" thus strongly suggests that an independent, preexisting duty to disclose, arising under either state or federal law, is essential to any successful honest services prosecution resting on an alleged failure to disclose.[8]

This conclusion based on the requirement of a "scheme to defraud" is greatly reinforced by the fact that such liability requires deprivation of an intangible "right." In other words, a legislator's constituents can only be victims of mail fraud if they were deprived of a service to which they have a "just

---

(continued...)

regarding the nature or elements of Chiarella's duty to disclose, the Court refused to affirm his conviction. *Id.* at 236-37.

[8] Because the government must, in every case, show fraud in order to establish a § 1346 violation, the meaning of the word "honest" as used in the phrase "right of honest services" must be read to harmonize with that requirement. This is easily done by construing it to mean "free from fraud or deception," WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1086 (1986); 7 OXFORD ENGLISH DICTIONARY 349 (2d ed. 1989) ("free from fraud"); BALLANTINE'S LAW DICTIONARY 566 (3d ed. 1969) ("descriptive of one who does not lie or cheat").

27

or legal title or claim." WEBSTER'S II NEW COLLEGE DICTIONARY 977 (3d ed. 2005) (definition of "right"). Common sense would dictate that absent a clear, affirmative duty of petitioner to disclose particular information to his constituents, they did not have a "right" to the information. *See Ullmann v. United States*, 350 U.S. 422, 427 (1956) ("rights and duties are correlative") (quotation marks and citation omitted); John Chipman Gray, THE NATURE AND SOURCES OF THE LAW 8-9 (2d ed. 1921) ("Right is a correlative to duty; where there is no duty there can be no right."). In this case, "[s]tate law governing public officials' conduct" will usually create "the correlative duty that establishes the right." George D. Brown, *Should Federalism Shield Corruption?*, 82 CORNELL L. REV. 225, 283 n.491 (1996). Thus, the most natural reading of § 1346 is that a public official can only be guilty of mail fraud for failure to disclose conflicts of interest if he violates a duty to disclose that information.

The word "service" further connotes an established set of duties arising from some relationship—most often one of employment. WEBSTER'S II NEW COLLEGE DICTIONARY 1033 (3d ed. 2005) ("service" means "[e]mployment in duties or work for another, esp. for a government"); Henry Campbell Black, A DICTIONARY OF LAW 1083 (1891) (defining "service" as "[t]he being employed to serve another; duty or labor to be rendered by one person to another"). Because a "service" is a "duty" owed by one party to another— typically as the consequence of an employment relationship—it is reasonable to infer that Congress intended to limit liability under § 1346 to situations where an employee or state official violates a

28

disclosure duty arising in connection with the employment relationship.

The Question Presented as restated by the Court asks, more specifically, whether the violated disclosure duty must be "imposed by state law." The answer to that question, on the record in this case, is plainly in the affirmative. Because the office of a state official is a construct of state law, its duties are defined primarily, if not exclusively, by reference to state law. *See Brumley*, 116 F.3d at 734. As importantly, though, as the district court expressly found, the government has failed to reference any arguably applicable disclosure duty under federal law, apart from § 1346. *See* Pet. App. 30a. There is therefore no occasion in this case to consider the extent of federal authority to statutorily impose disclosure duties on state officials.

Accordingly, while the language of § 1346 is less than crystal clear in specifying exactly the conduct it is intended to reach, it strongly indicates that nondisclosures may be actionable only where they violate an established duty to disclose, under state or federal law, apart from § 1346 itself. Since the government has alleged no such provision of federal law, it can only arise under state law and the Question Presented must be answered "yes."[9] The

---

[9] The course of incorporating state law as a federal rule of decision has often been adopted by this Court. *See United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 728 (1979) ("[W]here there is little need for a nationally uniform body of law, state law may be incorporated as the federal rule of decision."). That is true even if reference to preexisting state standards will produce non-uniform results when the statute is applied in different states.

29

decision of the court below reaching a contrary conclusion thus "slight[s] the wording of the statute." *Williams v. United States*, 458 U.S. 279, 286 (1982).

## II. THE NINTH CIRCUIT'S READING OF § 1346 TO MANDATE A FEDERAL COMMON LAW OF STATE OFFICIALS' DISCLOSURE DUTIES VIOLATES SEVERAL ESTABLISHED CANONS OF CONSTRUCTION

Three canons of construction support petitioner's view that in cases based on the government's "alternative" nondisclosure theory, § 1346 requires evidence that the defendant breached a disclosure obligation under either state law or under federal law

---

(continued...)

