No. 08-1196

# In the Supreme Court of the United States

BRUCE WEYHRAUCH, PETITIONER

*v.*

UNITED STATES OF AMERICA

*ON WRIT OF CERTIORARI*
*TO THE UNITED STATES COURT OF APPEALS*
*FOR THE NINTH CIRCUIT*

## BRIEF FOR THE UNITED STATES

ELENA KAGAN
  *Solicitor General*
    *Counsel of Record*
LANNY A. BREUER
  *Assistant Attorney General*
MICHAEL R. DREEBEN
  *Deputy Solicitor General*
ANTHONY A. YANG
  *Assistant to the Solicitor*
    *General*
DEMETRA LAMBROS
  *Attorney*

  *Department of Justice*
  *Washington, D.C. 20530-0001*
  *(202) 514-2217*

## QUESTION PRESENTED

Whether, to convict a state official for depriving the public of its right to the defendant's honest services through the non-disclosure of material information, in violation of the mail-fraud statute (18 U.S.C. 1341 and 1346), the government must prove that the defendant violated a disclosure duty imposed by state law.

## TABLE OF CONTENTS

Page

Opinions below ..................................... 1
Jurisdiction ........................................ 1
Statutory provisions involved ....................... 1
Statement .......................................... 2
Summary of argument ............................... 9
Argument:

    A state official's violation of the honest services statute
    by taking official action while intentionally concealing a
    material conflict of interest does not depend on proof
    that the official violated a disclosure duty imposed by
    state law ......................................... 13

    A. Section 1346's text and legal context establish
       that state officials may engage in honest-
       services mail fraud by concealing a material
       conflict of interest even if state law does not
       require disclosure of that conflict ................. 14

       1. The text of Section 1346 reinstated pre-
          *McNally* jurisprudence without reference to
          state law ..................................... 16

       2. Section 1346 reinstated pre-*McNally*
          jurisprudence that held that honest-services
          mail fraud does not require a violation of state
          law ......................................... 21

       3. Congress's reinstatement of pre-*McNally* law
          that honest-services fraud does not depend on
          a state-law violation is not undermined by any
          inconsistency in that body of law .............. 32

    B. Section 1346's drafting and legislative history
       confirm that public-sector honest-services fraud
       does not depend on an official's violation of state-
       law obligations ................................ 35

IV

Table of Contents—Continued:                    Page

C. Interpreting Section 1346 to exclude a state-law
   disclosure requirement does not create a federal
   common-law crime . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
D. Neither constitutional avoidance, federalism
   principles, nor the rule of lenity supports a state-
   law-violation requirement . . . . . . . . . . . . . . . . . . . . . . . 44
   1. The elements of Section 1346 sufficiently
      define its scope . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
   2. Section 1346 satisfies any applicable clear-
      statement principle animated by federalism
      concerns . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
   3. The rule of lenity does not support implying a
      state-law-violation requirement into Section
      1346 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53
Appendix . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1a

### TABLE OF AUTHORITIES

Cases:

*Anderson* v. *City of Parsons*, 496 P.2d 1333
   (Kan. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
*Anderson* v. *Zoning Comm'n*, 253 A.2d 16
   (Conn. 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
*Atherton* v. *FDIC*, 519 U.S. 213 (1997) . . . . . . . . . . . . . . 40
*Atlantic Sounding Co.* v. *Townsend*, 129 S. Ct. 2561
   (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
*Badders* v. *United States*, 240 U.S. 391 (1916) . . . . . . . . . . 50
*Boyce Motor Lines, Inc.* v. *United States*, 342 U.S.
   337 (1952) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
*Bradford* v. *United States*, 129 F.2d 274 (5th Cir.),
   cert. denied, 317 U.S. 683 (1942) . . . . . . . . . . . . . . . . . 24

V

Cases—Continued:                                    Page

*Cannon* v. *University of Chi.*, 441 U.S. 677 (1979) . . . . . . 16

*Carter* v. *United States*, 217 U.S. 286 (1910) . . . . . . . . 27

*Chiarella* v. *United States*, 445 U.S. 222 (1980) . . . . . . . . 30

*Cleveland* v. *United States*, 531 U.S. 12
(2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 14, 18, 19, 22

*Colautti* v. *Franklin*, 439 U.S. 379 (1979) . . . . . . . . . . . . . 47

*Corning Glass Works* v. *Brennan*, 417 U.S. 188
(1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Dean* v. *United States*, 129 S. Ct. 1849 (2009) . . . . . . . . . 20

*Dirks* v. *SEC*, 463 U.S. 646 (1983) . . . . . . . . . . . . . . . . . 30

*Durland* v. *United States*, 161 U.S. 306 (1896) . . . . . . . . 46

*Evans* v. *United States*, 504 U.S. 255 (1992) . . . . . . . 21, 51

*Exxon Mobil Corp.* v. *Allapattah Servs., Inc.*,
545 U.S. 546 (2005) . . . . . . . . . . . . . . . . . . . . . . 16

*Gregory* v. *Ashcroft*, 501 U.S. 452 (1991) . . . . . . . . . . . . . 50

*Jerome* v. *United States*, 318 U.S. 101 (1943) . . . . . . . . . . 19

*Jersey City* v. *Hague*, 115 A.2d 8 (N.J. 1955) . . . . . . . . . . 27

*Kirby* v. *Cruce*, 688 S.W.2d 161 (Tex. App. 1985) . . . . . . 27

*Kungys* v. *United States*, 485 U.S. 759 (1988) . . . . . . . . . . 49

*McCormick* v. *United States*, 500 U.S. 257 (1991) . . . . . . . 51

*McDermott Int'l, Inc.* v. *Wilander*, 498 U.S. 337
(1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*McNally* v. *United States*, 483 U.S. 350 (1987) . . . . *passim*

*Miles* v. *Apex Marine Corp.*, 498 U.S. 19 (1990) . . . . . . . . 15

*Mississippi Band of Choctaw Indians* v. *Holyfield*,
490 U.S. 30 (1989) . . . . . . . . . . . . . . . . . . . . . . . 19

*Morissette* v. *United States*, 342 U.S. 246 (1952) . . . . . . . . 21

*Muscarello* v. *United States*, 524 U.S. 125 (1998) . . . . . . . 52

VI

Cases—Continued: Page

*National Archives & Records Admin.* v. *Favish*,
541 U.S. 157 (2004) ............................... 16

*Neder* v. *United States*, 527 U.S. 1 (1999) ..... 34, 40, 48, 49

*Parr* v. *United States*, 363 U.S. 370 (1960) ............. 50

*Russello* v. *United States*, 464 U.S. 16 (1983) ......... 20

*SEC* v. *Capital Gains Research Bureau, Inc.*,
375 U.S. 180 (1963) ........................... 25, 30

*Salinas* v. *United States*, 522 U.S. 52 (1997) .......... 51

*Screws* v. *United States*, 325 U.S. 91 (1945) ........... 47

*Shushan* v. *United States*, 117 F.2d 110 (5th Cir.),
cert. denied, 313 U.S. 574 (1941) .................. 24

*Smith* v. *City of Albany*, 61 N.Y. 444 (1875) ........... 27

*Sorich* v. *United States*, 129 S. Ct. 1308 (2009) ........ 45

*State ex rel. Attorney Gen.* v. *Broadaway*, 93 S.W.2d
1248 (Ark. 1936) ................................. 26

*Texas Indus., Inc.* v. *Radcliff Materials, Inc.*,
451 U.S. 630 (1981) .............................. 40

*United States* v. *Alexander*, 741 F.2d 962 (7th Cir.
1984) ...................................... 22, 24

*United States* v. *Alkins*, 925 F.2d 541 (2d Cir. 1991) .... 47

*United States* v. *Antico*, 275 F.3d 245 (3d Cir. 2001),
cert. denied, 537 U.S. 821 (2002) ............. 31, 41, 48

*United States* v. *Barber*, 668 F.2d 778 (4th Cir.),
cert. denied 459 U.S. 829 (1982) .................. 26

*United States* v. *Barrett*, 505 F.2d 1091 (7th Cir.
1974), cert. denied, 421 U.S. 964 (1975) ............. 24

*United States* v. *Blanton*, 719 F.2d 815 (6th Cir. 1983),
cert. denied, 465 U.S. 1099 (1984) ................. 24

## VII

Cases—Continued:                                    Page

*United States* v. *Bloom*, 149 F.3d 649 (7th Cir. 1998) . . . . 42

*United States* v. *Brown*, 540 F.2d 364 (8th Cir.
  1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 29

*United States* v. *Brumley*, 116 F.3d 728 (5th Cir.),
  cert. denied, 522 U.S. 1028 (1997) . . . . . . 31, 32, 33, 42, 43

*United States* v. *Bruno*, 809 F.2d 1097 (5th Cir.),
  cert. denied, 481 U.S. 1057 (1987) . . . . . . . . . . . 21, 22, 24

*United States* v. *Bryan*, 58 F.3d 933 (4th Cir. 1995),
  overruled on other grounds by *United States* v.
  *O'Hagan*, 521 U.S. 642 (1997) . . . . . . . . . . . . . . . . . . 30, 42

*United States* v. *Bush*, 522 F.2d 641 (7th Cir. 1975),
  cert. denied, 424 U.S. 977 (1976) . . . . 21, 25, 27, 28, 29, 48

*United States* v. *Carbo*, 572 F.3d 112 (3d Cir. 2009) . . 41, 42

*United States* v. *Chestman*, 947 F.2d 551 (2d Cir.
  1991), cert. denied, 503 U.S. 1004 (1992) . . . . . . . . . . . 46

*United States* v. *deVegter*, 198 F.3d 1324 (11th Cir.
  1999), cert. denied, 530 U.S. 1264 (2000) . . . . . . . . . . . 42

*United States* v. *Dowling*, 739 F.2d 1445 (9th Cir.
  1984), rev'd on other grounds, 473 U.S. 207 (1985) . . . . 32

*United States* v. *Edwards*, 458 F.2d 875 (5th Cir.),
  cert. denied, 409 U.S. 891 (1972) . . . . . . . . . . . . . . . . . . 29

*United States* v. *Frost*, 125 F.3d 346 (6th Cir. 1997),
  cert. denied, 525 U.S. 810 (1998) . . . . . . . . . . . . . . . 31, 42

*United States* v. *Gaudin*, 515 U.S. 506 (1995) . . . . . . . . . . 49

*United States* v. *Gray*, 790 F.2d 1290 (6th Cir. 1986),
  rev'd *sub nom. McNally* v. *United States*, 483 U.S.
  350 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 26

*United States* v. *Hasner*, 340 F.3d 1261 (11th Cir.
  2003), cert. denied, 543 U.S. 810 (2004) . . . . . . . . . . . . . 42

VIII

Cases—Continued:           Page

*United States* v. *Holzer*, 816 F.2d 304 (7th Cir.),
vacated, 484 U.S. 807 (1987) .......... 21, 26, 27, 48, 49

*United States* v. *Isaacs*, 493 F.2d 1124 (7th Cir.),
cert. denied, 417 U.S. 976 (1974) ............... 22, 24

*United States* v. *Jennings*, 487 F.3d 564 (8th Cir.
2007) ...................................... 31, 48

*United States* v. *Keane*, 522 F.2d 534 (7th Cir. 1975),
cert. denied, 424 U.S. 976 (1976) .......... 25, 28, 29, 48

*United States* v. *Kemp*, 500 F.3d 257 (3d Cir. 2007),
cert. denied, 128 S. Ct. 1329 (2008) ................. 41

*United States* v. *Kincaid-Chauncey*, 556 F.3d 923
(9th Cir. 2009), petition for cert pending,
No. 09-5076 (filed June 29, 2009) ............... 41, 47

*United States* v. *Lopez-Lukis*, 102 F.3d 1164
(11th Cir. 1997) ............................ 31, 41

*United States* v. *Louderman*, 576 F.2d 1383 (9th Cir.),
cert. denied, 439 U.S. 896 (1978) ................... 29

*United States* v. *Lovett*, 811 F.2d 979 (7th Cir. 1987) .... 23

*United States* v. *Mandel*, 591 F.2d 1347 (4th Cir.),
vacated, 602 F.2d 653 (4th Cir. 1979), cert. denied,
445 U.S. 961 (1980) ............ 21, 23, 26, 28, 29, 38, 39

*United States* v. *Margiotta*, 688 F.2d 108
(2d Cir. 1982), cert. denied, 461 U.S. 913
(1983) .......................... 21, 24, 25, 27, 29, 39

*United States* v. *McGeehan*, No. 05-1954, 2009 WL
3380678 (3d Cir. Oct. 22, 2009) .................... 42

*United States* v. *McNeive*, 536 F.2d 1245 (8th Cir.
1976) ................................... 22, 29, 34

*United States* v. *Murphy*, 768 F.2d 1518 (7th Cir.
1985), cert. denied, 475 U.S. 1012 (1986) ........ 22, 24

IX

Cases—Continued:                                           Page

*United States* v. *O'Hagan*, 521 U.S. 642 (1997) . . . 30, 31, 45

*United States* v. *Panarella*, 277 F.3d 678 (3d Cir.),
   cert. denied, 537 U.S. 819 (2002) . . . . . . . . . . . . . . . 41, 42

*United States* v. *Rabbitt*, 583 F.2d 1014 (8th Cir.
   1978), cert. denied, 439 U.S. 1116 (1979) . . . . . . . . . . . 34

