American Bar Association
www.supremecourtpreview.org

No. 08-1196

IN THE

# Supreme Court of the United States

BRUCE WEYHRAUCH,

*Petitioner,*

v.

UNITED STATES OF AMERICA,

*Respondent.*

On Writ Of Certiorari
To The United States Court Of Appeals
For The Ninth Circuit

## REPLY BRIEF

DOUGLAS POPE
POPE & KATCHER
421 W. First Avenue
Suite 220
Anchorage, AK 99501
Telephone: (907) 272-8577

BRIAN J. MURRAY
NICOLE C. H. MASSEY
JONES DAY
77 West Wacker
Chicago, IL 60601
Telephone: (312) 782-3939

DONALD B. AYER
*Counsel of Record*
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
Telephone: (202) 879-3939

NATHANIEL P. GARRETT
JONES DAY
555 California Street
26th Floor
San Francisco, CA 94104
Telephone: (415) 626-3939

*Counsel for Petitioner*

i

# TABLE OF CONTENTS

**Page**

Table of Authorities ..................................................... iv

Reply .......................................................................... 1

I. The Government's Brief Obscures The Fact
That It Can Only Prevail If Honest Services
Fraud May Be Predicated On Nothing More
Than An Omission To Disclose Information,
Where There Is No Legal Disclosure Duty
Apart From § 1346 ................................................ 3

II. Assuming It Is Possible To Prove Honest
Services Fraud Simply By Showing An
Omission To Disclose And No Other
Deprivation Of A Right Or Duty, At Least
The Disclosure Duty Must Be Proven To Exist
Apart From § 1346 ................................................ 6

   A. The government's construction of the
statute is wrong for all the reasons
advanced in petitioner's opening brief ............ 6

   B. The government's analysis in support of its
extreme construction of the statute is
unsound on its face ......................................... 8

     1. Rather than interpret the words of the
statute, the government proclaims "the
right of honest services" to be a term of
art that simply reincorporates the pre-
*McNally* case law ......................................... 9

     2. The government's reliance on context
and purpose, legislative history, and
alleged canons of construction is equally
unpersuasive ............................................... 11

ii

## TABLE OF CONTENTS

(continued)

Page

3. The meaning of "honest services" that the government conjures up from the pre-*McNally* cases—as imposing a federal fiduciary duty of loyalty to be defined by federal courts—offers no guidance in determining generally applicable rules of disclosure for public officials ........................................ 13

C. The government's claimed right to prove honest services fraud based solely on a breach of a disclosure duty found only in § 1346 is contradicted by its own repeated statements and by its overview of the pre-*McNally* case law ........................................... 18

1. The government both briefly affirms and expressly rejects its alternative theory that honest services fraud is committed by an official who continues in office while failing to disclose a conflict of interest, but does not misuse his authority in response to it ......................... 18

2. The government's extensive citation of pre-*McNally* case law is inapposite, because the cases nearly all involve bribery, kickbacks, and self-dealing, where concealment was simply part of the fraud scheme and not, as here, the only honest service alleged to be denied ... 22

iii

## TABLE OF CONTENTS
### (continued)

Page

III. The Court Should Reject The Government's List Of "Three Basic Non-Jurisdictional Elements" Of Honest Services Fraud, Which Would Eliminate The Need To Prove Fraud As That Word Is Generally Understood ............ 26

Conclusion ................................................................. 30

iv

## TABLE OF AUTHORITIES

**Page**

### FEDERAL CASES

*Barber v. Gonzales,*
347 U.S. 637 (1954)...................................................9

*Black v. United States,*
No. 08-876 (U.S. petition granted May 18,
2009) ......................................................................1

*De Sylva v. Ballentine,*
351 U.S. 570 (1956).................................................12

*Engine Manufacturers Ass'n v. South Coast
Air Quality Management District,* 541 U.S.
246 (2004)................................................................9

*International Union of Electrical, Radio &
Machine Workers, Local 790 v. Robbins &
Myers, Inc.,* 429 U.S. 229 (1976) .........................10

*Kamen v. Kemper Financial Services, Inc.,*
500 U.S. 90 (1991)..............................................8, 12

*McNally v. United States,*
483 U.S. 350 (1987)....................................... *passim*

*Mississippi Band of Choctaw Indians v.
Holyfield,* 490 U.S. 30 (1989)...............................12

*Neder v. United States,*
527 U.S. 1 (1999).....................................................3

*Pfizer, Inc. v. Government of India,*
434 U.S. 308 (1978)................................................10

*SEC v. Chenery Corp.,*
318 U.S. 80 (1943)..................................................14

*Skilling v. United States,*
No. 08-1394 (U.S. petition granted Oct. 13,
2009) ......................................................................1

v

## TABLE OF AUTHORITIES

(continued)

Page

*United States v. Bush,*
    522 F.2d 641 (7th Cir. 1975)................................ 26

*United States v. DeVegter,*
    198 F.3d 1324 (11th Cir. 1999)............................ 15

*United States v. Dixon,*
    536 F.2d 1388 (2d Cir. 1976) ............................... 24

*United States v. Holzer,*
    816 F.2d 304 (7th Cir.), *vacated on other*
    *grounds by* 484 U.S. 807 (1987).................... 15, 25

*United States v. Margiotta,*
    688 F.2d 108 (2d Cir. 1982) ......................... 13, 25

*United States v. Rabbitt,*
    583 F.2d 1014 (8th Cir. 1978)............................. 24

*United States v. Rybicki,*
    354 F.3d 124 (2d Cir. 2003) (en banc) .......... 21, 23

*United States v. Silvano,*
    812 F.2d 754 (1st Cir. 1987) ............................... 26

*United States v. Trans-Missouri Freight Ass'n,*
    166 U.S. 290 (1897)............................................ 10

## STATE CASES

*Anderson v. City of Parsons,*
    496 P.2d 1333 (Kan. 1972)................................. 15

