UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 08 CR 888 |
| | ) | |
| WILLIAM CELLINI | ) | Judge James B. Zagel |

**DEFENDANT'S WRITTEN OFFER OF PROOF REGARDING
CRA'S INVESTMENT PERFORMANCE AND THE PERFORMANCE OF
TRS'S REAL ESTATE INVESTMENT PORTFOLIO**

The government elicited from Stuart Levine repeated testimony that Cellini's company Commonwealth Realty Advisors (CRA) obtained, increased, and maintained its business with the TRS through means other than the merits of CRA as a real estate investment advisor, including through Cellini's supposed clout or influence with the TRS and his relationships with TRS Board Trustees and staff personnel. In addition, the government elicited from Levine testimony indicating that Cellini's supposed influence or relationships with relevant TRS personnel contributed to TRS's decision to increase its investments in real estate from 8% to 14% of its overall portfolio. Both of these areas of testimony from Levine, explored at depth by the government, suggest to the jury that Cellini has financially profited from illegitimate means, and Cellini should be able to respond to that suggestion with appropriate evidence and cross examination.

Accordingly, Cellini should be able to attempt to rebut Levine's testimony on cross examination with questioning and evidence relevant to the issue of whether CRA was a competent real estate investment advisor that was worthy of TRS investment on the merits. Also, Cellini should be able to use questioning and evidence relevant to the performance of

1

TRS's real estate investments and the advisability of investing in real estate versus other asset classes.

### LEVINE'S TESTIMONY THAT OPENS THE DOOR TO THESE ISSUES

The following is a collection of testimony from Levine's direct examination that indicates that CRA obtained, increased, and/or maintained its business with the TRS through means other than competition on the merits, and also testimony that indicates Cellini's influence or relationships at TRS contributed to the decision to increase TRS's real estate investments as an asset class from 8% to 14% of the TRS portfolio:

- 10/12/11 Transcript at 717:1-722:17 (emphasis added):

Q. Did you have conversations with staff and other trustees about real estate investment decisions?
A. Yes.
Q. Did you talk with the defendant about real estate investment decisions?
A. Yes.
Q. And did you observe votes on different matters relating to real estate investments?
A. Would you repeat that question?
Q. Did you observe votes on different matters relating to real estate investment decisions?
A. I'm very sorry. I'm having trouble hearing. Would you repeat the question one more time?
Q. Sure. As a TRS trustee, were there times when the TRS board voted about real estate investment decisions?
A. Yes.
Q. Did you observe those votes?
A. Yes.
Q. Did you yourself vote?
A. Yes.
Q. And based on those experiences, how much influence did the defendant have over real estate investments in TRS after Mr. Bruner and Mr. Bauman adopted -- became --
MR. WEBB: Object.
BY MR. NIEWOEHNER:
Q. -- took their positions on August 9th?
MR. WEBB: Object to the form of the question.
THE COURT: Overruled.
MR. NIEWOEHNER: Should I repeat the question?
THE WITNESS: Please.
BY MR. NIEWOEHNER:

