UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 08 CR 888-4 |
| vs. | ) | Judge James B Zagel |
| | ) | |
| WILLIAM F. CELLINI, SR. | ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The UNITED STATES OF AMERICA, by and through GARY SHAPIRO, Acting

United States Attorney for the Northern District of Illinois, respectfully submits its

Sentencing Memorandum with respect to defendant William Cellini, stating as follows:

## I. INTRODUCTION

LEVINE:     If Tom feels that he'd rather walk away from the money than
            deal with Tony then there it is (laughs).

CELLINI:    (Laughs)

May 7, 2004 Transcript at 6.

Defendant William Cellini's laugh upon hearing that Thomas Rosenberg, whom he

claims was his good friend, was going to lose $220 million in state funds because Rosenberg

would not make a political contribution was telling.  There was no hint of concern or alarm—

instead, Cellini was amused by the very idea that Rosenberg would take a stand against the

corruption of the Blagojevich administration.  Further, the laugh also demonstrated Cellini's

profound indifference to the harm that the extortion was going to cause—not just to

Rosenberg and his company, but to the Teacher's Retirement System of Illinois, the teachers

1

it served, and the public. Cellini's amusement and indifference were the product of Cellini's own long-standing actions at TRS, where he himself had used his political clout to enrich himself and his allies without concern for the damage that corruption would inflict upon TRS, the teachers, or the public. This excerpt was just a small part of the evidence establishing that Cellini, despite his immense wealth and power, intentionally joined the conspiracy to extort Rosenberg. These facts, together with the other factors set forth in 18 U.S.C. § 3553(a)—in particular, the need to reflect the value our society places on the integrity of government officials, and the harm that is caused when that integrity is lost—demand a meaningful sentence of incarceration.

## II.    APPLICATION OF § 3553 FACTORS

### A.    Legal Standards

In the instant case, the properly-calculated Guidelines recommend a sentencing range of 78-97 months.[1] The range is, in part, a product of amendments to Guideline § 2C1.1 that took effect on November 1, 2004, based on "the [Sentencing] Commission's conclusion that, in general, public corruption offenses previously did not receive punishment commensurate with the gravity of such offenses." *See* U.S. Sentencing Guidelines Manual, Supplement to Appendix C, Amendment 666, pg. 82.

District courts must take the Guidelines into account in calculating a defendant's

---

[1] The government recognizes that the Probation Office determined that Cellini's Guidelines range is 63-78 months. PSR at 27. The difference in the calculations reflects the Probation Officer's determination that Cellini was entitled to a two-level downward adjustment for his role in the offense pursuant to Guideline § 3B1.2(b). The government objects to that calculation for the reasons stated in its government's version.

sentence. *See Booker v. United States*, 125 S.Ct. 738, 767 (2005). Although the Sentencing Guidelines are advisory only, "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). The Sentencing Guidelines are the *sole* factor in Section 3553(a) that provides any objective sentencing range that can practicably promote the overall goal of minimizing unwarranted sentencing disparities, which is itself a statutorily-mandated factor, Section 3553(a)(6). *See United States v. Mykytiuk*, 415 F.3d 606, 608 (7th Cir. 2005) ("The Guidelines remain an essential tool in creating a fair and uniform sentencing regime across the country.").

The Court must also consider the other factors set forth in Section 3553(a) in determining a sentence that is sufficient, but not more than necessary to achieve the goals of sentencing. In particular, Section 3553(a) requires that the Court consider, and thus that the sentence reflect, among other factors: (1) the nature and circumstance of the offense; (2) the history and characteristics of the defendant; (3) the need to reflect the seriousness of the offense, to promote respect for the law, and to afford adequate deterrence; and (4) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct. *See* 18 U.S.C. § 3553(a).

In this case, the factors set forth in 18 U.S.C. § 3553 generally weigh in favor of a meaningful sentence of incarceration. In particular, the nature of the crime, Cellini's history and past actions, the need for deterrence, and the need to avoid disparities among Cellini's co-defendants, all strongly militate in favor of a such a sentence. Cellini's age and infirmity,

on the other hand, may warrant consideration of a sentence below the range called for by a strict application of the Guidelines. Those factors do not, however, so far outweigh the other Section 3553 factors as to justify the probationary sentence sought by Cellini.

> **B.    The Nature of Cellini's Crimes Weighs Strongly in Favor of a Meaningful Sentence of Incarceration**

Cellini was an integral participant in an effort to extort a political contribution from Rosenberg by threatening to deprive Capri Capital of a $220 million TRS allocation. That money, of course, belonged to the teachers of Illinois and was to be managed for their benefit—not for the benefit of the conspirators who used it to squeeze Rosenberg. Cellini's crime was particularly troubling because of the particular state agency that was targeted. By corrupting the investment process at TRS, Cellini put at risk hundreds of millions of dollars of taxpayer money and the retirement savings of thousands of Illinois teachers, and undermined the faith our citizens, and in particular our teachers, deserve to have in the honesty of their government and the security of their futures. The nature of Cellini's crimes weighs strongly in favor of a sentence of incarceration.