For example, in civil rights actions, federal courts look to state law limitation periods as the relevant statute of limitations since the federal statutes provide no such period. *See, e.g., Wilson v. Garcia*, 471 U.S. 261, 266-67 (1985). In bankruptcy, notwithstanding the constitutional directive to establish "uniform laws * * * through the United States," U.S. CONST. Art. I., § 8, cl. 4, this Court has held that the applicability of a security interest to rents and profits derived from collateral should be resolved by reference to state law, rather than by creation of a uniform federal rule. *Butner v. United States*, 440 U.S. 48, 55-56 (1979). In copyright, this Court has likewise held that an illegitimate child's qualification to renew a deceased parent's copyright under 17 U.S.C. §1, *et seq.*, is governed by separate state laws on the rights of such children. *DeSylva v. Ballentine*, 351 U.S. 570, 580-81 (1956). More generally, federal courts have also regularly looked to state law when a federal statute implicates ownership or property. *See, e.g., United States v. Capital Tax Corp.*, 545 F.3d 525, 532 (7th Cir. 2008) (declining to adopt a federal rule for equitable conversion under CERCLA and instead "look[ing] to state law for guidance in interpreting the [federal] statute").

30

separate and apart from 18 U.S.C. § 1346: the clear statement rule, the doctrine of constitutional avoidance, and the rule of lenity. Adopting respondent's contrary interpretation results in the kind of intrusive, vague, and grievously ambiguous criminal statute that these canons presume Congress did not intend.

A. Reversal Of The Decision Below Is Compelled By The Well-Established Principle That Congress Must Speak Clearly When It Acts In A Way That Invades The Usual Prerogatives Of The States

When an interpretation of a federal statute would "upset the usual constitutional balance" between the federal government and the states, the Court has required "unmistakably clear" statutory language before it adopts that interpretation. *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) (quotation and citation omitted). This principle applies when Congress legislates in "traditionally sensitive areas" that "affec[t] the federal balance." *United States v. Bass*, 404 U.S. 336, 339 (1971). The prosecution of state officials for acts of public corruption "is perhaps the most sensitive area of potential federal-state conflict." Charles F.C. Ruff, *Federal Prosecution of Local Corruption*, 65 GEO. L.J. 1171, 1216 (1977). Interpreting § 1346 as a mandate for federal prosecutors and federal courts to develop from scratch a common law of the disclosure duties of state officials would alter the federal-state balance by dramatically expanding the criminal jurisdiction of the federal government. Such an expansion would require a clear indication that Congress so intended,

31

and there is none to be found in the twenty-eight words that compose § 1346.

1. The clear statement rule protects the states' "substantial sovereign powers" in our federal system, *Gregory*, 501 U.S. at 461, and "assures" that Congress "faced, and intended to bring into issue," the relative powers of the federal government and the states. *Bass*, 404 U.S. at 349. The importance of the clear statement rule in the context of federal prosecution of state and local officials cannot be doubted. *See* Brown, *Should Federalism Shield Corruption?*, 82 CORNELL L. REV. at 228 ("Constitutional and policy issues concerning the proper scope of federal criminal law—substantial ones to begin with—are particularly sensitive when the defendants are state and local officials."). State governments have primary responsibility to set the performance standards and ethical responsibilities of their own officials. *See Gregory*, 501 U.S. at 460 ("Through the structure of its government, and the character of those who exercise government authority, a State defines itself as a sovereign."); *see also Evans v. United States*, 504 U.S. 255, 290 (1992) (Thomas, J., dissenting) (public corruption by state and local officials is "a field traditionally policed by state and local laws"). And the federal government cannot prosecute omissions to disclose that are fully consistent with state law without "foreclos[ing the State] from experimenting and exercising [its] own judgment in an area to which States lay claim by right of history and expertise." *United States v. Lopez*, 541 U.S. 549, 583 (1995) (Kennedy, J. concurring).

32

The imposition of disclosure duties based on a gauzy federal vision of what good government requires is especially offensive on the facts of this case. In 1984, Alaskans voted to amend the state constitution to limit the length of the legislative session to 120 calendar days. *See* ALASKA CONST. art. II, § 8 (amended 1984). The purpose of the amendment was to permit "citizens who undertake public service" to have "employment outside the legislature" and enable public officials "to return to private sector jobs and families." ALASKA STATE GOVERNMENT AND POLITICS 243 (Gerald A. McBeath & Thomas A. Morehouse eds., 1987). In combination with strict limits on pay and a shortened session, the voters' election to govern through legislators who are simultaneously employed in both the public and private sectors promotes Alaska's interest in a legislature with a low degree of "professionalism."