*United States* v. *Ragen*, 314 U.S. 513 (1942) . . . . . . . . . . 47

*United States* v. *Rauhoff*, 525 F.2d 1170 (7th Cir.
   1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*United States* v. *Reamer*, 589 F.2d 769 (4th Cir. 1978),
   cert. denied, 440 U.S. 980 (1979) . . . . . . . . . . . . . . . . . 48

*United States* v. *Rybicki*, 354 F.3d 124 (2d Cir. 2003),
   cert. denied, 543 U.S. 809 (2004) . . . . . . . . . . . . . 21, 31, 44

*United States* v. *Sawyer*:
   85 F.3d 713 (1st Cir. 1996) . . . . . . . . . . . . . . . . . . . . . 41, 47
   239 F.3d 31 (1st Cir. 2001) . . . . . . . . . . . . . . . . . . . . . 31, 42

*United States* v. *Scallion*, 533 F.2d 903 (5th Cir.
   1976), cert. denied, 429 U.S. 1079 (1977) . . . . . . . . . . . 29

*United States* v. *Silvano*, 812 F.2d 754 (1st Cir.
   1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27

*United States* v. *Sorich*, 523 F.3d 702 (7th Cir. 2008),
   cert. denied, 129 S. Ct. 1308 (2009) . . . . . . . . . . . . . 31, 42

*United States* v. *States*, 488 F.2d 761 (8th Cir. 1973),
   cert. denied, 417 U.S. 909, and 417 U.S. 950 (1974) . . . 29

*United States* v. *Sun-Diamond Growers*, 138 F.3d 961
   (D.C. Cir. 1998), aff'd on other grounds, 526 U.S.
   398 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*United States* v. *Urciuoli*, 513 F.3d 290 (1st Cir.
   2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

X

Cases—Continued:                                          Page

    *United States* v. *Vinyard*, 266 F.3d 320 (4th Cir.
      2001), cert. denied, 536 U.S. 922 (2002) . . . . . . . . . . . . . 31

    *United States* v. *Walker*, 490 F.3d 1282 (11th Cir.
      2007), cert. denied, 128 S. Ct. 1649 (2008) . . . . . . . . 41, 48

    *United States* v. *Warner*, 498 F.3d 666 (7th Cir.),
      cert. denied, 128 S. Ct. 2500 (2008) . . . . . . . . . . . . . . . 47

    *United States* v. *Williams*, 545 F.2d 47 (8th Cir.
      1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

    *United States* v. *Woodward*, 149 F.3d 46 (1st Cir.
      1998), cert. denied, 525 U.S. 1138 (1999) . . . . . . . . 41, 48

    *Village of Hoffman Estates* v. *Flipside, Hoffman
      Estates, Inc.*, 455 U.S. 489 (1982) . . . . . . . . . . . . . . . . 49

    *Virginia* v. *Moore*, 128 S. Ct. 1598 (2008) . . . . . . . . . . . . 43

    *Williams* v. *State*, 315 P.2d 981 (Ariz. 1957) . . . . . . . . . . . 26

Constitution, statutes and regulation:

    U.S. Const. Amend. IV . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

    Anti-Drug Abuse Act of 1988, Pub. L. No. 100–690,
      102 Stat. 4181:

        § 4603(2), 102 Stat. 4287 . . . . . . . . . . . . . . . . . . . . 20

        § 6211, 102 Stat. 4359 . . . . . . . . . . . . . . . . . . . . . . . 20

    16 U.S.C. 3372(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    16 U.S.C. 3373(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    18 U.S.C. 371 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    18 U.S.C. 666 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

    18 U.S.C. 666(a)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    18 U.S.C. 842(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    18 U.S.C. 924(g)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    18 U.S.C. 1262 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

XI

Statutes and regulation—Continued:                     Page

18 U.S.C. 1341 ................................. *passim*

18 U.S.C. 1346 ................................. *passim*

18 U.S.C. 1951(a) ................................ 2

18 U.S.C. 1952(a) ................................ 19

18 U.S.C. 1952(b) ................................ 19

18 U.S.C. 1955 ................................... 19

18 U.S.C. 1958 ................................... 19

18 U.S.C. 1961(1)(A) ............................. 19

22 U.S.C. 2714(a) ................................ 20

22 U.S.C. 2714(b) ................................ 20

22 U.S.C. 2714(e)(6) ............................. 20

Alaska Stat. § 24.60.030(e)(3) (2002) ............. 6, 43

Tex. Penal Code Ann. § 36.08(e) (West 1994) .......... 43

17 C.F.R. 240.10b-5 .............................. 29

Miscellaneous:

Anti-Corruption Act of 1988, S. 2793, 100th Cong.,
2d Cong. (1988) .............................. 35, 37, 38

133 Cong. Rec. (1987):

p. 22,339 ..................................... 38

p. 32,959 ..................................... 51

p. 32,961 ..................................... 51

134 Cong. Rec. (1988):

pp. 15,045-15,047 ............................. 37

p. 15,046 ................................. 36, 39, 51

p. 30,310 ..................................... 37

p. 30,766 ..................................... 37

pp. 30,766-30,767 ............................. 37

XII

Miscellaneous—Continued:           Page

p. 30,767 ............................................ 37, 51

p. 30,768 ............................................ 38

p. 30,781 ............................................ 37

p. 30,826 ............................................ 38

p. 30,920 ............................................ 37

p. 30,936 ............................................ 37

pp. 31,071-31,072 ......................... 37

pp. 31,071-31,073 ......................... 38

p. 32,639 ............................................ 39

p. 32,678 ............................................ 39

p. 33,150 ............................................ 38

p. 33,250 ............................................ 38

pp. 33,296-33,297 ......................... 38

p. 33,297 ......................................... 38, 51

p. 33,318 ........................................ 38, 39

H.R. 5210, 100th Cong., 2d Cong. (1988) ........ 37, 38, 39

*Mail Fraud: Hearing on H.R. 3089 and H.R. 3050 Before the Subcomm. on Criminal Justice of the House Comm. on the Judiciary*, 100th Cong., 2d Sess. (1988) ...................... 35, 36, 37, 39, 51

Floyd R. Mechem, *A Treatise on the Law of Public Offices and Officers* (1890) ........................ 28

William L. Prosser, *Handbook of the Law of Torts* (1955) ......................................... 30

S. 2531, 100th Cong., 2d Sess. (1988) .................. 36

# In the Supreme Court of the United States

No. 08-1196

BRUCE WEYHRAUCH, PETITIONER

*v.*

UNITED STATES OF AMERICA

*ON WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT*

## BRIEF FOR THE UNITED STATES

### OPINIONS BELOW

The opinion of the court of appeals (Pet. App. 1a-21a) is reported at 548 F.3d 1237. The order and opinion of the district court (Pet. App. 22a-36a) is unreported.

### JURISDICTION

The judgment of the court of appeals was entered on November 26, 2008. The petition for rehearing was denied on January 7, 2009. The petition for a writ of certiorari was filed on March 25, 2009, and was granted on June 29, 2009. The jurisdiction of this Court rests on 28 U.S.C. 1254(1).

### STATUTORY PROVISIONS INVOLVED

The relevant statutes are reprinted in the appendix. App., *infra*, 1a-2a.

(1)

2

**STATEMENT**

A grand jury in the District of Alaska charged petitioner with honest-services mail fraud, in violation of 18 U.S.C. 1341 and 1346; attempted extortion under color of official right, in violation of 18 U.S.C. 1951(a); bribery concerning programs receiving federal funds, in violation of 18 U.S.C. 666(a)(1)(B); and conspiracy to commit mail and wire fraud, extortion, and bribery, in violation of 18 U.S.C. 371. J.A. 11-37. In a pre-trial order denying the government's motion to admit certain evidence, the district court held that, in order to prove honest-services mail fraud based on a state official's failure to disclose a conflict of interest, the government must establish a "duty [to disclose] imposed by state law." Pet. App. 35a-36a. The court of appeals reversed and remanded, finding no basis for concluding that "Congress intended to condition the meaning of 'honest services' on state law." *Id.* at 16a.

1. In May 2007, a federal grand jury issued an indictment that, *inter alia*, charged petitioner with honest-services mail fraud, in violation of 18 U.S.C. 1341 and 1346. J.A. 35-36; see J.A. 11-37 (indictment).

The indictment alleges that, in February 2006, the Governor of Alaska announced an agreement with three oil companies to construct a natural-gas pipeline from Alaska's North Slope. The agreement contemplated that the State would significantly change its taxation of oil production, and it therefore required the Alaska legislature's approval. J.A. 15-16. The agreement proposed a "petroleum production tax" (PPT) under which the oil companies would pay a 20% tax rate based on their net profits and receive a 20% tradeable tax credit. J.A. 16-17. That formula, known as the "20/20" PPT rate, was

3

much debated throughout the 2006 regular and special sessions of the Alaska State Legislature. *Ibid.*

The construction of the gas pipeline was important to VECO Corp. ("Company A" in the indictment), a multi-national company that derived significant income from field-services contracts with oil companies in Alaska. J.A. 14, 16.[1] VECO supported the 20/20 PPT legislation and opposed legislation imposing a higher tax rate. J.A. 17.

Petitioner is a lawyer who, from 2002 until January 2007, was an elected member of the Alaska House of Representatives. J.A. 14. The indictment alleges that, in May 2006, petitioner solicited VECO executives to secure legal work to perform after his retirement from the legislature in exchange for petitioner's support as a legislator for the 20/20 PPT legislation. J.A. 18-19, 23-24, 26-28. The indictment further alleges that in exchange for VECO's promise of future legal work (J.A. 20, 26, 28), petitioner agreed to perform official acts benefitting VECO, including voting in favor of PPT legislative proposals supported by VECO; lobbying other elected officials to support such legislation; assisting in maneuvering the PPT legislation through the House and Senate; and "shoe-horn[ing]" himself into a meeting on legislative counter-proposals and reporting the details to VECO. J.A. 19, 25-26, 29-30.

According to the indictment, petitioner voted for PPT legislation supported by VECO, including amendments to the legislation. J.A. 19, 24. For instance, after voting the "wrong way" on an amendment, petitioner switched his vote based on instructions from VECO. J.A. 24. The next day, petitioner advised VECO's chief

---

[1] VECO's identity as "Company A" became public during pretrial litigation. See, *e.g.*, Pet. App. 23a-24a.

4

executive officer that a higher, 21% tax rate was a "political reality," but petitioner nevertheless would vote for VECO's preferred legislation. J.A. 25-26. Petitioner subsequently tried unsuccessfully to have the legislative session adjourned before a vote on an amendment that VECO opposed. J.A. 28. One day later, petitioner told a VECO executive that the PPT bill was "coming along poorly" and that it was "real frustrating" to petitioner given his efforts to further VECO's interests concerning the legislation. *Ibid.*

The government intends to prove that petitioner took these official actions affecting VECO's interests concerning the PPT legislation without disclosing to the public or the Alaska legislature that he was at the time soliciting employment from VECO. J.A. 39.

2. The honest-services mail fraud count of the indictment alleges that, by the actions described above, petitioner and his co-defendants schemed "to defraud and deprive the State of Alaska of its intangible right to the honest services of * * * [petitioner], performed free from deceit, self-dealing, bias, and concealment." J.A. 35. The indictment further alleges that petitioner mailed to VECO a solicitation of legal employment for the purpose of executing that scheme or artifice to defraud. J.A. 18, 23, 36-37. That charge is based on the mail fraud statute, 18 U.S.C. 1341, which makes it unlawful for any person, "having devised or intending to devise any scheme or artifice to defraud," to use the mail "for the purpose of executing such scheme or artifice or attempting to do so," and on Section 1346, which states that "the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. 1346.

5

Section 1346 responded to *McNally* v. *United States*, 483 U.S. 350 (1987). *McNally* held that Section 1341 precluded a mail fraud prosecution brought on the theory that the citizens of a state "had been deprived of their right to have the [State's] affairs conducted honestly" by a public official who participated in a self-dealing scheme in which he "did not disclose [his] interest" in the official actions taken under that scheme. *Id.* at 352, 355, 361 & n.9. The Court recognized that the government's position was that a public official's "failure to disclose [his] financial interest, even if state law did not require it," constituted a scheme or artifice to defraud under Section 1341. *Id.* at 361 & n.9. The Court also acknowledged that "a line of decisions" from the courts of appeals held that "the mail fraud statute proscribes schemes to defraud citizens of their intangible rights to honest and impartial government." *Id.* at 355. But the Court concluded that the text of Section 1341 "does not refer to th[at] intangible right," *id.* at 356, and therefore "read § 1341 as limited in scope to the protection of property rights," *id.* at 360. "If Congress desires to go further," the Court explained, "it must speak more clearly than it has." *Ibid.*

The following year, Congress enacted 18 U.S.C. 1346 to reinstate one of the intangible rights that courts had recognized before *McNally* as a basis for a mail fraud conviction: "the intangible right of honest services." *Cleveland* v. *United States*, 531 U.S. 12, 19-20 (2000).