*Burton Township v. Speck,*
    144 N.W.2d 347 (Mich. 1966) ............................. 15

*Commonwealth v. Howard,*
    379 S.W.2d 475 (Ky. 1964) ................................. 11

*Miller v. Porter,*
    47 Ky. (8 B. Mon.) 282 (1847).............................. 11

vi

## TABLE OF AUTHORITIES
### (continued)

Page

*Pressey v. Township of Hillsborough,*
117 A.2d 646 (N.J. Super. Ct. App. Div.
1955) ....................................................... 15

*State ex rel. Cook v. Seneca County Board of
Commissioners,* 889 N.E.2d 153 (Ohio Ct.
App. 2008) ............................................ 15

### FEDERAL STATUTES

18 U.S.C. § 1346 .............................................. *passim*

### STATE CONSTITUTIONS
### AND STATUTES

ALASKA STAT. § 24.60.020 (2007) ............................. 15

KY. CONST. § 173 ...................................................... 11

KY. REV. STAT. ANN. § 11A.020(1)(c) (2009;
effective 1992) ........................................ 11

KY. REV. STAT. ANN. § 45A.455(2) (2009;
effective 1980) ....................................... 11

### OTHER AUTHORITIES

1 BOUVIER'S LAW DICTIONARY (1897) ...................... 27

William C. Anderson, A DICTIONARY OF LAW
(1893) ................................................... 27

George Gleason Bogert, HANDBOOK OF THE LAW
OF TRUSTS (1921) ................................... 13

John C. Coffee, Jr., *Modern Mail Fraud,* 35
AM. CRIM. L. REV. 427 (1998) .............................. 15

Tamar Frankel, *Fiduciary Law,* 71 CAL. L.
REV. 795 (1983) ................................... 13

# REPLY

Section 1346 was enacted in 1988 to reverse the holding of *McNally v. United States*, 483 U.S. 350 (1987), which limited the coverage of the federal fraud statutes to schemes aimed at wrongfully depriving another of money or property. Section 1346 thus made explicit that those statutes extend to fraud schemes aimed at "depriv[ing] another of the intangible right of honest services."

At issue in this case, and the other two cases on which this Court has granted review,[1] is the outer boundary of those "right[s] of honest services" that may constitute the ultimate object of a prosecutable fraud scheme. Certainly, when the government alleges misperformance of public responsibilities as the thing denied by the fraudulent conduct, it must show that the defendant's performance was inconsistent with some legal duty or entitlement. Failing that, the "service[]" rendered by the official must be regarded as legally proper and no one has been defrauded of anything.

The parties appear to agree on that much. But they disagree on the sources of law that the government can draw upon to show that some actual "right of honest services" was denied by fraudulent conduct. Petitioner submits, as the trial court held, that the "honest service" denied—the duty whose breach is the ultimate wrong at issue—must rest on some established principle of law that exists separate

---

[1] *See Black v. United States*, No. 08-876 (U.S. petition granted May 18, 2009); *Skilling v. United States*, No. 08-1394 (U.S. petition granted Oct. 13, 2009).

2

from the reference in § 1346 to a right of honest services.

The government asserts, to the contrary, that a fraudulent denial of honest services can be established simply by proving the nondisclosure of a perceived conflict of interest, which act may violate a state official's federal fiduciary duty of disclosure found in the phrase, "right of honest services," even though it violates no disclosure duty found anywhere else in state or federal law.

Petitioner submits that the government's theory should be rejected as unsound because it simply criminalizes the act of nondisclosure and eliminates the need to prove any effort to deny anything *by fraud. See* infra, section III.

But even if a failure to disclose information can, standing alone, be a fraudulent denial of honest services, it must rest on an actual state or federal disclosure requirement. *There is no issue in this case whether that legal duty to disclose must arise as a matter of state as distinguished from federal law.*[2] It simply cannot be found in the penumbra of the undefined concept of "honest services."

---

[2] The question presented, which asks whether "the government must prove that the defendant violated a disclosure duty imposed by state law," is accurate within the context of this case only because the district court found—and the government never disputed—that no relevant federal law disclosure duty, separate and apart from § 1346, required disclosure under the circumstances here. Pet. App. 30a.

3

I. **The Government's Brief Obscures The Fact That It Can Only Prevail If Honest Services Fraud May Be Predicated On Nothing More Than An Omission To Disclose Information, Where There Is No Legal Disclosure Duty Apart From § 1346**

In resolving the issue before the Court—whether the alleged nondisclosure by petitioner can be prosecuted as a denial of honest services without showing that it violated some provision of law independent of § 1346—it is critically important that the government is relying on the omission to disclose as the only honest service denied, the ultimate object of the alleged fraud.

In proving any ordinary case of fraud, including mail fraud, the prosecutor routinely offers evidence of material misrepresentations or omissions that are part of the fraudulent means by which the defendant allegedly pursued the object of his fraud, whether it be the deprivation of money, property or some intangible legal right. *See, e.g., Neder v. United States*, 527 U.S. 1, 16 (1999). No showing of some other violation of law is required to support admission of such evidence. Much of the government's brief, and most of its discussion of the pre-*McNally* case law, Gov. Br. ("GB") 23-31, is devoted to establishing this proposition, with which petitioner has no disagreement.

In this case, however, the explicit premise of the rulings below was the government's request to prove its case under what the district court referred to as an "alternative theory of the crime" to the quid pro quo bribery theory alleged in the indictment. Pet. App. 30a. Specifically, the rulings below were made in direct response to the government's motion to be allowed to prove its honest services case *without*

4

*showing any improper conduct except for the failure to disclose.*

Because the government's brief blurs the line between their quid pro quo theory, the validity of which has never been challenged, *see* Pet. App. 36a, and this alternative, pure nondisclosure theory, it bears emphasizing why the procedural history limits this Court's review to the latter. The indictment principally alleged that petitioner violated § 1346 by performing official acts benefiting VECO "in exchange for VECO's promise of future legal work." GB 3 (citing J.A. 20, 26, 28). Petitioner offered no legal objection to this prototypical quid pro quo fraud theory.