*Q. After Mr. Bruner and Mr. Bauman became chair of the investment committee and executive director on August 9th, 2001, based on your experience at TRS, how much influence did the defendant have over real estate investments at TRS?*
*A. Considerable.*
*Q. And based on your experience, what was the source of the defendant's influence?*
15 MR. WEBB: Objection; form of the question.
16 THE COURT: Overruled.
17 BY THE WITNESS:
*A. His source of influence were the -- his relationship with the executive director and with certain members of the board of trustees.*
Q. Did that include Mr. Bruner?
A. Yes.
Q. Did that include yourself?
A. Yes.
*Q. Based on your experience at TRS, did anyone else have more influence than the defendant on real estate matters?*
*A. No.*
Q. Now, were there limits to the influence that the defendant had on real estate matters?
A. Yes.
Q. What kind of limits were there?
A. There were policies and procedures in effect at the Teachers' Retirement System that had to be followed.
Q. So did that limit what the defendant was able to do at TRS?
A. Yes.
Q. Now, you described an earlier conversation you had with Keith -- excuse me. You had described an earlier conversation you had with the defendant about Keith Bozarth where you described that Bozarth -- the defendant was unhappy about the amount of money that TRS was investing in real estate. Do you recall that?
A. Yes.
Q. Did TRS invest more money in real estate after Jon Bauman became executive director?
A. Yes.
Q. Are you familiar with something called a TRS asset allocation plan?
A. Yes.
Q. What is that?
A. That is a breakdown of what percentage of the money that TRS had would be invested in any particular asset class.
Q. Did TRS invest in different asset classes?
A. Yes.
MR. NIEWOEHNER: Your Honor, may I publish Page 937 of Teachers' 1?
THE COURT: You may.
BY MR. NIEWOEHNER:
Q. And if you could turn to that, Mr. Levine.
A. Yes. That's 937?
Q. That's right. Mr. Levine, looking at your exhibit, are these board minutes as well?
A. Yes. They are board minutes of April 11th, 2002.
Q. And on April 11th of 2002, was Mr. Bauman the executive director by that point?

3

A. Yes.
*Q. And does it reflect that on a motion by Jan Cleveland, which was seconded by Phillip Schmidt, it was resolved to adopt what's called a Policy Asset Mix 3 as set forth in the following table, and it shows an entry saying Asset Class and an asset saying New Target. What were the asset classes?*
*A. The asset classes were different areas of investment that the Teachers' Retirement Fund would be invested in.*
*Q. And under the column labeled New Target, what does that reflect?*
*A. This Policy Asset Mix 3 was different than the asset class percentages prior to this meeting.*
*Q. Prior to this meeting -- and you see next to real estate, there's a number of 14 percent. Do you see that?*
*A. Yes.*
*Q. What does that reflect?*
*A. That reflects the amount of money that the Teachers' Retirement Fund wanted to ultimately invest in real estate.*
*Q. And was 14 percent different from the prior target?*
*A. Yes.*
*Q. What was the prior target?*
*A. 8 percent.*
*Q. So how much was the increase from 8 to 14 percent?*
*A. Hundreds of millions of dollars.*
*Q. Because in 2002, did TRS have billions of dollars in assets?*
*A. Yes.*
*Q. In 2002, was the defendant's -- in 2002, was the defendant's company, Commonwealth, one of a handful of firms that invested TRS dollars in real estate?*
*A. Yes.*
Q. In -- now, this meeting was in did you say April of 2002?
A. Yes, sir, April 11th, 2002.
Q. Prior to April 2002, that board meeting, did you talk with the defendant about TRS's real estate allocation?
A. Yes.
Q. Did you have at least one conversation with the defendant on that topic?
A. Yes.
Q. Do you recall that -- and in relation to April 2002, when was that conversation?
A. Within a month.
Q. Do you recall it generally or specifically?
A. Generally.
*Q. What did the defendant indicate in that conversation about the asset allocation?*
*A. That he wished that the amount of money that TRS would invest in real estate be increased.*

- 10/12/11 Transcript at 737:19-738:22 (emphasis added):

Q. Mr. Levine, right before we broke, you were -- you had explained that TRS had something called an asset allocation. Do you recall that?
A. Yes.

4

Q. And that in particular, in April of 2002, TRS increased from 8 percent to 14 percent the amount of money it invested in real estate. Do you recall that?
A. Yes.
Q. And, in fact, in October of 2002 -- excuse me.
MR. NIEWOEHNER: Your Honor, could I publish Teachers' 1, Page 974?
THE COURT: You may.
BY MR. NIEWOEHNER:
Q. Mr. Levine, if you could turn to Page 974 in your exhibit. And what date are the board minutes on that page?
A. October 29th, 2009.
Q. I think you may have -- what was the year?
A. I'm sorry, 2002.
*Q. So this is several months after the board increased from 8 percent to 14 percent, is that correct?*
*A. Yes.*
*Q. And, in fact, on October 29th, 2002, did TRS invest additional money with a series of real estate firms?*
*A. Yes.*
*Q. If you look through the first one that's on the board, Commonwealth Realty received $150 million allocation, is that correct?*
*A. Yes.*