Cellini attempts to minimize his crimes by suggesting that they are "comparatively minor offense[s] in the political arena." Def. Version at 58. But Cellini is wrong—a credible attempt to use $220 million of teachers' money to extort a political contribution could never accurately be characterized as a "minor" offense.

Cellini's argument that his offenses were minor because they "resulted in no harm to Rosenberg or TRS" is misguided. *Id.* at 56. The only reason that Rosenberg and TRS

suffered no permanent harm was because of the government's intervention; otherwise, Rosenberg was going to be frozen out of any further TRS money, at significant cost to both himself and to TRS. *See* May 12 Tr. at 16 (Cellini: "I mean I think what their position is, or at least Tony's is, okay so he may have to get something here, but he ain't gonna get anything more."). Further, Cellini's actions both exposed Rosenberg to an actual extortion attempt and put TRS and its assets at risk. That Rosenberg and TRS may have escaped actual economic loss in no way minimizes the seriousness of Cellini's criminal conduct.

Nor do Cellini's repeated suggestions in his version of the offense that he is actually innocent support the propositions that his crime was minor or that he is deserving of leniency. Unless directed otherwise, the government will not respond to each of the numerous inaccuracies contained in Cellini's version of the offense, but will instead limit our response to noting two tactics employed by Cellini that bear directly on his culpability.

First, Cellini states his version of events as *fact*—in effect ignoring both the evidence at trial and the jury's verdict. For example, Cellini's version suggests that he "had an agenda of helping Rosenberg that has nothing to do with Levine and is flatly inconsistent with Levine's corrupt plan," and that Cellini "was uncomfortable with the behavior being exhibited by Rezko and Kelly in linking state action with fundraising." Def. Version at 15, 19. Those contentions, along with many others, are directly contrary to both the evidence and the jury's verdict, which was that Cellini knowingly agreed to join the extortion. Although it is Cellini's right to continue to deny culpability, his denials underscore his complete lack of remorse for his criminal conduct and establish that he resolutely refuses to

accept any responsibility for that conduct.

Second, instead of accepting responsibility and expressing remorse, Cellini attempts to deflect attention from his own conduct by casting unwarranted aspersions on Thomas Rosenberg, one of the victims of Cellini's crimes. For example, Cellini continues to insist that Rosenberg sent Allison Davis to Antoin Rezko with a bribe offer, despite the lack of credible evidence that this occurred. *Id.* at 14. Not only did Rosenberg deny offering a bribe in exchange for TRS business, both on the witness stand and during a contemporaneous recorded telephone conversation with Cellini, but, as Cellini knows, Davis likewise denied that Rosenberg directed him to send any such message. In fact, as Cellini is aware, both Davis and Rezko have told the government that Rosenberg's name was raised by Davis in an impromptu conversation he had with Rezko and Kelly. Cellini's effort to blame the victim in order to absolve himself provides further evidence of Cellini's failure to accept responsibility for his own conduct.[2]

Moreover, contrary to Cellini's suggestion, Cellini's offense was not committed in "the political arena." *Id.* at 58. TRS is a state agency run for the benefit of teachers. It has one mission: to protect and invest the money contributed by the teachers and the State to ensure the secure retirement of the State's public schoolteachers. Interference with and

---

[2] Similarly, Cellini incorrectly suggests that at a meeting in February 2004, "Rosenberg, Levine, and Vrdolyak discussed Rosenberg's willingness to make a payment to Levine in some undetermined amount in connection with the 2004 TRS allocation." Def. Version at 6. Cellini cannot support this assertion, which badly misstates Levine's account of that meeting. The citation that Cellini did provide from Levine's trial testimony is inapt; the cited section is a string of questions by defense counsel that were stricken as improper, and never answered.

corruption of TRS's investment activities for personal gain is a crime against both the beneficiaries of TRS and the citizens of the State. Cellini's crime had nothing to do with "politics," and suggesting otherwise is just one more demonstration of Cellini's complete lack of acceptance of personal responsibility for his conduct.

Ultimately, the sentence imposed in this case must be commensurate with what Cellini did, not what he may now wish he had done. Cellini was fully capable of refusing to participate in the conspiracy, and indeed, could have stopped it. Cellini had enough standing with Levine, Rezko, and Kelly that he could have dissuaded them from attempting to extort Rosenberg in the first place, or he could have used his influence with Jon Bauman to prevent their efforts from succeeding. And, of course, he could have alerted the authorities to the conduct to which he had been made privy. But instead, Cellini made the conscious choice to join the conspiracy and help it succeed, apparently to foster his own relationship with the Blagojevich administration and to maintain his own power, influence, and economic interests. In assessing Cellini's culpability, this Court should take into account the fact that Cellini easily could have, and should have, chosen a different path.

### C. Cellini's History and Characteristics Weigh In Favor of a Meaningful Sentence of Incarceration

Cellini's decision to help Rezko, Kelly, and Levine use their clout to extract political contributions from Rosenberg in exchange for TRS business was consistent with Cellini's prior dealings at TRS. Cellini's knowledge of and experience with trading state actions for contributions provided the foundation that made him willing and able to assist Rezko and

Kelly if that meant that Cellini could maintain his own position of influence.[3] Cellini's prior history demonstrates that his participation in the extortion was not, in fact, an aberration.