In turn, Alaska's disclosure rules advance the State's allegiance to a model of governance by citizens. Because the Alaska citizenry's "commitment to a part-time citizen legislature implies that legislators are expected and permitted to earn outside income," the statutes establishing "Standards of Conduct" for Alaskan legislators do "not impose unreasonable or unnecessary burdens that will discourage citizens from entering or staying in government service." ALASKA STAT. § 24.60.010(4). To that end, Alaska's disclosure provisions require that state legislators disclose *actual* conflicts-of-interest resulting from dual employment, but not *potential* conflicts-of-interest. *See* ALASKA STAT. § 24.60.200. Thus, a state legislator must disclose when he receives more than $5,000 in compensation for "personal services" from an entity "known to have

33

a substantial interest in legislative * * * action." *Id.* § 24.60.200(a)(2). But no companion provision mandates disclosure of possible *future* compensation.

By seeking to prosecute petitioner under § 1346 for failing to disclose potential future employment—conduct found by the district court to be lawful under all provisions of law cited by the government, which ruling the government did not appeal—respondent acts in contravention of the State's expressed policy choices. It is difficult to imagine a more direct assault on comity and the benefits that flow from our federalist structure, including sensitivity to the diverse needs of a heterogeneous society and innovation and experimentation in government. *See Gregory*, 501 U.S. at 458 (citation omitted).

2. Twice before, this Court has invoked the clear statement rule to limit the reach of the mail fraud statute. In *Cleveland v. United States*, 531 U.S. 12 (2000), the Court was faced with the question whether state gaming licenses constituted property within the coverage of the federal mail fraud statute. Because such a conclusion would have involved the federal government in regulating a broad range of conduct traditionally regulated by the states, the Court invoked the clear statement rule and found no such statement to exist. *Id.* at 24.

And in *McNally*, the Court interpreted 18 U.S.C. § 1341 as limited in scope to the protection of property rights "[r]ather than construe the statute in a manner that leaves its outer boundaries ambiguous and involves the Federal Government in setting standards of disclosure and good government for local and state officials[.]" 483 U.S. at 360. In a footnote with particular relevance to this case, the majority

34

cautioned that although Congress "may well" criminalize a state official's conduct even though such conduct is either permitted or not expressly forbidden by state law, "it would take a much clearer indication than the mail fraud statute evidences[.]" *Id.* at 361 n.9.

This "much clearer indication" of an intention to let federal courts override state disclosure rules through a body of federal common law cannot be found in the text of § 1346. The one-sentence statute makes no mention of any intention to create such a uniform federal standard. Nor does it reference any overriding federal interest that might arguably justify such actions. Thus, while the statute's prompt enactment manifests a clear intention to reverse *McNally's* holding by extending the mail fraud statute to cover the intangible right of honest services, it contains no statement, clear or otherwise, that federal courts should develop a common law of the disclosure obligations owed by state officials.

### B. It Is Further Compelled By The Principle Of Constitutional Avoidance, So That The Statute Is Not Rendered Void For Vagueness

If the disclosure obligations owed by a state official under § 1346 are not defined by reference to independent disclosure duties otherwise existing in the law, the statute's potential reach becomes almost unbounded. This Court has long recognized the "basic principle that a criminal statute must give fair warning of the conduct that it makes a crime." *Bouie v. City of Columbia*, 378 U.S. 347, 350 (1964); *see also United States v. Reese*, 92 U.S. 214, 220 (1926) ("Every man should be able to know with certainty when he is committing a crime."). A statute is void

35

for vagueness if the statute either "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 128 S. Ct. 1830, 1845 (2008) (citations omitted). Allowing federal common law to define the disclosures that must be made in order to avoid prosecution for denial of "honest services" would fail both prongs of this Court's vagueness test.

1. Interpreting a legislator's disclosure duties under an ever-evolving and amorphous common law standard would not "enable ordinary people to understand what conduct [the statute] prohibits." *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999) (plurality opinion). Section 1346 specifies that a "scheme to defraud" includes the deprivation of another's "intangible right of honest services," and in that way expresses legislative intent to expand the offense beyond deprivations of money or property; but it does not say what "honest services" may be, or when they are withheld deceitfully.

In the political sphere, the line that separates political patronage from political corruption is "blurred and shifting." Geraldine Szott Moohr, *Mail Fraud and the Intangible Rights Doctrine: Someone to Watch Over Us*, 31 HARV. J. LEGIS. 153, 195-96 (1994). Generally, local and state politicians rely on their ethics rules to demarcate the boundaries that separate the two. Allowing federal prosecutors, judges, and juries to decide *ex cathedra* when the line of propriety has been crossed would create a level of uncertainty that is intolerable.