3.  a.  In pre-trial proceedings, the government indicated its intent to introduce evidence that petitioner had a duty under state law to disclose that he was soliciting and negotiating employment with VECO at the same time that he was taking official action on the PPT legislation. Pet. App. 23a. It argued that petitioner's failure

6

to disclose that conflict of interest was relevant to prove, *inter alia*, petitioner's "intent to defraud through the deliberate concealment of his conflict of interest" and his "consciousness of guilt" concerning his use of "public office for [his] personal gain." Gov't Trial Br. 19 (filed Aug. 29, 2007). The government explained that, *inter alia*, Alaska law specifically prohibits legislators from taking official action substantially benefitting or harming those with whom they are negotiating for employment. J.A. 46 (citing Alaska Stat. § 24.60.030(e)(3) (2002)).

Petitioner subsequently filed a motion *in limine*, arguing that no Alaska statute or rule required that he disclose his negotiations with VECO. Petitioner thus asked that the district court preclude the government from admitting evidence regarding state disclosure requirements. J.A. 52-53. The government simultaneously filed a motion seeking leave to introduce into evidence four items relevant to establishing petitioner's "inten[t] to conceal the existence of [his] financial" conflict of interest (J.A. 71): (1) Alaska legislative ethics publications in petitioner's possession that excerpted state statutory conflict-of-interest and disclosure requirements; (2) evidence that Alaska state legislators customarily acknowledge (and the legislative clerk records) conflicts of interest on the floor of the legislature; (3) a description of the legislative ethics training petitioner received; and (4) evidence that petitioner served on the legislature's Select Committee on Ethics, which instructs legislators on their ethical obligations and distributes ethics publications. J.A. 39-41. The government argued that petitioner had a duty to disclose his conflict of interest under both state law and general fiduciary principles, J.A. 41-45, 68, and that honest-services mail fraud may

7

be proved either on the theory that petitioner (a) "knowingly violated a state law" or (b) "knowingly concealed the existence of a conflict of interest" in violation of his "fiduciary duties to the public of the State of Alaska," J.A. 41, 45-46.

b.  The district court denied the government's motion and granted petitioner's request to exclude the evidence. Pet. App. 22a-36a.  As relevant here, the court rejected the view that honest-services fraud may be based on a duty to disclose inhering in federal law, and instead held that "any duty to disclose sufficient to support the mail * * * fraud charges here must be a duty imposed by state law." *Id.* at 35a-36a; see *id.* at 31a-36a.

The court recognized that Alaska statutes regulate legislative conflicts of interest by (1) prohibiting legislators from "tak[ing] or withhold[ing] official action or exert[ing] official influence that could substantially benefit or harm the financial interest of another person with whom the legislator is negotiating for employment" and (2) imposing a more general duty to "conduct the public's business in a manner that preserves the integrity of the legislative process and avoids conflicts or even appearances of conflicts of interest." Pet. App. 25a, 28a (citations omitted).  In addition to those abstention obligations, the court concluded that Alaska law requires every legislator to obtain the legislature's consent before abstaining from any vote. *Id.* at 27a-28a.  But the court concluded that no state-law provision required petitioner to *disclose* his conflict of interest before taking official action on the PPT legislation, *id.* at 29a, and the court reasoned that, because Alaska statutes "supersede the provisions of the common law relating to [a legislator's] conflict of interest," any disclosure "duty

8

must be found in a statute" for "purposes of Alaska law." *Id.* at 28a (citation omitted).

4. On the government's interlocutory appeal, the court of appeals reversed. Pet. App. 1a-21a. The court held that a state official may be convicted of honest-services mail fraud under 18 U.S.C. 1341 and 1346 without "proof that the conduct at issue also violated an applicable state law." Pet. App. 1a-2a.

The court of appeals explained that, before *McNally*, it had construed the mail fraud statute to reach such schemes "without reference to any underlying state law duty." Pet. App. 15a. It also observed that, under its pre-*McNally* jurisprudence and the decisions of other courts of appeals, "two core categories of conduct by public officials" would support a conviction for honest-services fraud without reference to state law: "(1) taking a bribe or otherwise being paid for a decision while purporting to be exercising independent discretion and (2) nondisclosure of material information." *Id.* at 19a.

Because Congress accepted *McNally*'s invitation to "speak more clearly" by enacting Section 1346 and thereby extended the mail fraud statute to proscribe schemes to deprive citizens of the intangible right to honest services, Pet. App. 11a, the court of appeals reasoned that "Congress demonstrated a clear intent to reinstate the line of pre-*McNally* honest services cases," which "generally did not require state law to create the duty of honesty that public officials owe the public." *Id.* at 17a. "Congress'[s] intent in reinstating the honest services doctrine after *McNally*," the court concluded, was to bring "at least the two core categories of official misconduct" previously recognized "within the reach of § 1346." *Id.* at 20a.

9

The court of appeals concluded that nothing in "the text or legislative history of § 1346 reveal[s] that Congress intended to condition the meaning of 'honest services' on state law." Pet. App. 16a. Accepting petitioner's state-law restriction, the court explained, would lead to the unusual result that "conduct in one state might violate the mail fraud statute, whereas identical conduct in a neighboring state would not," *ibid.*, even though "Congress has given no indication it intended the criminality of official conduct under federal law to depend on geography." *Id.* at 16a-17a.

The court of appeals explained that its interpretation of Section 1346 did not improperly intrude on state interests. "Congress has a legitimate constitutional basis for preventing public officials from using the mails to perpetrate fraud," the Court observed, and "federal action based on a valid constitutional grant of authority" is legitimate, whether or not "state law prohibits particular conduct." Pet. App. 17a-18a.

Turning to the facts of this case, the court concluded that the indictment's allegations "describe an undisclosed conflict of interest and could also support an inference of a quid pro quo arrangement to vote for the oil tax legislation in exchange for future remuneration in the form of legal work." Pet. App. 20a. Because such alleged misconduct by petitioner "falls comfortably within the two categories long recognized as the core of honest services fraud," the court held that the government could proceed on both theories. *Ibid.*

## SUMMARY OF ARGUMENT

The honest-services prohibition in 18 U.S.C. 1346 covers a state official's concealment of a material conflict of interest while taking official action that furthers that undisclosed interest. Proof that the official violated

10

a disclosure duty imposed by state law is not required. Section 1346's text, context, and history all support that conclusion, and no non-textual canon of construction justifies adding a state-law gloss. An implied state-law-violation requirement is unwarranted and unnecessary, and it would frustrate Congress's paramount interest in uniform application of federal criminal law in an area of critical importance: the protection of citizens against corruption and conflicts of interest among public officials.

A. Section 1346 must be understood in light of *McNally v. United States*, 483 U.S. 350 (1987), because Congress's purpose was to reinstate and protect the previously recognized intangible right of honest services that *McNally* rejected. The prosecution in *McNally* posited that a state official's failure to disclose a conflict of interest—"even if state law did not require it"—constituted a deprivation of honest services. *Id.* at 361 n.9. Congress's intent to restore the pre-*McNally* law on honest-services fraud necessarily extended to schemes like the one in *McNally* itself—a scheme that was prosecuted without showing any state-law violation.

The text of Section 1346 confirms that conclusion. Section 1346 states that "the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." Nothing in that language signifies an intent to incorporate state law. Settled principles of construction reinforce that interpretation. Federal law is presumed not to depend on state law, in part because Congress is generally understood to intend its enactments to have uniform national application. When Congress departs from that background principle, it usually expressly refers to state law—as it has in a number of federal criminal laws, in-

11

cluding ones enacted contemporaneously with Section 1346. Those principles apply with special force here. In response to *McNally*, Congress restored the federal protection against state and local corruption that lower courts had uniformly recognized. Congress had every reason to provide the Nation's citizenry with an equal right to honest services from public officials, rather than supplying a patchwork of federal protection that varied State by State, county by county, town by town, according to local laws enacted for different purposes.

The term "the intangible right of honest services" is a term of art, and its use signals Congress's intention to adopt doctrine from pre-*McNally* decisions. Public-sector prosecutions typically involved two types of crimes: (1) accepting a bribe or kickback in payment for official action, or (2) taking action on an official matter while concealing a material conflict of interest. Of particular significance here, those cases uniformly recognized that an honest-services fraud conviction in the nondisclosure category need not be predicated on a state-law disclosure requirement. Rather, the cases consistently held that public officials had inherent fiduciary duties to act in the public's interest and to make disclosure of conflicting interests, and that taking official action on undisclosed conflicts breached the duty of loyalty and constituted honest-services fraud. Courts interpreting Section 1346 have properly looked to pre-*McNally* law to define the crime, and, consistent with that doctrine, no state-law violation is necessary.

B. The drafting and legislative history reveals that Congress did not intend to base nondisclosure honest-services fraud on violations of state law. Congress considered several post-*McNally* proposals that would have incorporated state law into the definition of a related

12

intangible-rights offense or made state-law violations a sentencing enhancement. But it rejected those proposals in favor of a simple, unqualified phrase that refers to pre-existing honest-services law, which had rejected any dependence on state law. From the Justice Department's initial proposal forward, proof of the elements of a state offense was not required.

C. The interpretation of Section 1346 without a state-law component does not create a common-law crime. Courts look to pre-*McNally* law to give content to Section 1346, just as they look to the common law to inform the meaning of money-or-property fraud in Section 1341. Interpreting statutory language drafted against a backdrop of prior case law is not the invention of a common-law crime. Applying that approach, courts have identified two core forms of honest-services fraud, each of which involves a breach of the duty of loyalty. These types of frauds can take many forms, but that does not open up new forms of liability that sweep past pre-*McNally* landmarks.

Petitioner's position—that courts should invent and define a state-law requirement that has no precursor in federal fraud law—would itself launch courts on a common-law-style mission of supplying limits that Congress rejected. That step is both unwarranted and unwise: federalizing state rules adopted for different purposes would raise far greater state sovereignty concerns than does the court of appeals' decision.

D. Reading state law into Section 1346 cannot be justified as necessary to avoid a serious constitutional question (of vagueness), to alleviate federalism concerns, or to serve the rule of lenity. Section 1346's elements sufficiently define and narrow the crime to avoid vagueness and lenity concerns. The government must

13

prove a breach of the duty of loyalty, an intent to deceive, and materiality. A defendant who breaches those settled duties, by accepting bribes or kickbacks or by failing to disclose self-dealing or material conflicts of interest, *and* who intends to deceive the citizenry, has ample notice of his criminal conduct. Concerns about changing the federal-state balance are also misplaced. Congress intentionally sought to restore the federal-state balance before *McNally*—under which federal prosecutions safeguarded the integrity of state and local government, thereby filling an otherwise unmet need. And the rule of lenity has no role to play in this case. Section 1346, properly construed in light of its background, is not ambiguous. Nor does anything in the language, legislative history, or purpose of the statute permit implying a state-law limit that Congress did not enact.

## ARGUMENT

### A STATE OFFICIAL'S VIOLATION OF THE HONEST SERVICES STATUTE BY TAKING OFFICIAL ACTION WHILE INTENTIONALLY CONCEALING A MATERIAL CONFLICT OF INTEREST DOES NOT DEPEND ON PROOF THAT THE OFFICIAL VIOLATED A DISCLOSURE DUTY IMPOSED BY STATE LAW

In *McNally* v. *United States*, 483 U.S. 350 (1987), this Court rejected the unanimous view of the courts of appeals that the mail fraud statute, 18 U.S.C. 1341, protected against not only schemes to obtain money or property, but also schemes to deprive others of intangible rights, such as the intangible right of honest services. The pre-*McNally* jurisprudence had recognized two core public-sector types of honest-services fraud: schemes involving (1) bribery or kickbacks or (2) the

14

nondisclosure of a public official's conflict of interest in connection with his official action. The use of the mails in such schemes, the courts of appeals uniformly held, constituted mail fraud regardless whether the defendant official's actions also violated a duty under state law. See *McNally*, 483 U.S. at 377 n.10 (Stevens, J., dissenting). Those decisions reflected a consensus that a public official defrauds the citizenry when he takes official action on a matter in which he has a secret conflict of interest because he has a federal duty, recognized in the mail fraud statute itself, to disclose such a conflict.

The year after *McNally*, Congress amended the law to cover "the intangible right of honest services" (18 U.S.C. 1346) that the lower courts previously had protected under Section 1341. *Cleveland* v. *United States*, 531 U.S. 12, 19-20 (2000). Congress thereby prohibited the core misconduct that the pre-*McNally* decisions had addressed. Section 1346's statutory text, its surrounding legal context, and its drafting and legislative history confirm that honest-services mail fraud may be established by a state official's scheme to take official action on a matter in which he has a material, intentionally concealed conflict of interest, even if its disclosure is not required by state law. Petitioner's contrary view cannot be reconciled with the text, context, history, or purpose of Section 1346.

A. **Section 1346's Text And Legal Context Establish That State Officials May Engage In Honest-Services Mail Fraud By Concealing A Material Conflict Of Interest Even If State Law Does Not Require Disclosure Of That Conflict**

Congress's legislative response to *McNally* demonstrates that, under Section 1346, a state official's scheme to conceal and act upon a material conflict of interest

need not violate a state-law disclosure duty to constitute mail fraud. *McNally* rejected a prior line of decisions recognizing that a "public official owes a fiduciary duty to the public" and unanimously holding that the mail fraud statute proscribed schemes to defraud citizens of their "intangible rights to honest and impartial government." 483 U.S. at 355, 358; *id.* at 362-364 (Stevens, J., dissenting). Justice Stevens, in dissent, would have recognized those decisions as valid interpretations of the mail fraud statute and would have upheld the convictions in *McNally* for defrauding citizens of the intangible "right to the honest services" of government officials. *Id.* at 362. When Congress enacted Section 1346, it employed language derived directly from *McNally* and the line of authority that *McNally* rejected.