The indictment's sketchy and unspecific allegations against petitioner, however, reveal a lack of evidence to support the quid pro quo theory.[3] Perhaps for that reason, twelve days before trial, the government by motion in limine sought leave, as well to proceed under an "alternative" theory (Pet. App. 30a)—that that petitioner violated § 1346 simply by failing to "'disclos[e] to the Alaska State Legislature the fact that he had solicited, and was in fact negotiating for, employment from' VECO," and doing nothing else. J.A. 56.

The government motion explained that, through its alternative theory, it would show "a knowing concealment of a conflict of interest by [petitioner], as

---

[3] Compare J.A. 23-31, with the allegations against co-defendant Kott. *See* J.A. 20-23 (co-defendant stating, "You'll get your gasline, the governor gets his bill, and I'll get my job in Barbados.")

5

well as evidence demonstrating a violation of Alaska state law by [petitioner], in connection with [petitioner's] solicitation and negotiation of employment with [VECO]." J.A. 39-40. More specifically, the government asserted that a public official can be found guilty under § 1346 when he

> fails to disclose the existence of a conflict of interest or violates a state law in connection thereto * * * irrespective of whether the public official took *any* act thereafter, much less a fraudulent or harmful act.

J.A. 42. In petitioner's case, the government moved for leave to prove guilt by showing simply that petitioner never "declared a conflict of interest concerning the [PPT] legislation that benefitted [VECO], nor did [he] request to abstain from voting on that legislation." J.A. 71.

The district court ruled that petitioner's failure to disclose was in full accord with Alaska law. Pet. App. 29a. It also noted that the government had made no reference to any separate federal law disclosure requirement. Pet. App. 30a. Accordingly it denied the government motion to prove its alternative theory as outlined in its papers. Pet. App. 36a.

On appeal, the government did not challenge the court's rulings on Alaska law or the absence of a separate federal law disclosure provision. Instead it argued that an official's failure to disclose a conflict of interest, without more, can violate the right of honest services, even if the conduct is consistent with identifiable state and federal disclosure rules. *See* Brief of Appellant at 14-15, 24, *United States v. Weyhrauch*, No. 07-30339 (9th Cir. Feb. 1, 2008).

6

In response, the Ninth Circuit reversed the district court ruling, and thus allowed the case to go forward on the government's alternative theory, even absent any claimed breach of a disclosure duty arising under state or federal law apart from § 1346. It takes significant effort to cut through the underbrush in the government's brief and find a defense of this ruling.

## II. Assuming It Is Possible To Prove Honest Services Fraud Simply By Showing An Omission To Disclose And No Other Deprivation Of A Right Or Duty, At Least The Disclosure Duty Must Be Proven To Exist Apart From § 1346

### A. The government's construction of the statute is wrong for all the reasons advanced in petitioner's opening brief

The government's theory that petitioner violated § 1346 merely by failing to disclose a perceived conflict of interest would leave the disclosure duties of state officials to the vagaries of an alleged federal fiduciary duty of loyalty, criminally enforceable and said to be owed by all public officials to their constituents pursuant to the phrase "right of honest services" in § 1346. GB 26-27, 44-48. This contention must be rejected for all of the reasons set forth in petitioner's opening brief.

Petitioner showed in his opening brief that the government's contentions give short shrift to the words of the statute. The statute's reference to "the right of honest services," and the imposition of heavy criminal penalties for its fraudulent denial, are most reasonably understood in context to require proof of a specific right, and thus an identifiable legal duty of substance. Opening Br. 22-29.

7

Further, petitioner showed that the government's position also offends this Court's clear statement rule. Opening Br. 30-34. The ultimate point at issue here cannot be made more clearly than this Court made it in *McNally*:

> [I]f state law expressly permitted or did not forbid a state officer such as Gray to have an ownership interest in an insurance agency handling the State's insurance, it would take a much clearer indication than the mail fraud statute evidences to convince us that having and concealing such an interest defrauds the State and is forbidden under federal law.

483 U.S. at 361 n.9. Section 1346, while expressing an intention to criminalize the fraudulent denial of actual intangible rights based on duties found in the law, does not purport to make the "right of honest services" itself a font of substantive disclosure duties of state officials, which supplant and override the duties which otherwise exist in the law.

In addition, any notion that the "right of honest services" embodies "an inherent 'fiduciary duty' to the public," GB 26, carrying with it particular disclosure duties to be determined case-by-case by the federal courts, offends three other principles that have long been clearly enunciated by this Court.

First, it offends the requirement that criminal laws not be unduly vague—that they must give fair warning and not invite discriminatory enforcement. Opening Br. 34-37. Second, as the broadest of all possible interpretations of an arguably ambiguous statute, it also offends the rule of lenity. Opening Br. 37-39. Finally, by requiring the development of a criminally-enforceable disclosure code for state

8

officials in the absence of a clear congressional mandate or significant federal interest,[4] it offends this Court's longstanding aversion to federal common law making. Opening Br. 39-44.

## B. The government's analysis in support of its extreme construction of the statute is unsound on its face

The government does not begin to respond to petitioner's contentions until page 40 of its brief. Instead, it purports to rely primarily on pre-*McNally* case law and the principle that whatever went then should go now. GB 21-35.

What the Solicitor General offers by way of actual legal analysis to support its position is more of the loose thinking and prosecutorial overreaching that have brought the statute to its current indeterminate state. Rather than deal with the words of the statute, the government dismisses those words as a "term of art," to be skipped over in favor of resort to the pre-*McNally* case law. GB 11.