- 10/12/11 Transcript at 745:2-24 (emphasis added):

Q. Mr. Levine, you can look at your screen if that will help. So as of May 2002, does this reflect the committee chair positions that were significant in terms investment committee -- or investment decisions made by TRS?
A. Yes.
Q. At that point, you were chair of the rules and personnel committee, Mr. Bruner was chair of the investment committee, and Mr. Bauman was the executive director, is that right?
A. Yes.
Q. Mr. Levine, I'm going to ask you to focus at your time at TRS before January 1st of 2003, so in that timeframe. In that timeframe, did you use your influence and position at TRS to benefit yourself?
A. Yes.
Q. Did you obtain money or try to obtain money for yourself based on your position and influence at TRS?
A. Yes.
*Q. Did you try to obtain money in connection with an investment that Mr. Kjellander brought to TRS?*
*A. Yes.*
*Q. Did you make investment decisions and vote on the TRS board to help your friends who wanted TRS business?*
*A. Yes.*

10/12/11 Transcript at 753:24-756:22 (emphasis added):

5

Q. Based on your understanding of the proposal, would Jon Bauman retain any ability to influence real estate investments at TRS if TRS was combined in some way?
A. No.
Q. Why not?
A. Because all of -- the consolidation suggested that all of the investment authority would lie in the consolidated fund.
Q. How about Jim Bruner, would Jim Bruner retain any influence about the real estate -- real estate investments that TRS made?
A. No.
Q. Why not?
A. Because the -- no member of the Teachers' Retirement staff would have any decision-making as to investments of the
Teachers' Retirement System money.
Q. Would the same be true of you? Would you have any further influence?
A. No.
Q. Now, did the pension proposal require the Illinois state legislature to pass a law to make it happen?
A. Yes.
Q. Did you discuss the pension fund proposal with the defendant prior to June 1st of 2003?
A. Yes.
Q. Did you have more than one conversation with the defendant?
A. Yes.
Q. Over what time period did you have those conversations in relation to June 1st of '03?
A. Within months.
Q. Do you recall them generally or specifically?
A. Generally.
Q. Were they in person, on the phone, or both?
A. Both.
Q. Do you recall if anybody else participated in those conversations?
A. No.
Q. After you learned about the proposal from Bauman, did you talk to the defendant?
A. Yes.
*Q. What did you tell the defendant about this pension proposal?*
*A. I told Mr. Cellini that were this consolidation to take place that we at TRS would have no ability to influence how TR -- how TRS's money would be invested and that Mr. Cellini's real estate asset company that did business with TRS might be -- the relationship may be endangered.*
Q. What was the defendant's reaction to the idea of combining the pension system?
A. He was against it.
Q. Did you and the defendant agree to do anything about the pension proposal?
A. Yes.
Q. What did you agree to do?
A. We agreed to ask Mr. Rezko and Mr. -- we agreed that Mr. Cellini would talk to Mr. Rezko and Mr. Kelly and ask them to convince the governor that this consolidation should not be made.
Q. Why was it the defendant who was going to talk to Mr. Rezko and Mr. Kelly?

A. Because he had a relationship with them and I didn't.
Q. Did you want to deal with Rezko or Kelly because they had some particular expertise with pension funds?
A. No.
Q. Why did you want to deal with them?
A. Because they had influence over Governor Blagojevich.
Q. From what the defendant said, what did you -- what was he going to say in his conversation with Rezko and Kelly?
A. Mr. Cellini was going to tell Mr. Rezko and Kelly that if they would convince Governor Blagojevich not to consolidate the pension funds, that Mr. Cellini and I would use our influence at the Teachers' Retirement System to aid any companies that they wished the Teachers' Retirement System to invest in.