### 1. Cellini's History of Dealings with Illinois Politicians

Before committing the offenses of conviction, Cellini spent many years enjoying positions of privilege and influence with high-level State officials. The root of his influence was his ability to raise and contribute substantial sums to those officials' campaign coffers. As the evidence showed, Cellini was a prodigious fundraiser. Not only did Cellini host his own regular fundraisers (as described by Mark Traylor at trial), he also had a relationship with the Illinois Asphalt Pavement Association, whose members routinely made significant political contributions. As a result of his fundraising, Cellini developed extensive contacts with officials at the highest levels of state government and, unlike other Illinois citizens, gained substantial access to, and influence with, those officials. Over the years Cellini was able to use that access and influence to obtain substantial business from the State. Indeed, much of Cellini's extraordinary wealth derived from businesses, including Commonwealth Realty Advisors, that were dependent on the State in some way. In addition, Cellini's access put him in a unique position to see how government business and politics actually were conducted in this State, during the Blagojevich administration and before.

---

[3] Much of the evidence of Cellini's history discussed in this section was elicited at Cellini's trial, but some additional evidence is drawn from witness statements and documents that were not presented at trial. In presenting this additional evidence, the government relies only upon statements made by its trial witnesses (with one exception discussed below) because the Court has already had the opportunity to judge the credibility of those witnesses. The government does not rely upon statements made by Tony Rezko, but notes that Rezko's statements (which the defense has) do not in any way exculpate Cellini.

After working to establish himself as a Republican insider, Rod Blagojevich's election as governor threatened Cellini's clout. Therefore, in order to maintain his access and influence, Cellini covertly switched sides, and ingratiated himself with members of Blagojevich's "kitchen cabinet," using the same methods that had worked for him in years past: contributing and raising campaign funds. Cellini's efforts for Blagojevich were highly successful (*e.g.,* raising over $400,000 for Blagojevich, a Democrat, at a single event in September 2002, notwithstanding that Cellini was a life-long Republican who intentionally concealed that he was a sponsor of the event), and they had their desired effect.

### 2. Cellini's Influence at TRS

The evidence showed that Cellini used his access and clout to control decisions made at TRS that significantly affected his own economic interests. TRS was of particular concern to Cellini because his company, Commonwealth, lacked other significant clients, and relied heavily on TRS allocations to stay in business. *See* Exhibit 1 (February 11, 2004 Cellini email in which Cellini directed Commonwealth management to "work towards getting other funds in order to get away from the danger of losing the Company if we lose TRS").[4] Specifically, Cellini repeatedly inserted officials whom he could influence or control into positions of power at TRS, with the goal of having TRS take actions that were good for Cellini, regardless of their merit from the perspective of the beneficiaries of TRS or the citizens of Illinois.

---

[4] Cellini's concerns were well-founded, as Commonwealth went out of business once TRS stopped investing money with the company.

Cellini laid out his philosophy for selecting state employees in a series of candid emails he sent to his top staff at Commonwealth. Those emails demonstrate that Cellini valued one key criteria above all others—the candidate needed to be loyal to Cellini and his political allies. Thus, when Cellini described the qualities he wanted in a candidate for a particular state job, he stated:

> OF COURSE [the candidate] WOULD NEED TO BE SOMEONE WHO WOULD BE POLITICALLY ASTUTE – AND LOYAL TO A COUPLE OF THE "kitchen cabinet" GUYS WHO ARE ASKING ME (I'D LIKE THEM TO REMEMBER ME ALSO).

Exhibit 2 (emphasis in original). In a subsequent email in that chain, Cellini clarified further his real concern with the candidate, saying "do I have any reason to be concerned about his loyalty to us (me)?" *See* Exhibit 3.

Cellini applied his litmus test of loyalty to the people that he promoted for the TRS Executive Director job as well. Thus, in 2004, Cellini sent an email to the CEO of Commonwealth to discuss a potential replacement for Jon Bauman as Executive Director of TRS, in which he stated:

> Jon Bauman was retained by this administration in great part because I vouched for his ability – they did not want to keep him (and may not want to keep him). The problem is finding someone who is both capable and "astute" who can be counted upon.

Exhibit 4. When the Commonwealth CEO suggested a candidate, Cellini responded, "I don't

know him – I'd sure like someone someone knows – and knows well enough to determine if they met ALL the criteria." *Id.* (emphasis in original).

### a.    The Removal of Keith Bozarth

Keith Bozarth became Executive Director of TRS in 1998.[5]  Almost immediately, Cellini began efforts to persuade Bozarth that he should follow Cellini's lead in managing TRS. Within weeks of Bozarth's start, Cellini took Bozarth to lunch and, during the lunch, made a point of referencing his various connections to state boards, and his access to then-Governor George Ryan. Bozarth reasonably understood Cellini to be attempting to intimidate him. Thereafter, Cellini pressed Bozarth to promote Bauman to become the Chief Investment Officer at TRS, and to support the appointment of James Bruner as head of the TRS Board's Investment Committee.  Despite Cellini's efforts, Bozarth declined to make either of these appointments, viewing neither as being in the best interest of TRS.