36

This case powerfully demonstrates that § 1346 fails to provide fair warning to potential defendants. Petitioner, who as a member of the Select Committee on Ethics in the Alaska State Legislature was familiar with the State's ethics framework, complied with all applicable state laws when he solicited employment from VECO. The government contends that despite the legality of petitioner's conduct under state law, petitioner had fair warning that his conduct violated the federal mail fraud statute. But even now that petitioner has been charged, the government has failed to provide a concise explanation for what petitioner was required to do to comply with the honest services statute. What exactly did petitioner need to disclose, and when? To whom was disclosure necessary? Would a press release have sufficed, or was more required? Answers to these questions are nowhere to be found in the "amorphous and open-ended," *United States v. Bloom*, 149 F.3d 649, 654 (7th Cir. 1998), "inconclusive," Pet. App. 12a, and "vague and undefined," *United States v. Urciuoli*, 513 F.3d 290, 294 (1st Cir. 2008), language of § 1346.

2. A common law definition of disclosure obligations would also "encourage[] seriously discriminatory enforcement." *Williams*, 128 S. Ct. at 1835. Vague statutes violate due process by placing "unfettered discretion" in the hands of law enforcement, thereby permitting or even encouraging arbitrary, discriminatory enforcement. *Papachristou v. City of Jacksonville*, 405 U.S. 156, 168 (1972). By unmooring § 1346 from a specific, independent disclosure obligation, the court of appeals' interpretation "invites abuse by headline-grabbing prosecutors in pursuit of local officials, state

legislators, and corporate CEOs." *Sorich v. United States*, 129 S. Ct. 1308, 1310 (2009) (Scalia, J., dissenting from denial of certiorari). Under the court of appeals' view of the statute, prosecutors bent on making a splash have enormous leeway to implement their vision of an "uncorrupted process" by which public officials should be required to "take official action." Brief of Appellant at 16, *United States v. Weyhrauch*, No. 07-30339 (9th Cir. Feb. 1, 2008).

The risk of arbitrary and discriminatory enforcement is further heightened where, as here, prosecutorial decisions arise in the context of a larger investigation with major implications for the careers of highly-visible, established political figures. Indeed, the relatively benign character of allegations leveled against petitioner in this case raise substantial doubt about whether petitioner would have even been charged had the employer he solicited not had substantial ties to the ill-fated prosecution of Senator Stevens. *See* Neil A. Lewis, *Justice Dept. Moves to Void Stevens Case*, N.Y. TIMES, Apr. 1, 2009, at A1.

C.  **If The Court Finds The Statute Ambiguous, The Rule Of Lenity Also Requires That Violations Based On Nondisclosure Rest On A Preexisting Duty To Disclose Separate From § 1346**

Even if the clear statement rule and the avoidance doctrine did not cure the ambiguity concerning § 1346's ambit, the rule of lenity would require the Court to reject the government's interpretation of the honest services statute as making the disclosure obligations of state officials a matter of federal common law. This Court recently reaffirmed the

38

principle that "[u]nder a long line of our decisions, the tie must go to the defendant. The rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them." *United States v. Santos*, 128 S. Ct. 2020, 2025 (2008) (citations omitted).

The rule of lenity operates only when a substantial doubt over the meaning of a statute remains after all other applicable canons of construction have been exhausted. *See United States v. Shabani*, 513 U.S. 10, 17 (1994). When such a doubt remains, however, this Court has not hesitated to apply the rule in recognition of the fundamental values it protects:

> [The rule] is founded on two policies that have long been part of our tradition. First, a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed. To make the warning fair, so far as possible the line should be clear. Second, because of the seriousness of criminal penalties, and because criminal punishment usually represents the moral condemnation of the community, legislatures and not courts should define criminal activity.

*Bass*, 404 U.S. at 348 (quotation marks, citations and footnote omitted).

In *McNally*, the Court held that when the federal mail fraud statutes can be read in one of two rational ways, "we are to choose the harsher only when Congress has spoken in clear and definite language." 483 U.S. at 359-60 (citing *Bass*, 404 U.S. at 347). The Court applied the rule of lenity in *McNally* to avoid

39

an interpretation that construed § 1341 "in a manner that leaves its outer boundaries ambiguous and involves the Federal Government in setting standards of disclosure and good government for local and state officials[.]" *Id.* at 360. Yet when faced with two rational interpretations of § 1346, the Ninth Circuit chose the one that leaves the statute's outer boundaries indefinite and permits federal prosecutors and federal courts to promulgate an ethical regime for state employees.

## III. THE NINTH CIRCUIT'S RECOGNITION OF A FEDERAL COMMON LAW GOVERNING STATE OFFICIALS' DISCLOSURE DUTIES IS WRONG UNDER THIS COURT'S MANY CASES ADDRESSING THE RULE OF FEDERAL COMMON LAW

There is no dispute in this case that petitioner did not violate a single federal statute, state statute, or written rule of ethics applicable to members of the Alaska legislature when he did not disclose his employment solicitation. Nor did he violate any duty imposed by Alaska's common law, which was superseded by the state's statutorily-codified legislative conduct scheme. In ruling that the disclosure duties whose violation may trigger the application of § 1346 must be defined by a "uniform [federal] standard for 'honest services' that governs *every* public official" (Pet. App. 21a), the Ninth Circuit has thus called for the creation of federal common law criminalizing conduct. That holding must be reversed because the duties of state officials to disclose conflicts of interest is not one of the "few and restricted" areas where it is appropriate for federal courts to create federal common law.