The parties agree that Congress "manifest[ed] a clear intention to reverse *McNally*'s holding" (Pet. Br. 34) by enacting Section 1346 to protect "the intangible right of honest services," 18 U.S.C. 1346. In such circumstances, where Congress "respond[s] directly" to overturn a decision of this Court and "adopts without further elaboration [a] term used in [that decision]," Congress is assumed—in the absence of contrary indication—to have "intended [the statutory term] to have its established meaning." *McDermott Int'l, Inc.* v. *Wilander*, 498 U.S. 337, 342 (1991). Particularly "where, as here, the legislative history reveals that Congress incorporated words having a special meaning," its use of such "terms of art" must be understood in light of their pre-existing meaning. *Corning Glass Works* v. *Brennan*, 417 U.S. 188, 201-202 (1974).[2] The application of those

---

[2] That principle flows from the presumption that "Congress is aware of existing law when it passes legislation," *Miles* v. *Apex Marine Corp.*, 498 U.S. 19, 32 (1990); see *Atlantic Sounding Co.* v. *Townsend*, 129

16

principles demonstrates that Congress used "the intangible right of honest services" as a term of art in Section 1346 to capture and reinstate the core of pre-*McNally* law of honest-services mail fraud, including its refusal to require a state-law disclosure duty.

*1. The text of Section 1346 reinstated pre-McNally jurisprudence without reference to state law*

a. This Court in *McNally* reversed the mail fraud conviction of a state official (Gray) for using the mails to advance a self-dealing scheme in which he concealed his conflict of interest. The government alleged that Gray, a high-ranking state official possessing authority over Kentucky's workers' compensation insurance, schemed with Hunt, an individual with political connections giving him *de facto* control over the company the State would select as its insurance agent, to obtain a portion of the insurance commissions paid by the insurance companies to the State's agent. *McNally*, 483 U.S. at 352-353, 355. McNally, an aider and abetter, nominally operated a company controlled by Gray and Hunt to which the State's selected insurance agent paid commissions under the scheme. *Id.* at 352-353.

The prosecution proceeded on the theory that the state official's "failure to disclose" his conflict of interest to others in state government—"even if state law did not require it"—deprived the people of Kentucky of the

---

S. Ct. 2561, 2573 (2009), and the understanding that the Court's "evaluation of congressional action * * * must take into account its contemporary legal context." *Cannon* v. *University of Chi.*, 441 U.S. 677, 698-699 (1979); see *Exxon Mobil Corp.* v. *Allapattah Servs., Inc.*, 545 U.S. 546, 587 (2005) (Ginsburg, J., dissenting) (noting the ordinary assumption that "Congress legislated against a background of law already in place and the historical development of that law") (citing *National Archives & Records Admin.* v. *Favish*, 541 U.S. 157, 169 (2004)).

"right to have the Commonwealth's affairs conducted honestly." *McNally*, 483 U.S. at 361 n.9; see *id.* at 355 (jury instructions). The court of appeals affirmed Gray's and McNally's convictions based on the recognized principles that public officials "owe[] a fiduciary duty to the public" and that the mail fraud statute prohibits such officials from defrauding citizens of their "intangible rights to honest and impartial government." *Id.* at 355, 358; see *id.* at 362 & n.1, 364 (Stevens, J., dissenting) (explaining that federal courts had "uniformly and consistently" read the statute to protect citizens' "right to the honest services" of government officials).

This Court reversed, concluding that Congress's use of the phrase "scheme or artifice to defraud" in Section 1341 "clearly protects property rights" but "does not refer to the intangible right of the citizenry to good government." *McNally*, 483 U.S. at 356; see *id.* at 356-360. The Court accordingly "read § 1341 as limited in scope to the protection of property rights" and explained that, "[i]f Congress desires to go further, it must speak more clearly than it has." *Id.* at 360.

b.  Congress enacted Section 1346 the following year to specify that, as used in the mail fraud and related statutes,

> the term "scheme or artifice to defraud" includes a scheme or artifice to deprive another of the intangible right of honest services.

18 U.S.C. 1346. That provision restores an "intangible right" that *McNally* declined to recognize. Thus, as this Court explained, "Congress amended the law specifically to cover one of the 'intangible rights' that lower courts had protected under § 1341 prior to *McNally*:

18

'the intangible right of honest services.'" *Cleveland*, 531 U.S. at 19-20 (quoting 18 U.S.C. 1346).[3]

Petitioner admits that Congress "manifest[ed] a clear intention to reverse *McNally*'s holding" (Pet. Br. 34), but contends (*id.* at 28) that Section 1346 should apply to a state official's scheme to act on an undisclosed conflict of interest only if he violates a "disclosure duty * * * 'imposed by state law.'" That interpretation, however, would incorrectly ascribe to Congress the intent to accept, rather than overturn, a critical aspect of *McNally*'s holding. The convictions in *McNally* were premised on the theory that the state officials' "failure to disclose their financial interest, *even if state law did not require it*," deprived the State's citizens of their right of honest services. 483 U.S. at 361 n.9 (emphasis added); see *id.* at 377 n.10 (Stevens, J., dissenting) (discussing cases holding that mail fraud statute forbids schemes that do not violate state law). If petitioner were correct that a state-law disclosure duty were necessary to convict petitioner for taking official actions in which he deceptively concealed his conflict of interest, the *McNally* defendants would remain beyond the reach of the mail fraud statute notwithstanding Section 1346.

c.   Nothing in Section 1346 supports petitioner's contention. The provision's text does not refer to "state law," let alone suggest an intent to incorporate a state-law violation as an element of mail fraud. In fact, all indications point in the opposite direction.

First, "in the absence of a plain indication to the contrary," this Court normally assumes that Congress does "not mak[e] the application of [a] federal act dependent

---

[3]   Congress did not attempt to cover "intangible rights" more generally and therefore did not cover other forms of public-corruption schemes, such as licensing fraud. *Cleveland*, 531 U.S at 20 & n.3.

on state law," *Mississippi Band of Choctaw Indians* v. *Holyfield*, 490 U.S. 30, 43 (1989) (quoting *Jerome* v. *United States*, 318 U.S. 101, 104 (1943)), in part because "federal statutes are generally intended to have uniform nationwide application." *Ibid.* *Jerome* applied that principle to the federal bank-robbery statute, holding that the word "felony" encompassed federal rather than state offenses. 318 U.S. at 104. And in the mail fraud statute's protection of property rights, this Court has similarly indicated that whether a state-law interest "constitutes 'property' or 'rights to property' is a matter of federal law." *Cleveland*, 531 U.S. at 25-26 n.4 (citation omitted). Petitioner identifies no "plain indication" warranting incorporation of state law into the offense defined by Section 1346.

Second, Congress has repeatedly used express text when it intends to depart from this background presumption and define federal offenses—including offenses involving use of the mail—by reference to state law. See, *e.g.*, 18 U.S.C. 1952(a) and (b) (use of mail in connection with offenses "in violation of the laws of the State in which they are committed"); 18 U.S.C. 1958 (use of mail with intent that a murder be committed for payment "in violation of the laws of any State"); *McNally*, 483 U.S. at 377 n.10 (Stevens, J., dissenting) (citing 18 U.S.C. 1952(b)).[4] Congress's failure to use such lan-

---

[4] See also, *e.g.*, 16 U.S.C. 3372(a)(2), 3373(d) (transporting, selling, or purchasing fish or wildlife obtained "in violation of any law or regulation of any State"); 18 U.S.C. 842(e) (knowing distribution of explosive materials to a person in state where their purchase, possession, or use would be in "violation of any State law"); 18 U.S.C. 1262 (transportation of liquor contrary to "the laws of [the] State"); 18 U.S.C. 1955 (conducting a gambling business in "violation of the law of a State or political subdivision"); 18 U.S.C. 1961(1)(A) (federal racketeering predicates involving offenses chargeable as felonies "under State law").

guage in Section 1346 severely undermines the view that a state-law disclosure duty must exist before an honest-services mail fraud prosecution may be brought against a state official who schemes to take official action while concealing a material conflict of interest.

Indeed, elsewhere in the statute that included Section 1346, Congress expressly defined a federal offense based on the defendant's intent to engage in conduct that "violates [a] state law." Anti-Drug Abuse Act of 1988, Pub. L. No. 100–690, § 6211, 102 Stat. 4359 (enacting 18 U.S.C. 924(g)(3)); cf. id. § 4603(2), 102 Stat. 4287 (enacting 22 U.S.C. 2714(a), (b) and (e)(6) to mandate the denial or revocation of a passport to individuals who cross an international border while committing a drug offense in "violation of State law"). Where, as here, "Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Dean* v. *United States*, 129 S. Ct. 1849, 1854 (2009) (quoting *Russello* v. *United States*, 464 U.S. 16, 23 (1983)).

Those principles of construction are particularly important here because Congress had sound reason to avoid dependence on state law. "Because laws governing official conduct differ from state to state, conditioning mail fraud convictions on state law means that conduct in one state might violate the mail fraud statute, whereas identical conduct in a neighboring state would not." Pet. App. 16a. Federal protection in this area should not vary based solely on the differences in state laws enacted for different purposes.

### 2. Section 1346 reinstated pre-McNally jurisprudence that held that honest-services mail fraud does not require a violation of state law

Congress's use of the phrase "the intangible right of honest services," 18 U.S.C. 1346, following *McNally* reinforces the conclusion that an honest-services offense does not depend on duties defined by state law. "The definite article 'the'" in that phrase "suggests that 'intangible right of honest services' had a specific meaning to Congress when it enacted the statute" and reflects that "Congress was recriminalizing mail- and wire-fraud schemes of *that* 'intangible right of honest services,' which had been protected before *McNally*." *United States* v. *Rybicki*, 354 F.3d 124, 137-138 (2d Cir. 2003) (en banc), cert. denied, 543 U.S. 809 (2004); cf. *Evans* v. *United States*, 504 U.S. 255, 259-260 (1992) ("[W]here Congress borrows terms of art" it "adopts the cluster of ideas that were attached to each borrowed word.") (brackets in original) (quoting *Morissette* v. *United States*, 342 U.S. 246, 263 (1952)).

Although many pre-*McNally* cases did not use the precise words "honest services" (Pet. Br. 23 n.5), they employed analogous formulations such as a "betrayal of the public trust," *United States* v. *Holzer*, 816 F.2d 304, 311 (7th Cir.), vacated, 484 U.S. 807 (1987), or variants such as "honest and faithful services," *United States* v. *Bruno*, 809 F.2d 1097, 1105 (5th Cir.), cert. denied, 481 U.S. 1057 (1987); *United States* v. *Margiotta*, 688 F.2d 108, 120 (2d Cir. 1982), cert. denied, 461 U.S. 913 (1983); *United States* v. *Bush*, 522 F.2d 641, 648 (7th Cir. 1975), cert. denied, 424 U.S. 977 (1976), "faithful and honest services," or "loyal and honest services," *United States* v. *Mandel*, 591 F.2d 1347, 1357 (4th Cir. 1979), vacated, 602 F.2d 653 (per curiam) (affirming convictions by

22

equally divided en banc court), cert. denied, 445 U.S. 961 (1980); *United States* v. *McNeive*, 536 F.2d 1245, 1250 (8th Cir. 1976); *United States* v. *Isaacs*, 493 F.2d 1124, 1150 (7th Cir.), cert. denied, 417 U.S. 976 (1974). Other cases simply invoked the public's "right to the honest services of its public officials," *Bruno*, 809 F.2d at 1105; see *United States* v. *Murphy*, 768 F.2d 1518, 1530 (7th Cir. 1985), cert. denied, 475 U.S. 1012 (1986). The Sixth Circuit in *McNally* itself remarked that cases had addressed "scheme[s] to defraud the citizenry and government of an intangible right, such as honest service." *United States* v. *Gray*, 790 F.2d 1290, 1294 (1986) (quoting *United States* v. *Alexander*, 741 F.2d 962, 964 (7th Cir. 1984)), rev'd *sub nom. McNally*, *supra*. Congress chose the phrase "honest services" to capture the teachings of these cases.

Justice Stevens in his *McNally* dissent specifically labeled that well-settled body of precedent as protecting the public's right to the "honest services" of government officials, 483 U.S. at 362-363 & n.1 (Stevens, J., dissenting). Congress logically incorporated that terminology in its effort to overrule *McNally*. And this Court has subsequently used "honest services" as a term of art, explaining that Congress enacted Section 1346 "specifically" to reinstate "the intangible right of honest services" that "lower courts had protected under § 1341 prior to *McNally*." *Cleveland*, 531 U.S. at 19-20.

Petitioner would consult dictionaries to define "right," "honest," and "services" as separate terms in Section 1346 (Pet. Br. 26-28), without addressing the words in context or analyzing the core pre-*McNally* honest-services jurisprudence that *McNally* rejected and Congress sought to reinstate. Those prior decisions, like the text of Section 1346, did not require proof

23

of a state official's violation of state law to support a conviction for honest-services mail fraud.

a. Before *McNally*, the lower courts consistently read the first clause of the mail fraud statute—which prohibits using the mail in furtherance of "any scheme or artifice to defraud," 18 U.S.C. 1341—to include schemes designed to deprive the citizenry of its intangible right to have public officials perform their duties honestly. See *McNally*, 483 U.S. at 358. Those public corruption honest-services cases typically involved the prosecution of state or local officials who committed two types of crimes: (1) accepting a bribe or kickback in exchange for official action or (2) taking action within the scope of official duties to further his undisclosed personal interest—with the same course of conduct sometimes implicating both types of fraud.