Based on those cases, the government asserts that state officials must satisfy a general, federal law fiduciary duty of loyalty, including independent, criminally-enforceable disclosure duties, all flowing

---

[4] In the area of public corruption, state citizens and their public officials generally expect "their rights and obligations would be governed by state-law standards." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 98 (1991). The government's claimed federal interest in combating state and local corruption, GB 50-51, appears to be fully and appropriately served by the Justice Department's ability to intervene when public officials fail to perform disclosure duties that are actually owed under existing laws and local prosecutors fail to act.

9

from nothing but the words, "right of honest services." GB 26-27, 44-46. This effort to federalize the disclosure duties of state officials is both unsupported by the statute's text, and completely unworkable.

This Court may conclude, as *amicus* NACDL argues, that a statute criminalizing the fraudulent denial of "honest services" is vague beyond repair, and thus unconstitutional. Brief for National Ass'n of Criminal Defense Lawyers as *Amicus Curiae* Supporting Petitioner at 14-15, *Weyhrauch v. United States*, No. 08-1196 (U.S. Sept. 21, 2009). But a reasoned effort to read those words in a disciplined way can avoid some of its most extreme abuses. The government's brief shows no interest in that endeavor.

   1. **Rather than interpret the words of the statute, the government proclaims "the right of honest services" to be a term of art that simply reincorporates the pre-*McNally* case law**

"Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 252 (2004) (quoting *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985)). More specifically, words in a statute "should be interpreted whenever possible according to common usage." *Barber v. Gonzales*, 347 U.S. 637, 641 (1954). Yet the government relieves itself of any need to discuss the words of the statute by its *ipse dixit* pronouncement that the phrase is a "term of art" with a preexisting meaning. GB 11.

10

A term of art, however, is one or more words that have acquired a meaning that is "fixed * * * wherever it is used." *Pfizer, Inc. v. Gov't of India*, 434 U.S. 308, 315 (1978). Such an "unambiguous[] * * * meaning," *Int'l Union of Elec., Radio & Mach. Workers, Local 790 v. Robbins & Myers, Inc.*, 429 U.S. 229, 243 (1976), can result from, and be settled by, "long usage and judicial construction." *United States v. Trans-Mo. Freight Ass'n*, 166 U.S. 290, 353 (1897) (White, J., dissenting).

The phrase "intangible right of honest services" cannot be such a term of art because, in fact, pre-*McNally* courts did not use the term at all. And the government's suggestion that it could nonetheless still be a term of art because Congress intended the phrase to act as a stand-in for "analogous formulations," GB 21, is truly remarkable.

The government has conceded that because pre-*McNally* courts "announced conflicting rules," "Congress could not have intended to restore every single pre-*McNally* decision." GB 32. Petitioner is aware of no other case where this Court ignored the meaning of the words of a statute, because it deemed a certain previously unused phrase a term of art standing for various other formulations that lack a consistent meaning. *See* GB 21. There is plainly no reason that § 1346 should not be construed in accordance with the ordinary meaning of the words Congress used. *See* Opening Br. 22-29.

11

2. **The government's reliance on context and purpose, legislative history, and alleged canons of construction is equally unpersuasive**

a. The government argues that, at a minimum, the statute was intended to reverse this Court's holding in *McNally*, and claims, without basis, that but for its reading of the statute, the *McNally* defendants would be left "beyond the reach of the mail fraud statute notwithstanding Section 1346." GB 18.

The conduct of the *McNally* defendants appears clearly to come within the statute, when § 1346 is read to require the fraudulent denial of a duty that is actually owed under some provision of law. As the government recognizes, GB 16, far from a simple omission to disclose information, the central wrong in *McNally* was the surreptitious use of official position to direct commissions from workers' compensation insurance contracts to the defendants, conduct which the *McNally* defendants "[s]urely * * * knew" was unlawful. 483 U.S. at 375 (Stevens, J., dissenting). Indeed, section 173 of the Kentucky Constitution has long made it a felony for any public official at any level of government to "receiv[e], directly or indirectly, * * * any interest, profit or perquisites arising from * * * moneys to be raised through his agency." *See* KY. REV. STAT. ANN. § 45A.455(2) (2009; effective 1980); *id.* § 11A.020(1)(c) (2009; effective 1992); *Commonwealth v. Howard*, 379 S.W.2d 475, 478 (Ky. 1964); *Miller v. Porter*, 47 Ky. (8 B. Mon.) 282, 283-85 (1847).

b. The government's recitation of § 1346's legislative history, GB 35-39, likewise fails to support its position. The recited legislative history is

12

composed principally of statements by legislators who either took the fanciful position that § 1346 was designed to reinstate all pre-*McNally* case law—a view which even the government is unwilling to defend, GB 32—or the unremarkable position that § 1346 was intended to "reverse the *McNally* decision and allow Federal prosecutors" to predicate an honest services charge on the deprivation of an intangible right. *See* GB 37-39.

c. The government's reliance on canons of construction, GB 18-19, is likewise unavailing. It cites a background assumption that federal statutes are not usually "'dependent on state law,'" *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 43 (1989), and the corollary that Congress "has repeatedly used express text" to depart from that assumption. GB 18-19. It does not follow, however, that the meaning ascribed to § 1346 "must be wholly the product of a federal court's own devising," *Kamen*, 500 U.S. at 98, or that its substantive content "is not to be determined by state * * * law" in some respects. *De Sylva v. Ballentine*, 351 U.S. 570, 580 (1956). And where a statute punishes fraudulent deprivations of intangible rights to services, growing out of a relationship between a state official and his government, it is obvious that many if not all of the rights in issue will be creatures of state law.