- 10/13/11 Transcript at 828:1-830:9 (emphasis added):

*Q. Did you continue to discuss TRS investment matters with the defendant in 2003 and the spring of 2004?*
*A. Yes.*
Q. As a general matter, did you try to help the defendant with any issues relating to TRS investments in real estate?
MR. WEBB: Object to general. I don't object to specific. Object to the form of the question.
THE COURT: The objection is overruled. I regard it as a prefatory question. You can answer.
BY MR. NIEWOEHNER:
*Q. Did you try to help the defendant with issues relating to TRS investments in real estate?*
*A. Yes.*
*Q. Did issues come up that periodically would affect Commonwealth Realty?*
*A. Yes.*
*Q. Was that the company that the defendant was associated with?*
*A. Yes.*
*Q. Did Commonwealth receive fees from TRS for managing TRS money?*
*A. Yes.*
Q. Did other -- did all the real estate managers, like KBS or Lincoln, did they also receive fees?
A. Yes.
Q. Were these the fees established through contracts that TRS had with the different companies?
A. Yes.
Q. And was the amount of money that Commonwealth made from TRS matters set out in this contract?
A. Yes.
Q. Are you familiar with Mike Bartletti?
A. Yes.
Q. Who was Mike Bartletti?
A. Mike Bartletti was an employee of the Teachers' Retirement System.
Q. Did Mr. Bartletti work on real estate matters?
A. Yes.
Q. Who did Mr. Bartletti report to?
A. Jon Bauman.

7

Q. As part of Bartletti's job, did he deal with the fees that TRS paid to its managers?
A. Yes.
***Q. In about May of 2004, was Jon Bauman working on a plan that would change the fees that TRS paid to its real estate managers?***
***A. Yes.***
***Q. Did Bauman's plan potentially change how much money Commonwealth would be paid?***
***A. Yes.***
Q. Are you familiar somebody named Mark Kirincich?
A. I'm familiar with the name.
Q. Who was he?
A. It's my understanding that he was the president of Commonwealth Realty.
Q. In May of 2004, did you discuss Bauman's plan to potentially change the fees with the defendant?
A. Yes.

In addition, the government played excerpts and questioned Levine as to his interpretation of a May 12, 2004, recorded telephone call between Levine and Cellini in a manner repeatedly suggesting that CRA was not fully earning its fees from TRS and that Cellini was maneuvering to defeat a potential change in fee structure for TRS's real estate investment managers.

- 10/13/11 Transcript at 831:4-832:6:

Q. And this call is on May 12th at 8:44 p.m. Is that correct?
A. Yes, sir.
Q. And you're speaking with the defendant in this call?
A. Yes.
Q. I'm going to turn your attention to page 3. I'm going to say -- and just turn your attention to line 31. And you say at that point, "Bauman's got a bug, why am I paying for some former administration, all these fees out to these guys." And what fees did you understand -- or what fees were you referring to?
A. The management fees that TRS was paying to certain -- certain of the TRS real estate asset managers.
Q. And if you turn to page 4, at line 1 you say, "So what he's decided to do is change the um, uh, the pay structure" --
A. Excuse me, Mr. Niewoehner. Line 1 -- line 2?
Q. Oh, yes. I'm sorry. My mistake. At page 4, line 2.
A. Yes, I'm there.
Q. You say, "So what he's decided to do is change the um, uh, the pay structure on a, fee structure for all the asset managers and if they don't want to, to do what it is then he'll fire 'em." And at line 2 when you say "he's decided," who are you referring to?
A. Jon Bauman.
Q. And when you said at line 4 "all the asset managers," what were you referring to?