Even worse (from Cellini's perspective), Bozarth successfully convinced the TRS Board to reduce the amount of funds that were invested in real estate assets (from 14% to 8% of TRS's portfolio).  After Bozarth took this step, Cellini arranged a meeting with Bozarth in which he told Bozarth a story about the executive director of another state agency who was removed after he "got out of step politically." Again, Bozarth reasonably understood Cellini's story as conveying that he too could be removed.

Cellini's thinly veiled threat was not an idle one.  As demonstrated at trial, Cellini

---

[5] According to Steve Loren, Bozarth's predecessor, Bob Daniels, admitted to Loren that Daniels had originally hired Bauman at TRS at Cellini's direction.

subsequently orchestrated the removal of Bozarth as executive director, using information obtained by Bauman about one of Bozarth's top staffers to enlist Levine to pressure Bozarth to leave. Cellini's maneuvering was a success, as Bozarth resigned from TRS once he recognized that Levine and his allies on the TRS Board were against him.

### b. The Installation of Jon Bauman as Executive Director

As the evidence showed, Cellini was also instrumental in appointing Bozarth's replacement, Jon Bauman. Shortly after Bozarth was forced out, Cellini used his influence with Levine, Bruner, and others to ensure that his candidate, Phillip Schmidt, was elected as a trustee by the TRS Board. Schmidt's election tipped the balance of the TRS Board in favor of a bloc of trustees led by Levine, whom Cellini could trust to act as he wished. And immediately upon taking power in August 2001, at Cellini's suggestion, this bloc hired Bauman to replace Bozarth as Executive Director, over the objections of the teachers' representatives. As Cellini told Levine and Rosenberg at different times, Cellini had been close to Bauman's father, and Bauman was Cellini's "guy."

The installation of Jon Bauman paid immediate dividends for Cellini. By April 2002, at Bauman's urging, the TRS Board returned to an asset plan that called for 14% of the portfolio to be invested in real estate assets, and in October 2002, Commonwealth received a $150 million allocation of TRS funds. From the time of Bauman's installation until at least May 2004, Bauman, who was indebted to Cellini, gave him special access, and generally ensured that Commonwealth's interests were protected at TRS. Bauman's reference to Cellini as "the Pope" summed up their relationship.

By May 2004, Bauman had begun to grow more independent because of his own relationship with Chris Kelly, and was considering a plan to change the system of reimbursement for TRS real estate asset managers—a plan Cellini feared would mean less money for Commonwealth. In a recorded May 12, 2004 conversation with Levine, Cellini described a number of steps he was taking to block the move, including off-line conversations with Bauman, appealing to his Board allies, Levine and Bruner, and ultimately the possibility—previously discussed—of moving Bauman to another job (at the University of Illinois). In the end, however, both Levine and Cellini concluded that Bauman was unlikely to take a step directly contrary to Cellini's wishes. As Levine put it, if Bauman "[got] on his high horse," Cellini could consider "put[ting] him in his place." *See* May 12 Tr. at 18.

In fact, it was Cellini's ability to control Bauman that made Cellini a critical part of the Rosenberg extortion. It was Cellini who could—and did—direct Bauman to either hold or release the $220 million allocation. It was Cellini who could—and did—arrange, through Bauman, for Capri to receive a $20 million token investment instead of the $220 million allocation to prevent Rosenberg from complaining. Ultimately, the Rosenberg extortion could not have happened without Cellini's agreement and facilitation.

### c. Cellini's Corrupt Actions to Maintain Control Over the TRS Board

Cellini did not rely solely upon his ability to influence Bauman as his only means of affecting TRS decision-making. Recognizing that the TRS Board ultimately controlled

Bauman's fate, Cellini made sure that he both kept his allies on the TRS Board and that those allies controlled the key committee assignments, such as the Chairs of the Investment Committee and the Rules & Personnel Committee (which determined Bauman's pay). According to information provided by Levine and corroborated by Steve Loren and the wiretaps, Cellini cut deals in which he traded fundraising help to keep his allies on the TRS Board.

### i.        Illegal Deal to Re-appoint James Bruner as Trustee

One of Cellini's closest allies on the TRS Board was James Bruner. As Bruner recently noted in a letter submitted to the Probation Office and the Court requesting leniency for Cellini, Bruner knew Cellini for decades through their joint association with the Illinois Asphalt Pavement Association. At the same August 2001 TRS Board meeting where Cellini's allies achieved a majority and took control of TRS, Cellini arranged for Levine to orchestrate Bruner's appointment as Chair of the TRS Investment Committee.

Bruner was originally appointed to the TRS Board by Governor Edgar, and his term expired in 2002, while George Ryan was Governor. As Cellini told Levine, Ryan was initially reluctant to re-appoint Bruner because he was one of Edgar's choices, but Cellini was able to change Ryan's mind by pointing out that Bruner was working with Cellini to raise funds for Ryan's defense fund.[6] Bruner admitted to the government that he had donated $10,000 to Ryan's defense fund in 2002 in response to a request made by the Illinois Asphalt

---

[6] Loren also heard this admission because he overheard a conversation in which Cellini discussed the matter with Levine.