40

*Wheeldin v. Wheeler*, 373 U.S. 647, 651 (1963). To the contrary, it is black letter law that federal courts cannot create common law crimes, *see, e.g., United States v. Hudson*, 11 U.S. (7 Cranch) 32, 33 (1812), and that is what the Ninth Circuit has done in this case.

"Federal courts, unlike state courts, are not general common-law courts and therefore do not possess a general power to develop and apply their own rules of decision" to the cases before them. *City of Milwaukee v. Illinois*, 451 U.S. 304, 312 (1981). In order to cabin the "runaway tendencies" of a federal common law "untethered to a genuinely identifiable (as opposed to judicially constructed) federal policy," *O'Melveny & Meyers v. F.D.I.C.*, 512 U.S. 79, 89 (1994), this Court has recognized federal common law only in very limited circumstances. *See Miree v. DeKalb County*, 433 U.S. 25, 32 ("[T]he issue of whether to displace state law [with federal common law] * * * is primarily a decision for Congress."). Those rare instances are: (1) where Congress clearly empowers the courts to develop a uniform federal policy designed to displace state law with federal law (*see, e.g., Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41 (1987)); or (2) where there is a "direct conflict between federal and state law" that implicates "uniquely federal interests" (*Boyle v. United Tech. Corp.*, 487 U.S. 500, 504 (1988)). This case falls in neither category.

There is no evidence, and the government has never argued, that the first exception applies here. It does not come into play simply because a federal statute is involved, but only when Congress creates a comprehensive federal statutory regime intended to

41

unify the law in pursuit of some federal interest. *See Pilot Life Ins. Co.*, 481 U.S. at 46-47, 54-57. Certainly that did not occur here.

Nor is there any identifiable conflict between state and federal law to support implication of federal common law on the second ground. If a state law can be enforced without somehow impairing a uniquely federal policy or interest, the two regimes do not truly conflict and there is no argument for displacing state law with federal common law. *O'Melveny & Meyers*, 512 U.S. at 87 ("Our cases uniformly require the existence of [a significant] conflict as a precondition for recognition of a federal rule of decision."); *Wallis v. Pan American Petroleum Corp.*, 384 U.S. 63, 68 (1966) ("In deciding whether rules of federal common law should be fashioned, normally the guiding principle is that a significant conflict between some federal policy or interest and the use of state law in the premises must first be specifically shown."); *Florida Lime & Avocado Growers v. Paul*, 373 U.S. 132, 142-43 (1963) (upholding California standard for avocado sales that differed from the federal standard where both could be enforced simultaneously).

After weighing competing policy interests, Alaska has determined that requiring its legislators to disclose *potential* conflicts of interest is not the best way to maintain a strong, well-functioning state legislature. That determination offends no identifiable federal interest. To the contrary, it advances the well established federalism interest in allowing the laboratories of the fifty states to experiment with a variety of governmental

42

approaches. *See New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting).

Regulation of the conduct of state officials is, of course, primarily the concern of the states themselves. *See Brumley*, 116 F.3d at 734. And criminal law is an area traditionally created and enforced by the states. *Lopez*, 514 U.S. at 561 n.3 (collecting cases). In fields of law that states have traditionally occupied, the conflict between state and federal policies must be particularly sharp to justify federally pre-empting state law. *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947). The only federal interests that the Ninth Circuit could identify in regulating the conduct at issue here were purely speculative. *See* Pet. App. 18a. The panel below opined that because state regulation of certain industries "*can* have national or international implications," the federal government "*may* wish to prevent" improper influence by creating uniform disclosure obligations. *Id.* (emphasis added). That is precisely the sort of abstract, remote, and conjectural federal interest that this Court has categorically rejected as a basis for federal common law. *Miree*, 433 U.S. at 32-33.

The rationale is particularly unpersuasive in that no one even argues that Alaska's disclosure regime, and others like it, have produced legislation somehow adverse to the interests of the United States, or, if it has, that common law relating to the mail fraud statute would prevent the problem. For those reasons alone, no "uniform federal law" is called for here. In *Atherton v. F.D.I.C.*, 519 U.S. 213 (1997), the Court refused to create federal common law relating to the duty of care owed by officers of

43

federally chartered and insured financial institutions, partly because there was no showing that applying state law had actually threatened any federal interest. *Id.* at 219, 225. Similarly, in *Wallis*, the Court did not create federal common law to address claims related to land owned and leased by the federal government where "there has been no showing that the state law is not adequate to achieve" the federal government's policy interests. 384 U.S. at 63. Surely the potential harms to the federal government in those cases were far greater than any abstract federal interest in the proper amount of public disclosures by state legislators. Pet. App. 17a-18a.