*Mandel* involves a typical honest-services case based on bribery. Maryland's governor was convicted under Section 1341 for use of the mail in a scheme in which he aided passage of racetrack legislation in exchange for undisclosed financial and other benefits from several racetrack owners. *Mandel* explains that "the fraud involved in the bribery of a public official lies in the fact that," while "outwardly purporting to be exercising independent judgment in passing on official matters, the official has been paid for his decisions." 591 F.2d at 1362. In such cases, the "public is not receiving what it expects and is entitled to, the public official's honest and faithful service." *Ibid.* Other pre-*McNally* decisions upheld mail fraud prosecutions of similar acts of public corruption. See, *e.g.*, *United States* v. *Lovett*, 811 F.2d 979, 981-982, 985-986 (7th Cir. 1987) (lobbyist bribed mayor to ensure his client received cable franchise);

24

*Isaacs*, 493 F.2d at 1149-1150 (governor accepted bribes to influence regulation of horse racing).[5]

Kickbacks, like bribes, involve an official's acquisition of a monetary payment or other item of value from an entity or person who desires official action, usually in the context of a transaction with the government that provides the source of funds to be kicked back. For instance, in *Margiotta*, a *de facto* government official who controlled local decisions contrived the appointment of an insurance broker who selected companies to insure local-government properties. The defendant arranged the broker's appointment on the understanding that the broker would kick back to the defendant's designees a portion of the future brokerage fees that the broker would receive under the arrangement. See 688 F.2d at 113-115, 127-130.[6]

---

[5] See also, *e.g.*, *Bruno*, 809 F.2d at 1104-1106 (official in sheriff's office and prison guard schemed to bribe judge assigned to prisoner's case); *Murphy*, 768 F.2d at 1524-1530 (state judge accepted bribes to fix the outcomes of cases); *Alexander*, 741 F.2d at 963-965 (county assessor's deputies accepted bribes to reduce tax assessments); *United States* v. *Rauhoff*, 525 F.2d 1170, 1171, 1175-1176 (7th Cir. 1975) (bribery of Secretary of State to procure contracts for production of license plates); *Bradford* v. *United States*, 129 F.2d 274, 275-277 (5th Cir.) (city councilman bribed by auto dealer to urge city to buy dealer's buses), cert. denied, 317 U.S. 683 (1942).

[6] See also, *e.g.*, *United States* v. *Blanton*, 719 F.2d 815, 816-818 (6th Cir. 1983) (governor arranged for friends to receive state liquor licenses in exchange for a share of the profits), cert. denied, 465 U.S. 1099 (1984); *United States* v. *Barrett*, 505 F.2d 1091, 1103-1105 (7th Cir. 1974) (county clerk received portion of insurance broker's commissions from insurance policies clerk was responsible for obtaining), cert. denied, 421 U.S. 964 (1975); *Shushan* v. *United States*, 117 F.2d 110, 114-115 (5th Cir.) (member of public levee board, who secretly would receive a portion of fees paid under a proposed bond-refund plan, voted

25

Failures to disclose a conflict of interest concerning official action also constituted a recognized form of honest-services fraud before *McNally*. When an official takes action in such circumstances, he purports to act as a loyal, disinterested public servant, but deprives the public of its right to determine for itself whether he is operating in the public's best interest. The crux of the violation in such a case is the official's deliberate concealment from the citizenry of matters that might reasonably be thought to corrupt the official's decisions. Cf. *SEC* v. *Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 196 & n.50 (1963) (fiduciary's duty to disclose conflicts of interest serves to reveal whether he is "serving two masters or only one") (internal quotation marks and citation omitted).

The pre-*McNally* cases held that a public official operates under a conflict of interest, and has an attendant disclosure duty, when he, an associate, or person from whom he receives or expects to receive things of value will benefit from or be harmed by his official actions.[7] Many of these cases recognized that such conflicts arise where the official has a personal financial interest that would be affected by his official action. See, *e.g.*, *Bush*, 522 F.2d at 647-648, 651-652 (city public-relations director used official position to influence the award of advertising contract to his company without disclosing his interest); *United States* v. *Keane*, 522 F.2d 534, 538, 546 (7th Cir. 1975) (city councilman voted on

---

on and lobbied colleagues to approve that plan), cert. denied, 313 U.S. 574 (1941).

[7] Financial interests such as kickbacks can thus trigger a duty of disclosure. Kickbacks may be analyzed either as similar to bribes or as involving a fiduciary's breach of "a duty to disclose material information or give notice of his conflict of interest." *Margiotta*, 688 F.2d at 128.

26

matters directly affecting value of properties in which he had non-public ownership interest without disclosing that interest), cert. denied, 424 U.S. 976 (1976). Other cases involved conflicts resulting from the official's financial relationship with other persons whether or not official action was promised as a quid pro quo. See, *e.g.*, *Holzer*, 816 F.2d at 307-309 (judge failed to disclose that he received loans from lawyers with cases before him); *United States* v. *Brown*, 540 F.2d 364, 374-375 (8th Cir. 1976) (city building commissioner failed to disclose that contractors whose bids he acted upon paid his girl-friend's rent at his request).[8]

The fraud found in those bribery/kickback and non-disclosure-of-conflict cases accords with the longstanding common law principle that a public official owes an inherent "fiduciary duty" to the public. See *McNally*, 483 U.S. at 355; *id.* at 372 (Stevens, J., dissenting). As the Sixth Circuit explained in *McNally*, the decisions "are premised on an underlying theory that a public official acts as 'trustee for the citizens and the State . . . and thus owes [them] the normal fiduciary duties of a trustee, *e.g.*, honesty and loyalty.'" *Gray*, 790 F.2d at 1294 (quoting *Mandel*, 591 F.2d at 1363).[9]

_____

[8] See also *United States* v. *Barber*, 668 F.2d 778, 784-785 & n.4 (4th Cir.) (Alcoholic Beverage Control Commissioner concealed from the public that he was obtaining free liquor for himself and others from liquor companies), cert. denied, 459 U.S. 829 (1982). Cf. *United States* v. *Silvano*, 812 F.2d 754, 759-760 (1st Cir. 1987) (city budget director failed to disclose that he arranged for his friend to receive lucrative city projects).

[9] State courts similarly recognized the fiduciary duty owed by public officials to the citizenry and the State. See, *e.g.*, *Williams* v. *State*, 315 P.2d 981, 983 (Ariz. 1957) ("The relationship between a state official and the state is that of principal and agent and trustee and [trust benefi-ciary].");  *State ex rel. Attorney Gen.* v. *Broadaway*, 93 S.W.2d 1248,

27

Courts further reasoned that an "affirmative duty to disclose material information arises out of [that] fiduciary relationship" and an official's breach of that duty while taking official action in the face of a conflict constitutes fraud that deprives the public of its right to the official's honest and faithful services. *United States* v. *Silvano*, 812 F.2d 754, 759 (1st Cir. 1987); see, *e.g.*, *Holzer*, 816 F.2d at 307 ("A public official is a fiduciary toward the public * * * and if he deliberately conceals material information from them he is guilty of fraud."); *Margiotta*, 688 F.2d at 127-128 (defendant who "undert[akes] basic functions of government" has a "duty to disclose material information or give notice of his conflict of interest"); *Bush*, 522 F.2d at 651-652.[10]

---

1253 (Ark. 1936) ("It is * * * elementary that a public officer occupies a fiduciary position."); *Anderson* v. *Zoning Comm'n*, 253 A.2d 16, 19 (Conn. 1968) ("A public official owes an undivided duty to the public" and "is not permitted to place himself in a position which would subject him to conflicting duties or expose him to the temptation of acting in any manner other than in the best interest of the public."); *Anderson* v. *City of Parsons*, 496 P.2d 1333, 1337 (Kan. 1972) (recognizing "the common law principle that a public officer owes an undivided duty to the public whom he serves and is not permitted to place himself in a position that will subject him to conflicting duties or cause him to act other than for the best interests of the public."); *Jersey City* v. *Hague*, 115 A.2d 8, 11 (N.J. 1955) (Public officials "stand in a fiduciary relationship to the people whom they * * * serve." (citation omitted)); *Smith* v. *City of Albany*, 61 N.Y. 444, 445 (1875) (Council member owes duty of loyalty that prohibits arrangements "by which his individual interest could come in conflict with the interests of his constituents."); *Kirby* v. *Cruce*, 688 S.W.2d 161, 170 (Tex. App. 1985) ("There can be no dispute that public officers * * * are fiduciaries to the public.").

[10] Those holdings again accorded with longstanding common-law descriptions of fiduciaries' obligations. See *Carter* v. *United States*, 217 U.S. 286, 306 (1910) (A public official is forbidden from "retain[ing] any profit or advantage which he may realize through the acquirement of an interest in conflict with his fidelity as an agent" and, "[i]f he takes any

28

b. Significantly for this case, the courts of appeals that addressed the question before *McNally* "uniformly" recognized that a mail fraud conviction need not be predicated on a violation of state law. *Mandel*, 591 F.2d at 1361; see *McNally*, 483 U.S. at 355 (citing *Mandel* as illustrative of courts of appeals' honest-services jurisprudence); *id.* at 377 n.10 (Stevens, J., dissenting) (citing *Mandel* and other decisions holding that mail-fraud statute forbids schemes that do not violate state law). Although courts permitted the use of state and local provisions governing official conduct as evidence that could tend to prove or disprove the defendant's intent to engage in a deceptive scheme, *e.g.*, *Bush*, 522 F.2d at 653; *Keane*, 522 F.2d at 555, 557; they concluded that a violation of state law was not needed to establish honest-services fraud. *E.g.*, *Bush*, 522 F.2d at 646 n.6, 651-652; *Keane*, 522 F.2d at 544-545.

Some courts reasoned that no external codification of the official's duty to provide honest services (including the duty to disclose material information) is necessary because that duty is inherent in the official's fiduciary relationship with the citizenry: A disclosure duty need not be based upon a particular provision "prescribing such a duty" because it may "exist because of the relationship between the one possessing the material infor-

---

* * * benefit in violation of his duty, or acquires any interest adverse to his principal, without a full disclosure, it is a betrayal of his trust."); Floyd R. Mechem, *A Treatise on the Law of Public Offices and Officers* § 839, at 562 (1890) (discussing the "universal" rule for "principals and agents, both public and private, that the agent shall not be permitted, in the course of the execution of his agency, to put himself in such a position that his own interests shall be antagonistic to those of his principal" and that "[p]ublic policy therefore demands and the law declares, that, except with the full knowledge and consent of his principal, the agent shall not in the execution of his trust deal with or for himself.").

29

mation and another, for example, employer-employee; public official-public body." *Mandel*, 591 F.2d at 1363 (citing cases); see *Margiotta*, 688 F.2d at 124 (duty to disclose material information arises from a fiduciary relationship, not local law, under the court's interpretation of "the elements of a mail fraud violation"); *Brown*, 540 F.2d at 374-375 & n.7 (duty to disclose arises from official's duty of loyalty and not state-law obligation); *Bush*, 522 F.2d at 646 n.6, 652 (same). Other pre-*McNally* decisions emphasized that the "purpose of 18 U.S.C. § 1341 is to prevent the Postal Service from being used to carry out fraudulent schemes" and reasoned that this federal interest may cause a scheme to fall within the statute's prohibition "regardless of whether it happens to be forbidden by state law." *United States* v. *States*, 488 F.2d 761, 767 (8th Cir. 1973), cert. denied, 417 U.S. 909, and 417 U.S. 950 (1974); accord *McNeive*, 536 F.2d at 1247 n.2; *Keane*, 522 F.2d at 544-545; *United States* v. *Edwards*, 458 F.2d 875, 880 (5th Cir.), cert. denied, 409 U.S. 891 (1972).[11]

c. The reasoning of pre-*McNally* courts mirrors the Court's rationale in securities-fraud decisions, which interpret regulatory language that parallels the mail fraud statute.[12] Those decisions recognize that the touchstone

---

[11] Cf. *United States* v. *Louderman*, 576 F.2d 1383, 1387 (9th Cir.) (concluding that, in case that did not concern honest services fraud, "state law is irrelevant in determining whether a certain course of conduct is violative of the wire fraud statute"), cert. denied, 439 U.S. 896 (1978); *United States* v. *Williams*, 545 F.2d 47, 50 (8th Cir. 1976) (same); *United States* v. *Scallion*, 533 F.2d 903, 910 (5th Cir. 1976) (same), cert. denied, 429 U.S. 1079 (1977).

[12] Rule 10b-5 makes it unlawful to employ any "device, scheme, or artifice to defraud" or to engage in a practice that operates or would operate "as a fraud or deceit upon any person" in connection with the purchase or sale of any security. 17 C.F.R. 240.10b-5.