13

3. **The meaning of "honest services" that the government conjures up from the pre-*McNally* cases—as imposing a federal fiduciary duty of loyalty to be defined by federal courts—offers no guidance in determining generally applicable rules of disclosure for public officials**

The government asserts that every public official has a generalized duty to disclose information based on the "common law principle that a public official owes an inherent 'fiduciary duty' to the public." GB 26. That "fiduciary duty," the government claims, means that all public officials owe their constituents the "normal fiduciary duties of a trustee, *e.g.*, honesty and loyalty." GB 26 (quoting *United States v. Gray*, 790 F.2d 1290 (6th Cir. 1986) (internal quotation marks omitted)). The government maintains that duty has been incorporated into § 1346 as an element of the crime of mail fraud. GB 44-46.

In a single stroke, the government thus would transform § 1346 from a criminal sanction for the fraudulent denial of rights and duties that otherwise exist in the law, to an independent source of substantive duties of the vaguest and most uncertain sort.

There are many types of fiduciaries under the law, each with varying duties, "including agents, partners, directors and officers, trustees, executors and administrators, receivers, bailees, and guardians." Tamar Frankel, *Fiduciary Law*, 71 CAL. L. REV. 795, 795 (1983). It has long been clear that the obligations owed by a fiduciary vary depending on the fiduciary's particular role. *See* George Gleason Bogert, HANDBOOK OF THE LAW OF TRUSTS 16-42

14

(1921) (distinguishing between variable fiduciary duties owed in a trust and eleven other fiduciary relationships, including executorships, guardianships, and officers of corporations); *see also United States v. Margiotta*, 688 F.2d 108, 142 (2d Cir. 1982) (Winter, J., concurring in part and dissenting in part) (the "most notable feature" of the common law governing fiduciary obligations "is the degree to which fiduciary obligations vary from relationship to relationship"). The same point was made in a case argued earlier this Term: the word "fiduciary" "appear[s] in diverse settings" and has a "context-dependent nature." Brief of Securities Industry & Financial Markets Ass'n as *Amicus Curiae* Supporting Respondent at 9-14, *Jones v. Harris Assocs.*, No. 08-586 (U.S. Aug. 27, 2009) (collecting cases illustrating varying fiduciary duties).

Thus, when the government says that a public official is a "fiduciary," it "only begins [the] analysis" and "gives direction to further inquiry," such as: "What obligations does he owe as a fiduciary?" *SEC v. Chenery Corp.*, 318 U.S. 80, 85-86 (1943). While the duties of a trustee of a legal incompetent are quite high and discernible based on the dependent, helpless character of the beneficiary, and the trustee of a trust fund can easily understand that he owes a duty not to embezzle the fund's proceeds, not to self-deal with its property, and not to invest the money improvidently, the disclosure duties owed by a

15

legislator, where no one has troubled themselves to set up particular rules, are a substantial mystery.[5]

Because "the common law has never developed a substantial body of precedents dealing with the disclosure obligations of the public official," John C. Coffee, Jr., *Modern Mail Fraud*, 35 AM. CRIM. L. REV. 427, 453 (1998), the only guideposts available to a public official are the "honest services" cases themselves. Yet there is no consensus among those cases as to the character and extent of a public official's fiduciary duties to his constituents.[6] More fundamentally, because the nature and extent of specific obligations owed under a fiduciary duty are

---

[5] Of course, Alaska has set up particular rules and explicitly superseded any "inherent" or "common law" disclosure duties. *See* ALASKA STAT. § 24.60.020 (2007).

[6] *Compare United States v. Holzer*, 816 F.2d 304 (7th Cir.) (public official's duty akin to trustee's), *vacated on other grounds by* 484 U.S. 807 (1987), *with Burton Twp. v. Speck*, 144 N.W.2d 347, 350 (Mich. 1966) (public official's duty akin to agent's). And, while some jurisdictions expansively define a public official's fiduciary duty, *Pressey v. Twp. of Hillsborough*, 117 A.2d 646, 648-49 (N.J. Super. Ct. App. Div. 1955) ("'an inescapable obligation to serve the public with the highest fidelity * * * and above all to display good faith, honesty and integrity'"), others construe the duty more narrowly. *See State ex rel. Cook v. Seneca County Bd. of Comm'rs*, 889 N.E.2d 153, 161 (Ohio Ct. App. 2008) (public officials have no "fiduciary duty in legislative decisionmaking"); *United States v. DeVegter*, 198 F.3d 1324, 1328 (11th Cir. 1999) (public officials' fiduciary duty is simply "to make governmental decisions in the public's best interest"). Some states have even determined that public officials owe no fiduciary duties to reveal possible future conflicts of interest. *See Anderson v. City of Parsons*, 496 P.2d 1333, 1337 (Kan. 1972).

16

dependent on context, there is no practical way for a public official to determine, in the abstract, what sorts of perceived conflicts of interest he must disclose and to whom.

This is especially true for state legislators, who vote on matters that cover most any aspect of everyday life. Like others, they have families, relatives, friends, business and investment dealings, and maybe a hobby or two. They also bring to their job a point of view, a life history, and perhaps have made speeches and written books and articles. Simply telling a public official that he has a "fiduciary duty of loyalty" to disclose that which the public might believe could affect his job performance does little to assist him in defining the sorts of disclosures that are required.[7]

This problem is especially acute under the government's alternative theory of honest services fraud, which would require proof only of a material nondisclosure of information in violation of some duty to disclose, and no conduct at all amounting to any other misconduct of his office. Is a state legislator required, under the government's theory, to disclose every lobbyist contact concerning particular legislation, absent any law so requiring? What about a conversation about pending legislation with his wife? Or friend? Or with a constituent who

----

[7] This issue is not unlike the questions that confront judges in their decisions whether to recuse in a particular case or to disclose some measure of familiarity with persons appearing before them. All of these issues involve uncertain judgments of degree, unsuited to enforcement by criminal sanctions absent specific bright-line rules.