8

A. All the real estate asset managers.[1]

- 10/13/11 Transcript at 832:20-833:21:

Q. And the defendant continues at line 11 and says, "He said you know our first blush of runnin' some numbers looks like that it could possibly benefit us in the short run, but in the long run uh, it puts us at substantial risk." When the defendant said at line 11 "he said," who is your understanding he's referring to?
A. Mr. Kirincich.
Q. And at line 15 when the defendant said, "It puts us at substantial risk," who did you understand he was referring to?
A. Commonwealth Realty.
Q. And if you could turn to page 6. And if you look at line 4, you see the defendant speaking says, "Kirincich said that they ran some more numbers and he said he's still not sure and he's still leery." Who did you understand was still leery?
A. Mr. Kirincich.
Q. Did you understand that the defendant wanted this fee restructuring to take place at that time?
MR. WEBB: Objection. Can I object? I don't want -- object to the interpretation.
THE COURT: Why don't you use "believe" for that one too.
BY MR. NIEWOEHNER:
*Q. Based on what the defendant said, did you believe that the defendant wanted this fee restructuring that Bauman was proposing to go forward at that time?*
*A. No.*

In addition to those specific questions and answers, essentially the entire portion of the May 12, 2004, recorded call played by the government concerned the issue of management fees for TRS real estate managers, including CRA, and the potential impact a change in fee structure would have on CRA.

---

[1] The actual transcript of this portion of the call, which the jury had in front of them, is further suggestive of the notion that TRS's real estate investment firms, such as CRA, were not performing well for TRS. From the transcript at page 3, lines 23 through 36:

> LEVINE: Now the incentive fee was very large, but the returns were very large. Now they agreed at one point to defer their uh, their incentive fee so they can't get more than 1.75 of percent of assets in any one given year. So they, they're being paid out. Their current returns are not stellar. So Bauman's got a bug up his ass, why am I paying for some former administration uh, all these fees out to these guys and they're not, they're not doin' such a great uh, job now. Now the fact is they, they earned it.

**PROPOSED EVIDENCE REGARDING CRA'S INVESTMENT PERFORMANCE AND THE PERFORMANCE OF TRS'S REAL ESTATE PORTFOLIO**

As a TRS Board Trustee, Levine would have been privy to reports, analyses, and information concerning the performance of TRS's investments and its investment portfolio, including its investments in real estate. Cellini seeks to examine Levine with respect to CRA's investment performance, as well as the performance of TRS's real estate portfolio, as indicated by certain of the reports and information Levine received. One such report, which Cellini would introduce on cross examination of Levine, was distributed in the regular course of business by TRS Executive Director Jon Bauman in connection with the February 2004 TRS Board meeting (*see* February 4, 2004 Memorandum from Jon Bauman, Executive Director and Acting Chief Investment Officer to the TRS Board of Trustees, EH1223_00075) ("Feb. 4 Memo"), which Levine attended. (Government Exhibit Teachers 1 at 1065.) This memorandum indicates that prior to the February 2004 Board meeting, TRS staff conducted due diligence with respect to its outside real estate investment advisors and reflects an analysis of the performance of those companies, including CRA. (*See* Feb. 4 Memo., EH1223_00075, 76). The memorandum notes that one of CRA's investment fund ranked in the first percentile of real estate advisors for the one-year, three-year, and five-year periods. (*Id*.) CRA's rate-of-return for the one year period, for instance, was 20.87%. (*Id*.) This report (and the questioning that would accompany this report) are directly relevant to rebutting Levine's testimony that he aided CRA and that CRA would have somehow been harmed without his assistance or been harmed in the event the pension consolidation had occurred. More importantly, this report is directly relevant to rebutting the notion – which has been emphasized to the jury on numerous occasions – that CRA was not a merit-worthy company, such that Cellini obtained and maintained CRA's business with the TRS strictly by virtue of his influence, which is highly prejudicial.