Pavement Association, and that he had also solicited contributions from other roadbuilding contractors.[7]

### ii. Illegal Deal to Retain Stuart Levine

As demonstrated at trial, Cellini navigated the changes produced by Rod Blagojevich's impending election as governor by aligning himself with Rezko and Kelly shortly before the election. As part of his negotiations with Rezko and Kelly, Cellini made an "accommodation" in which he and Levine agreed, in exchange for Rezko and Kelly using their influence to oppose the consolidation of TRS with other state pension funds, to use their influence and position with TRS to assist Rezko and Kelly raise contributions by helping donors get TRS funds. As part of that deal, Cellini ensured that his key players, including Levine and Bauman, were kept in place. Pursuant to the accommodation, when Levine's term expired in May 2004, Levine was re-appointed to the TRS Board. *See* May 7 Tr. at 8 (Cellini recounting how he reminded Kelly to arrange to re-appoint Levine).

### d. Cellini Corruptly Helps Commonwealth and Levine

As noted above, Cellini used his influence over Bauman to protect Commonwealth's interests after Blagojevich became Governor in 2003. One example of this influence is an incident that occurred during the meeting among Cellini, Loren, Levine, and Bauman at Levine's office at the John Hancock Tower in early 2004 in which the four men discussed

---

[7] The government has relied on Bruner's statement here. Cellini has vouched for Bruner's credibility by submitting a sentencing letter written by Bruner. The government notes that it does not have evidence that Bruner was aware of the deal that Cellini struck with Governor Ryan on Bruner's behalf.

Commonwealth's allocations with TRS. At the meeting, according to both Loren and Levine,[8] Bauman disclosed to the participants the amount of money he anticipated that TRS would allocate to its real estate asset managers, including Commonwealth, at the upcoming February 2004 TRS Board meeting. At Cellini's urging, Bauman agreed to increase Commonwealth's allocation by $50 million so that Commonwealth could invest with a company called Senior Lifestyles.

No other real estate manager's allocation was increased at the meeting, nor did any other real estate manager get such an opportunity to pitch their case to Bauman, Levine, and Loren. Further, the meeting took place in violation of the rules that governed *ex parte* contacts between TRS trustees/staff and their clients. Under the existing *ex parte* rules, such a meeting should have been disclosed. Notably, Bauman was the Chief Ethics Officer for TRS, and was thus responsible for maintaining a log of *ex parte* contacts between TRS staff and outside parties about TRS business. Not surprisingly, there is no reference to the Hancock meeting in the *ex parte* log.

Cellini's actions at the Hancock meeting were not corrupt merely because the TRS staff did not comply with the *ex parte* rules—they were also corrupt because Cellini was attempting to help Levine obtain an illegal benefit from a TRS investment. Prior to the meeting, Levine had told Cellini that Levine was going to receive a benefit if TRS funds

---

[8] Loren testified about the meeting at Cellini's trial, while Levine testified about it only during the trial of *United States v. Rezko*.

were invested with Senior Lifestyles.[9]  Levine had arranged to receive a kickback from a broker working with Senior Lifestyles if TRS invested money with the company.  Thus, Cellini took advantage of his relationship with Bauman to help both himself and Levine, and did so in a way that concealed from Bauman the fact that Levine was going to benefit.

### e.  Cellini's Steering of an Improper Financial Benefit to Levine Related to the Carlyle Group

The Hancock meeting was not the only time that Cellini sought to steer an improper financial benefit to Levine related to a favored TRS investment.  According to Levine, and corroborated by bank records, Cellini also rewarded Levine for his help ensuring that TRS invested money with an investment company, the Carlyle Group, that paid money to Cellini's business partner, Robert Kjellander.[10]

In 2002, Kjellander asked Levine to facilitate a $150 million TRS investment with the Carlyle Group.  Kjellander was helping the Carlyle Group because he was going to receive a 1% finder's fee from Carlyle if TRS made the investment.  Levine's help was needed because, even though the TRS staff approved the investment, the teachers' representatives on the TRS Board raised a concern about the finder's fee being paid to Kjellander.  Levine intervened to help Carlyle with the TRS Board, and the investment was ultimately approved at an August 2002 TRS Board meeting.

Levine, however, did not disclose to the TRS Board or staff his business relationship

---

[9] Levine testified to this during the trial in *United States v. Rezko*.

[10] Levine testified to his arrangement with Cellini, Kjellander, and the Carlyle Group during the trial in *United States v. Rezko*.

with Kjellander. Levine, on behalf of a dental HMO, had engaged Kjellander and Cellini to lobby the state of Illinois on an ongoing basis. Levine gave Kjellander about 20% of the money that Levine was paid by the dental HMO (*e.g.*, in 2001, Levine was paid about $241,000 by the dental HMO, and gave 20% of that amount to Kjellander). In turn, bank records show that Kjellander gave half the money that he received from Levine to Cellini.

In recognition for the help that Levine had provided to Carlyle, Cellini told Levine that he no longer had to pay Kjellander or Cellini for their help with the dental HMO. Bank records show that the last payment Levine made to Kjellander was for July 2002.