Moreover, the disclosure duties of state officials are a matter of peculiar, if not unique, interest to the states. That subject is far removed from any issue concerning "the primary conduct of the United States or any of its agents or contractors," as to which this Court has most commonly found the sort of "unique federal interest" justifying federal common law. *See Miree*, 433 U.S. at 28-29 (declining to create federal common law where the case presented "no question[s] regarding the liability of the United States or the responsibility of the United States"). The conclusion that § 1346's opaque words are a mandate for a uniform federal common law of state officials' disclosures is thus inconceivable, given the primary state interests and virtually nonexistent federal interest at issue.

That conclusion is inconceivable for another reason as well. This Court has repeatedly reiterated that there is no federal common law of crimes. *See, e.g., United States v. Oakland Cannabis Buyer's Co-op.,*

44

532 U.S. 483, 490 (2001) ("federal crimes are defined by statute rather than by common law"); *United States v. Lanier*, 520 U.S. 259, 267 n.6 (1997) ("Federal crimes are defined by Congress, not the courts."); *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 181 (1994) ("there is no federal common law of crimes"); *Hudson*, 11 U.S. (7 Cranch) at 33 (same). That longstanding proposition rests on an array of concerns, some of which are developed elsewhere in this brief. *See* Parts II.A-C. Yet by construing § 1346 as a directive to federal courts to create a uniform federal law of state officials' disclosure duties, whose violation is enforceable as a federal felony, the Ninth Circuit has directly offended this longstanding principle.

## IV. THE LEGISLATIVE HISTORY LENDS NO SUPPORT TO THE DECISION BELOW

For all of the reasons set forth above, § 1346 requires, at a minimum, the violation of a preexisting duty to disclose in order to support prosecution of a state official for a simple failure to disclose a conflict of interest. While, on that basis, it is arguably unnecessary even to inquire into the relevance of legislative history, *see Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 119 (2001), the scant history of the statute suggests no contrary reading.

### A. The Sparse Legislative History Of § 1346 Provides No Useful Guidance For The Proper Interpretation Of The Statute

When resolution of a question of federal law turns on the meaning of a statutory term, the Court may look to legislative history if the statutory language is unclear. *See Blum v. Stenson*, 465 U.S. 886, 896

45

(1984). But reliance on legislative history for the purpose of divining legislative intent is "a step to be taken cautiously." *Piper v. Chris-Craft Indus., Inc.*, 430 U.S. 1, 26 (1977).

There are only two items of legislative history pertinent to the text of § 1346 as actually passed. First, on the day that the Omnibus Drug Bill, including the section that added § 1346 to Title 18, was enacted, Rep. Conyers offered remarks on the floor of the House. He noted that before *McNally*, the mail and wire fraud statutes were interpreted to "protect the right of the public to the honest services of public officials and others responsible for the conduct of public or public affairs, the right of a member of an organization to the honest services of the leaders of that organization, and the right of employers to the honest service of their employees." *See* 134 Cong. Rec. H11108-01 (daily ed. Oct. 21, 1988) (statement of Rep. Conyers) (internal citations omitted). The purpose of the amendment, according to Rep. Conyers, was to "restore[] the mail fraud provision to where that provision was before the *McNally* decision" by making it "no longer necessary to determine whether or not the scheme or artifice to defraud involved money or property." *Id.* Rep. Conyers stated, "no other change in the law is intended." *Id.*

Rep. Conyers' statement confirms that Congress intended to overturn *McNally*'s distinction between tangible and intangible rights. Yet he expressed no view on the scope of the "honest services" covered by the statute or the source of the duties owed by state legislators. Accordingly, the House legislative history

46

has no bearing one way or the other on the question presented here.[10]

Second, several weeks after the passage of the statute, Senator Biden entered a report into the Congressional Record stating:

> This section overturns the decision in *McNally v. United States* in which the Supreme Court held that the mail and wire fraud statutes protect property but not intangible rights. Under the amendment, those statutes will protect any person's intangible right to the honest services of another, including the right of the public to the honest services of public officials. The intent is to reinstate all of the pre-*McNally* caselaw pertaining to the mail and wire fraud statutes without change.

134 Cong. Rec. S17360-02 (daily ed. Nov. 10, 2008) (statement of Sen. Biden). Such "post *hoc* statements of a congressional Committee are not entitled to much weight." *Weinberger v. Rossi*, 456 U.S. 25, 35 (1982). In any event, the glib assertion that § 1346 simply reinstated all of the pre-*McNally* caselaw wholesale is incoherent, because, as discussed below in Part IV.B, that caselaw was fractured and inconsistent.