30

of "fraud" is "deception," *United States* v. *O'Hagan*, 521 U.S. 642, 653-654 (1997), and conclude that an individual "who fails to disclose material information" can commit fraud through his silence if he has "a duty to [disclose]" that information. *Chiarella* v. *United States*, 445 U.S. 222, 228 & n.9, 232, 235 (1980). A fiduciary has a duty to disclose his own conflicting interest, and if he instead "feign[s] fidelity" to the principal, he has engaged in "deception through nondisclosure." *O'Hagan*, 521 U.S. at 653-655.

The Court's cases, much like pre-*McNally* jurisprudence, also teach that a duty to disclose may arise when the individual has "a fiduciary or other similar relation-[ship] of trust and confidence." *Chiarella*, 445 U.S. at 228 (citation omitted); see *O'Hagan*, 521 U.S. at 652; *Dirks* v. *SEC*, 463 U.S. 646, 654 (1983); cf. *Capital Gains Research Bureau, Inc.*, 375 U.S. at 194 & n.44 ("Courts have imposed on a fiduciary an affirmative duty of 'utmost good faith and full and fair disclosure of all material facts.'") (quoting William L. Prosser, *Handbook of the Law of Torts* 534-535 (1955) (citing cases)). Although "the common law in *some* jurisdictions" imposed a similar obligation in the securities-trading context, this Court recognized (again, like pre-*McNally* courts) a broader, federal disclosure duty derived from the applicable federal statute and its purposes, see *Dirks*, 463 U.S. at 653 & n.10 (emphasis added), notwithstanding the "absence of statutory language or legislative history specifically addressing" that duty. *Chiarella*, 445 U.S. at 230.

d. The courts of appeals have uniformly recognized Congress's intention to reinstate pre-*McNally* doctrine in Section 1346. See, *e.g.*, *United States* v. *Bryan*, 58 F.3d 933, 940 n.1, 942 (4th Cir. 1995) (Section 1346

31

"clear[ly] indicat[es]" that "Congress was content with the pre *McNally* interpretations of the mail fraud statute," including those finding no requirement of a state-law violation), overruled on other grounds by *O'Hagan*, 521 U.S. at 650.[13] When Congress enacted Section 1346 to overturn *McNally*, its action was intended to revitalize the pre-existing doctrine in the courts of appeals, which had consistently rejected the contention that a violation of an underlying state-law obligation was necessary to violate the mail fraud statute in public-sector honest-services cases.

---

[13] See also, *e.g.*, Pet. App. 17a ("Congress demonstrated a clear intent to reinstate the line of pre-*McNally* honest services cases."); *United States* v. *Sorich*, 523 F.3d 702, 707 (7th Cir. 2008) (similar), cert. denied, 129 S. Ct. 1308 (2009); *United States* v. *Jennings*, 487 F.3d 564, 577 n.9 (8th Cir. 2007) (similar); *Rybicki*, 354 F.3d at 136-138 (Courts must interpret Section 1346 by "look[ing] to the case law * * * that *McNally* overruled"); *United States* v. *Antico*, 275 F.3d 245, 261 n.16 (3d Cir. 2001) (Congress restored mail fraud to its "pre-*McNally* status."), cert. denied, 537 U.S. 821 (2002); *United States* v. *Sun-Diamond Growers*, 138 F.3d 961, 973 n.13 (D.C. Cir. 1998) (Congress intended "to revive pre-*McNally* caselaw, at least with respect to the deprivation of honest services."), aff'd on other grounds, 526 U.S. 398 (1999); *United States* v. *Frost*, 125 F.3d 346, 364 (6th Cir. 1997) (Section 1346 "restore[s] the mail fraud statute to its pre-*McNally* scope, according to previous opinions interpreting the intangible right to honest services."), cert. denied, 525 U.S. 810 (1998); *United States* v. *Lopez-Lukis*, 102 F.3d 1164, 1169 (11th Cir. 1997) (using "pre-*McNally* cases as persuasive authority in evaluating the scope of honest-services" because Section 1346 was intended to "overrule *McNally* and reinstate prior law"); accord *United States* v. *Vinyard*, 266 F.3d 320, 326 n.4 (4th Cir. 2001), cert. denied, 536 U.S. 922 (2002); *United States* v. *Sawyer*, 239 F.3d 31, 39 (1st Cir. 2001); cf. *United States* v. *Brumley*, 116 F.3d 728, 733 (5th Cir.) (en banc) (acknowledging Congress's restorative purpose, but recognizing that, given that the doctrine "was not a unified set of rules," "Congress could not have intended to bless each and every pre-*McNally* lower court 'honest services' opinion"), cert. denied, 522 U.S. 1028 (1997).

32

3. *Congress's reinstatement of pre-*McNally *law that honest-services fraud does not depend on a state-law violation is not undermined by any inconsistency in that body of law*

Petitioner's contention (Pet. Br. 47–50) that Congress could not have sought to reinstate "all" pre-*McNally* honest-services jurisprudence provides no support for his view that a state-law violation is a prerequisite in this case. Congress could not have intended to restore every single pre-*McNally* decision because, in some contexts, the lower courts had announced conflicting rules and had failed to clarify the doctrine's scope. But Section 1346 covers what had emerged before *McNally* as the paradigm cases of deceptive breaches of loyalty in both the public and the private sectors, on which the courts had reached general consensus. That consensus, as explained, embodied the understanding that an official's duty to disclose conflicts of interests derived from federal law and did not depend on state-law prescriptions.

The relevant pre-*McNally* case law was not "fractured and inconsistent" as petitioner contends. Pet. Br. 46, 47-50. The Fifth Circuit's decision in *United States* v. *Brumley*, 116 F.3d 728, 733-734 (en banc), cert. denied, 522 U.S. 1028 (1997), incorrectly identifies "uncertaint[y]" over whether a defendant's duties must derive from state law. The one pre-*McNally* case *Brumley* cites as supporting a state-law-violation requirement in fact accepts that a disclosure obligation arises from a "public official's fiduciary duty to the citizenry," *United States* v. *Dowling*, 739 F.2d 1445, 1449 (9th Cir. 1984), rev'd on other grounds, 473 U.S. 207 (1985), making it consistent with the holding of pre-*McNally* courts generally that an honest-services fraud conviction need not

33

be based on a violation of a separate state-law duty. See pp. 27-29, *supra*. Moreover, the cases that *Brumley* cites—*Holzer, Silvano, Lovett, Bruno, Barber, Bradford*, and *Shushan*—to illustrate its more general view that the meaning of "honest services" was "uneven" before *McNally*, see 116 F.3d at 733, do not support that view: They present factual scenerios that fall comfortably into the core bribery/kickback and undisclosed-conflict categories of honest-services cases. See pp. 24-26, *supra*.[14]

Petitioner's suggestion (Pet. Br. 48) that the courts of appeals were divided on "whether pecuniary harm must be proven" in public-sector honest-services cases is even farther afield. No such requirement is at issue in this case. And a requirement of pecuniary harm would conflict with the central purpose of the honest-services provision: to permit conviction in bribery/kickback and undisclosed-conflict cases even when the defendant does not deprive the victim of money or property. Schemes to deprive another of honest services are prohibited because they corrupt governmental functions and undermine political accountability, not because they necessarily harm the public fisc. A pecuniary-harm requirement would render Section 1346 largely, if not entirely, redundant of the mail fraud statute as construed in *McNally*—and thus negate Congress's effort to reverse the effect of that decision.

---

[14] Petitioner quotes a law-review article and the dissent in *Rybicki* to support his claim that pre-*McNally* cases do not provide a uniform understanding of honest-services fraud. Pet. Br. 47-48. The article, however, cites only to *Brumley*, and petitioner acknowledges that the *Rybicki* dissent is limited to the question of a pecuniary harm requirement in private-sector cases. *Ibid.*

34

In any event, no pre-*McNally* conflict existed on the subject of pecuniary harm in public-sector cases. Petitioner acknowledges (Pet. Br. 48) that several circuits rejected any such requirement, but incorrectly attributes the opposite rule to the Eighth Circuit based on its decisions in *McNeive*, 536 F.2d at 1252, and *United States* v. *Rabbitt*, 583 F.2d 1014, 1024-1026 (1978), cert. denied, 439 U.S. 1116 (1979). Both cases overturned convictions and both noted that the alleged schemes did not involve monetary harm to the public, but neither rested its holding on the view that such harm must be proved.[15] Thus neither disrupts the pre-*McNally* consensus that a public official's bribe-taking or undisclosed conflict may be actionable regardless of whether it results in pecuniary harm. Cf. *Neder* v. *United States*, 527 U.S. 1, 25 (1999) (pecuniary loss is not an element of mail fraud).

Petitioner therefore provides no reason to turn from the uniform pre-*McNally* law on honest-services fraud. Rather, all indications support the conclusion that Congress intended to revitalize the pre-*McNally* understanding of honest-services fraud in the courts of ap-

---

[15] *McNeive* held that the passive acceptance of small tips for ministerial, non-discretionary official acts exercised with no favoritism and without concealment did not establish an "intent to defraud" or a scheme to defraud. 536 F.2d at 1246, 1251-1252. *Rabbitt* found insufficient evidence of fraud when a legislator received a commission for recommending an architecture firm as "competent" to other officials who awarded building projects because the legislator had no authority over the contracts, which were awarded on merit after a formal selection process untainted by impropriety. 583 F.2d at 1020 & n.4, 1024-1026 & n.20. The court reasoned that the defendant's actions involved matters "outside his official duties" that did not implicate a "duty to disclose his interest" or deprive the public of his honest services as a legislator. *Id.* at 1024-1026 & n.20.

35

peals: no state-law duty of disclosure (and no pecuniary loss) was needed in order to convict a public official for deceptive nondisclosure of a material conflict of interest in a matter on which he took official action.

**B. Section 1346's Drafting And Legislative History Confirm That Public-Sector Honest-Services Fraud Does Not Depend On An Official's Violation Of State-Law Obligations**

The drafting and legislative history of Section 1346 confirm that the statute draws its meaning from pre-*McNally* honest-services decisions, which rejected the view that a state official who schemes to act upon a concealed conflict of interest must violate a disclosure duty imposed by state law. The history reflects that Congress developed honest-services proposals expressly utilizing state law as a sentencing factor and incorporating state law as an element of a related offense, but ultimately chose text for Section 1346 that does not require that the government prove a violation of state law to establish honest-services mail fraud. Petitioner concludes that the relevant legislative history is of "little use" (Pet. Br. 47) only by overlooking substantial portions of it and failing to acknowledge Congress's drafting decision to omit "state law" requirements from Section 1346. See Pet. Br. 44-47. The full history demonstrates the disconnect between petitioner's position and the statute Congress enacted.

1. Although several legislative proposals were introduced in the wake of *McNally*, Section 1346 grew out of the Anti-Corruption Act of 1988, S. 2793, 100th Cong., 2d Cong. (1988), which itself evolved from text proposed by the Department of Justice during "hearings on legislation to overturn * * * *McNally*." See *Mail Fraud: Hearing on H.R. 3089 and H.R. 3050 Before the Sub-*

36

*comm. on Criminal Justice of the House Comm. on the Judiciary*, 100th Cong., 2d Sess. 1, 7 (1988) (*Hearing*) (statement of Chairman Conyers) (explaining that *McNally* eliminated the "intangible rights doctrine, which is based on the theory" that corrupt public officials violate "fiduciary duties" of "honesty and loyalty"). The Department proposed two parallel provisions (18 U.S.C. 225(a) and (d)) targeting schemes to "deprive or defraud [the public] of the honest services" of state and federal public officials, *Hearing* 23, 25 (proposed text), and used "the core phrase * * * 'scheme or artifice to defraud'" to incorporate "the substantial body of case law developed prior to *McNally*," *id.* at 10, 29. Like Section 1346, the text defining those offenses did not refer to state law, and the Department made clear that "proof of the elements of a State offense would not be required" under either honest-services provision. *Id.* at 32-33; accord 134 Cong. Rec. 15,046 (1988) (statement of Sen. McConnell) (same regarding S. 2531, 100th Cong. 2d Sess. (1988)).[16]

The Department's proposal, however, expressly incorporated "state law" in two other ways. It authorized longer sentences for honest-services mail fraud intended to "facilitate an offense under the laws of * * * a State." *Hearing* 23, 25 (Section 225(a) and (d)). And it proposed a separate mail fraud provision targeting schemes to corrupt the "election process" through schemes concerning ballots or voter-registration forms

---

[16] Consistent with pre-*McNally* decisions recognizing the evidentiary role played by state and local proscriptions (pp. 28-29, *supra*), the Department explained that "[s]tate and local law would continue to provide guidance as to what constitutes 'honest services' to which inhabitants of these jurisdictions are entitled." *Hearing* 32.

37

that, *inter alia*, were "illegal under the laws of the State." *Hearing* 23-24 (Section 225(b)).