17

buttonholes him in the district? What if the legislator has a distant cousin in the oil business who will prosper under one legislative outcome? Does the mere fact that some or all of these facts might be of interest to someone mean that the official has a fiduciary duty to disclose them? If so, there is no end of what he must disclose. And, if not, there is no conceivable way to know either what must be disclosed, or what means of disclosure will be sufficient to avoid prosecution by the United States Attorney.

The obvious answer to these questions is that governments are capable of defining the disclosure duties that are owed by their officials, and must do so if they seek to hold officials criminally liable for a simple omission to disclose. Where both the state and federal governments have failed to impose any such discernible duty, and, as under the government's alternative theory, there is no assertion that concealment was a means of achieving the deprivation of any other right or entitlement, any claim of criminality must be rejected out of hand. It obviously cannot be maintained on the premise that § 1346's "right on honest services" is itself the font of criminally-enforceable disclosure duties.

18

C. The government's claimed right to prove honest services fraud based solely on a breach of a disclosure duty found only in § 1346 is contradicted by its own repeated statements and by its overview of the pre-*McNally* case law

1. The government both briefly affirms and expressly rejects its alternative theory that honest services fraud is committed by an official who continues in office while failing to disclose a conflict of interest, but does not misuse his authority in response to it

At only a handful of places does the government's brief even address the question before the Court—whether honest services fraud is established simply by showing a public official's failure to disclose a "conflict of interest," where no law other than § 1346 required disclosure and the official does nothing improper but continues to perform his job following the nondisclosure.

That the government knows this to be the issue in this case is suggested by the brief's primary argument heading, which addresses "A State Official's Violation Of The Honest Services Statute By Taking Official Action While Intentionally Concealing A Material Conflict Of Interest * * * ." GB 13 (capitalization modified). For the theory thus enunciated demands nothing more than continued performance of official duties following the nondisclosure, not any exercise of power in an abusive way.

In addition to four other very short references scattered throughout the brief—GB 11, 14 (twice), and 27—this theory, on which the entire case turns,

19

is enunciated in only one additional instance, and this time with greater clarity:

> Failures to disclose a conflict of interest concerning official action also constituted a recognized form of honest-services fraud before *McNally*. When an official takes action in such circumstances, he purports to act as a loyal, disinterested public servant, but deprives the public of its right to determine for itself whether he is operating in the public's best interest. *The crux of the violation in such a case is the official's deliberate concealment from the citizenry of matters that might reasonably be thought to corrupt the official's decisions.*

GB 25 (emphasis added). Finally, here, the government's brief is explicit and clear in elaborating the "alternative" pure nondisclosure theory on which it caused its case to turn by filing its motion in limine in the district court, J.A. 42 (quoted supra at 5), and which it boldly defended in the court below.[8]

But the government's few defenses of the proposition actually at issue are surrounded and overwhelmed by clearer statements of a far more plausible character that contradict its essential claim in this case. Indeed, in the very first sentence of its summary of argument, the government asserts:

---

[8] In the Ninth Circuit, the government argued that "honest services fraud charges may be proven * * * through evidence demonstrating that the official knowingly failed to disclose a conflict of interest in connection with his or her official position." Brief of Appellant at 23, *Weyhrauch*, No. 07-30339; *see id.* at 26.

20

> The honest-services prohibition in 18 U.S.C.
> [§] 1346 covers a state official's concealment
> of a material conflict of interest *while taking*
> *official action that furthers that undisclosed*
> *interest.*

GB 9 (emphasis added). This assertion is completely
beside the point of the government's alternative
theory, whose critical innovation is that honest
services fraud is shown based simply on an act of
nondisclosure, without showing that, thereafter, "the
public official took *any* act * * * much less a
fraudulent or harmful act." J.A. 42.

Several other statements in the government's
brief echo and give emphasis to this first sentence of
its summary of argument. These formulations are
invoked most forcefully to argue that its reading of
the statute is not unduly vague and uncertain. The
government reassures us that the statute actually
"require[s]" not just the concealment of a conflict of
interest while continuing to serve, but also use of
official authority to advance ulterior interests:

> Schemes to deprive others of "the intangible
> right of honest services" *require* that a public
> official, agent, or someone who owes a
> comparable duty of loyalty breaches that duty
> by *secretly acting in his own interests* while
> purporting to act in the interests of his
> principal.

GB 44 (emphases added).[9] Again on page 45, the
government states that § 1346:

---

[9] The government's favorable citation to *United States v.*
*Rybicki*, GB 44, for this proposition is telling. The Second

21

> *criminalizes only schemes in which an employee or public officer takes official action to further his own interests* while pretending to act in the interests of those to whom he owes a duty of loyalty.

GB 45 (emphasis added).

Lest there be any doubt the government means what it says, it used virtually these exact words in its brief in *Black* to likewise give reassurance of the reasonable limits on § 1346. Brief for the United States at 36-37, *Black v. United States*, No. 08-876 (U.S. Sept. 30, 2009) (stating that § 1346 "criminalizes only schemes in which an employee or public officer secretly takes official action to further his own interests while pretending to act in the interests of those to whom he owes a duty of loyalty"); *see also id.* at 35-36.

These categorical assertions that § 1346 must be read to require not only concealment of a perceived conflict of interest, but also a public official's use of his authority to advance his own interests, are in direct contradiction of the government's alternative theory of liability. For that reason, among many others, this Court should reject the government's

------

(continued...)

Circuit there concluded that "[i]n bribery or kickback cases, the undisclosed bribery itself is sufficient to make out the crime, but in self-dealing cases, the existence of a conflict of interest alone is not sufficient to do so." *United States v. Rybicki*, 354 F.3d 124, 141 (2d Cir. 2003) (en banc).

22

alternative theory of liability and reverse the decision below.