Another document, Government Exhibit Teacher 12, which is a presentation from the February 19-20, 2004 TRS Board meeting, discusses similar information. (*See* February 19-20, 2004 Real Estate Rebalancing and POB Funding Teachers' Retirement System of the State of Illinois, GX Teachers 12, EH1218_00005). Levine's position as a Trustee makes it a virtual certainty that he received and was provided the opportunity to review this presentation. According to the presentation, TRS was interested in allocating 60% of its available main trust fund real estate dollars and 60% of its POB trust fund real estate dollars for core real estate asset investments, (*Id*. at EH1218_00009), and CRA was one of two TRS real estate advisors that invested primarily in core real estate assets. (*Id*. at EH1218_00014-17). The presentation indicates that CRA had a 5-year rate of investment return of 13.43%, which put it in the 1st percentile of real estate advisors. (*Id*. at EH1218_00016). For the same reasons as the February Bauman memorandum, this presentation is directly relevant to Levine's direct examination testimony and to the argument made by the government throughout trial that CRA was not a merit-worthy company.

Finally, Cellini would also seek to examine Levine with a summary chart compiling data from TRS's annual reports that indicates the performance of TRS's real estate portfolio as compared to other asset classes between 1999 and 2005[2]:

---

[2] The data in Cellini's proposed chart is compiled from TRS's annual reports from 2003 (TRS-CEL005634-5757), 2004 (TRS-CEL005524-5633), and 2005 (TRS-CEL005421-5523), which have been produced to the government and certified as business records by the TRS in accordance with Rule 902(11)

11

**Comparison of the TRS Real Estate Investment Fund to the Other TRS Investment Funds from 1999-2005**

| Asset Class | 2005 | 2004 | 2003 | 2002 | 2001 | 2000 | 1999 |
|---|---|---|---|---|---|---|---|
| Real Estate | **19.9%** | **13.2%** | **8.8%** | **2.4%** | **9.8%** | **8.8%** | **13.5%** |
| Equity – U.S. | 8.1% | 21.6% | 0.5% | (15.2%) | (12.0%) | 6.5% | 17.1% |
| Equity – Intl. | 17.3% | 32.8% | (5.2%) | (6.8%) | (19.5%) | 19.9% | 8.4% |
| Fixed Income | 6.6% | 0.7% | 10.7% | 9.7% | 7.2% | 3.7% | 4.0% |
| Private Equity | 20.0% | 10.3% | (11.4%) | (12.7%) | (5.4%) | 137.7% | 22.7% |
| Short-Term Investment | 2.2% | 1.1% | 1.5% | 2.7% | 6.2% | 5.9% | 5.4% |

As this chart indicates, TRS's investments in real estate during this time period yielded positive returns each year and performed relatively well compared to investments in other asset classes. The government, through Levine and other witnesses, has argued that TRS's decision in 2002 to increase its allocation to real estate from 8% to 14% was not consistent with the best interests of TRS and/or was prompted by an improper exercise of Cellini's supposed power. The information in this summary chart is critical to rebutting that argument and showing that there were compelling reasons why TRS would want to invest a greater percentage of its portfolio in real estate.

## CONCLUSION

For these reasons, Cellini should be able to introduce the foregoing evidence and explore associated questioning during cross examination of Levine.

          Respectfully Submitted,

          /s/ Thomas L. Kirsch II
          Dan K. Webb
          Thomas L. Kirsch II
          Winston & Strawn LLP
          35 West Wacker Drive
          Chicago, Illinois 60601
          (312) 558-5600
          (facsimile) (312) 558-5700
          dwebb@winston.com
          tkirsch@winston.com

**CERTIFICATE OF SERVICE**

The undersigned attorney hereby certifies that the following document:

**DEFENDANT'S WRITTEN OFFER OF PROOF REGARDING
CRA's INVESTMENT PERFORMANCE AND THE PERFORMANCE OF
TRS'S REAL ESTATE INVESTMENT PORTFOLIO**

was served on October 13, 2011, in accordance with FED. R. CRIM. P. 49, FED. R. CIV. P. 5, LR 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system as to ECF filers.

/s/ Thomas L. Kirsch II
Thomas L. Kirsch II