### 3. Cellini's Facilitation of an Exchange of Fundraising for a State Road Building Contract

As Cellini explained to Levine on the wiretap, shortly before the events that formed the basis of his conviction, Cellini sought to help a firm owned by Sergio Pecori obtain a state road building contract by going to Chris Kelly and promising that Pecori would host a fundraiser.[11] Once the contract was issued, Cellini then turned to Pecori to ensure that the promised fundraiser would take place. But Pecori and his partners, perhaps unaware of the deal that Cellini had struck on their behalf, backed out of the fundraiser because of their concerns about the way that the Blagojevich administration was handing out contracts to contributors.

---

[11] Cellini, of course, was well aware that Rezko and Kelly were, in his words, "hammerin' people . . . with contracts for fundraising," but was determined to keep dealing with them. May 8 Tr. at 6; *see* May 8 Tr. at 16-17 ("Levine: Do you stop dealing with [Rezko and Kelly]? Cellini: Phew, you know neither one of us wanna do that, you know.").

Cellini's own recorded statements indicated that the Pecori bribe was not exceptional but, rather, consistent with the way that Cellini had worked for years. Cellini understood exactly what Rezko and Kelly were doing (*e.g.*, using their insider status to trade state action for campaign contributions) because he had engaged in the same practice, albeit in a more sophisticated and subtle way. Thus, when Cellini discussed his concerns about Rezko and Kelly with Levine, he did not complain about the fact that they were demanding contributions in exchange for contracts—he merely complained about the *way* in which they were doing it. In particular, Cellini was concerned that the overt demands that Rezko and Kelly made would create a trail that government investigators could follow too easily, ultimately resulting in a pattern of evidence that would be used by to make some of the participants "cave in like a herd of turtles" and cooperate with the government. May 8 Tr. at 15-16.

In contrast, Cellini explained, he had taken care to be more subtle:

I mean now all of us have done that for years when you know somebody is gonna get somethin' or you, maybe, maybe even help somebody get somethin' and you call to let 'em know . . . you know you're gonna be okay. . . . You know it's like gettin' credit.

*Id.* at 16. According to Cellini, this "credit" system allowed officials discreetly to obtain contributions in return for state action. As a practical matter, it also provided Cellini with an opportunity to earn credit—by acting as a middleman, Cellini ensured that his calls for fundraising would be answered, and his power and influence would be maintained. In sum,

as Cellini contended to Levine, although his methods were more discreet than Rezko's and Kelly's, the true nature of his conduct was no different.

### D. The Need For the Sentence Imposed To Provide Deterrence

This Court should give significant weight to the need to provide general deterrence to others who would commit crimes of this sort. *See* 18 U.S.C. § 3553(a)(2)(B). In this instance, the sentence of probation requested by the defendant would send the message that efforts to corrupt state government may be excused. In contrast, a meaningful sentence of incarceration would send a strong message of deterrence to those who are tempted to corrupt governmental functions. Such a sentence would demonstrate that, no matter how much money you accumulate, or how many friends and supporters you enjoy, there is no protection from prison when you are caught corrupting public institutions.

The need for deterrence is particularly strong with respect to a person like Cellini, who exercised considerable influence over governmental functions despite the fact that he held no official title, and thus was not subject to many of the laws that are designed to hold public officials accountable for their actions. Cellini took no oath of office, owed no duty of honest services to the people of Illinois, was not bound by *ex parte* rules, filled out no economic disclosure forms, and filed no campaign contribution disclosures. Nevertheless, as the evidence showed, he was in a position to influence and affect decisions of great importance to the citizens of Illinois, and to corrupt the processes by which those decisions were made. Further, the need for deterrence in circumstances such as these is especially great in light of the difficulty of investigating and prosecuting the kind of secret-handshake

deal involved in this case. As Cellini discussed on the wiretap, he was well aware that the government would be investigating his actions, and he prepared for that day by, for example, preparing a cover story with Chris Kelly about what Kelly should say if law enforcement asked him about his relationship with Cellini. May 8 Tr. at 14 ("If somebody comes in with badges and flashes them at you and in the course of the conversation says do you know Bill Cellini... you gotta be prepared with what it is."). But for the wiretap that captured Cellini's scheming with Levine, this would have been a difficult prosecution to make. Meaningful sentences may well be the most effective way to deter insiders like Cellini who commit extensive fraud in secret, believing they will get away with it.

In contrast, Cellini's proposed sentence of probation—or even a token term of imprisonment—would send exactly the wrong signal here. It would not promote respect for the law but, to the contrary, would deprecate the seriousness of Cellini's effort to use $220 million in teachers' money to extort campaign contributions. And, perhaps even worse, such a sentence could be seen as suggesting that different rules apply to the wealthy and powerful.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

Cellini argues that a sentence of probation is appropriate here because he is "far less culpable" than Vrdolyak, whom Cellini believes to be the only defendant prosecuted as a result of the Board Games investigation who might be comparable to himself. Def. Version at 59. Such comparisons are always fraught with difficulty, but Cellini's argument is wrong on all fronts. In fact, Cellini's co-defendant, Lon Monk, provides a more apt comparison.