Nowhere in the entirety of § 1346's legislative history did any congressman address the source of any disclosure duties whose violation by a state

---

[10] Rep. Conyers was one of eleven Representatives to vote against the omnibus drug bill, *see* 134 Cong. Rec. H11108-01 (daily ed. Oct. 21, 1988) (roll call of votes), but he supported the inclusion of § 1346.

47

official could violate the "right of honest services." The legislative history is thus of little use as an aid in interpreting the words of the statute in the context of this case.

## B. Any Effort To Implement A Statutory Intent To "Reinstate All Of The Pre-McNally Case Law" Would Render The Statute Incoherent

In addition to the fact that Senator Biden's *post-hoc* assertion of an intent to "reinstate all" pre-*McNally* case law is entitled to little, if any, deference, any judicial effort to implement it would be frustrated by substantial inconsistencies in that existing case law. While the Court below rested its decision in substantial part on Congress's "clear intent to reinstate the line of pre-*McNally* honest services cases," Pet. App. 17a, it did so only after discussing at some length the "divergent views" of various circuits "on the proper meaning of 'honest services'" for public officials. *Id.* at 12a; *see id.* at 13a-17a.

The Ninth Circuit is hardly the first to recognize that the pre-*McNally* cases fall far short of establishing a "uniform set of rules." *Brumley*, 116 F.3d at 733; *see also* Geraldine Szott Moohr, *Mail Fraud Meets Criminal Theory*, 67 U. CIN. L. REV. 1, 16 (1998) (pre-*McNally* "decisions do not provide a consistent definition of honest services fraud").

The lack of coherence in the body of pre-*McNally* law is illustrated by the attempt of the *en banc* Second Circuit Court of Appeals to divine a standard set of rules from the pre-*McNally* precedent in the context of private-sector honest services cases. *United States v. Rybicki*, 354 F.3d 124 (2d Cir. 2003) (en banc). Of the ten appellate judges who undertook

48

a comprehensive study of this subset of pre-*McNally* case law, four concluded that "[it] is only too obvious that there is no settled meaning to the phrase 'the intangible right to honest services' that is capable of providing constitutionally adequate notice." *Id.* at 160 (dissent by Jacobs, J., joined by Walker, C.J., and Cabranes and Parker, JJ.). And the *Rybicki* majority itself, while offering the narrow observation that pre-*McNally* cases involving a private employee's failure to disclose material facts required "perhaps some economic or pecuniary detriment" to the victim, expressly qualified that assertion by acknowledging one "atypical" pre-*McNally* case that held otherwise. *Id.* at 141 n.16.

The confusion becomes overwhelming when the examination of pre-*McNally* cases is expanded beyond the private fraud cases, to which *Rybicki* expressly confined its discussion (354 F.3d at 138-39), to encompass honest services cases against public officials. On the issue specifically flagged in *Rybicki*—whether pecuniary harm must be proven— a number of courts rejected any such requirement. *United States v. Holzer*, 816 F.2d 304, 309-10 (7th Cir. 1987) (rejecting argument that government must show that public official obtained something of value from victims of the fraud); *United States v. Mandel*, 591 F.2d 1347, 1364 n.12 (4th Cir. 1979) (rejecting "construction of the mail fraud statute * * * to the effect that pecuniary or property injury is necessary"). The Eighth Circuit, however, reached the opposite conclusion. *United States v. Rabbitt*, 583 F.2d 1014, 1025-26 (8th Cir. 1978) (overturning conviction of public official in part because there was no pecuniary harm to citizens); *United States v. McNeive*, 536 F.2d 1245, 1252 (8th Cir. 1976) (same).

49

These and other disagreements among the courts of appeals in pre-*McNally* cases show that any such approach to construing the statute demands a determination of *which* pre-*McNally* case to rely on. The quest thus resembles looking for answers in ambiguous legislative history—a search for statements congenial to one's own predisposition. *See Exxon Mobil Corp. v. Allapattah Services, Inc.*, 545 U.S. 546, 568 (2005) (comparing judicial investigation of legislative history to an exercise in "looking over a crowd and picking out your friends").

In any given circuit, this problem of selecting which of divergent precedents to rely on is compounded by the institutional preference inherent in the notion of binding circuit precedent. When conflicts between circuits arise, courts would presumably be bound by the pre-*McNally* case law from their own circuits. *See* Pet. App. 12a ("[W]e turn for guidance in construing the statute to our pre-*McNally* case law and any relevant post-*McNally* decisions, and then consider pre- and post-*McNally* decisions from our sister circuits."). As a consequence, if § 1346 actually reinstated all pre-*McNally* law, it would be a "truly extraordinary statute, in which the substantive force of the statute varied in each judicial circuit." *Brumley*, 116 F.3d at 743 (dissent).