2. After Senator McConnell introduced S. 2531 based on the Department's proposal, the bill evolved into the Biden-McConnell Anti-Corruption Act of 1988, S. 2793. See 134 Cong. Rec. at 15,045-15,047, 30,766-30,767 (Sens. Thurmond and McConnell). That bill retained without material change the Department's public-sector honest-services and election-based mail fraud provisions (Section 225) and added a new provision (18 U.S.C. 1346) to expand the existing mail fraud statute to private-sector honest-services frauds. 134 Cong. Rec. at 30,936, 31,071-31,072. Under S. 2793, Section 1346 defined the term "scheme or artifice to defraud" in Section 1341 to include "a scheme or artifice to deprive an organization of the intangible right of honest services," but was expressly limited to schemes seeking "anything of value" or intending "loss or harm to the organization." *Ibid.*

On October 14, 1988, the Senate incorporated S. 2793 into the pending Omnibus Anti-Substance Abuse Act of 1988, H.R. 5210, 100th Cong., 2d Sess. See 134 Cong. Rec. at 30,310, 30,766, 30,781, 30,920, 30,936 (Amendment 3699, Item 16). The amendment's sponsors explained that the honest-services provisions were intended to "reverse the McNally decision and allow Federal prosecutors to bring the kinds of public corruption charges that they were able to bring before 1987" and therefore should "be read in the context of" and "in conjunction with pre-McNally case law interpreting the phrase 'scheme or artifice to defraud' in the mail and wire fraud statutes." *Id.* at 30,766 (Sen. Biden) (citing *Mandel, Keane, Bush, Isaacs, Brown,* and *States* as illustrative pre-*McNally* decisions); see *id.* at 30,767 (Sen.

38

DeConcini) (bill "reject[s]" *McNally*); *id.* at 30,768 (Sen. Simon) (bill "restores the law to much the way it was prior to McNally"); cf. 133 Cong. Rec. 22,339 (1987) (Rep. Conyers) (citing, *inter alia, Mandel, Keane,* and *Silvano*). The Senate passed H.R. 5210, as amended, and transmitted it to the House. 134 Cong. Rec. at 30,826.[17]

3. The House amended the Senate's separate honest-services provisions by consolidating them into Section 1346; eliminating the text that limited Section 1346 to schemes seeking anything of value or intending loss or harm; and deleting the Senate's sentencing enhancement and election-process provisions. The House thus amended Section 1346 into its final form by eliminating all references to state law. See 134 Cong. Rec. at 33,150, 33,250, 33,318.

Representative Conyers, who presided at the hearing at which the Department of Justice first offered its honest-services bill, confirmed that Section 1346 was intended "to overturn the McNally decision" and "restore[] the mail fraud provision" to its pre-*McNally* status, when "every Federal appellate court that had considered [its] scope" had held that it "protect[s] the right of the public to the honest services of public officials." 134 Cong. Rec. at 33,296-33,297 (citing *Mandel* and *Margiotta* as illustrative); cf. *id.* at 33,297 (discussing private-sector decisions). His statement (*ibid.*) specifically cited the pages in *Mandel*, 591 F.2d at 1358-1364, recognizing the "uniformly" held view that an honest-services scheme to defraud (including schemes based on the nondisclosure of material information) is not de-

---

[17] The Senate subsequently passed S. 2793 as a free-standing bill, 134 Cong. Rec. at 31,071-31,073, but the House took no action on that bill.

39

pendent upon a state-law violation. *Id.* at 1361.[18] The House passed H.R. 5210 as the Anti-Drug Abuse Act of 1988, 134 Cong. Rec. at 33,318, and returned the bill to the Senate.

On October 21, 1998, the Senate agreed to the House language without further amendment. 134 Cong. Rec. at 32,678. Senator McConnell described the honest-services provision in Section 1346 as "restor[ing] much that had been lost in the McNally decision" by providing the federal government with the "authority needed to go after vote-buyers, corrupt officials, and white-collar criminals" under the mail fraud statute. *Id.* at 32,639.

In short, Congress chose not to make convictions for honest-services fraud dependent on state law. Although the legislative provisions from which Section 1346 evolved included textual references to state law for two other purposes, the core prohibition on honest-services fraud, from the Department of Justice's initial legislative proposal onward, never did. And "the federal interest in consistent coverage of the prohibited conduct" nationwide ultimately resulted in an honest-services provision that did not in any way turn on "the elements of a State offense." *Hearing* 32; accord 134 Cong. Rec. at 15,046 (Sen. McConnell) ("proof of the elements of a State offense would not be required") (S. 2531).

---

[18] Petitioner contends (Pet. Br. 45-46) that Representative Conyers' statements have "no bearing" on the issue at hand. That is incorrect. In citing *Mandel* and *Margiotta*, Representative Conyers called attention to two of the leading pre-*McNally* honest services cases, both of which expressed the consensus view that a state official's duty to disclose a conflict of interest was a core fiduciary obligation he owed to the citizenry. See *Margiotta*, 688 F.2d at 121-122, 124; *Mandel*, 591 F.2d at 1363-1365.

40

**C. Interpreting Section 1346 To Exclude A State-Law Disclosure Requirement Does Not Create A Federal Common-Law Crime**

1. Petitioner contends that the court of appeals' conclusion that Section 1346 imposes a disclosure duty on state and local officials improperly creates a federal common-law crime. Pet. Br. 39-40. That contention lacks merit. Courts develop federal common law when they create a "rule of decision that amounts, not simply to an interpretation of a federal statute * * * but, rather, to the judicial 'creation' of a special federal rule of decision." *Atherton* v. *FDIC*, 519 U.S. 213, 218 (1997). See generally *Texas Indus., Inc.* v. *Radcliff Materials, Inc.*, 451 U.S. 630, 640-643 (1981). In contrast, the court of appeals here *interpreted* Section 1346 in light of its text and history as incorporating the core honest-services doctrine that existed before *McNally*. Just as courts look to prior decisional law to give content to the statutory term "fraud" in Section 1341 because (absent contrary textual clues) Congress is deemed to intend that term to have the "well-settled meaning" of "fraud" at common law, *Neder*, 527 U.S. at 22-23, so too may courts turn to pre-*McNally* cases to give effect to *Congress's* decision to base "the intangible right of honest services" on that jurisprudence. To do otherwise and read a previously unknown state-law predicate into Section 1346 would contravene the text, history, and purpose of that provision.

2. The courts of appeals have overwhelmingly followed the interpretative course that the court of appeals took here. Those courts have interpreted Section 1346's reference to schemes to deprive another of the "right to honest services" as covering the two core categories of official misconduct recognized in pre-*McNally* honest-

services precedent: (1) taking a bribe or kickback for a decision while purporting to exercise independent discretion, and (2) failing to disclose a material conflict of interest in a matter on which the official takes official discretionary action. See Pet. App. 19a.[19] Thus, when an official secretly takes private payment for official action (*e.g.*, by accepting a bribe), he has deprived the public of his honest services within the meaning of Section 1346. *United States* v. *Lopez-Lukis*, 102 F.3d 1164, 1169 (11th Cir. 1997). Likewise, "[w]hen an official fails to disclose a personal interest in a matter over which she has decision-making power, the public is deprived of its right either to disinterested decisionmaking itself or, as the case may be, to full disclosure as to the official's potential motivation behind an official act." *United States* v. *Woodward*, 149 F.3d 46, 62 (1st Cir. 1998) (quoting *United States* v. *Sawyer*, 85 F.3d 713, 724 (1st Cir. 1996)), cert. denied, 525 U.S. 1138 (1999).

Consistent with the pre-*McNally* consensus, a majority of the courts of appeals, like the court here, also hold that honest-services fraud need not be based on a "state law violation." See *United States* v. *Walker*, 490 F.3d 1282, 1299 (11th Cir. 2007) (explaining that duty to disclose arises from a relationship of trust independent from a state statute or regulation), cert. denied, 128

---

[19] Accord *United States* v. *Carbo*, 572 F.3d 112, 115-116 (3d Cir. 2009); *United States* v. *Kincaid-Chauncey*, 556 F.3d 923, 942-943 (9th Cir. 2009), petition for cert. pending, No. 09-5076 (filed June 29, 2009); *United States* v. *Urciuoli*, 513 F.3d 290, 295 n.3 (1st Cir. 2008); *United States* v. *Kemp*, 500 F.3d 257, 279 (3d Cir. 2007), cert. denied, 128 S. Ct. 1329 (2008); *United States* v. *Panarella*, 277 F.3d 678, 690 (3d Cir.), cert. denied, 537 U.S. 819 (2002); *Antico*, 275 F.3d at 262-263; *United States* v. *Woodward*, 149 F.3d 46, 54 (1st Cir. 1998), cert. denied, 525 U.S. 1138 (1999); *Lopez-Lukis*, 102 F.3d at 1169; *United States* v. *Sawyer*, 85 F.3d 713, 724-725 (1st Cir. 1996).

42

S. Ct. 1649 (2008); accord *United States* v. *Sorich*, 523 F.3d 702, 712 (7th Cir. 2008), cert. denied, 129 S. Ct. 1308 (2009); *United States* v. *Hasner*, 340 F.3d 1261, 1269 (11th Cir. 2003), cert. denied, 543 U.S. 810 (2004); *United States* v. *Sawyer*, 239 F.3d 31, 41-42 (1st Cir. 2001); *United States* v. *deVegter*, 198 F.3d 1324, 1328 (11th Cir. 1999) (private-sector honest-services fraud), cert. denied, 530 U.S. 1264 (2000); *United States* v. *Bloom*, 149 F.3d 649, 654 (7th Cir. 1998); *United States* v. *Frost*, 125 F.3d 346, 366 (6th Cir. 1997) ("Federal law governs the existence of fiduciary duty under the mail fraud statute."), cert. denied, 525 U.S. 810 (1998); *Bryan*, 58 F.3d at 940 & n.1. The Fifth Circuit's decision in *Brumley* is the single outlier.[20]

3. It is petitioner's own proposal to incorporate a state-law duty that would require federal courts to make interpretative decisions in what might be described as a common-law fashion. Because the statute's text provides no guidance, courts would have to decide what

_____

[20] *Brumley* stated that Section 1346 requires proof that a state official charged with honest-services fraud violated a duty "rooted in state law," 116 F.3d at 735, and concluded that Brumley, a state official who adjudicated workers' compensation claims, violated a state criminal statute by soliciting and accepting a large amount of money from a lawyer who appeared before him while simultaneously ruling on the lawyer's cases and "us[ing] his position * * * to assist [the lawyer's] dealings with the agency." *Id.* at 731, 734-736. The Third Circuit has cited *Brumley* approvingly in the course of affirming honest-services convictions where the defendants also violated state criminal law, but has reserved the question of whether a state-law violation is necessary under Section 1346. See *Panarella*, 277 F.3d at 698-699 & n.9; see also *United States* v. *McGeehan*, No. 05-1954, 2009 WL 3380678, at *6 & n.6 (3d Cir. Oct. 22, 2009) (noting court's reservation of whether a statutorily created state-law duty is necessary in each case and observing that the court has been "equivocal" on that point); *Carbo*, 572 F.3d at 115, 117 n.4.

43

sources of state law would qualify to impose duties: Would the law have to be a criminal law? See, *e.g.*, *Brumley*, 116 F.3d at 733-734 (finding state criminal law sufficient, but leaving open whether it was necessary). If so, would a misdemeanor, rather than a felony, suffice? Or could the "law" be found in administrative regulations, common-law decisions, or even ethics pamphlets? Courts would also have to decide whether a disclosure duty must be spelled out in state law, or whether it could instead be implied from an affirmative prohibition. Notably, *Brumley* itself did not involve a state disclosure provision but instead rested on a prohibition against certain conduct creating a conflict of interest. See *id.* at 735-736 (finding that Brumley violated a Texas criminal law, Tex. Penal Code Ann. § 36.08(e) (West 1994)), making it a misdemeanor for an official with judicial authority to accept a benefit from a person interested in a matter before the official or his tribunal).[21]

In addition to those difficulties, federalizing state-law duties would intensify the very concerns about state sovereignty that petitioner unjustifiably raises in opposition to the court of appeals' decision. See Pet. Br. 30-34; see also pp. 49-51, *infra*. The court of appeals' approach supplies a uniform federal rule, grounded in longstanding fiduciary principles, that neither builds upon nor displaces state laws or codes of ethics. In contrast, petitioner's approach would attach to a set of state-law duties federal consequences that the States did not contemplate and may not desire. Cf. *Virginia* v.

---

[21] The government contends that petitioner similarly violated Alaska law prohibiting his official action on a matter that could substantially benefit or harm a entity with which he was negotiating for employment. See Alaska Stat. § 24.60.030(e)(3) (2002); p. 7, *supra*.

44

*Moore*, 128 S. Ct. 1598, 1606 (2008) (reading of Fourth Amendment to incorporate state search standards "would often frustrate rather than further state policy"). Making state law an ingredient of mail fraud would fragment federal criminal law in a way harmful to federal policy interests, but would do nothing to promote—and indeed might undermine—the independent interests of the States.

### D. Neither Constitutional Avoidance, Federalism Principles, Nor The Rule Of Lenity Supports A State-Law-Violation Requirement

Petitioner contends that three interpretive principles support his contention that this Court should superimpose on Section 1346 the requirement of proving a state-law disclosure duty. In petitioner's view (Pet. Br. 29-39), constitutional avoidance (to avoid vagueness concerns), principles of federalism, and the rule of lenity justify that result. Section 1346, however, is limited in ways that sufficiently clarify its scope and narrow its application. Claims of vagueness, federalism, and lenity are misplaced.

#### 1. The elements of Section 1346 sufficiently define its scope

Honest-services fraud contains three basic non-jurisdictional elements: (a) a breach of the duty of loyalty; (2) intent to deceive; and (c) materiality.