> 2. **The government's extensive citation of pre-*McNally* case law is inapposite, because the cases nearly all involve bribery, kickbacks, and self-dealing, where concealment was simply part of the fraud scheme and not, as here, the only honest service alleged to be denied**

The government purports to rely on the pre-*McNally* case law as the source of its theory that § 1346 itself imposes a fiduciary duty of loyalty that gives rise to criminal punishment for intentional omissions to disclose conflicts of interest, where the official continues in office but no other improper conduct is proven. GB 14. But even if the statute made that case law dispositive, which it does not, the government's own discussion of these cases makes clear that they do not support its position.

According to the government, the pre-*McNally* cases:

> typically involved the prosecution of state or local officials who committed two types of crimes: (1) accepting a bribe or kickback in exchange for official action or (2) taking action within the scope of officials duties *to further his undisclosed personal interest*— with the same course of conduct sometimes implicating both types of fraud.

GB 23 (emphasis added). To the extent that these two categories encompass the universe of pre-*McNally* cases, they lend no support at all to the government's alternative theory for one simple reason: Both categories of cases involve the breach of

23

some other actual legal duty—generally some other misuse of official authority—in addition to nondisclosure itself.

In the bribery/kickback cases discussed by the government, GB 23-24 & nn.5-6, some payment or benefit is typically conveyed in exchange for commission of an improper official act. In fact, though, such improper official act to advance the briber's objective probably is not essential, since an alternative misuse of authority likely occurs when one uses the influence of a public position to induce payments for one's personal benefit. *See Rybicki*, 354 F.3d at 141 ("In bribery or kickback cases, the undisclosed bribery itself is sufficient to make out the crime."). In either case, however, the essential wrong is not simply the act of nondisclosure. It is rather misuse of official position, usually for personal gain, with the nondisclosure used as a fraudulent device aiding the achievement of that end.

The second category of cases, "taking action within the scope of official duties to further * * * undisclosed personal interest," is generally referred to as self-dealing. Like bribery and kickbacks, it involves the misuse of official authority to advance personal objectives, which misconduct is the deprivation of honest service. In self-dealing cases, as well, the nondisclosure is not itself the object of the fraud or the honest service denied, but rather the fraudulent means to evade detection of the primary wrong.

Pre-*McNally* decisions say as much, as the government takes pains to note. GB 44-45. Some of these cases, moreover, were emphatic to reverse convictions precisely because they rested on simple nondisclosure of a conflict of interest.

24

In *United States v. Dixon*, 536 F.2d 1388, 1400-01 (2d Cir. 1976), for example, Judge Friendly noted that the evidence:

> was simply that Dixon had caused the mails to be used to receive proxies solicited by a proxy statement which did not contain the information about loans to Dixon that it should have contained. To hold that this [nondisclosure] constituted a violation of the mail fraud statutes would stretch its words beyond normal bounds * * * ."

Likewise, in *United States v. Rabbitt*, 583 F.2d 1014, 1026 (8th Cir. 1978), the court reversed a state legislator's conviction based on his concealed interest in an enterprise receiving government contracts because he "did not, in his official capacity, control the awarding of state contracts to architects," and thus lacked the power to self-deal.

Tellingly, the government's *Black* brief cites both *Rabbitt* and *Dixon* favorably for the proposition that "existing boundaries can provide clarity about the statute's coverage." *Black* GB 39-40.

Despite its generally accurate description of the categories of pre-*McNally* cases, the government's discussion ultimately morphs the concept of self-dealing into the more pliable and encompassing category of "[f]ailures to disclose a conflict of interest *concerning* official action," GB 25 (emphasis added), without regard to whether the related performance in office was self-motivated or entirely upright and proper. It does this because it must, if it is to be allowed to pursue its alternative theory that petitioner may be prosecuted for nondisclosure,

"irrespective of whether [he] took *any* act thereafter, much less a fraudulent or harmful act," J.A. 42.

While the government purports to rely on a handful cases in support of its theory of honest services fraud based only on "an official's breach of th[e fiduciary] duty [to disclose] while taking official action in the face of a conflict," GB 27, those cases do not support its position either.

In *United States v. Margiotta*, 688 F.2d 108 (2d Cir. 1982), for example, a party political chairman was found to wield governmental power to direct the county's insurance business, and on that basis to owe a fiduciary duty as a governmental official. The "crux" of the "impropriety" on which the conviction rested was a "secret scheme, pursuant to which" he recommended that a certain insurance agency receive the government's business, "on the understanding that the Agency would kick back a portion of its compensation to Margiotta's political allies." *Id.* at 127. There is no suggestion that a bare nondisclosure in lieu of this fraudulent solicitation of kickbacks would somehow have sufficed.

The three additional cases the government centrally relies upon likewise involve nondisclosure as a means to cover up the ultimate corrupt action.

In *United States v. Holzer*, 816 F.2d 304, 307-08 (7th Cir. 1987), a Cook County judge "used his public office to obtain money" in the form of "loans" from lawyers and failed to disclose them as required, thus abusing his official position and "depriv[ing]" the State of the "benefits" of its decision "that judges shall not be compensated out of fees paid by the litigants."

26

Similarly, in *United States v. Silvano*, 812 F.2d 754, 760 (1st Cir. 1987), the Boston city budget director arranged for a city health insurance contract to be awarded based on the facially inadequate bid submitted by a friend, and then "used his position to attempt to extort money" from another insurer whose bid had thus wrongly been rejected.

Finally, in *United States v. Bush*, 522 F.2d 641, 647-48 (7th Cir. 1975), a city public relations director "used his official position within the mayor's inner circle to exert * * * substantial influence" over the award of an advertising contract to his own company, "took steps to insure that the proceeds of the venture could not be traced to him, [and] misrepresented his interest."

Each of these decisions contains unsurprising language noting the wrongfulness of concealing the misuses of office and breaches of duty that are the "crux" of the fraud in each case. Such language lends no support to the government's effort in this case to establish honest services fraud based simply on an omission to disclose, in violation of no duty found anywhere outside of § 1346.