Lon Monk was sentenced to 24 months' imprisonment for his role in extorting a

campaign contribution for Rod Blagojevich from a racetrack owner where (1) Monk's role was limited to simply delivering the extortionate message; (2) Monk's participation lasted only a few days; (3) Monk held no public office; (4) the extortion was initiated and directed by Blagojevich, not Monk; (5) Monk was not going to benefit directly from the contribution; and (6) the extortion was ultimately unsuccessful.[12]  However, while Monk's crime was similar to Cellini's, Monk's actions after he was charged decidedly were not.  In contrast to Cellini, Monk admitted his guilt, accepted responsibility for the harm he caused, and provided substantial assistance to the government by cooperating.  In view of all of these facts, Cellini's request for a sentence substantially more lenient than the sentence imposed upon Monk is unpersuasive.

Cellini's attempt to compare his situation to Vrdolyak's is unpersuasive. The most obvious distinction between the two is one that Cellini ignores—Vrdolyak pled guilty and admitted his crimes.  Indeed, the letters that Vrdolyak provided in support of leniency at sentencing often emphasized the fact that Vrdolyak had expressed shame and remorse for what he had done. *See e.g,.* Exhibits 5and 6 (Siegler and Pierce letters).  Such anecdotes are conspicuously absent from the letters Cellini has submitted.  Although Cellini has apparently expressed sorrow at his situation and its effect on his family, there is no evidence that Cellini has admitted any responsibility for his own plight.  In light of this fundamental disparity

---

[12]  Monk admitted significant additional criminal conduct, but that behavior was proffer-protected, so Monk's sentence was based entirely on the single extortion to which he pled guilty.

alone, no valid comparison relevant to sentencing may be made between Cellini and Vrdolyak.

**F.      Cellini's Letters of Support Deserve Little Weight**.

Cellini has enjoyed many privileges and much good fortune in his life.  He has made literally hundreds of millions of dollars over his career in business, is a leader in his community, and enjoys a large and supportive group of family and friends.  In short, Cellini has a wealth of advantages that distinguish him from the typical criminal defendant, who has few if any of those advantages.

Above all, the letters Cellini has submitted to the Court in support o his request for leniency are evidence of the privileges and good fortune he continues to enjoy. Those letters, written by family members and friends, describe acts of generosity or charity which Cellini argues weigh in favor of a probationary sentence.  It is reasonable for the Court to consider those letters, and the acts they describe, as mitigating factors.  But in doing so, the Court should keep in mind that Cellini's wealth and powerful positions in business and politics afforded him unusual opportunities to act generously.  As the Seventh Circuit has stated:

> Wealthy people commonly make gifts to charity.  They are to be commended for doing so but should not be allowed to treat charity as a get-out-of-jail card. . . . [C]haritable works must be exceptional before they will support a more-lenient sentence, for . . . it is usual and ordinary, in the prosecution of similar white collar crimes involving high-ranking corporate executives. . . to find that a defendant was involved as a leader in community charities, civic organizations, and church efforts.  People who donate large sums because they can should not gain an advantage over those who do not make such donations because they cannot.

*United States v. Vrdolyak*, 593 F.3d 676, 682-83 (7th Cir. 2010) (internal citations omitted).

Indeed, every single convicted defendant in the Board Games investigation, including Rod Blagojevich, Edward Vrdolyak, Tony Rezko, and Stuart Levine, has produced testimonial letters similar to those Cellini has submitted here. For example, Vrdolyak's letters included descriptions of (1) instances in which Vrdolyak procured medical care for strangers, *see* Exhibit 5 (Siegler Letter), describing how Vrdolyak helped poor people get medical care 100-150 times; (2) other charitable acts, *see* Exhibit 6 (Pierce Letter), describing how Vrdolyak provided free legal services and paid utility bills for disadvantaged people, and Exhibit 7 (Echols Letter), describing how Vrdolyak paid for law school for a destitute but promising student; and (3) employees whom he treated well (See Exhibit 8 (Andolino letter), describing how Vrdolyak created unnecessary jobs at his offices to help people financially and give them sense of worth. The similarities between the letters submitted on behalf of Vrdolyak and the letters submitted here illustrate that it simply is not extraordinary for a wealthy, powerful person—particularly one who understands the power that comes from bestowing favors on others—to have performed numerous acts of generosity in their lives.

Cellini certainly was both wealthy and powerful—in 2005, Cellini represented that his net worth was approximately $153 million. The source of much of Cellini's wealth was his success in a number of businesses that relied heavily upon state government—either because the industry was heavily regulated (such as Cellini's ownership interest in Argosy Gaming Company, which owned several Illinois casinos), or because the company relied upon state funds directly (such as Commonwealth's heavy reliance on TRS money) or

indirectly (such as through his property management companies that worked primarily with entities that leased property with the State of Illinois). Thus, Cellini's ability to act generously resulted in part from his efforts to maintain influence in State government.

Similarly, Cellini's influence gave him the ability to access wealth far beyond even his own deep pockets, including the money of the people of Illinois. At the individual level, as attested to by many of his supporters, Cellini was able to obtain state jobs for many people. Indeed, the number of state government workers who wrote in support of Cellini is notable, even for a man who lived and worked in Springfield. At a more general level, Cellini was able to help steer millions of dollars of government aid to projects he favored, such as the Abraham Lincoln Presidential Library and Museum. In both cases, Cellini's use of the power to influence gave him credit in the eyes of the individuals who benefitted, and garnered him respect in the community.