In the face of conflicting pre-*McNally* precedent relating to "honest services" fraud, the *Rybicki* dissent sums up the impossibility of simply reinstating pre-*McNally* law:

> [N]o unambiguous meaning can be assigned to a phrase that has no meaning except what can be distilled from some pre-

50

*McNally* cases provided that other pre-*McNally* cases are ignored, particularly since the designation of overruled cases that are in and those that are out is itself essentially arbitrary. Ordinary people cannot be expected to undertake such an analysis; rare is the lawyer who could do it; and no two lawyers could be expected to agree independently on the elements of an offense that must be defined by such a project.

*Rybicki*, 354 F.3d at 160 (dissent).

## V. REQUIRING HONEST SERVICES PROSECUTIONS OF STATE OFFICIALS FOR NONDISCLOSURE TO REST ON BREACH OF A PREEXISTING DUTY TO DISCLOSE IN NO WAY IMPEDES THE VIGOROUS PROSECUTION OF FRAUD AND BRIBERY

Interpreting § 1346 in nondisclosure cases like this one as requiring evidence that the defendant breached a disclosure obligation under either state law or under federal law separate and apart from 18 U.S.C. § 1346 would cure the federalism, vagueness, and lenity problems that plague respondent's interpretation. Importantly, such an interpretation would have no detrimental effect on the government's ability to prosecute blatant acts of public corruption, such as bribery.

Requiring a preexisting disclosure duty in order to prosecute nondisclosures of conflicts of interest will have no harmful consequence to the vast majority of public corruption prosecutions. The government can properly prosecute any fraudulent scheme involving the mails so long as the official violated some independent duty that gives rise to the correlative

51

"right of honest services." *See Rabbitt*, 583 F.2d at 1024 ("The concept of fraud on the public may clearly fall within the ambit of the mail fraud statute *where dishonest conduct by a public official directly implicates the functions and duties of that official's public office.*") (emphasis added). It simply cannot do so in the absence of such a duty, on the ground that a more candid and forthright alternative course of conduct could be imagined. *See United States v. Czubinski*, 106 F.3d 1069, 1077 (1st Cir. 1999) (finding that government could not prosecute public official for honest services fraud despite "reprehensible" conduct because official did not fail to perform his official duties).

Virtually every state—Alaska is no exception—has detailed ethics guidelines for public officials; "[t]he problem is not a lack of state laws on the subject of government misconduct." Brown, *Should Federalism Shield Corruption?*, 82 CORNELL L. REV. at 275-76. Quid pro quo bribery, for example, is outlawed in the public sector by every state. *See id.* Accordingly, the government can prosecute under § 1346 any state public official who uses the mails to implement a bribery scheme. *See United States v. Dixon*, 536 F.2d 1388, 1400 (2d Cir. 1976) (explaining that public official commits fraud by taking a bribe because "the public official has been paid to act in breach of his duties").

Honest services prosecutions are entirely proper when the government shows—in addition to the other elements of mail fraud—that the defendant failed to perform or misperformed duties that were incumbent

52

upon him.[11] But they are not proper where, as here, the government alleges that the public official violated some principle of good behavior that is not demonstrably obligatory under some statute, regulation, or another clear duty arising outside of § 1346. This approach prevents the absurd but, under respondent's view, theoretically permissible prosecution of a state legislator for his "decision to vote for a bill because he expects it will curry favor with a small minority essential to his reelection," or the prosecution of a mayor who "use[s] the prestige of his office to obtain a restaurant table without a reservation." *Sorich*, 129 S.Ct. at 1309 (Scalia, J., dissenting).

---

[11] As noted above in Part I, there is substantial doubt that the mere violation of an express duty to disclose constitutes fraud, and thus falls within the ambit of § 1341, as expanded by § 1346, absent further proof that the nondisclosure did in fact, or was intended to, facilitate the denial either of property, or the consequential performance of one's job.

53

## CONCLUSION

For the reasons stated above, the Court should reverse the judgment of the court of appeals and remand for further proceedings.

Respectfully submitted,

DOUGLAS POPE
POPE & KATCHER
421 W. First Avenue
Suite 220
Anchorage, AK 99501
Telephone: (907) 272-8577

DONALD B. AYER
  *Counsel of Record*
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Telephone: (202) 879-3939

BRIAN J. MURRAY
NICOLE C. H. MASSEY
JONES DAY
77 West Wacker
Chicago, IL 60601
Telephone: (312) 782-3939

NATHANIEL P. GARRETT
JONES DAY
555 California Street
26th Floor
San Francisco, CA 94104
Telephone: (415) 626-3939

*Counsel for Petitioner*

September 14, 2009