*Duty of Loyalty.* Schemes to deprive others of "the intangible right of honest services" require that a public official, agent, or someone who owes a comparable duty of loyalty breaches that duty by secretly acting in his own interests while purporting to act in the interests of his principal. See *Rybicki*, 354 F.3d at 141-142. Such

45

feigned loyalty to one's principal (here, the public) is a classic form of fraud. See *O'Hagan*, 521 U.S. at 653-654.

*McNally* itself exemplifies the equation of "honest services" with the duty of loyalty, see 483 U.S. at 355; it involved a breach of loyalty based on the nondisclosure of a personal financial interest that might reasonably be thought to influence official decisionmaking, "even if state law did not require [disclosure]," *id.* at 361 n.9. Other pre-*McNally* cases similarly illustrate the two general categories involving breaches of this duty: cases involving bribes or kickbacks and cases involving official action taken while operating under an undisclosed conflict of interest. See pp. 23-26, *supra*. Section 1346 therefore does not target all manner of dishonesty but rather criminalizes only schemes in which an employee or public officer takes official action to further his own interests while pretending to act in the interests of those to whom he owes a duty of loyalty.

Limiting actionable honest-services schemes in that manner ensures that Section 1346 does not "render[] criminal a state legislator's decision to vote for a bill because he expects it will curry favor with a small minority essential to his reelection"; cover "a mayor's attempt to use the prestige of his office to obtain a restaurant table without a reservation"; or reach "a public employee's recommendation of his incompetent friend for a public contract." *Sorich* v. *United States*, 129 S. Ct. 1308, 1309 (2009) (Scalia, J., dissenting from denial of certiorari). Honest-services fraud does not embrace allegations that purely political interests may have influenced a public official's performance of his duty. The core interests that give rise to the divided loyalties covered are personal financial interests of the official, his family, or his associates that raise a conflict with official

46

duties. See p. 26 & n.8, *supra*. Nor does honest-services fraud embrace an official's use of the "prestige" of his position or his recommendation of an incompetent friend for a contract. An official's duty of loyalty, and his duty to disclose, concern only matters within his exercise of official power and authority, not actions outside of those spheres.

In honest-services prosecutions involving the non-disclosure of material conflicts, courts can identify the types of conflicts that implicate a federal duty by consulting the extensive case law on the issue while recognizing that the paradigmatic case arises from the presence of personal financial interests. Whatever line drawing may be involved in defining the precise scope of the disclosure obligation, no difficult questions arise when, as is alleged in this case, an official takes action affecting a company with whom he is negotiating for future employment. And courts may resolve the harder questions at the outer boundaries of the offense in much the same way they do in other, similar areas of law. Courts, for example, must determine the kinds of relationships covered by the securities law's prohibition against misappropriation of information in violation of a fiduciary "or similar" relationship. See *United States* v. *Chestman*, 947 F.2d 551, 567-568 (2d Cir. 1991) (en banc) (finding family relationship covered), cert. denied, 503 U.S. 1004 (1992). In this context, as in others, judicial decisions regarding the scope of fiduciary duties have never been thought to raise insurmountable vagueness problems.

*Intent to Deceive.* The mail and wire fraud statutes punish only "scheme[s] or artifice[s]" to "defraud," thus limiting their scope to intentional, fraudulent conduct. See *Durland* v. *United States*, 161 U.S. 306, 313 (1896).

47

The government therefore bears the burden of proving beyond a reasonable doubt fraudulent intent—that is, an intent to deceive. See, *e.g.*, *United States* v. *Warner*, 498 F.3d 666, 691 (7th Cir. 2007), cert. denied, 128 S. Ct. 2500 (2008); *United States* v. *Alkins*, 925 F.2d 541, 549-550 (2d Cir. 1991). False representations, statements, or omissions unaccompanied by a subjective intent to deceive do not amount to fraud. See *United States* v. *Kincaid-Chauncey*, 556 F.3d 923, 946 (9th Cir. 2009) (nondisclosure must be coupled with intent to defraud), petition for cert. pending, No. 09-5076 (filed June 29, 2009); *Sawyer*, 85 F.3d at 732 & n.16 ("prior to *McNally*, courts endorsing the honest-services mail fraud theory invariably required some showing of deceit which is inherent in the term 'fraud'"); *id.* at 733 (even bribery requires intent to deceive in order to constitute honest-services fraud).

This Court has recognized that a specific intent requirement goes far towards eliminating constitutional concerns of the kind petitioner raises about vagueness and lack of fair warning. *Colautti* v. *Franklin*, 439 U.S. 379, 395 & n.13 (1979); *Screws* v. *United States*, 325 U.S. 91, 101-102 (1945) (plurality opinion). Because "statutes must deal with untold and unforeseen variations in factual situations," this Court demands "no more than a reasonable degree of certainty" and has long recognized that the "presence of culpable intent as a necessary element of the offense" significantly undermines vagueness concerns. *Boyce Motor Lines, Inc.* v. *United States*, 342 U.S. 337, 340, 342 (1952). Simply put, a "mind intent upon willful evasion is inconsistent with surprised innocence." *United States* v. *Ragen*, 314 U.S. 513, 524 (1942).

48

In light of the requirement of intent to deceive, Section 1346 does not cover a public official who fails to disclose a conflict of interest because he believes that he has no such conflict. Nor does it cover an official whose interest is public knowledge or whose official actions are undertaken without deceptive intent. State law may be relevant in this context: if an employee complies with state-law disclosure obligations and does not take other acts reflecting an intent to conceal a conflict, those facts will inform the factfinder's evaluation of his intent.

That evidentiary role of state law is not unusual. Both courts and juries are familiar with giving an official's compliance or noncompliance with state law (including state disclosure and reporting requirements) a supporting evidentiary role in assessing whether he intended to deceive. See, *e.g.*, *United States* v. *Jennings*, 487 F.3d 564, 578-580 (8th Cir. 2007); *United States* v. *Antico*, 275 F.3d 245, 265 (3d Cir. 2001) (defendant's failure to report his conflict of interest under state and local conflict-of-interest laws is relevant to prove intent to deceive), cert. denied, 537 U.S. 821 (2002); *Bush*, 522 F.2d at 653 (jury may consider evidence of defendant's filing "correct verified written statement of economic interest * * * in deciding whether or not defendant acted in good faith"); accord *Walker*, 490 F.3d at 1299; *Holzer*, 816 F.2d at 309; *Keane*, 522 F.2d at 553-557; *Woodward*, 149 F.3d at 62; cf. *United States* v. *Reamer*, 589 F.2d 769, 770-771 (4th Cir. 1978) (jury properly instructed that evidence of lawyer's violation of professional ethics was relevant to defendant's intent), cert. denied, 440 U.S. 980 (1979).

*Materiality.* Because materiality is an element of the mail fraud offense, *Neder*, 527 U.S. at 25, insignificant misrepresentations or omissions are not actionable.

49

In the present context, a legislator's nondisclosed conflict must make a difference to the way reasonable voters or fellow office holders assess whether he has placed his self-interest above that of the public. Although compliance with state law can be relevant in determining whether the undisclosed conflict is sufficiently serious to count as material under the mail fraud statute, materiality is ultimately a question for the factfinder to resolve on the evidentiary record. *United States* v. *Gaudin*, 515 U.S. 506, 511, 522-523 (1995). The evidence, including evidence of state-law requirements, will guide the jury's determination of whether the official's omission is a material one that has "a natural tendency to influence, or be capable of influencing, the decision of the decision-making body." *Id.* at 509 (quoting *Kungys* v. *United States*, 485 U.S. 759, 770 (1988)) (brackets omitted); see *Neder*, 527 U.S. at 22 n.5; see also, *e.g.*, *Holzer*, 816 F.2d at 307-308 ("objective" "standard of materiality" governs official's disclosure obligation).

In combination, those elements define a core crime of honest-services fraud that requires no additional non-textual elements to alleviate vagueness issues. Especially since "[v]agueness challenges to statutes which do not involve First Amendment freedoms must be examined in light of the facts of the case at hand," *Village of Hoffman Estates* v. *Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 n.7 (1982) (citation omitted), any lingering concerns about doubtful applications should be addressed on particular facts, not by judicial amendment of the statute.

### 2. *Section 1346 satisfies any applicable clear-statement principle animated by federalism concerns*

Petitioner claims that Section 1346 alters the traditional federal-state balance without the requisite clear

50

statement because the statute "dramatically expand[s]" the authority of the federal government to prosecute state officials for corruption. Pet. Br. 30; see *Gregory* v. *Ashcroft*, 501 U.S. 452, 460-461 (1991). That view is unfounded. Congress may prohibit the use of the mail system "in furtherance of a scheme that it regards as contrary to public policy," regardless whether it could proscribe the scheme in the absence of this federal connection. *Parr* v. *United States*, 363 U.S. 370, 389 (1960) (quoting *Badders* v. *United States*, 240 U.S. 391, 393 (1916)). And in enacting Section 1346, Congress did no more than reaffirm the federal-state balance in this area that had existed for decades before *McNally*. That extensive pre-*McNally* law obviated the need for federal courts, in petitioner's words, to "develop from scratch" new disclosure duties for state officials, Pet. Br. 30. See *McNally*, 483 U.S. at 362-363 & n.1, 365 (Stevens, J., dissenting) (noting uniform interpretation of statute to cover prosecution of state and local public officials; collecting cases). Congress incorporated in Section 1346 a defined body of law that over the course of many years had contributed to shaping federal-state relations.

Moreover, in reviving this law, Congress manifested its view that local corruption is a matter of significant federal interest. In discussions about the honest-services provisions of Section 1346, lawmakers specifically stressed the "overriding federal interest" (Pet. Br. 34) in combating state and local corruption, and they noted that state law and prosecuting authorities were not always equal to the task. Senator DeConcini explained that federal honest-services prosecutions were "a valuable tool in combating corruption in Government" because state prosecutions are "frequently insufficient to combat [such] corruption" in light of "the sophistica-

51

tion" and "interstate nature of many of these crimes." 134 Cong. Rec. at 30,767; see *id.* at 15,046 (Sen. McConnell) (discussing shortcomings of state public-corruption prosecutions); cf. *id.* at 33,297 (Rep. Conyers) (Congress has authority to enact legislation targeting "corruption in local government"); 133 Cong. Rec. at 32,959, 32,961 (Rep. Conyers) (Congress has a "duty to act" against such corruption). Department of Justice officials similarly explained that "a federal solution" was required to eradicate state and local corruption "inimical to maintaining public trust and confidence in our democracy." See *Hearing* 15-17, 30-31, 38 (explaining that state prosecutors usually welcome federal mail fraud prosecutions for public corruption; such officials often lack the resources, investigative tools, or requisite geographic jurisdiction to bring such cases); *id.* at 59 (former official noting "overwhelming consensus" among state prosecutors that federal prosecutions were "not an unwarranted intrusion on local prerogatives"). Those statements reflect the compelling federal interests that motivated Congress, after *McNally* halted honest-services prosecutions of state and local public officials, to reinstate the federal criminal prohibition.[22]

---

[22] Congress's assertion of federal authority over state and local corruption in other statutes further underscores its recognition of the federal interest in such matters. See, *e.g., McCormick* v. *United States,* 500 U.S. 257 (1991) (Hobbs Act prohibits state legislator's receipt of political contributions in exchange for promise to perform official act.); *Evans,* 504 U.S. 255 (same for local commissioner's receipt of non-campaign contributions); cf. *Salinas* v. *United States,* 522 U.S. 52 (1997) (bribery of sheriff need not have demonstrated effect on federal funds for bribery prosecution under 18 U.S.C. 666).

52

### 3. The rule of lenity does not support implying a state-law-violation requirement into Section 1346

Petitioner also errs in arguing (Pet. Br. 37-39) that the rule of lenity supports importing a state-law predicate into Section 1346. The rule of lenity applies only if there is a "grievous ambiguity" in the statutory text such that, "after seizing everything from which aid can be derived," the Court "can make no more than a guess as to what Congress intended." *Muscarello* v. *United States*, 524 U.S. 125, 138-139 (1998) (internal quotation marks and citations omitted).

Properly construed in light of its background, Section 1346's scope is not ambiguous (and certainly not "grievous[ly]" so). And nothing in the statutory language, purpose, or drafting history leaves room for a supposedly clarifying addition that would tie an honest-services prosecution to a violation of state law. The misconduct that deprives the public of its right to undivided loyalties from elected and appointed officials has long been understood as a federal crime. To import state law into a statute designed to provide a uniform and distinct level of federal protection runs counter to Congress's decision to revive pre-*McNally* law—a body of law that gave notice to public officials that deceptive breaches of the settled duty of loyalty warranted federal criminal punishment without a requirement of a state-law violation.

53

## CONCLUSION

The judgment of the court of appeals should be affirmed.

Respectfully submitted.

ELENA KAGAN
  *Solicitor General*

LANNY A. BREUER
  *Assistant Attorney General*

MICHAEL R. DREEBEN
  *Deputy Solicitor General*

ANTHONY A. YANG
  *Assistant to the Solicitor
    General*

DEMETRA LAMBROS
  *Attorney*

OCTOBER 2009

# APPENDIX

1. Section 1341 of Title 18, United States Code, provides in pertinent part:

**Frauds and swindles**

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both. * * * *

(1a)

2a

2.  Section 1346 of Title 18, United States Code, provides:

**Definition of "scheme or artifice to defraud"** .

For the purposes of this chapter, the term "scheme or artifice to defraud" includes a scheme or artifice to deprive another of the intangible right of honest services.