## III. The Court Should Reject The Government's List Of "Three Basic Non-Jurisdictional Elements" Of Honest Services Fraud, Which Would Eliminate The Need To Prove Fraud As That Word Is Generally Understood

The government's answering brief asserts, for the first time in this case, that "[h]onest-services fraud contains three basic non-jurisdictional elements: (a) a breach of the duty of loyalty; (2)(sic) intent to deceive; and (c) materiality." GB 44; *Black* GB 35. While for the reasons set forth above, the

27

decision below is incorrect quite apart from the propriety of these elements, the government's assertion merits attention in any effort to address the overall reach of the statute.

Petitioner submits that the government's formulation of the elements should be rejected, not only because it requires proof of no legitimate or coherent duty actually breached, but also because it is an effort to circumvent the requirement to prove fraud as commonly understood.

The most common understanding of fraud—which is undeniably an element in the proof of any violation of § 1346, *see McNally*, 483 U.S. at 362 (Stevens, J., dissenting)—is the use of material misrepresentation, concealment, or other deception to deny one or more others something of value to which they are entitled.[10]

---

[10] As this Court noted in *McNally*, "the words 'to defraud' * * * 'usually signify the deprivation of something of value *by* trick, deceit, chicane or overreaching.'" 483 U.S. at 358 (quoting *Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924)) (emphasis added). The same point was acknowledged in Justice Stevens' dissent, *id.* at 370-71, in its quotation of dictionaries from around the time of the mail fraud statute's enactment. The referenced dictionaries provide that "[t]o defraud is to withhold from another that which is justly due to him, or to deprive him of a right by deception or artifice," 1 BOUVIER'S LAW DICTIONARY 530 (1897) (internal quotation marks omitted); and define "defraud" as "[t]o cheat; to deceive; to deprive of a right by an act of fraud * * * to withhold from another what is justly due him, or to deprive him of a right, by deception or artifice." William C. Anderson, A DICTIONARY OF LAW 474 (1893) (internal quotation marks omitted). *See also* 483 U.S. at 370 (Stevens, J., dissenting) (quoting 1 Joseph Story, EQUITY JURISPRUDENCE § 186, at 189-90 (1870) (defining fraud as "every artifice made

28

Petitioner submits that adherence to the common understanding of fraud, as requiring the use of deception or trickery to effect a deprivation of some tangible or intangible right, is commanded by the statute's words. Moreover, requiring that *deception be a means of achieving the deprivation* at issue forecloses use of the statute to prosecute a public official's simple failure to disclose information unaccompanied by any other abuse of power, and leaves the disclosure duty violation to be addressed on its own terms. Conversely, by stating the supposed "elements" as a list, with no requirement that material, intentionally deceptive conduct *be a means* of accomplishing the deprivation of the intangible right, the government converts a simple breach of a duty to disclose into a fraudulent denial of honest services.

Assuming, contrary to the facts of this case, that an official knowingly breaches an actual duty to disclose certain information, but does nothing more and has no intention to misuse his authority in any respect, the government's list of elements would allow the following circular analysis: The knowing breach of the disclosure duty is both the honest service denied and the intentionally deceptive act. *See* GB 44-48. And the nondisclosure is material, since the statute required it to be done, and

_____

(continued...)

use of by one person for the purpose of deceiving another," or as "any cunning, deception, or artifice used to circumvent[,] cheat, or deceive another") (internal quotation marks omitted)).

29

disclosure might well "make a difference to the way reasonable voters or fellow office holders assess" the propriety of the official's performance. GB 49.[11]

The range of prosecutions thus enabled is illustrated by the case of a federal judge, who, out of annoyance at the burden, submits by mail a letter stating his refusal to fill out his financial disclosure form, and on that account breaches a clear disclosure duty. On its face, under the circular reasoning just described, the government's list of elements would bring this conduct within the mail fraud statute. This result makes no sense. While the judge should bear whatever sanction attaches to his breach of duty, absent some other improper purpose to misuse his authority in some way that the nondisclosure furthers, he has not committed a mail fraud.[12]

Thus, the government's reliance on a list of elements, in lieu of requiring intentional, material

---

[11] The government concedes that the propriety of a given act of nondisclosure under state law is relevant though not dispositive in determining whether a given failure to disclose involves intent to deceive and is material. GB 48-49. Thus, when all is said and done, the government seems to be defending a uniform federal common law rule of the disclosure duties of state officials, which will be applied differently in different states because contrary state laws will affect factual conclusions about materiality and intent to deceive.

[12] The judge's case is arguably distinguishable from a public official who submits a required disclosure form but deliberately omits some of the required information. Such action may amount to a false statement denying the existence of facts whose disclosure is required, and thus may amount to a deceptive act committed in order to deny the honest service—here the required public disclosure—at issue.

30

deception as a means to facilitate some other breach of duty or deprivation, is one of two critical elements in its bootstrap effort to convict petitioner because he did not publicly announce particular employment discussions. The other critical element is reliance on a made-up duty to disclose, that exists nowhere in the law apart from § 1346. The Court should take this opportunity to reject the government's position in both respects.

## CONCLUSION

For the reasons set forth above, and in petitioner's opening brief, the decision below should be reversed.

Respectfully submitted,

DOUGLAS POPE
POPE & KATCHER
421 W. First Avenue
Suite 220
Anchorage, AK 99501
Telephone: (907) 272-8577

DONALD B. AYER
*Counsel of Record*
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
Telephone: (202) 879-3939

BRIAN J. MURRAY
NICOLE C. H. MASSEY
JONES DAY
77 West Wacker
Chicago, IL 60601
Telephone: (312) 782-3939

NATHANIEL P. GARRETT
JONES DAY
555 California Street
26th Floor
San Francisco, CA 94104
Telephone: (415) 626-3939

*Counsel for Petitioner*

November 13, 2009