Although Cellini's efforts to help individuals and his community may be commendable, it must also be recognized that he received returns for those efforts beyond the satisfaction inherent in helping others. Every person Cellini helped, and particularly those who obtained state jobs because of him, owed him a favor—and favors are an important currency in politics. In particular, when Cellini helped get people jobs in agencies whose decisions affected Cellini's business interests, such as at TRS, Cellini benefitted, as did the beneficiary of his assistance.

The likelihood of bias is always present in letters from family and friends; here, a number of letters have been submitted by persons, such as Robert Kjellander and James

Bruner, who benefitted from reported deals in which (with or without their knowledge)[13] Cellini facilitated the exchange of state action for political contributions, and persons whose undisclosed political or financial connections with Cellini raise questions regarding their reliability as character witnesses. Naturally, the Court will not receive letters from all the people who were cheated or defrauded by Cellini's activities. Indeed, this is not possible, as his victims included all the citizens of Illinois. For all of these reasons, in light of the limitations inherent in such evidence, the Court should be cautious about placing too much weight on letters of support submitted in this case. And, more generally, neither the letters nor the acts of generosity to friends and family described therein can balance out the harm caused by Cellini's illegal conduct. He must be punished for that conduct.

### G. Cellini's Age and Health Do Not Warrant a Sentence of Probation

The government agrees that the combination of Cellini's health and age makes this one of the relatively rare situations where it may well be appropriate to impose a sentence below the applicable Guidelines range. Cellini goes too far, however, by suggesting that his age and health justify a sentence of probation.

Standing by itself, the fact that Cellini is 77 years old does not justify a reduction in his sentence. Indeed, Cellini faces the prospect of prison now as a result of his decision to commit the crimes of conviction when he was at the age of 69. *See United States v. Anderson*, 517 F.3d 953, 966 (7th Cir. 2008) (affirming six-year sentence for a 73-year-old

---

[13] Whether Bruner and Kjellander were aware of what Cellini did does not matter—their stated belief that Cellini sought nothing improper from his position of influence is simply inaccurate.

real-estate developer who was convicted for paying a $10,000 bribe and noting that the district court "did acknowledge the defendant's advanced age but this factor also may have worked against Anderson. The judge noted that Anderson was well off financially and could have relaxed and enjoyed his golden years. While many criminals commit crimes from lack of opportunity and desperation, Anderson had acted out of greed."); *see also United States v. Watkins*, 393 Fed. Appx. 392, 393 (7th Cir. 2010) (70-month within-Guideline sentence reasonable for 66-year-old fraud defendant with various medical issues, including high blood pressure).

The government recognizes, however, that Cellini has experienced some significant health issues, as detailed in the PSR and in letters he submitted to the Court, and that those issues are more significant in light of his age.  Cellini's medical condition, however, is not a basis to excuse him from a meaningful sentence of incarceration. The Bureau of Prisons has significant experience treating inmates with conditions like Cellini's.  More specifically, Dr. Paul Harvey, the Regional Medical Director for the BOP's North Central Region since 2009, has reviewed the letters submitted by Cellini's various medical providers, as well as the more recent statements that Cellini has released to the media about his medical condition, and has concluded that "there is no reason that Mr. Cellini's medical needs cannot be met within the Bureau of Prisons." *See* Exhibit 9 at 1; *e.g.*, http://articles.chicagotribune.com/ 2012-06-27/news/ct-met-cellini-hospitalized-brief-20120627_1_springfield-power-broker-william-cellini-scandal-plagued-blagojevich-administration.

In light of this assessment, and of current reports concerning Cellini's health, any

deviation from the guidelines range based on age and infirmity should be relatively modest, especially when considered in conjunction with other aggravating sentencing factors.

## III.    CONCLUSION

For the reasons stated above, taking into account all of the relevant facts, the government respectfully asks that the Court sentence defendant William Cellini to a meaningful term of imprisonment.

Respectfully submitted,

GARY S. SHAPIRO
Acting United States Attorney

By:    s/Christopher S. Niewoehner
CHRISTOPHER S. NIEWOEHNER
JULIE B. PORTER
GREG DEIS
DEBRA RIGGS BONAMICI
Assistant United States Attorneys
219 S. Dearborn Street, 5th Floor
Chicago, Illinois  60604
(312) 353-5300

## <u>CERTIFICATE OF SERVICE</u>

The undersigned Assistant United States Attorney hereby certifies that in accordance with Fed. R. Crim. P. 49, Fed. R. Civ. P. 5, LR5.5, and the General Order on Electronic Case Filing (ECF), the following document:

GOVERNMENT'S SENTENCING MEMORANDUM

was served pursuant to the district court's ECF system as to all ECF filers, on July 11, 2012.

/s/ Debra Riggs Bonamici
Assistant United States Attorney
219 South Dearborn Street
Chicago, Illinois 60604
(312) 353-3741