**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 08 CR 888 |
| v. | ) | |
| | ) | Judge James B. Zagel |
| WILLIAM CELLINI | ) | |
| | ) | |

**DEFENDANT'S SUBMISSION**
**WITH RESPECT TO SENTENCING FACTORS**
**SET FORTH IN 18 U.S.C. § 3553**

# TABLE OF CONTENTS

Page

INTRODUCTION ....................................................................................................1

A SENTENCE OF PROBATION WOULD BE SUFFICIENT, YET NOT GREATER THAN NECESSARY, TO ACHIEVE ALL OF THE PURPOSES OF SENTENCING SET FORTH AT 18 U.S.C. § 3553(A)(2) ...................................................................3

I.   Nature and Circumstances of the Offense: 18 U.S.C. § 3553(a)(1) ...................5

II.  History and Characteristics of the Defendant: 18 U.S.C. § 3553(a)(1) ............10

    **A.**   Mr. Cellini's Age and Infirmity ...............................................................10

    **B.**   A Tradition of Humility and Charity ........................................................15

    **C.**   Early Professional and Family Life ...........................................................17

    **D.**   Devotion to Family ....................................................................................19

    **E.**   Real Estate Businesses and Relationships with Staff ...............................22

    **F.**   Community Recognition of Mr. Cellini's Honesty and Integrity ..............29

    **G.**   Mr. Cellini's Extraordinary Charity..........................................................36
        **1.**   Mr. Cellini's Support of Charitable Causes.......................................37
        **2.**   Mr. Cellini's Personal Charitable Interventions ................................41

    **H.**   Mr. Cellini's Military Service and Civic Involvement ............................48
        **1.**   Military Service ..................................................................................48
        **2.**   Civic Involvement...............................................................................50

III. Just Punishment for the Offense and Promotion of Respect for the Law:  18 U.S.C. § 3553(a)(2)(A) ....................................................................................54

IV.  Specific and General Deterrence: 18 U.S.C. § 3553(a)(2)(B) &(C)................56

V.   Avoidance of Unwarranted Sentencing Disparity: 18 U.S.C. § 3553(a)(6) .....58

    **A.**   Stuart Levine.............................................................................................58

    **B.**   Ed Vrdolyak.............................................................................................59

    **C.**   Joe Cari ....................................................................................................61

    **D.**   Steve Loren ..............................................................................................62

**E.** Lon Monk.................................................................................................................63

CONCLUSION.................................................................................................................65

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Gall v. United States*,
    552 U.S. 38 (2007)..................................................................................1, 3

*Kimbrough v. United States*,
    552 U.S. 85 (2007)......................................................................................3

*Pepper v. United States*,
    131 S. Ct. 1229............................................................................................3

*United States v. Adelson*,
    441 F. Supp. 2d 506 (S.D.N.Y. 2006)......................................................48

*United States v. Baxter*,
    217 F. App'x 557 (7th Cir. 2007) .............................................................36

*United States v. Booker*,
    543 U.S. 220 (2005)....................................................................................3

*United States v. Carter*,
    530 F.3d 565 (7th Cir. 2008) ...............................................................36, 49

*United States v. Carter*,
    538 F.3d 784 (7th Cir. 2008) .....................................................................10

*United States v. Holt*,
    486 F.3d 997 (7th Cir. 2007) .....................................................................11

**STATUTES**

18 U.S.C. § 3553..............................................................................................3, 1

18 U.S.C. § 3553(a) ..................................................................................... passim

18 U.S.C. § 3553(a)(1)...........................................................................3, 5, 7, 10

18 U.S.C. § 3553(a)(2)(A) ................................................................................53

18 U.S.C. § 3553(a)(2)(B) ................................................................................55

18 U.S.C. § 3553(a)(2)(C) ................................................................................55

18 U.S.C. § 3553(a)(6).......................................................................................58

U.S.S.G. App. C, Amend. 739 .....................................................................10, 49

## INTRODUCTION

The Advisory Sentencing Guidelines are only a "starting point" and "initial benchmark" in the determination of a just and appropriate sentence. *See Gall v. United States*, 552 U.S. 38, 49-51 (2007).[1] As directed by the Supreme Court, "after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district court judge should then consider all of the 3553(a) factors." *Id*. at 49-50. Furthermore, the Supreme Court has held that the Court "may not presume that the guidelines range is reasonable," but should rather "make an individualized assessment based on the facts presented." *Id.*

The statutory factors set forth in 18 U.S.C. § 3553(a) are intended to assist the Court in arriving at a just sentence, "sufficient but not greater than necessary" to achieve the purposes of sentencing. 18 U.S.C. § 3553(a). In this case, both the Advisory Sentencing Guidelines and a thorough consideration of the § 3553(a) factors yield the conclusion that a sentence of probation[2] would be the just result in this case.

First, the nature and circumstances of the offense, in which Mr. Cellini participated in five recorded phone calls over the span of about a week in connection with an extortion scheme that was largely hidden from him, justify a sentence of probation.

---

[1] On July 23, 2012, the defense filed its Objections to the Presentence Investigation Report and explained that Cellini's guideline level is 8, which corresponds to 0-6 months of imprisonment and permits a probationary sentence.

[2] The Government's Sentencing Memorandum argues that probation is not a "meaningful" sentence. (Government Sentencing Memorandum at 20.) The United States Supreme Court disagrees. In *Gall*, the defendant's advisory guideline calculation was 30-37 months based on his having participated for seven months in a conspiracy to distribute Ecstasy in which he netted over $30,000. In determining that a sentence of probation was sufficient punishment in that case, the Court observed that although a custodial sentence was "qualitatively more severe" than a probationary sentence of the same term, probation is a substantial restriction on an individual's liberty. *Gall*, 552 U.S. at 48. The Court stated, "Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty . . . probationers may not leave the judicial district, move or change jobs without notifying and in some cases receiving permission from their probation officer or the Court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking . . . most probationers are also subject to individual 'special conditions' imposed by the Court." *Id.* (internal citations omitted).

Second, Mr. Cellini's "history and characteristics" present an extraordinarily powerful argument for the exercise of leniency in sentencing. Mr. Cellini is an elderly man in poor health. He is approaching 80 years old, and in recent months, he developed life-threatening cardiovascular issues, including an acute blood clot in the groin of his right leg, stemming from a second heart attack in June. Mr. Cellini further suffers from a variety of other ailments, including prostate cancer and a frequently debilitating neurological disorder, which, combined with his advanced age and damaged heart, suggest unfortunately that Mr. Cellini has a very limited amount of time left to live. Supporters of Mr. Cellini submitted over 364 letters on his behalf that suggest it would be tragic and unjust for Mr. Cellini to spend his few remaining days behind bars.[3] With regard to the vast majority of these letters, their authors volunteered unsolicited to write to the Court in support of Mr. Cellini. These letters were submitted by a variety of individuals – including an Indonesian orphan, a young man suffering from cerebral palsy, and a Chinese political asylum seeker – all of whom Mr. Cellini befriended, supported, and championed with no expectation of receiving anything in return, other than the knowledge that he was able to make a positive difference in their lives. The 364 letters attest to the fact that Mr. Cellini went far beyond making a positive difference in certain individuals' lives; simply put, through thousands of individual instances over the course of a lifetime of quiet beneficence and charity, Mr. Cellini transformed lives and contributed to the health and vitality of the Springfield community. These actions, for which Mr. Cellini has never sought recognition, should inform the critical determination as to any punishment to be meted out in this case. Mr. Cellini's documented and exemplary record of military service should also inform the sentencing determination. Considerations of "just punishment," "specific deterrence," "general deterrence,"

---

[3] Several additional letters have been submitted by treating physicians solely on the topic of Cellini's health concerns.

and the need "to avoid unwarranted sentencing disparities" all align in favor of a sentence of probation in this case.

### A SENTENCE OF PROBATION WOULD BE SUFFICIENT, YET NOT GREATER THAN NECESSARY, TO ACHIEVE ALL OF THE PURPOSES OF SENTENCING SET FORTH AT 18 U.S.C. § 3553(a)(2)

18 U.S.C. § 3553(a) provides the framework for the imposition of federal sentences. *See United States v. Booker*, 543 U.S. 220, 233-34 (2005). This statute requires courts to give thorough consideration to a number of factors, including the "nature and circumstances of the offense" and factors that focus on the defendant and his or her life history. *Gall*, 552 U.S. at 50; *Kimbrough v. United States*, 552 U.S. 85 (2007); *Pepper v. United States*, 131 S. Ct. 1229, 123 ("Highly relevant if not essential to the selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics.").

On the truly unique facts of this case, the "nature and circumstances of the offense" support a probationary sentence. *See* 18 U.S.C. § 3553(a)(1). As discussed in greater detail below, Mr. Cellini stands convicted of some participation in a conspiracy to extort Tom Rosenberg, but it is undisputed (and likely almost without precedent in cases involving comparable facts) that Mr. Cellini was never even informed of and did not participate in the most critical aspects of that conspiracy, including the actual decision, planning, and alleged attempt to extort Rosenberg by providing him a choice between paying a kickback and making a campaign contribution. Indeed, it is uncontroverted that at least for a time, Mr. Cellini actively attempted to aid Rosenberg and defeat the extortion efforts of the mastermind of the conspiracy, Stuart Levine. It was Levine, along with Tony Rezko, Chris Kelly, and others – not Mr. Cellini – who set out to harm Rosenberg, and Levine, Rezko, and Kelly who involved Mr. Cellini in their plot strictly by virtue of the fact that Mr. Cellini had been working to help Rosenberg obtain the TRS allocation that was the subject of that plot. Against that background, the evidence at trial and

jury's verdict established that Mr. Cellini did no more than act as a middleman for the purpose of smoothing out a situation he knew little about involving corrupt individuals with unknown plans and ulterior motives.

Consideration of Mr. Cellini's life and characteristics also present compelling justification for a probationary sentence. Mr. Cellini's kindness and generosity, manifested in countless individual acts of charity, has been evidenced by a veritable avalanche of letters to this Court. These letters establish that Mr. Cellini spent a lifetime trying to improve the lives of those he encountered, without regard to their station in life or his own interest. In its Sentencing Memorandum, the government cynically dismisses the attestations to Mr. Cellini's charity from former governors, retired Illinois Supreme Court Justices, and business executives, as evidence that Mr. Cellini acted benevolently over the years as a means of courting power and obtaining influence. But the letters describe a different reality. First, the letters make it abundantly clear that Mr. Cellini never publicized his numerous charitable acts. To the contrary, he kept his generosity quiet, seeking neither thanks nor recognition. Second, numerous letters specifically explain that even when the author had occupied a position of power in which he or she could have conferred a benefit on Mr. Cellini, he never asked for any favors. Third, for dozens of letter writers, it is obvious from the circumstances that Mr. Cellini could never have held out any hope or expectation that the individual would ever be in a position to repay Mr. Cellini's kindnesses. Mr. Cellini's charity and generosity were born out of the fundamental tenet with which he was raised and which he has upheld throughout his life – that one should help others when and how one can because it is the right thing to do. Mr. Cellini's life is a testament to that principle, as are the experiences of all who have been the beneficiaries of his kindness.

I.      **Nature and Circumstances of the Offense: 18 U.S.C. § 3553(a)(1)**

The specific circumstances underlying the Counts of conviction, as well as the conduct for which Mr. Cellini was acquitted, have been discussed at length in various post-trial filings and will not be repeated here. For purposes of evaluating the nature and circumstances of this offense, however, certain circumstances merit brief discussion.

First, Mr. Cellini was not an elected public official. For all of government's discussion of his supposed influence in political matters, the reality is that Mr. Cellini has not held public office since 1973.

Second, it is critical to recall that even under the government's view of the case, the conduct with which Mr. Cellini was charged and convicted consisted of participating in five taped and two untaped phone conversations over the span of approximately one week within the context of a conspiracy initiated and plotted by other parties months prior. Mr. Cellini's sentence should appropriately account for the extremely limited duration of his participation in the conspiracy.

Third, Mr. Cellini was a peripheral participant, at most, in the conspiracy. It is undisputed that Levine, for his part, repeatedly lied to and deceived Mr. Cellini, and Rosenberg, for his part, consistently provided Mr. Cellini incomplete information, such that ultimately, at the time of his participation in the phone calls upon which his criminal conviction was based, Mr. Cellini lacked information as to numerous critical facts, including, at least, the following:

- Mr. Cellini was unaware of the dispute between Levine and Rosenberg in 2001 concerning Rosenberg's refusal to pay Levine various requested bribes, which preceded and informed Levine's subsequent plot to extort Rosenberg in 2004.

- Mr. Cellini had no idea about the April 14, 2004 meeting between Rezko and Levine at the Standard Club, during which Levine and Rezko agreed to extort Rosenberg in relation to TRS allocation to Capri pursuant to a plan Levine had developed earlier in 2004, also without Mr. Cellini's knowledge.

5

- Mr. Cellini had no knowledge of the meeting among Levine, Rezko, and Kelly in late April 2004 during which they agreed to try to use Mr. Cellini to approach Rosenberg to advance their corrupt agenda, and during which they decided to present Rosenberg a two-pronged choice between paying a campaign contribution and a kickback to Levine.

- Mr. Cellini had no information about the amount of the campaign contribution that Levine was going to request from Rosenberg.[4]

- Mr. Cellini did not know Levine intended to provide Rosenberg a choice between paying a campaign contribution and paying a kickback to Levine and Rezko.

- Mr. Cellini did not know of Ed Vrdolyak's participation in the plot to extort a kickback from Rosenberg.

- Mr. Cellini had no knowledge of the breadth and depth of the personal corruption engaged in by Levine, Rezko, Kelly, and others. He was unaware, for example, of Levine's plan to steal $20 million from the public coffers to enrich himself, Rezko's corrupt participation in those schemes, and Levine's double life of prostitution, drug dealing, and drug abuse. Far to the contrary, all available evidence suggests Mr. Cellini regarded Levine as a model citizen and philanthropist (as did the rest of the world), and Rezko and Kelly as prominent, well-regarded public figures.

Thus, the Court should consider that while Mr. Cellini was convicted of participating in the conspiracy to extort Rosenberg, Mr. Cellini also was indisputably lied to and misinformed about that conspiracy throughout the duration of his participation, and Mr. Cellini should not be punished for misconduct he never intended or for circumstances about which he was deliberately kept in the dark.

Fourth, the remarkable reality in this case is that Rosenberg, the extortion victim, sought and received assistance from Mr. Cellini specifically as to the Capri TRS allocation that was the subject of the extortion conspiracy. Indeed, Mr. Cellini initially was successful in providing the assistance Rosenberg requested (ironing out the Capri ownership issue that was causing there to

---

[4]Indeed, it is unclear Mr. Cellini knew anything of the plan to request a campaign contribution. Although Levine testified in this case that he told Mr. Cellini during an unrecorded call that he (Levine) intended to ask Rosenberg for a campaign contribution, he previously told the FBI that Mr. Cellini was unaware of that aspect of the plot.

be a hold on the allocation). Thus, incredibly, Mr. Cellini very nearly personally defeated the conspiracy with which he has been convicted; were it not for the corrupt involvement of Rezko, Mr. Cellini would have defeated Levine's plot, and this case never would have arisen. Likewise, if Mr. Cellini had simply refused to help Rosenberg, Mr. Cellini never would have become involved in the Capri situation, and this case would not have arisen. But stepping in to mediate disputes was not at all unusual for Mr. Cellini. As numerous letter writers confirmed, Mr. Cellini routinely assisted parties in resolving their differences and moving forward into productive relationships.

For example, Ellen Barnes wrote that she witnessed Mr. Cellini acting as a problem-solver for more than 30 years without a single impropriety, observing that he was a "natural born mediator . . . ever generous if he could be helpful."[5] Daniel Curran, who worked closely with Mr. Cellini when Mr. Curran served as President of the Illinois Asphalt Pavers Association, wrote that Mr. Cellini was able to listen to the concerns voiced by everyone in the room and then to help others to reach a decision that was beneficial to everyone involved.[6] Mr. Curran explained that Mr. Cellini was "always worried about doing what was right" and was "often the peacemaker that could come up with a solution that was best for all concerned."[7]

Mr. Cellini brought warring entities together regarding legislative issues with the Illinois Commerce Commission and, as observed by N. Richard and M. Kay King, always went out of his way "to bring people together . . . [to] try to help settle differences and facilitate solutions to problems."[8] Bob Rogers, who worked with Mr. Cellini for seven years in connection with the Lincoln Library and Museum, observed, "Bill was a mediator, peace maker and a way-finder

---

[5]Letter of Ellen Barnes, Tab 56 at 1.
[6]Letter of Daniel Curran, Tab 100 at 1.
[7]*Id.*
[8]Letter of N. Richard and M. Kay King, Tab 35 at 1.

who dealt in the art of the possible. He knew how to bring people together over issues . . . He found the common ground that bridged understanding and then he removed himself from the relationship."[9]

As observed by Dominic DiFrisco, "without seeking prominence, [Mr. Cellini] was often thrust into situations of leadership by the hordes of people who sought his counsel and help."[10] Longtime friend and business associate Andy Van Meter concluded of Mr. Cellini, "For more than forty years I have been privileged to witness Bill arrange agreements and maneuver compromises among political factions and between ambitious politicians. His tools were always infinite patience and a genuine desire to help all honest parties."[11] Mr. Cellini's demonstrated history as mediator and peacemaker provides important context for his decision to attempt to fulfill a similar role with regard to the events of this case, and specifically, the dispute between Levine and Rosenberg.

Fifth, Levine told Mr. Cellini that his (Levine's) dispute with Rosenberg related to the estate of Ted Tannenbaum, the deceased, mutual business partner of Levine and Rosenberg, In particular, Mr. Cellini understood that the dispute involved Rosenberg's refusal to provide Levine an accounting for LakeShore Entertainment (a film company co-owned by Rosenberg and Tannenbaum) in connection with Levine's (corrupt) efforts to administer the Tannenbaum estate. This background, alluded to in the recorded calls, provides further, critical context for Mr. Cellini's involvement as mediator.

Sixth, Mr. Cellini should not be punished for his presumed political influence. The jury verdict, consisting of convictions on Counts II and IV and acquittals on Counts I and III,

---

[9]Letter of Bob Rogers, Tab 6 at 3.
[10]Letter of Dominic DiFrisco, Tab 113 at 1.
[11]Letter of Andy Van Meter, Tab 10 at 1.

indicates that the jurors found that the misconduct in this case was restricted to a narrow time frame in early May 2004, and that the jury rejected the government's allegations that Mr. Cellini participated in a broader, longer-running conspiracy to steer TRS business to the Blagojevich administration. The Court should therefore reject the government's unfair effort to ignore the jury's verdict and inject Mr. Cellini's supposed political influence and conduct of which he has been acquitted into these sentencing proceedings.

To be sure, as revealed by the outpouring of letters sent to the Court on Mr. Cellini's behalf, a career of over 50 years in a community as close and as small as Springfield inevitably will yield a certain amount of community recognition and close personal and professional relationships, including with members of the political community. But absent reliable factual support that Mr. Cellini abused those relationships, rather than mere presumption or conjecture that he did so (or allegations that he did so that were specifically rejected by the jury), such as the government offers, Mr. Cellini's supposed political influence is totally irrelevant to his sentencing. Numerous individuals in positions of power and influence in the Springfield community and beyond with whom Mr. Cellini interacted and had relationships, many of whom undoubtedly were in positions that gave them the ability to provide a benefit to Mr. Cellini, have confirmed in letters included with this submission that Mr. Cellini never requested anything improper of them.

Upon hearing Mr. Cellini derided in the media as a "behind the scenes kingpin," longtime Springfield resident Lawrence Selinger observed:

> The fact of the matter is that Bill used a position of some influence (which he richly deserves and for which he worked incredibly hard), in order to constantly assist and benefit people of the community, who were hard working and honest but who had not been able to achieve any financial success or provide enough for their families. That the term could be used as a slur against Bill Cellini only reveals the extent to which the media has misunderstood the person Bill really is

or the ways in which he has always used his talents and his gifts for the betterment of the community.[12]

The prominence Mr. Cellini held in the Springfield community was the result of his constant beneficence and charity. Far from constituting a factor that should aggravate the sentence in this case, the reverence with which Mr. Cellini is held by those who know him well is a powerful argument for leniency.

## II.    History and Characteristics of the Defendant: 18 U.S.C. § 3553(a)(1)

Mr. Cellini's history and personal characteristics also compellingly argue for a probationary sentence. Mr. Cellini is an elderly man in very poor health. A period of incarceration may amount to a sentence of life imprisonment. This is a critical consideration that, when weighed against Mr. Cellini's commendable life of civic and charitable work and devotion to family and community, suggest that a sentence of incarceration would be not only underserved and improper, but potentially dangerous.

### A.    Mr. Cellini's Age and Infirmity

The November 10, 2010 amendments to the Advisory Sentencing Guidelines make it clear that age and age-based considerations are specifically relevant to sentencing. Specifically, the November 1, 2010 amendments altered Advisory Guidelines Section 5H1.1 to provide that age and age-based considerations are specifically allowed as grounds for guideline departures. *See* U.S.S.G. Appendix C, Vol. III, Amend. 739 at 348. The amendment was enacted to make clear that even under the Advisory Guideline calculations, and separate and apart from § 3553(a) considerations, advanced age and illness properly mitigate criminal sentences. Courts in this Circuit have likewise recognized age as a factor that should can and should properly mitigate a defendant's sentence. *See, e.g.*, *United States v. Carter*, 538 F.3d 784 (7th Cir. 2008)

---

[12]Letter of Lawrence Selinger, Tab 7 at 2.

(determining that a 61-year-old defendant with no specified health concerns should receive a sentence 63 months below the guideline calculation based in part on his advanced age); *United States v. Holt*, 486 F.3d 997, 1004 (7th Cir. 2007) (granting a 62-month departure from the advisory guideline calculation on the sole basis that the defendant who was a young man at the time of sentencing would be middle-aged when released from prison).

The age and health considerations before the Court in this case make a convincing argument for a probationary sentence. Mr. Cellini is 77, and in a month will be 78 years of age. On June 4, 2012, while awaiting sentencing on this proceeding, he suffered a heart attack on the operating table during a surgical procedure to place stents in his heart to treat two substantial arterial blockages. Problems with Mr. Cellini's heart were discovered during a stress test he took at the beginning of June because of his experience of recurring tightness in his chest, fatigue, and weakness. The stress test revealed possible additional problems with Mr. Cellini's heart circulation. Treating cardiologist Dr. Brian Miller recommended heart catheterization and an angiogram. These diagnostic tools revealed the need for two new stents. During the procedure in which those stents were placed, Mr. Cellini's heart threw off a blood clot that resulted in a heart attack. Subsequent testing while Mr. Cellini remained hospitalized revealed that his heart has been seriously damaged. Dr. Miller recommended a minimum of six weeks of convalescence and rehabilitation for Mr. Cellini's heart. Mr. Cellini has not been able to commence full cardiovascular rehabilitation as yet, however, because following the heart attack and stent implanting, an acute blot clot was discovered in his leg and groin, which was deemed by his physicians to be a life-threatening health risk. It was only after July 10 of this year that he was even permitted to walk briefly. As discussed in a previous filing, Mr. Cellini currently is undergoing a daily regimen of multiple blood-thinning medications to address the blood clot and

11

had been advised by his physicians, including vascular specialist Dr. Raghu Killuri, to avoid travel and limit his activity pending the results of a sonogram on September 25, 2012, due to a serious risk that locomotion could dislodge the clot, which could travel to Mr. Cellini's lungs or heart and cause immediate death. Because of the clot in Mr. Cellini's groin, he had not begun rehabilitating his damaged heart. The sonogram indicated that medications had contained the clot in Mr. Cellini's groin. However, Dr. Killuri stated that because of Mr. Cellini's two clots and medical history, he has a propensity for clots to form, which can be deadly; Dr. Killuri advised that at the first symptoms of clotting, Mr. Cellini must immediately obtain emergency treatment or risk the possibility of a stroke or death.

Mr. Cellini's recent heart attack and resulting life-threatening blood clot was not the first of his chronic heart problems. In the 1990s, he experienced a heart attack, or myocardial infarction.[13] He was admitted to the emergency room in connection with this event in the 1990s and "underwent cardiac catheterization and then stenting of his left anterior descending coronary artery."[14] According to pulmonary specialist Dr. Glennon H. Paul, M.D., who has acted as a general treating physician for Mr. Cellini for 30 years (and who wrote his letter to the Court before Mr. Cellini's June 4 heart attack), "he is in a high risk category for recurrent myocardial infarctions."[15] Before the time of his stress test and stenting procedures performed this June, Mr. Cellini was already being treated for coronary heart disease, dyslipidemia, and hypertension.[16] Dr. Brian Miller, the cardiologist who has been acting as treating physician for Mr. Cellini's heart condition since the 1990s, wrote somewhat presciently in March 2012 that he had become

---

[13] Letter of Brian Miller, M.D., F.A.C.C., Tab 367 at 1-2.
[14] Letter of Brian Miller, M.D., F.A.C.C., Tab 367 at 1-2.
[15] Letter of Glennon H. Paul, M.D., Tab 366 at 1.
[16] *Id.*

increasingly concerned about Mr. Cellini's cardiovascular disease.[17]    Specifically, Dr. Miller observed that Mr. Cellini's elevated stress levels were manifesting themselves "as increased hypertension as well as an increased amount of chest discomfort."[18]

In addition to his recent heart attack and persistent heart disease, Mr. Cellini has suffered from prostate cancer; he underwent surgery performed by Dr. William Catalona and remains under the supervision of Dr. William Severino for a possible resurgence of the cancer.[19]  Also, Drs. Edward Trudeau and Kevin Imhoff treat Mr. Cellini for a frequently crippling neurological disorder, cervical spinal stenosis, that has twice resulted in his losing feeling in his arms and hand and needing to undergo emergency evaluation as to whether he had actually had a stroke.[20] Mr. Cellini has also been diagnosed with lumbar spinal stenosis.[21]   Both cervical and lumbar stenosis are degenerative disk diseases that can result in weakness or numbness in the limbs and difficulty walking.[22]   These give rise to chronic back pain.  Indeed, Mr. Cellini's heart doctor, Dr. Miller, observed that Mr. Cellini was having difficulty walking and was beginning to suffer falls, injuring his knees and hips.[23]   Further, Mr. Cellini suffers from other health ailments that, while not dire, stem from advanced age and poor health, including such things as gastroesophageal reflux disease ("GERD"), cataracts, and anxiety.[24]   Mr. Cellini's numerous

---

[17]*Id.*

[18]*Id.*

[19]Letter of William Severino, M.D., Tab 369 at 1.

[20]Letter of Edward Trudeau, M.D., FAAPMR, Tab 365 at 1.

[21]*Id.*

[22]*Id.*

[23]Letter of Brian Miller, M.D., F.A.C.C., Tab 367 at 2.

[24]All told, Mr. Cellini's medical conditions currently necessitate that he regularly ingest more than a dozen different prescription and over-the-counter medications, each with its own additional side effects. These include the following: Brilanta and Plavix (heart stents); Lovenox and Warfarin (blood thinner for clots); Nitroglycerin (chest pain); Lipitor (cholesterol); Prednisone (asthma); Zyrtex and Loratadine (bronchial allergies); Celebrex (arthritis); Famotidine and Nexium (GERD); Alprazolam, Lorazepam, Wellbutrin, and Paxil (anxiety); Baclofen (pain relief); and Melatonin (sleep).

ailments currently have left him in a fragile, weakened state, requiring frequent rest due to fatigue and exhaustion.

Mr. Cellini's health issues are unquestionably serious, made all the more so by the fact that they are experienced by a man approaching the end of his life at nearly 80 years of age. Mr. Cellini's younger sister Janis expresses concern that Mr. Cellini is now well beyond the age at which their parents died, with their father succumbing to a heart attack at age 62 and their mother suffering a heart aneurysm at age 72.[25] Indeed, all members of Mr. Cellini's close family have passed away at ages younger than Mr. Cellini is now. His brother succumbed to cancer at age 42, his grandmother and grandfather passed away at ages 38 and 52, respectively, and none of his uncles lived to see age 77. Andy Van Meter, a friend of Mr. Cellini's for 40 years, observes, "Bill is now an old man. Heart troubles and a cancer battle manifest his morality. He has reached the stage in life when friends of longstanding pass away, workaday interests wane, and only your close family sustains you."[26]

Mr. Cellini's advanced age and failing health present strong arguments for leniency in sentencing. Even the government recognizes that "the combination of Mr. Cellini's health and age makes this one of the relatively rare situations where it may well be appropriate to impose a sentence below the applicable Guideline range." (Government Sentencing Memorandum at 26.) Any sentence that might be imposed on Mr. Cellini would remove him from the care of his long-time treating physicians, a matter about which all of the doctors have expressed concern. Indeed, according to the United States Social Security Administration, current male life expectancy is 75; Mr. Cellini will be 78 next month, further supporting that a sentence of imprisonment is likely to amount to a life sentence. Worse, any prison time for Mr. Cellini could

---

[25]Letter of Janis Cellini, Tab 2 at 4.
[26]Letter of Andy Van Meter, Tab 10 at 1.

result in his suffering from illness or death away from his family and from the doctors who are treating him. This is an unimaginably harsh result for a man who, aside from the events of this case, has led an exemplary life characterized by enormous integrity and profound concern for his community, as discussed in greater detail below.

### B.    A Tradition of Humility and Charity

William Cellini was born and raised on the working class north side of Springfield. His father started as a coal miner and then worked as a police officer in Springfield for 30 years, ascending to the position of Chief of the Juvenile Crime Division before he retired. During the time Mr. Cellini's father worked in the Juvenile Division, Sangamon County had no facility for juvenile offenders. On many occasions, the Cellini family took in runaways or errant teenagers whom Mr. Cellini's father could not bear to send to the lock-up.[27] Mr. Cellini and his father also worked to provide outlets for the neighborhood children. Mr. Cellini and his father organized a group who worked with local landowners to build Fairview Park on the north side of Springfield so the children had a place to play and then obtained the assistance of local merchants in sponsoring baseball teams.[28]

Mr. Cellini's mother, Edith, was a pillar of strength and stability not only for Mr. Cellini's immediate family, consisting of Mr. Cellini and his brother, Robert, and sister, Janis, but for the whole Cellini extended family of aunts, uncles, and cousins as well as for other immigrant families in the neighborhood. Many letter writers, some in their 90s, wrote of Mr. Cellini's mother and the Sunday night dinners she prepared and served to the extended Cellini family. Julie Cellini recalls in her letter that when she started dating Mr. Cellini, she met his

---

[27]Letter of Julie Cellini, Tab 1 at 1.
[28]Letter of Claudio Pecori, Tab 259 at 1.

family in the context of one of the traditional Sunday dinners at Mr. Cellini's childhood home.[29]

Mr. Cellini's mother also worked to earn additional money for the family, taking in laundry

when the children were young and then working in various clerical positions when they reached

school age. Mr. Cellini's father, in addition to his job as police officer, worked as a warehouse

security guard on weekends.

The family work ethic was passed on to Mr. Cellini, who worked from the time he was a

very young man, cleaning chickens in his uncle's poultry house, acting as a delivery boy, and,

when he was a bit older, playing piano in a dance band.[30] As related in the letter of Charles

Salvo, family friend of 60 years, when Mr. Cellini was young, if he was not in school, helping

parents around the house, or playing in a band, he was dressing chickens in his uncle's poultry

house.[31] Through his industriousness, Mr. Cellini was able to put himself through school as well

as to support others. Mr. Cellini spent his spare time earning money so he could help family and

friends in need of assistance and was able, on multiple occasions, to provide relatives with

money for food, rent, and medical bills.[32] Even at an early age, Mr. Cellini was anonymous in

his support, not wishing to cause his family members any shame or discomfort.[33]

Abundantly clear from the letters submitted to the Court on Mr. Cellini's behalf was that

he took pride in his family's working-class background and internalized the strong family values

it imparted. Peggy Ryan, who spent many years babysitting for Mr. Cellini's children, Claudia

and Bill Jr., provided her observation that even after he attained a measure of professional

---

[29]Letter of Julie Cellini, Tab 1 at 1.

[30]Cellini continued playing piano in a band until 1963, when professional responsibilities intervened. He served as the Chairman of Springfield's Musicians' Union for ten years. In that role, in the late 1950s or early 1960s, Cellini was responsible for merging the then-separate white and black musicians unions into one.

[31]Letter of Charles Salvo, Tab 284 at 1.

[32]Letter of Cellini's first cousin, Bonita Cellini DeRosa, Tab 104 at 1.

[33]*Id.*

success, Mr. Cellini "was comfortable and happy being bossed around by his mother while she cooked spaghetti in her humble home on Springfield's north end for whoever happened to show up on any given Sunday."[34]   Douglas and Sue Schwartz wrote that after a dinner they hosted for Bill and Julie Cellini and Mr. Cellini's sister, Janis, they found Mr. Cellini in their kitchen doing the dishes.  As recounted in their letter, Mr. Cellini explained, "[his] mother taught him to always take care of [the] hosts."[35]   The Schwartz letter also recalled that Mr. Cellini always "spoke so highly of his mother and father and their humble beginnings."[36]

### C.   Early Professional and Family Life

Respectful and proud as he was of his family's beginnings, Mr. Cellini was destined to take a different professional path.  He was the first in his family to attend college, which he attended on an NROTC scholarship, and the first in his immediate family to graduate from high school.  Mr. Cellini graduated from college with a degree in Physics, took a job in engineering, and then ran for political office.  During this time, Mr. Cellini worked as a teacher of physics, algebra, and English in a high school in rural central Illinois.  Mr. Cellini has received the "Distinguished Alumni Award" from Illinois College, as well as the "Outstanding Leadership Award" from Bradley University's School of Engineering and Construction.  In 1961, when he was 27 years old, Mr. Cellini ran for and was elected to the Sangamon County Board of Supervisors, his first elected office.  Because this was a part-time position, Mr. Cellini continued in his teaching position while attending graduate school.  In 1963, Mr. Cellini was elected to the full-time position of Springfield City Council where he also served as the Commissioner of Public Works.  While serving in this position, at 29 years of age, Mr. Cellini met and married Julie England, who was working as a newspaper reporter.  Louis Humphrey II described in his

---

[34]Letter of Peggy Ryan, Tab 28 at 1.
[35]Letter of Douglas and Sue Schwartz, Tab 293 at 1.
[36]*Id.*

letter observations of Mr. Cellini at the annual picnics in the park for staff during Mr. Cellini's tenure as city streets commissioner. Regarding the staff, including the laborers who worked on the Springfield streets and sewers, Mr. Humphrey remarked upon their "sincere devotion" to Mr. Cellini, explaining, "[Mr. Cellini] treated those guys the same way he eventually treated governors, senators, and business executives . . . he treated them with respect and dignity . . . He was to them, and has unflappably remained to all, a kind, honest, generous, modest and soft-spoken gentleman, in the truest sense of the word."[37]

In 1967, Mr. Cellini ran unopposed and was elected to a second term on the Springfield City Council. Mr. Cellini supported Richard Ogilvie in the 1968 gubernatorial election and after Ogilvie was elected, he appointed Mr. Cellini to his cabinet as Director of Public Works and Buildings for the State of Illinois. This was Mr. Cellini's first statewide office, and he served in this position until 1970, when Ogilvie appointed him as Illinois' first Secretary of Transportation. When Ogilvie was defeated in the gubernatorial race by Dan Walker in 1973, Mr. Cellini left his position in the Transportation Department. Mr. Cellini never again held public office.

In 1969, Mr. Cellini's son, Bill Jr., was born. Mr. and Mrs. Cellini were devastated to learn that Bill Jr. was born with gastroschisis, a medical condition in which his abdomen was literally inside out, with all of his internal organs outside his body.[38] The condition necessitated that Bill Jr. spend four months in intensive care at Children's Memorial Hospital and endure numerous surgeries.[39] As recounted in Julie Cellini's letter, Bill Jr. had last rites administered to him several times, as the doctors were time and again convinced that he would not live through

---

[37]Letter of Louis Humphrey II, Tab 181 at 1.
[38]Letter of Julie Cellini, Tab 1 at 2.
[39]*Id.*

the first few months.[40]  Throughout this ordeal, Mrs. Cellini described Mr. Cellini as "steadfast," going to work each day, spending his nights next to Bill Jr.'s isolette, and making it his mission to understand the technologies for Bill Jr.'s care.[41]  As Julie Cellini's letter explained, Mr. Cellini was then to "restructure his own life with our son's needs front and center."[42]  Specifically, Mr. Cellini gave up on his political career to build a financial base so that Mrs. Cellini could stay home and devote herself to Bill Jr.'s full-time care.[43]  In 1972, Mr. Cellini accepted an appointment as Executive Director of the Illinois Asphalt Pavement Association ("IAPA"), a trade association for Illinois contractors based in Springfield.  This was his first job in the private sector outside of his teaching jobs.  In 1974, Mr. and Mrs. Cellini welcomed their second child, daughter Claudia.

### D.     Devotion to Family

As evidenced by hundreds of letters submitted on Mr. Cellini's behalf, his love for his wife Julie and children Bill Jr. and Claudia is without limit.  He has supported his wife and his children in every endeavor they have wanted to pursue with unstinting enthusiasm and unconditional support.  Julie Cellini wrote that no matter what she wanted to do, Mr. Cellini was there every step of the way cheering her on from the sidelines.[44]  When his son Bill Jr. developed an interest in music, Mr. Cellini allowed a band of four teenagers – Bill Jr. and three friends – to practice in their basement, provided advice on equipment and performances, and even carpeted the floors and walls of a portion of the basement to give it the feeling of a studio.[45]  When Bill Jr. developed an interest in the movie business, Mr. Cellini supported his son unconditionally and,

---

[40]*Id.*
[41]*Id.*
[42]*Id.*
[43]Letter of Julie Cellini, Tab 1 at 4.
[44]*Id.*
[45]Letter of Jeffrey Enlow, Tab 125 at 1.

as recalled by Dennis Farrell, cleared his calendar to meet with a minor investor in a movie Bill Jr. was creating.[46] When Claudia and Raffi Vartanian decided that they wanted to be married, Mr. Cellini traveled to New York to meet with Raffi's parents and took time with them to establish a comfort level between the families.[47]

As described in numerous letters, Mr. Cellini is now a loving and devoted grandfather to Claudia and Raffi's daughter. Less known is that even in the midst of trial, an exceedingly stressful time in his life, Mr. Cellini fed his granddaughter breakfast every day and tucked her in each night.[48] On the day of the verdict, when the rest of the family was in a state of agitation, Mr. Cellini set about baby-proofing the apartment.[49]

Mr. Cellini's devotion to his family was not restricted to providing his time and resources. He also served his children by imparting to them a strong work ethic and never letting them foster an attitude of entitlement. Claudia and Bill Jr. wrote of their father's amazing work ethic,[50] of his impressing upon them that they were no better or worse than anyone else,[51] and of his counsel that hatred and jealousy had no place in their vocabulary.[52] Mr. Cellini's example seems to have been successful. Peggy Ryan, longtime babysitter for Claudia and Bill Jr., wrote that Mr. Cellini instilled great values in the children.[53] She observed that Claudia was always the first to stand up for another child being treated poorly.[54] Kent Yager wrote about a summer job to which Bill Jr. was assigned that most people refused because of its being unglamorous and

---

[46]Letter of Dennis Farrell, Tab 21 at 2.
[47]Letter of Raffi Vartanian, Tab 32 at 1.
[48]*Id.*
[49]*Id.*
[50]Letter of Claudia and William Cellini, Jr., Tab 3 at 1.
[51]*Id.* at 2.
[52]*Id.* at 3.
[53]Letter of Peggy Ryan, Tab 28 at 1.
[54]*Id.*

subject to unsanitary working conditions.[55]  When Mr. Yager contacted Mr. Cellini to offer his assistance in getting Bill Jr. reassigned, Mr. Cellini responded that his son was not above the work, that he should be happy to have a job, and that Cellinis are no better than anyone else.[56]

Mr. Cellini's support of his family has extended far beyond his nuclear family to that of his deceased brother's wife and children and to nieces, nephews, and cousins.  Before his mother Edith died, Mr. Cellini promised her that he would always take care of the family.[57]  Mr. Cellini has kept that promise.  Mr. Cellini's brother Robert was diagnosed with lung cancer at 38.  Upon hearing the news and being informed of the poor prognosis for recovery, Mr. Cellini called every doctor he knew.[58]  He waited for face time at doctors' offices and contacted programs for experimental treatments.[59]  When his brother Robert passed away at 42, he left behind a wife and two sons who were teenagers at the time.  As attested to by Robert's widow, Sharon Cellini, Mr. Cellini has provided emotionally and financially for her and her sons since the time of her husband's death and has acted as a surrogate father and grandfather.[60]  One of Robert's sons, Craig Cellini, wrote that throughout his teenage and young adult years, Mr. Cellini was the person that Craig would look to for support, guidance, and advice.[61]  That support has extended to Craig Cellini's younger son, who was diagnosed with autism at age two and suffers from serious medical issues, including a primary immune deficiency.  Both Craig Cellini and his wife Laura wrote of the generous support Mr. Cellini has provided in securing diagnosis and treatment for their young son and explained that Mr. Cellini was to their children the grandfather

---

[55]Letter of Kent Yager, Tab 362 at 2.
[56]*Id.*
[57]Letter of G. Virginia Conlee, Tab 91 at 1.
[58]Letter of Julie Cellini, Tab 1 at 4.
[59]*Id.*
[60]Letter of Sharon Cellini, Tab 77 at 1.
[61]Letter of Craig Cellini, Tab 18 at 1.

they never had.[62]  One of Mr. Cellini's nieces, Kathleen England, wrote about the month she would spend every summer at the Cellini home.  She recalled that she was treated as a daughter, not as a niece, and that the kindness and support she enjoyed helped her grow in confidence and to overcome what she described as a debilitating shyness.[63]

### E.    Real Estate Businesses and Relationships with Staff

At the same time as Mr. Cellini began work with the IAPA in 1972, and after having sought and obtained permission from the association, Mr. Cellini and a partner formed a real estate development company called New Frontier Developments and later, in 1977, a management company called New Frontier Management (collectively, "New Frontier").  New Frontier has been involved in the planning, development, marketing, and financing of senior apartment complexes, office buildings, retail complexes, and residential units.  The company employs about 300 people statewide.

Mr. Cellini's sister Janis wrote that it was her belief that Mr. Cellini had a particular interest in housing developments that catered to seniors, based on his experience of an immigrant family in which grandparents and elders were always taken care of by family.[64]  Janis recalled that over ten years ago, Mr. Cellini suggested to the then-President of New Frontier that the company should provide the local Senior Citizen Center with 2,000 square feet of space in one of his housing developments free of charge. When the then-New Frontier President raised concerns about profit, Mr. Cellini responded with concern for the senior citizens.[65]  The result was that the Senior Center has been housed rent-free in the New Frontier development for the last ten years.[66]

---

[62]*Id.*
[63]Letter of Kathy England, Tab 124 at 1.
[64]Letter of Janis Cellini, Tab 2 at 3.
[65]*Id.*
[66]*Id.* at 4.

Numerous individuals who have worked with Mr. Cellini's real estate companies have written in support of Mr. Cellini. Don DePhillips, who was employed with New Frontier Development for 25 years, explained that the company was committed to quality real estate developments and exhibited concern for the end user.[67] For two projects that were losing money, he explained, there was never a suggestion that quality be sacrificed to cut cost.[68] Patrick Somers, president of the successor property management company to New Frontier, wrote of his observation that Mr. Cellini rejected business offers that might have resulted in unfair advantage or an unfair result.[69] Mr. Somers also attested to the fact that many times over the years, Mr. Cellini directed him to better maintain certain properties for the benefit of the residents, often to the detriment of profit.[70]

One result of New Frontier's efforts was high-quality, low-cost living facilities being provided to Springfield's senior citizens and persons with disabilities.[71] Alfred Vermiglio, who worked on and off as construction project manager for Mr. Cellini since the 1990s, explained, "[E]ach of the projects that I worked on, in some way, reflect the character of Mr. Cellini: providing low cost housing for the elderly and people with disabilities; providing residences for future leaders of our society; transforming a blighted area into a thriving neighborhood; and creating works of public art, open to all, at no charge. Mr. Cellini and his family have done great things in this area as well as throughout the State."[72] April Smith, who lived in Near North Village, one of the New Frontier developments, described it as a diverse community of seniors and handicapped people who were able to live independently even while confined to

---

[67]Letter of Don DePhillips, Tab 111 at 1.
[68]*Id.*
[69]Letter of Patrick Somers, Tab 8 at 1.
[70]*Id.* at 2.
[71]*See* Letter of Robert Barker, Tab 55 at 1.
[72]Letter of Alfred Vermiglio, Tab 342 at 1.

wheelchairs, to get out and about, and even to have pets.[73]  She extolled the building feature of heated parking, stated that the development was built with "everyone's interest in mind" and not simply the investors, and attested that "Bill Cellini made it happen."[74] Rachel Mills, Social Director for New Frontier Properties in Springfield, explained that Mr. Cellini was the first in town to provide social programs for residents, including resident councils, seasonal parties, monthly potlucks, outside weekly entertainment newsletters, and decorations for the community rooms.[75]  These community-building events in each of the New Frontier developments, coupled with immaculate living conditions, contributed to daily expressions of gratitude from the residents.[76]

In addition to benefitting seniors, the disabled, and other individual residents, the high quality of the New Frontier developments served to revitalize many formerly blighted areas of Springfield.  Jeffrey Enlow, long-time Springfield resident, recounted that owing to the efforts of Mr. Cellini and New Frontier, buildings were redeveloped and repurposed that could have been torn down.[77]  The buildings were then used for office and commercial space, contributing to the stability of the surrounding neighborhood.[78]  Examples of this include the Illinois Watch Company, the Sangamo Electric factory, the Concordia Seminary Complex, the Lincoln Depot where Abraham Lincoln gave his famous Farewell Address, and the Sears Roebuck department store.[79]  Mr. Enlow observed, "It's easy to complain about one's city or to begin every comment on its future with 'Somebody ought to do this' or 'somebody ought to build that.'  For the last 35

---

[73]Letter of April Smith, Tab 305 at 1.
[74]*Id.*
[75]Letter of Rachel Mills, Tab 238 at 1.
[76]*Id.*
[77]Letter of Jeffrey Enlow, Tab 125 at 2.
[78]*Id.*
[79]*Id.*

years, Bill Cellini has been that somebody."[80]  Mr. Cellini's real estate projects also helped to revitalize disadvantaged parts of Chicago.  New Frontier employee Vincent Forgione explained that the University Village development for which New Frontier was responsible provided 900 homes in the heart of Chicago's near south side.[81]  This development transformed the old Maxwell Street market site, which had become a derelict area, into a location that attracted further development, together with the opportunity for hundreds of jobs and homes.[82]  As related by international union representative Edward Smith of Washington, D.C., Mr. Cellini's real estate company created thousands of union construction jobs that gave workers "good wages . . . good health care for their families and retirement security in the form of pensions for the workers and their spouse[s]."[83]  According to Mr. Smith's observations, Mr. Cellini insisted on jobs creation first and investment second.[84]

Beyond benefitting residents and revitalizing areas of Springfield, Mr. Cellini's efforts in the area of real estate had positive collateral consequences in the community.  Mr. Cellini shared his expertise with others.  When the Catholic Church of the City of Sherman wanted to develop a senior citizen living community, for example, Mr. Cellini donated his time and expertise to assist in ensuring the success of the (non-New Frontier) project.[85]  Mr. Cellini also participated with local special education schools to improve facilities and programs.[86]

To the many individuals who worked directly with New Frontier, Mr. Cellini provided not merely economic opportunity but a work environment characterized by tolerance and

---

[80]*Id.*
[81]Letter of Vincent Forgione, Tab 136 at 1.
[82]*Id.*
[83]Letter of Edward Smith, Tab 307 at 1.
[84]*Id.*
[85]Letter of Vince Toolen, Tab 333 at 1.
[86]*Id.*

warmth. Colleen Cavanagh, who has worked as an assistant at New Frontier since 2000, described an instance in which the father of a staff member died. Mr. Cellini not only closed the office so all of the staff could attend services, but paid for the catered reception.[87] Robin Ellison, who worked as an assistant to Mr. Cellini, wrote of his kindness to her during the time that she lost her father to a rare form of cancer.[88] During the month and a half that she and her mother kept vigil at her father's hospital bed, Mr. Cellini constantly made it a point to tell her that she should not worry about work and that whatever time she needed to take was fine.[89] When her father passed away, Mr. Cellini was there for emotional support and hosted the luncheon after the ceremony.[90] For Penny Williams, another employee, Mr. Cellini provided all the time off she needed during her husband's battle with pancreatic cancer and provided her full pay for an extended month absence.[91] Beyond that, knowing the enormous pride that Ms. Williams' husband had taken in his lawn, Mr. Cellini anonymously arranged for the lawn to be taken care of once Ms. Williams' husband was too ill to do it himself.[92] Although Ms. Williams tried to learn who was responsible for this accommodation, she did not learn that it was Mr. Cellini until seven years later.[93]

In the case of former employee Susan Davsko, her husband contracted ALS in 2010 and passed away just this past March. Ms. Davsko wrote of her observations of Mr. Cellini's true concern for the families of those with whom he worked.[94] She related that Mr. Cellini would regularly come to her home to visit her husband in the final stages of his disease and observed

---

[87] Letter of Colleen Cavanagh, Tab 73 at 1.
[88] Letter of Robin Ellison, Tab 123 at 1.
[89] *Id.*
[90] *Id.*
[91] Letter of Penny Williams, Tab 358 at 1.
[92] *Id.*
[93] *Id.*
[94] Letter of Susan Davsko, Tab 107 at 2.

that even after her husband had lost the ability to speak, he would relish Mr. Cellini's visits, which were characterized by humorous stories and good cheer.[95]

As reported by numerous individuals associated with New Frontier, Mr. Cellini always treated everyone with respect and showed concern for their professional development as well as their personal and family issues. Kate Humphrey wrote to describe the professional experience of her mother, now deceased, who worked as Mr. Cellini's assistant at the IAPA from 1960 until her retirement in 2004. According to Ms. Humphrey, Mr. Cellini saw in her mother a person with little education but with a good heart.[96] Over the course of their more than 40-year working relationship, Mr. Cellini taught her how to present herself in a professional manner and provided numerous travel and other opportunities to Mrs. Humphrey and her family.[97]

Current employees relate that in small, everyday ways, Mr. Cellini expressed consideration for those who worked with him. On numerous occasions he would call to take orders and provide lunch for the office staff.[98] When he traveled, he brought back personalized gifts and provided individualized presents for the holidays.[99] As explained by Marvin Traylor, Mr. Cellini's innate kindness was born out of an approach to the people around him that did not draw distinctions based on status. Mr. Cellini "treated people the same, whether they were people of power and influence who could assist him, or people who came from very humble backgrounds and could not."[100] Mr. Traylor explained, "I watched him offer counsel to those

---

[95] *Id.*
[96] Letter of Kate Humphrey, Tab 180 at 1.
[97] *Id.*
[98] Letter of Colleen Cavanagh, Tab 73 at 1.
[99] *Id.*
[100] Letter of Marvin Traylor, Tab 335 at 1.

who came to him seeking help and noticed the respect and gratitude he received from those he touched."[101]

The same spirit extended to Mr. Cellini's treatment of those who worked in his home. Peggy Ryan, now a respected Springfield attorney who served as the first woman president of Springfield's Sangamo Club, worked as a babysitter for the Cellini children for many years. Ms. Ryan wrote of her experience of Mr. Cellini's patience, tolerance, and warmth and observed that "linemen and cleaning ladies" were "treated with the same kindness as the mayor or a senator."[102]

Mr. Cellini's quiet and unassuming way extended to the manner in which he conducted himself in the community. At a fundraiser for the Children's Art Museum that Mr. Cellini hosted in his home, his focus was on the service of his guests. As observed by Thomas Short:

> Cellini might as well have been an employee of the catering staff. He served drinks and food throughout the evening, no hobbing and nobbing, just taking care of the large crowd in his house. I found this [a] very humble gesture in the name of a good local cause. He could have been outside smoking cigars, drinking wine with the lawyers, doctors and businessmen, yet he was working, trying to keep everyone else satisfied.[103]

When the wife of a Springfield realtor died, her services were populated with various high-level officials as she had served as the assistant to a prominent politician.[104] While numerous state officials slipped in and out of a side door to pay their respects without waiting in a long line, Mr. Cellini stood with the rest of the crowd and waited an hour and a half.[105] While in itself a small

---

[101]*Id.*
[102]Letter of Peggy Ryan, Tab 28 at 1.
[103]Letter of Thomas Short, Tab 30 at 2.
[104]Letter of Barbra Steward, Tab 318 at 1.
[105]*Id.*

gesture, as remarked by those who observed this, it was "indicative of [Mr. Cellini's] unassuming manner."[106]

### F.     Community Recognition of Mr. Cellini's Honesty and Integrity

In a case such as this in which so much has been publically printed and opined about Mr. Cellini's influence in the Springfield community, it is important to consider the manner in which he has managed that influence over his more than 50-year public career.   In this section, the experiences of those who have interacted with Mr. Cellini in business and political matters, both large and small, will be excerpted from the letters submitted to the Court on Mr. Cellini's behalf. What these statements make unmistakably clear is that Mr. Cellini does not need to be punished in any way in this case for his standing in Springfield.   During his career, Mr. Cellini has taken great care to ensure that he did not misuse whatever influence his relative professional success might have afforded to seek personal benefit.   To the contrary, in letter after letter, many of which were written by individuals in positions of authority who would have been perfectly capable of extending benefits to Mr. Cellini, he did not ask for favors and did not make anyone feel in the least bit uncomfortable in any of their professional or personal interactions.

Charles A. Adams had a firm in the construction industry in southern Illinois and worked with Mr. Cellini with regard to the Illinois Department of Transportation, Federal Highway Administration, and Illinois Environmental Protection Agency.   Mr. Adams wrote, "In every case, on every issue, Bill's advice was consistent and steadfast. 'Take the high road, be honest and only present the facts.'"[107]

Daniel Ault served as Vice President of Commonwealth Realty Advisors, a firm Mr. Cellini and his partners co-founded.   Mr. Ault was the individual charged with approving all

---

[106]*Id.*
[107]Letter of Charles Adams, Tab 37 at 1.

Commonwealth investment decisions. He stated that he was never "directed, pressured, or otherwise influenced by Bill [Cellini] to make any decisions regarding investments." Rather, communications with Mr. Cellini regarding TRS specifics were limited and "comments offered by Bill were all in the spirit of doing what was right for TRS."[108]

Robert J. Barker, a real estate developer in Springfield, found Mr. Cellini to be "fair, honest, and most importantly a man whose word is his bond."[109]

Ellen Barnes was involved in large real estate development projects with Mr. Cellini for 30 years. She explained that in every case, political approvals, zoning approvals, and public-private finance were involved and that the temptation to cross lines was ever-present for both the development team and for the public officials with whom they dealt. Ms. Barnes attested, "In all those years Bill never crossed those lines and I was always proud to be associated with him . . . ."[110]

Philip Bradley served in the cabinets of both Governors Thompson and Edgar, was the head of several state agencies, and served on community and college boards, including the Lincolnwood Community College Board. He related that although Mr. Cellini would come to him to advocate on behalf of a client, his concerns were reasonable and the outcomes he sought were never untoward. If Mr. Bradley chose not to accommodate Mr. Cellini, he observed, not only did he not receive threats, but never even felt any pressure or that his relationship with Mr. Cellini would somehow suffer as a result.[111]

Jim Bruner served as President of the IAPA that employed Mr. Cellini, as well as on the Teachers Retirement Board for 16 years. Mr. Bruner observed that Mr. Cellini's investment

---

[108]Letter of Daniel Ault, Tab 46 at 1.
[109]Letter of Robert Barker, Tab 55 at 1.
[110]Letter of Ellen Barnes, Tab 56 at 1.
[111]Letter of Philip Bradley, Tab 14 at 2.

company took some bad TRS investments and turned them around and that the company was always a profit leader and generally number one. Mr. Bruner further observed that Mr. Cellini never asked him for anything. If TRS came up in conversation, Mr. Cellini would only ask how Commonwealth was doing for TRS.[112]

Victor J. Cacciatore ran a sweeping and construction company during the time that Mr. Cellini was Director of Public Works in Springfield and in a position to seek favors from him. Not only did Mr. Cacciatore state that Mr. Cellini never asked any favors of him, he confirmed, "In my practice of law and every other endeavor, Bill was at my side as a friend, and he never sought anything in return but my friendship."[113]

Gene Callahan maintained a 19-and-a-half-year relationship with Alan Dixon during Mr. Dixon's service as State Treasurer, Secretary of State, and U.S. Senator, ascending to the position of Dixon's Chief of Staff. He also worked as Press Secretary as well as Chief of Staff for Lieutenant Governor and Senator Paul Simon. Mr. Callahan affirmed, "Never and I repeat N-E-V-E-R did Bill Cellini ever ask me to do anything illegal, immoral or unethical. Nor have I heard of anyone I respect say that Bill Cellini was anything less than honest."[114]

Richard Ciotti averred, "Knowing Cellini as I have for all my life, I could swear in a court that I have never seen or heard of him doing anything wrong even as small as a speeding ticket."[115]

Timothy Docter explained that his father was with Maclair Asphalt Co. and, along with others, was instrumental in hiring Mr. Cellini as Executive Director of the IAPA. When Mr. Docter's father was killed suddenly in an accident, he was thrust into leadership of a

---

[112]Letter of Jim Bruner, Tab 15 at 1.
[113]Letter of Victor Cacciatore, Tab 67 at 2.
[114]Letter of Gene Callahan, Tab 16 at 1.
[115]Letter of Richard Ciotti, Tab 82 at 1.

multimillion-dollar highway company and sought counsel from Mr. Cellini. Mr. Cellini counseled that "honesty and fairness with my employees, my customers, and even my competition would lead me in the right direction."[116]

Governor Jim Edgar wrote that he dealt with Mr. Cellini on matters involving state government. Governor Edgar stated, "On many occasions I did not agree with Bill's position on an issue and I would often take action which was contrary to Bill's position. In all of this time and in all of these issues, I never personally saw nor did I hear on any of those occasions that Bill acted improperly in any manner. Bill never asked me to take any action which I deemed inappropriate."[117]

Dennis Farrell was an IBM executive during a time that Mr. Cellini was brought in to assist IBM with the transformation of integrated services for all state and local government in Illinois. Mr. Farrell confirmed, "Cellini's advice and guidance was of the highest order. IBM has never made corporate political contributions of any amount anywhere and at any time. In assisting IBM there was never a question of Mr. Cellini using any influence or connections." "He provided uncommon intelligence to a new calculus of business. What his hard work and perseverance accomplished for the State of Illinois . . . was extraordinary."[118]

Gayle Franzen stated, "During my extensive public and private career I had many dealings with Bill and at no time did he ever ask for any favors or special treatment. At times I would lean on Bill for his advice because I knew that it would be given based on his integrity and honesty."[119]

---

[116]Letter of Timothy and Kathy Docter, Tab 115 at 1.
[117]Letter of Governor Jim Edgar, Tab 121 at 1.
[118]Letter of Dennis Farrell, Tab 21 at 1.
[119]Letter of Gayle Franzen, Tab 139 at 1.

William Ghesquiere served as Chief Counsel of the Illinois Department of Transportation ("IDOT") when Mr. Cellini was employed as Executive Director of the IAPA. Later, Mr. Ghesquiere went on to hold other sensitive positions, including Counsel and Deputy Counsel to the Governor and Deputy Attorney General. During the entirety of his more than 35-year association with Mr. Cellini, Mr. Ghesquiere averred, "[Cellini's] conduct with me was always proper."[120]

J. William Roberts held a variety of public positions, including State's Attorney for Sangamon County, United States Attorney for the Central District of Illinois, and Chief Counsel to Governor Edgar. Each of the offices conferred on him significant discretion. Mr. Roberts confirmed, "Never once during the years I held those positions did Bill Cellini ask me to exercise that discretion to do anything inappropriate, offensive, or wrong, that would benefit him, his family, or his business interests."[121]

Karen Hasara served in various public offices, including member of the county board, Senator, and Mayor of Springfield. Ms. Hasara wrote, "Bill never once asked me to take any action that was not ethical, honest, or in the best interest of my constituents. To me, this is the most important message I can give: With all his involvement, he could have leaned on me for so many things through the years, and never did."[122] In addition, Ms. Hasara observed that Mr. Cellini ceased all lobbying activities so that Julie Cellini could volunteer on the Illinois Historic Preservation Agency.[123]

---

[120]Letter of William Ghesquiere, Tab 23 at 2.
[121]Letter of J. William Roberts, Tab 27 at 1.
[122]Letter of Karen Hasara, Tab 25 at 1.
[123]*Id.*

James R. Helm stated, "In all of my years in government and in the political arena, Bill Cellini has never asked me for any favor to be done that would benefit him in any way. I have always appreciated that."[124]

Gerald Smith was the Manager of the Renaissance Hotel conversion to the President Abraham Lincoln hotel. Mr. Smith wrote that when Mr. Cellini was part of the ownership group of the Renaissance Hotel, Mr. Cellini insisted on paying for his own lunch all of the many times he had lunch at the hotel. Mr. Smith also related that Mr. Cellini asked about a distinct coffee he liked that the hotel served, but would not let Mr. Smith order the coffee through the hotel.[125]

A.D. Van Meter has known Bill for more than 50 years as banker and friend. Mr. Van Meter observed that Mr. Cellini has the "highest ethical standards." Mr. Van Meter wrote, "On more than one occasion, when the parties might have had an honest dispute of facts, I have seen him compromise and consent to an agreement which may not have been in his best interest, but which would accomplish the successful conclusion of the transaction. I have never seen him attempt to take undue advantage of any person in business or personally."[126]

William I. Wheeler served for 33 years as an attorney for several State of Illinois agencies. He had contact with Mr. Cellini in the context of projects in which Mr. Cellini was involved that required review and approval by the regulatory programs under Mr. Wheeler's direction. Mr. Wheeler was the individual responsible for administrative decisions and legal interpretations and fielded regular contact from all manner of developers and permit applicants. Mr. Wheeler averred, "Without exception inquiries from Cellini were simply that. He inquired as to what was needed to obtain approval and I informed him as I would any other caller. He

---

[124]Letter of James Helm, Tab 174 at 1.
[125]Letter of Gerald Smith, Tab 308 at 1.
[126]Letter of A.D. Van Meter, Tab 340 at 1.

was invariably polite and in no case did he ask for or ever seem to expect any kind of special treatment. His conduct contrasted with that of many callers who made their points in very inappropriate and emotional ways. I was able to treat Cellini's projects in the usual manner and neither he nor anyone else complained to me about the handling of his projects."[127]

James E. Wolfe acted as Assistant Chief Counsel to IDOT and later as Deputy Director of Intergovernmental Affairs during the same time that Mr. Cellini worked for the IAPA. Mr. Wolfe stated that Mr. Cellini conducted himself "in accordance with the highest ethical standards." Mr. Wolfe stated, "[Mr. Cellini] was aware of and always complied with the law. After I left IDOT I kept in contact with Bill. Again, in the ensuing 17 years, Bill never asked me to do anything unethical or illegal."[128]

These expressions of support for leniency in Mr. Cellini's sentence come from numerous individuals of unmistakable power and influence in the Springfield community and beyond. Their influence extended to the very business matters in which Mr. Cellini held professional interests. The fact that each and every one of these individuals could affirm to this Court that Mr. Cellini never attempted to use his association with them for any improper purpose is testament to Mr. Cellini's demonstrated personal integrity over a 50-year professional career. These factual observations stand in stark contrast to the various assumptions and slurs that have been inflicted upon Mr. Cellini and his family since the advent of the proceedings in this case and which appear with prodigious regularity in the Government Sentencing Memorandum. Mr. Cellini's lifetime of demonstrated integrity lends critical perspective on the verdict in this case, which falls well outside of the pattern of professional propriety Mr. Cellini has upheld for the last 50 years.

---

[127]Letter from William Wheeler, Tab 356 at 1.
[128]Letter of James Wolfe, Tab 11 at 1.

### G.     Mr. Cellini's Extraordinary Charity

The letters submitted in this case evidence Mr. Cellini's extraordinary contributions to charitable causes, which includes supporting formal charitable endeavors financially and with his time and talent.   It also includes numerous instances in which Mr. Cellini reached out to individuals who were economically disadvantaged, physically or emotionally challenged, or otherwise in need.   Time after time, as revealed by myriad letters from an astonishingly diverse group of beneficiaries, Mr. Cellini extended his support and assistance where and when it was needed and transformed lives.   His charity cannot be dismissed as mere "checkbook charity,"[129] but is, rather, the mark of a profoundly kind and generous man who has endeavored throughout his life to quietly and consistently do what he thought was right.   That Mr. Cellini never sought recognition for his charitable acts, many of which would never have become known were it not for the sentencing and letter-writing process, further underscores that fact that these acts were not part of some sort of public persona.   Rather, they are efforts Mr. Cellini has made consistently throughout his life as an extension of his exceptional character.   That character is unquestionably relevant to the Court's sentencing determination in this case. *See United States v. Carter*, 530 F.3d 565, 578 (7th Cir. 2008) (reversed and remanded case for resentencing when the court did not take adequate consideration of the defendant's public service as part of the defendant's history and characteristics under § 3553(a)); *United States v. Baxter*, 217 F. App'x 557, 560 (7th

---

[129]The prosecution has argued that Cellini should not, because of his financial success, be given special consideration that is unavailable to others who do not have the same resources or opportunities. (Government Sentencing Memorandum at 23-26) (citing *United States v. Vrdolyak*, 593 F.3d 676 (7th Cir. 2010)).   While generally correct, this principle fails to account for the undeniably extraordinary extent of Cellini's charitable contributions, which extend far beyond writing some checks to good causes. In addition, it fails to account for the fact that many of Cellini's charitable acts were not primarily financial, but rather extensions of his time, his care, and his compassion.   Unlike mere financial contributions, these efforts can and have altered the course of numerous lives.

Cir. 2007) (a defendant's civil and charitable works are properly considered pursuant to § 3553(a)).

### 1. Mr. Cellini's Support of Charitable Causes

Mr. Cellini has been a consistent benefactor to numerous charitable causes in the Springfield community, with a special focus on organizations that minister to disadvantaged children. Saint Patrick's School in Springfield is a privately funded school dedicated to providing elementary school education for inner-city, disadvantaged children.[130] The school depends on donated funds and had reached the point several years ago at which it was close to being forced to shut its doors.[131] Mr. Cellini stepped up and quietly and discreetly donated a large amount of money that allowed the school to stay open.[132] His contribution was known only to a few people who were closely associated with the school.[133]

In 2001 and 2002, Mr. and Mrs. Cellini were one of the driving forces behind the expansion of services at the Hope Institute,[134] a school that both administers residential programs to children with severe autism and behavioral disorders and makes educational programs available to 180 Springfield-area special needs children.[135] That expansion of services and programs impacts 26,000 children each year.[136] Mr. Cellini not only supported the Hope Institute financially, but opened his home to host events for the school.[137] In addition, Mr. Cellini underwrites many events and programs for the Hope Institute for which he receives no public

---

[130]Letter of Robert Colantino, Tab 90 at 1.
[131]*Id.*
[132]*Id.*
[133]*Id.*
[134]Letter of Charles Salvo, Tab 284 at 1.
[135]Letter of G. Virginia Conlee, Tab 91 at 1.
[136]Letter of Charles Salvo, Tab 284 at 1.
[137]Letter of N. Richard and M. Kathy Kay, Tab 35 at 2.

recognition.[138]  At holiday time, Mr. Cellini personally shops for gifts and stocking stuffers for the special-needs children the Institute serves.[139]

Mr. Cellini has been actively involved in various scholarship programs, including taking the lead in raising money and organizing IAPA scholarships for engineering students at the University of Illinois, the University of Bradley, and Southern Illinois University.[140]  Due to Mr. Cellini's efforts, this scholarship program has gone from a state to a national program and now provides millions of dollars in scholarships across the United States.[141]  When the Sacred Heart High School sought funds for an endowment to provide financial assistance to students unable to afford tuition, Mr. Cellini made the effort possible with a major contribution.[142]

Mr. Cellini's commitment to providing opportunities to young people has also taken the form not only of coaching youth baseball teams for a number of years, but also of sponsoring baseball teams for young people who might not have otherwise been able to play.  Barry McAnarney wrote to explain that Mr. Cellini had been sponsoring youth baseball teams in Springfield for 46 years, including the team on which Mr. McAnarney played as a boy.[143]  Each year, Mr. Cellini added another four or five teams to the list of those he sponsored.[144]  Although 99% of the people in Springfield are unaware of this,[145] for the last ten years, Mr. Cellini has paid both the sponsorship and individual team fees of any Fairfield Little League players and teams otherwise unable to pay.  Kelly Gilmore wrote, "Bill didn't do so for any benefit, except to

---

[138]Letter of Richard and Kim Lawrence, Tab 208 at 1.
[139]*Id.*
[140]Letter of Timothy Docter, Tab 115 at 2.
[141]*Id.*
[142]Letter of Sister Marilyn Jean Runkel, Tab 279 at 1.
[143]Letter of Barry McAnarney, Tab 231 at 1.
[144]*Id.*
[145]Letter of Larry Selinger, Tab 7 at 2.

know that the kids had an opportunity to play."[146]  Beyond team sponsorship, Mr. Cellini assisted

teams that qualified for national tournaments but needed resources to be able to attend.[147]  When

major improvements to local baseball facilities were needed, including repair of the scoreboard

and fencing, Mr. Cellini immediately financed the repairs so that the field was ready for opening

day.[148]

Mr. Cellini has supported several religious organizations.  He has been a consistent

supporter of Catholic Charities with time and effort, never seeking the limelight or any

recognition or special favors.[149]  He has been a wonderful benefactor to the Ursuline Convent of

Saint Joseph, sending special treats for the sisters as well as arranging for them to enjoy

attending a theatrical production, for which he arranged both tickets and transportation.[150]  He

has lent quiet assistance to the Springfield Jewish Federation.[151]  He has long supported Jewish

community events in Illinois, including the propagation of Israeli bonds and Jewish Federation

fundraisers[152] and he attended Temple Israel's 50th anniversary celebration, despite the fact that it

was in the same time frame as the trial in this case.[153]

Numerous additional organizations to which Mr. Cellini has extended support include the

Springfield Art Association, which ensures that art appreciation is available to all Springfield

Children,[154] the Central Illinois Food Bank, which serves the needy in 23 counties,[155] and the

---

[146]Letter of Kelly Gilmore, Tab 159 at 1.

[147]Letter of Barry McAnarney, Tab 231 at 1.

[148]Letter of Lawrence Selinger, Tab 7 at 1.

[149]Letter of Reverend Monsignor David Lantz, Tab 204 at 1.

[150]Letter of Sister Brandan Jacoby OSU, Prioress, Tab 188 at 1.

[151]Letter of Gloria Schwartz, Tab 294 at 1.

[152]Letter of Lisa Stone, Tab 31 at 1.

[153]*Id.*; Letter of Jack and Rita Victor, Tab 343 at 1.

[154]Letter of Bonita Cellini DeRosa, Tab 104 at 1.

[155]Letter of Ralph and Betty Hurwitz, Tab 184 at 1.

Fabretto Children's Foundation, a private organization that schools and feeds 10,000 materially poor children in Nicaragua.[156]

In all of his charitable efforts, as comes through again and again in the letters submitted on his behalf, Mr. Cellini participated personally and directly rather than through mere financial support and never sought recognition for his work. Charles Salvo wrote of Mr. Cellini's ongoing relationship with "organizations that focused on improving the lives of others not through high profile public events but through quiet, get your hands dirty assistance"[157] and explained that Mr. Cellini never sought the spotlight.[158] Addressing the suggestion that Mr. Cellini's relative economic advantages might somehow discount the extent of his generosity, Rabbi Michael Datz opined:

> In our collective cynicism, it is often all too easy to be dismissive of a man's philanthropy, or suspicious of the motives; but even if Bill *were* in a better position than many to be generous – nevertheless, I have known many such individuals who *have* had the means and yet did not step up to the plate with the same broad spirit and gladness of heart as have Bill and Julie Cellini.[159]

These observations are particularly prescient when, as here, the charitable efforts in question stem from a deep commitment to a particular cause. For Mr. Cellini, that cause has been making sure that children, and particularly disadvantaged or disabled children, had every possible educational and recreational opportunity. Combined with Mr. Cellini's direct, personal participation in the causes he supports and his consistent avoidance of recognition, there is abundant support for the fact that Mr. Cellini's charitable works are a reflection of his high moral character.

---

[156]Letter of Carl Marinacci, Tab 227 at 1.
[157]Letter of Charles Salvo, Tab 284 at 1.
[158]*Id.*
[159]Letter of Rabbi Michael Datz, Tab 19 at 2.

### 2. Mr. Cellini's Personal Charitable Interventions

Mr. Cellini's charity extends far beyond support for causes and organizations. Based on the letters submitted on his behalf and the astonishing experiences they relate, it is no exaggeration to say that Mr. Cellini's life has been characterized and defined by service to others. All those who know him well have no doubt, in fact, that Mr. Cellini's greatest pleasure in life is the ability to provide opportunities for success and advancement to those who would otherwise never have had a chance. As explained by longtime friend Richard Hart, Mr. Cellini has worked hard and become successful but has always reached out to assist others along the way:

> In the process, he has helped many other people and has never forgotten those people he grew up with. There are many such people – some might call them little people. Bill would not. Bill has never forgotten those people and has helped them in ways that can only be characterized as kind, generous, thoughtful, and loyal. If a family or person was in distress or need, Bill was there to ask "How can I help?" And help he did without any expectation of personal benefit or reward. He loves people, and he has wanted to help make their lives a little better where he could. That is just Bill.[160]

A perfect example of this is the case of T. Razza Rau. When Mr. Cellini met Mr. Rau, Mr. Rau was a stranger from Indonesia who had been abandoned as a toddler and had supported himself since early childhood.[161] Mr. Rau had not finished college and had a transient job. However, he had the burning desire for education.[162] Mr. Cellini was able to assist Mr. Rau in enrolling in college despite his meager credentials and financed his tuition and living expenses.[163] Mr. Rau succeeded beautifully, went on to attend Cornell Law School (which Mr. Cellini also entirely financed), and is now working in the JAG Corps. For Mr. Rau, however, the greatest gift he feels that Mr. Cellini gave him was the introduction to the model of a warm and

---

[160]Letter of Richard E. Hart, Tab 173 at 2.
[161]Letter of Julie Cellini, Tab 1 at 3.
[162]*Id.*
[163]*Id.*

supportive family, a model that had been entirely lacking from Mr. Rau's life experience.[164]  As

related by Mr. Rau, he was welcomed into the Cellini home at Christmas, Thanksgiving, and

other holidays when he had nowhere else to go and experienced "tremendous personal growth"

from his acceptance into a loving family.[165]  Upon his graduation from law school, Mr. Rau said

to Mr. Cellini, "I will never know why you did this for me."[166]  As Mr. Rau observed:

> The true nature of Bill's selfless desire to help without benefit is perhaps clearest
> in the many cases like mine – people who started with nothing to offer anyone
> and even after years of his help, the only thing of value we can offer him is to
> continue his legacy of public service.[167]

Another example of an individual whose life was transformed by Mr. Cellini's kindness

is David Dailey, a man with cerebral palsy who was a former student of Janis Cellini.  When

Janis first encountered Mr. Dailey, he was unkempt and rejected by his peers due to his

appearance and their discomfort with his disabilities.[168]  He did, however, have a quick wit and a

penchant for stand-up comedy.[169]  At Mr. Cellini's suggestion, Janis gave Mr. Dailey a forum for

entertaining his classmates with jokes and stories, which both increased Mr. Dailey's confidence

and afforded increased comfort to his classmates.[170]  With Mr. Cellini's encouragement and

support, Mr. Dailey was accepted into a junior college, and later a four-year program from which

he graduated with a B.A. in special education.[171]  Mr. Cellini assisted Mr. Dailey in finding

scholarships and loans and lent financial support.[172]  After Mr. Dailey graduated college but was

unable to find employment, Mr. Cellini and his family again provided support and

---

[164]Letter of T. Razza Rau, Tab 5 at 2.
[165]*Id.*
[166]Letter of Julie Cellini, Tab 1 at 3.
[167]Letter of T. Razza Rau, Tab 5 at 3.
[168]Letter of Janis Cellini, Tab 2 at 3.
[169]*Id.*
[170]*Id.*
[171]Letter of David Dailey, Tab 102 at 1.
[172]Letter of Janis Cellini, Tab 2 at 3.

encouragement.[173]  Mr. Dailey was able to gain employment with the State of Illinois, where he

has worked for 32 years as an advocate for those with disabilities.[174]  Mr. Dailey credits Mr.

Cellini's kindness and support with his success in life and ability to assist others afflicted with

similar disabilities.  Mr. Dailey writes:

> I know that I personally would not be where I am today without the help of this
> man and his family.  They have so kindly supported me in my time of need.  And
> through him, I feel I have been able to help hundreds of people with disabilities
> over the years.  This would not have been possible had I not received help from
> Bill.  He continued to provide me with the encouragement and support that had
> been so crucial in my past.  He seemed to know what I could do before I even
> knew my capabilities.[175]

Another instance of Mr. Cellini's extension of support to a young person in need was the

case of Brian Su, a Chinese man who took political asylum in the United States after the

Tiananmen massacre in 1989.[16][176]  Mr. Su writes that Mr. Cellini acted as a father figure for him

and his young family.[177]  When Mr. Su was able to bring his wife to the United States from

China, Mr. Cellini hosted an American-themed reception for Mr. Su, his wife, and all of their

invited guests to celebrate Mr. Su's acceptance into this country.[178]

For Kathy Throop, who found herself, at 21 years of age, living alone with no income,

Mr. Cellini gave her the start she needed.[179]  Ms. Throop actually fainted in line at the

unemployment office, as she had gone some time without food.  A man at the office told her he

knew someone who might be able to help and then brought her to Mr. Cellini's office.  Mr.

Cellini hired her on the spot for a job for which she came to understand there was no actual need,

---

[173]Letter of David Dailey, Tab 102 at 1.
[174]*Id.*
[175]*Id.*
[176]Letter of Brian Su, Tab 9 at 1.
[177]*Id.*
[178]Letter of James L. Fulgenzi, Tab 146 at 1.
[179]Letter of Kathy Throop, Tab 328 at 1.

and provided employment for several months until she could locate a full-time position. During that time, Mr. Cellini often bought her lunch or brought food from home to share with her.[180]

Mr. Cellini responded similarly when he learned of other people, particularly young people, in need. In one instance, his sister Janis was substitute-teaching at a local truant school.[181] She explained to Mr. Cellini that she had learned that the children in the school did not have the money to afford lunch.[182] When Mr. Cellini heard this he called the regional office to determine the cost of a lunch ticket, determined how many children did not have a ticket, and carefully calculated the cost for each child to have lunch for the entirety of the school year. He then wrote a check for the full amount with one caveat: no one was to know who was responsible.[183]

When Mr. Cellini served on the board for a local small private school, an issue arose with the school not having met the fire safety code.[184] Because the cost of the repairs exceeded the school's limited means, the school was in danger of being shut down. Mr. Cellini quickly provided his own funds to ensure that all issues had been dealt with so the school could move forward. Mr. Cellini did this "quietly and with absolutely no fanfare or publicity" such that few board members ever even knew the story.[185]

When individuals encountered crisis or severe misfortune, Mr. Cellini was unfailingly available to provide critical assistance. When a college freshman was involved in a multi-vehicle accident that necessitated his being on a ventilator in critical care for several days, Mr. Cellini offered to arrange transportation of the young man to a local hospital as well as any other

---

[180]*Id.*
[181]Letter of Janis Cellini, Tab 2 at 2.
[182]*Id.*
[183]*Id.*
[184]Letter of Craig Schermerhorn, Tab 289 at 1.
[185]*Id.*

needed assistance to the family.[186]  For another friend who lost her father unexpectedly and was tasked with managing a small business, Mr. Cellini stepped in to assist with advice about how to organize and run the operation.[187]  For an old friend who had fallen upon hard times and had become a desperate alcoholic living on the streets of Chicago, Mr. Cellini was one of a small group of friends that never turned its back on the individual but offered emotional support and personal counsel to assist him in rebuilding his life.[188]  Mr. Cellini's loyalty meant so much to the individual that before he died, he described Mr. Cellini as one of two true friends he had had in his life.[189]  For a couple who found themselves unable to have children but desperate to start a family, Mr. Cellini brought to their attention the opportunity for them to adopt a child, based on his recollection of a conversation years before in which they revealed a possible interest in adoption.[190]  As attested to by Edith Miller, "I have never known anyone that was truly in need to be turned down, and there were some Bill helped numerous times.  It didn't matter if they were Republican or Democrat, rich or poor, if they were in a jam and Bill could help he did."[191]

In less dramatic situations as well, Mr. Cellini offered help when families found themselves without jobs or income or young people found themselves unable to afford education. As related by Timothy Sean McAnarney:

> Bill never forgot where he came from . . . Hundreds of blue-collar working men and women owe their livelihoods to Bill.  He was never so busy that he wouldn't try to find work for those who weren't rich or politically connected.  There was nothing in it for him, but he cared and he helped so many people realize their dreams.[192]

---

[186]Letter of Joseph Bonefeste, Tab 60 at 2.

[187]Letter of Marilyn Cagnoni, Tab 68 at 1.

[188]Letter of Dianne Barghouti Hardwick, Tab 24 at 1.

[189]*Id.*

[190]Letter of Dr. Gerry Schermerhorn, Tab 29 at 1.

[191]Letter of Edith Miller, Tab 239 at 1.

[192]Letter of Timothy Sean McAnarney, Tab 232 at 1.

Donald Jackson echoed the same sentiment, explaining that when members of a social organization in which he and Mr. Cellini participated lost a job or suffered other problems, it was always Mr. Cellini to whom they turned for support and guidance.[193]   And Mr. Cellini came through time after time.   Mr. Jackson explained, "Repeatedly, always in a quiet manner and never seeking recognition or even acknowledgment of his efforts," Mr. Cellini found or provided resources.[194]   Mr. Cellini's assistance was available to all.   Mr. Jackson observed, "What impressed me most was the fact that [Mr. Cellini] freely gave his help to anyone – regardless of his or her social, political or economic status."[195]

Particularly rewarding to Mr. Cellini were instances in which he could serve as a mentor for young people desirous of pursuing careers in politics or in public interest.   Drin O'Connor wrote about Mr. Cellini's participation in a mentor program aimed at expanding the role of women in Springfield politics.[196]   Candace Trees, Sangamon County's first African-American County Clerk, wrote that Mr. Cellini served as a role model for young people in the Springfield community.[197]

Willis Logan explained that he and Mr. Cellini developed a close friendship dating back to the time during which Mr. Cellini served as a member of the Board of Directors for a bank at which Mr. Logan worked as a teller.[198]   Over the years, Mr. Logan would visit Mr. Cellini at his office to talk about politics, family, and community issues.[199]   When Mr. Logan wanted to

---

[193]Letter of Donald Jackson, Tab 187 at 1.
[194]*Id.*
[195]*Id.*
[196]Letter of Drinda O'Connor, Tab 253 at 1.
[197]Letter of Candace Trees, Tab 337 at 1.
[198]Letter of Willis Logan, Tab 4 at 1.
[199]*Id.*

become involved in public service, Mr. Cellini was there to guide him.[200]  When Mr. Logan

wanted to get more minorities involved in the community, Mr. Cellini helped him strategize and

organize.[201]  Mr. Logan attested;

> And he was always helping somebody.  It was as though he lived for that very
> purpose.  Some may have considered that trait a weakness, but I was always
> mesmerized by his deep affection for people. . . [Mr. Cellini] extended me the
> same kindness, the same respect every time I saw him.  He knew not color nor
> circumstance.  If you were in need, and you asked him for help, his hand was
> always outstretched.  It is quite possibly, impossible to count the numbers of
> individuals or families he has helped find a job, or get a promotion, or settle some
> dispute, find a place to stay, or any number of other issues requiring
> resolution. . . . He helped me because that's the way he is.  A truly giving caring
> person whose legacy will be forever based on obliging the needs of others.[202]

Alan Woodson wrote that Mr. Cellini had bonded with his father, an African-American

man who had been active in Springfield politics in the 1960s, and had been one of the first to

congratulate Mr. Woodson when he obtained an elected position.[203]  Mr. Woodson recalled that

the most significant aspect of his exchanges with Mr. Cellini were Mr. Cellini's urgings that Mr.

Woodson use his elected position for the betterment of his constituents, as well as to "help bind

together our community as a whole."[204]

For Lori Evers, a young woman who sought to advance her position through education

but lacked the necessary funds, Mr. Cellini extended a no-interest loan for graduate school and

then forgave the loan entirely as a graduation gift.[205]  Equally significant to Ms. Evers, who had

worked in Mr. and Mrs. Cellini's home, is that the Cellinis helped her to "navigate life decisions

---

[200]*Id.*

[201]*Id.*

[202]*Id.*

[203]Letter of Dr. Alan Woodson, Tab 360 at 1.

[204]*Id.*

[205]Letter of Clay Evers, Tab 126 at 1.

as parents do their daughters."[206]   As attested to by former Chief Justice of the Illinois Supreme

Court, Benjamin Miller:

> Leaving public service Bill continued to use his unusual intellect, his dedication
> to detail, and simple hard work to achieve success in business.  And along the
> way, he stopped repeatedly, giving a large portion of his time, to mentor young
> people interested in political careers; to give support, financial and otherwise, to
> people who needed his help; to give back to his community in uncounted ways;
> and to give counsel and advice to all who asked.[207]

Each and every one of these demonstrated examples of Mr. Cellini's selfless charity

should appropriately be considered in connection with his sentencing.  As observed by the court

in *United States v. Adelson*:

> [S]urely, if ever a man is to receive credit for the good he has done, and his
> immediate misconduct assessed in the context of his overall life hitherto, it should
> be at the moment of his sentencing, when his very future hangs in the balance.
> This elementary principle of weighing the good with the bad, which is basic to all
> the great religions, moral philosophies, and systems of justice, was plainly part of
> what Congress had in mind when it directed courts to consider, as a necessary
> sentencing factor, "the history and characteristics of the defendant."

441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006).

### H.    Mr. Cellini's Military Service and Civic Involvement

#### 1.    Military Service

Mr. Cellini served for 27 years in the Illinois National Guard, an army reserve unit.  In

this position he spent one weekend a month meeting and training as well as two weeks a year on

active duty.  He also served on the Selective Service Board, which required frequent trips to

Washington, D.C.  Julie Cellini wrote of Mr. Cellini's practice of getting doughnuts for the

family at 5 a.m. on the mornings he left for his weekend of training in the attempt to make up for

his children's sporting events and birthday parties that he inevitably missed.[208]  During his 27

---

[206]Letter of Lori Evers, Tab 127 at 1.
[207]Letter of Justice Benjamin Miller, Tab 26 at 1.
[208]Letter of Julie Cellini, Tab 1 at 3.

years of National Guard Service, Mr. Cellini was subject to active duty if need arose. As described in a letter written to the Court on Mr. Cellini's behalf by Major General Richard G. Austin:

> [T]he National Guard is the first line of defense for the home front whether in cases of natural disasters such as flooding or tornados or in support emergency services due to earthquakes or winter weather conditions. Further the National Guard is often called upon to provide home security and handle civil disturbance throughout the state of Illinois subject to the call of the Governor. Cellini was for 27 years subject to the call of active duty beyond his normal requirements and stood ready to respond if called upon to do so. . . Like most Guard personnel the Cellini family and their children grew up scheduling activities and outings around Guard weekends and summer training camps but as a result the responsibilities and ethics of the military (Duty-Honor-Country) were learned, and still today are carried on by the family.[209]

Mr. Cellini ascended from the rank of Private to that of Lieutenant Colonel.[210] This was a position that required Presidential nomination and Senate confirmation.[211] Major General Austin also confirmed, from personal knowledge, that Mr. Cellini's officer evaluation reports were of the highest order.[212] Hellar Armbruster, who served in the National Guard with some of the same officers with whom Mr. Cellini had worked, observed that all the individuals he encountered recalled Mr. Cellini as "hardworking, generous, kind . . . [and] selfless in his service."[213] In addition to his National Guard service, Mr. Cellini acted as the Illinois Chairman of the USO.[214]

While the Seventh Circuit has made it clear that all aspects of a defendant's history and characteristics are to be considered as § 3553(a) factors, *see United States v. Carter*, 530 F.3d 565, 578 (7th Cir. 2008), the United States Sentencing Commission, through amendments

---

[209]Letter of Major General Richard G. Austin, Tab 12 at 2.
[210]*Id.*
[211]*Id.*
[212]*Id.*
[213]Letter of Hellar Armbruster, Tab 44 at 1.
[214]Letter of Robert Gibson, Tab 158 at 1-2.

effective November 1, 2010, determined that the Advisory Guidelines Section 5H1.11 should *specifically allow* military service, along with age-related factors, to be considered as grounds for guideline departures. *See* U.S.S.G. Appendix C, Vol. III, Amend. 739 at 349. The amendment was enacted to make clear that even under the Advisory Guideline calculations, and separate and apart from § 3553(a) considerations, significant military service appropriately mitigates criminal sentences. In this case, Mr. Cellini's service in terms of National Guard training alone adds up to nearly *three years* of time he freely gave to his country. This does not count any of Mr. Cellini's USO service. Under both the Advisory Guidelines and § 3553(a), Mr. Cellini merits leniency in sentencing based on these facts.

Mr. Cellini's military service stemmed from a profound love of this country and belief in its political processes.[215] As people close to Mr. Cellini have written, he was a genuine patriot who counseled students to resist cynicism during the Vietnam era and to effect change through active participation in government.[216] Even at times in which it was unpopular, Mr. Cellini stood by U.S. veterans and supported them in words and in actions.[217] He passed his civic-mindedness on to his children. His son Bill Jr. directed a video documentary interview of the remaining World War I veterans. This film is now used as an educational series at the State Military Museum at Camp Lincoln.[218] Daughter Claudia, who lives and works in Dubai, regularly serves as host to U.S. soldiers from Qatar and Kuwait.[219]

### 2. Civic Involvement

In addition to his involvement in providing affordable housing and transforming blighted areas of Springfield through real estate investments, Mr. Cellini has made enormous

---

[215]Letter of William Ghesquiere, Tab 23 at 2.

[216]Letter of Donald Jackson, Tab 187 at 1.

[217]Letter of Robert Lynch, Tab 219 at 1.

[218]Letter of Major General Richard Austin, Tab 12 at 2.

[219]*Id.*

contributions to Springfield's vitality and reputation through his commitment to the success of the Abraham Lincoln Library and Museum. The Library and Museum were opened in 2000 at a ceremony attended by President George Bush and Senator Dick Durbin.[220] The opening was the culmination of a dream fostered and developed by Mr. and Mrs. Cellini. As explained by Richard Hart, who spoke with the Cellini's about the possibility of the Library more than ten years ago when the library was no more than an aspiration, the Cellinis hoped for years to bring all of the Lincoln artifacts owned by the State of Illinois out of storage and to the people.[221] Mr. Hart wrote that the Cellinis "both said that it was their duty to make this a personal goal that would serve the public and particularly younger people."[222] Mr. and Mrs. Cellini succeeded magnificently. Since its opening in 2000, the Lincoln Library has attracted more than 3 million visitors, making it the most visited presidential facility in the nation.[223] The Library has transformed Springfield into "an historic and cultural visitors Mecca for people from around the world."[224] The economic impact on the City of Springfield from the Library has been in the amount of over $35 million annually.[225] All of the letter writers who discuss the Library agree that it never would have been possible but for the tireless efforts of Mr. and Mrs. Cellini, who contributed not only substantial personal funds, but worked with legislators and private donors to bring the project to fruition.[226]

Throughout the process of the creation of the Library and Museum, Mr. and Mrs. Cellini served the project honestly and faithfully, never allowing personal interests to intervene. Bob

---

[220]Letter of Richard Hart, Tab 173 at 2. Although not mentioned in Mr. Hart's letter, then-Senator Barack Obama was also in attendance.
[221]*Id.*
[222]*Id.*
[223]Letter of Julie Cellini, Tab 1 at 5.
[224]Letter of R. Lou Barker, Tab 54 at 1.
[225]Letter of Cindi Fleischli, Tab 134 at 1.
[226]*Id.*

Rogers, a Los Angeles filmmaker, member of the Motion Picture Academy, and founder of BRC Imagination Arts, was selected to design the interactive museum exhibits for the Library and Museum.[227]  He worked side by side with the Cellinis on the project for seven years.[228]  During that time, Mr. Rogers observed, he witnessed many opportunities for those involved in the project to ask for favors of some kind.  Mr. Rogers explained that Mr. Cellini asked repeatedly for only one favor, which was to "please make the Lincoln Museum great for the sake of the people (and especially the *young* people) of Illinois and America."[229]  Mr. Rogers affirmed that Mr. Cellini never asked for anything for himself and refused to be involved in discussions of selection of the site lest there exist any appearance of impropriety based on his real estate holdings in the Springfield area.[230]

Even when it came to public recognition for the Library and Museum, Mr. Cellini refused to be a self-promoter.  E. Norman Sims wrote describing the time that the Library and Museum were to be publicly announced.[231]  Mr. Sims observed many people trying to push their way to the front of the crowd to have their pictures taken.[232]  When he observed Mr. Cellini as just another face in the mass of onlookers, Mr. Sims asked Mr. Cellini why he did not push his way up to the front to be recognized for his efforts.[233]  Mr. Cellini responded by simply smiling and saying "there was no need because it was not his project, it was all of ours, and that he just wanted to remember the day."[234]  Mr. Sims added that he did not think that Mr. Cellini would

---

[227]Letter of Bob Rogers, Tab 6 at 1.
[228]*Id.*
[229]*Id.* at 2.
[230]*Id.*
[231]Letter of E. Norman Sims, Tab 34 at 2.
[232]*Id.*
[233]*Id.*
[234]*Id.*

even recall the conversation in that it was nothing more than an outgrowth of Mr. Cellini's consistent attitude toward community service, that the work was its own reward.[235]

Jeffrey Enlow, a young man who was friends with Bill Jr., recounted a moment that illustrates the pleasure that Mr. and Mrs. Cellini derived from serving the Springfield community. He visited Mr. and Mrs. Cellini during the time that they planned a dinner for a group celebrating the Lincoln Bicentennial.[236] Mr. Enlow witnessed Mr. and Mrs. Cellini attending to every aspect of the dinner, from the table settings to the food and wine.[237] Mr. Enlow wrote, "[a]s I said goodbye to them and left, they were still working, side by side, getting ready for their visitors. Julie was scrubbing the sink with Ajax and Bill was setting the table. Little things like this speak volumes to me about the character of these wonderful people."[238]

Mr. Cellini's dedication to his Springfield community is also at evidence in the Halloween tradition of Mr. and Mrs. Cellini opening their home to children all across Springfield, some of whom are transported from disadvantaged areas of the City.[239] The Cellinis set up tables with various treats in the foyer of their home and welcome the children in to make their selections. The Halloween tradition is anticipated by both the children and by Mr. Cellini himself, who has often cancelled meetings and travel to ensure that he was home for the event.[240]

As explained by Craig Cellini, Mr. Cellini loves Springfield, "[n]ot 'Springfield' in the political sense as it is used outside of the city but the actual town in which he grew up and continues to call his home."[241] That Mr. Cellini loves his home is perhaps not remarkable. What

---

[235]*Id.*
[236]Letter of Jeffrey Enlow, Tab 125 at 1.
[237]*Id.*
[238]*Id.*
[239]Letter of James Fulgenzi, Tab 146 at 1.
[240]*Id.*
[241]Letter of Craig Cellini, Tab 18 at 2.

is remarkable, however, is that unlike the vast majority of the citizens of Springfield or any other community, Mr. Cellini has allowed that love to translate into actions that have unquestionably significantly augmented the health and well-being of both the community and its residents.

### III. Just Punishment for the Offense and Promotion of Respect for the Law: 18 U.S.C. § 3553(a)(2)(A)

The jury verdict in this case indicates a finding of misconduct in the context of a series of telephone conversations that took place between approximately May 7, 2004 and May 12, 2004. The verdict evidences that while there was a finding that Mr. Cellini participated in Levine's extortion scheme, he did not personally attempt to extort Rosenberg.[242] As discussed above, Mr. Cellini indisputably was unaware of several key components of Levine's extortion scheme. Thus, not only was the conduct for which Mr. Cellini has been found guilty restricted to a brief time period in May 2004, it was circumscribed by the limits of Mr. Cellini's knowledge of Levine's scheme.

Under these circumstances, concerns as to administering a just punishment and promoting respect for the law both point to a sentence of probation. As commented time and time again by the individuals who have submitted letters to the Court on Mr. Cellini's behalf, the conduct that was the subject of this case was an absolute anomaly for the Mr. Cellini they had come to know well through decades of close association. Based on the number and quality of the letters submitted in this case, it would be no exaggeration to state that the organic sentiment from Mr. Cellini's community is that a life spent tending to the needs and concerns of others and to the betterment of his community cannot and should not end in prison.

This sentiment is all the more compelling when one considers the fact that Mr. Cellini has been absolutely silent about the circumstances of his case. He has not protested his innocence.

---

[242]Compare conviction on Count II (conspiracy to commit extortion) with acquittal on Count III (attempted extortion).

He has not complained about the judicial process. He has sought no attention and has avoided public as well as private comment about the case. Michael Feraga wrote, "Recently during his trial, I observed first-hand Bill refusing to make comments about the case in the public forum. While he could have attempted to 'try' his case through the media, he instead kept quiet showing his respect and belief in the judicial process."[243] Jim Montana observed, "During the trial, Bill never once took the bait of the newspaper reporters anxious to solicit a negative remark from him about the trial."[244]

Mr. Cellini has been as quiet privately about the case as he has been publicly silent. Bob Rogers observed that despite what Mr. Rogers observed to be unfair media coverage of Mr. Cellini, which has "attacked him and accused him of all kinds of additional awful things (beyond the case) that are grossly untrue," "Bill refuses to criticize back, publicly or privately."[245] A.D. Van Meter wrote that during a recent lunch he had with Mr. Cellini in Springfield, several people stopped by the table to make comments on the trial. Despite the fact that Mr. Cellini was in a private forum and among friends, Mr. Van Mater observed, "Bill never responded other than to thank them for their concern and to indicate his confidence in the judicial system."[246]

While it is admirable, wise, and largely expected that a defendant will eschew public comment about their case, it is unusual indeed for a defendant to assiduously avoid discussion of that case, even with friends and close associates. However that is precisely what the letters evidence Mr. Cellini has done in this case, electing to have his only expressions be those of confidence in the judicial system. Under these circumstances, and given the narrow scope of the

---

[243]Letter of Michael Feraga, Tab 129 at 1.
[244]Letter of Jim Montana, Tab 241 at 1.
[245]Letter of Bob Rogers, Tab 6 at 2.
[246]Letter of A.D. Van Meter, Tab 340 at 2.

conduct at issue in this case, it would advance the cause of justice and promote respect for the law for Mr. Cellini to be afforded the utmost leniency in this case.

## IV. Specific and General Deterrence: 18 U.S.C. § 3553(a)(2)(B) &(C)

The goal of specific deterrence has already been met in this case. At nearly 78 years of age and after having spent the last six years of his life wrapped up in the personal and professional trauma of this case, it is indisputable that Mr. Cellini would never again find himself in these circumstances. Mr. Cellini has suffered adverse health consequences. Cardiologist Brian Miller wrote to the Court about the palpable health consequences to Mr. Cellini of the stress of this case, exacerbated by Mr. Cellini's unhealthy penchant for internalizing that stress.[247] Sue Ellen and John Billington explained, "[Mr. Cellini] has literally died a little bit at a time as a result of the allegations levied against him. His spirit and his body have been ravaged by the constant pressure the proceedings have placed on him and the tremendous stress that is inherent in all that he and his family have had to experience."[248]

Mr. Cellini's reputation in Springfield has been diminished by this case, a result that has been particularly painful to him given the pride he has always taken in his community. Earl Henderson Jr. wrote, "the trial and the conviction has, to date, devastated the reputation that has been Bill Cellini's cornerstone of private and public honesty, humility, generosity and a lifetime of contributions in efforts and investment for projects in Springfield."[249] Robin Ellison, who sees Mr. Cellini daily based on her position working with him in the office, explained that although both Mr. and Mrs. Cellini have tried to keep an upbeat disposition, she sees "stress and anxiety written all over them both [Mr. and Mrs. Cellini] emotionally and physically."[250] Andy

---

[247]Letter of Dr. Brian Miller, M.D., F.A.C.C., Tab 367 at 1-2.
[248]Letter of Sue Ellen and John Billington, Tab 13 at 3.
[249]Letter of Earl Henderson Jr., Tab 176 at 1.
[250]Letter of Robin Ellison, Tab 123 at 2.

Van Meter observed that it has been particularly difficult for Mr. Cellini in Springfield because of the relatively small size of the city, obviating the possibility of "comfortable anonymity." Mr. Van Meter wrote of Mr. Cellini's experience:

> Bill Cellini is the sort of person who would be personally ashamed to receive a traffic ticket. Since the government first indicated its interest extended to a citizen of Springfield, Bill and his family have suffered stoically through countless ill-informed news reports and editorials, mindless chatter, even thoughtless expressions of sympathy, as searing as any sentence.[251]

The case has also had palpable negative effects. The case engendered the loss to Mr. Cellini of Commonwealth Realty Advisors, a company that he worked hard to start and to build. Mr. Cellini has surrendered both his real estate and insurance brokerage licenses, both of which he had worked for years to maintain, sitting for renewal tests annually. He has voluntarily resigned from two bank boards and the board of his college, which had previously awarded him the Illinois College Distinguished Alumni Award, as well as from positions as consultant to industry groups. Of Mr. Cellini's resignations, Denise and Dan Courtney observed that Mr. Cellini stepped down in order to avoid making others feel uncomfortable, stating, "In so doing Bill put others before himself despite how personally painful it was for him to relinquish leadership."[252] Gregg and Melanie Humphrey shared a similar observation, remarking that although it was devastating for Mr. Cellini to resign as Executive Director of the Illinois Association of Wastewater Agencies (a position he held for 40 years), he did so "graciously and willingly . . . when he felt his personal situation might have a detrimental effect on the whole of the Association."[253]

For Mr. Cellini, the most painful effects of this case are those it has wrought on his family. The fallout from the case has damaged Mrs. Cellini professionally, as she was recently

---

[251]Letter of Andy Van Meter, Tab 10 at 1-2.
[252]Letter of Denise Druhot and Dan Courtney, Tab 119 at 2.
[253]Letter of Gregg and Melanie Humphrey, Tab 179 at 1.

terminated from the Illinois Historic Preservation Board on which she had served without pay, loyally, and with distinction since 1985. Worse, the case has resulted in Mrs. Cellini being hospitalized from stress and Bill Jr. suffering from severe stress-related health issues. Many who wrote letters pointed out that Mr. Cellini was always more concerned about the suffering of his family than his own, additional testament to the depth and quality of his character. Crystal Maher observed, for example, that the most difficult part of the trial for Mr. Cellini was that his family had to suffer, and that Mr. Cellini was "more concerned about the impact his conviction has on Julie, his children and grandchild than himself."[254]

As for general deterrence, the community has seen and has followed a very public trial and verdict. A strong message has been sent that no amount of tolerance will be extended to even comparatively minor offenses in the political arena. That message need not be amplified with a prison sentence for a man in fragile health toward the end of his life.

## V.     Avoidance of Unwarranted Sentencing Disparity: 18 U.S.C. § 3553(a)(6)

There have been a multitude of defendants convicted in recent years of crimes involving Illinois politics whose sentences have ranged from probation to virtual lifetime imprisonment. Consideration of those defendants' sentences, and the need to avoid sentencing Cellini to an unfairly disparate sentence by comparison, strongly argue for a probationary sentence.

### A.     Stuart Levine

The other defendants who directly participated in the Rosenberg extortion conspiracy, such as Stuart Levine and Tony Rezko, engaged in criminal conduct so radically dissimilar to Mr. Cellini – both with specific regard to the Rosenberg conspiracy and more generally – that any attempt to analogize those cases for purposes of sentencing is useful only to emphasize the fact that Mr. Cellini deserves a sentence far more lenient than those defendants. And indeed,

---

[254]Letter of Crystal Maher, Tab 224 at 1.

Levine's lifetime of criminality and depravity remarkably earned him only 5.5 years in prison. Levine cooperated with the government in order to reduce his sentence. However, by the government's own admission, Levine lied to the government about the involvement of Ed Vrdolyak in one of his corrupt schemes. And the jury rejected Levine's testimony that Mr. Cellini participated in the supposed accommodation agreement or Levine's attempt to extort Rosenberg. Weighing Levine's cooperation against crimes too numerous to count, which harmed and defrauded countless victims, including universities and charities – a record so heinous as to prompt Judge Amy St. Eve to characterize Levine as "one of the most corrupt individuals this district has ever seen" – the government agreed to slash Levine's sentence from life imprisonment to a sentence roughly equivalent to that of a small-time drug offender. Without question, to avoid unwarranted disparities in sentencing, Cellini deserves a sentence drastically more lenient than Levine; anything more than probation, by comparison, would be unjust.

### B.    Ed Vrdolyak

One individual associated with this matter to whom Mr. Cellini might more reasonably be compared is Ed Vrdolyak, who purportedly was to act as a conduit for and to share in the kickback Levine sought from Rosenberg. In contrast with Mr. Cellini, Vrdolyak participated with Levine in a litany of other bribe and fraud schemes, ultimately pleading guilty to conspiring with Levine to defraud Rosalind Franklin University ("RFU") in connection with the sale of certain real estate. Significantly, in stark contrast to the conduct of which Mr. Cellini was convicted, which occurred over the course of about a week, the conduct to which Vrdolyak pled guilty was ongoing for months, and his criminal and unethical acts stretched back decades. Specifically, from February to June 2006, Vrdolyak repeatedly spoke to Levine about how he (Vrdolyak) could abuse his position as a lawyer to secretly pay Levine his share of a $1.5 million

fee the two had improperly obtained in connection with the RFU real estate transaction. Citing RFU's loss of millions of dollars at a time when it was desperately short of money, Vrdolyak's extensive efforts to conceal his crime, and bad acts by Vrdolyak extending from 1990 to 2006, the government requested that Vrdolyak be sentenced to 41 months' imprisonment; he was sentenced to ten months in prison and five months of home confinement.

Mr. Cellini should receive a significantly lesser sentence than Vrdolyak for many reasons, including that Vrdolyak had a checkered history of unethical and illegal conduct. Indeed, in arguing that Vrdolyak deserved a sentence of 41 months of imprisonment, the government characterized Vrdolyak's fraud against RFU as "part of a practice and pattern of unethical and illegal behavior." The government cannot make any such claim with respect to Mr. Cellini, and his sentence should reflect that fact.

Furthermore, Vrdolyak knowingly participated in numerous criminal schemes with Levine, while planning to personally profit from those schemes (including the Rosenberg scheme). Ignoring all of these facts, the government argues that Mr. Cellini should be sentenced *more severely* than Vrdolyak because Mr. Cellini supposedly lacks remorse. The government's reasoning seems to be that because Vrdolyak discussed his criminal case in enough detail with friends and associates for them to speak about his level of remorse, he deserved a more lenient sentence than Mr. Cellini, who elected not to discuss his case at all. The argument is backward. As discussed above, the fact that Mr. Cellini elected to make no public comment whatsoever on this case, other than to express confidence in the judicial system, is information to be considered in mitigation of his sentence. The truth is that consideration of Mr. Cellini's culpability and history relative to that of Vrdolyak, who spent just ten months in prison, argues powerfully for a probationary sentence for Mr. Cellini.

60

### C. Joe Cari

An even more apt sentencing comparison is Joseph Cari, Jr. Cari was a managing director of a private equity firm and a political fundraiser. At the behest of Levine, Cari acted as a messenger to deliver an extortionate message to a firm seeking to obtain an allocation from TRS. Cari delivered that extortionate message to an executive of the firm, as well as to a secretary (whom he also threatened with being fired), the firm's general counsel, and its outside counsel. Unlike Mr. Cellini's case, Cari's motivation in assisting Levine was personal profit. Specifically, Cari's plea agreement provided that Levine told Cari that "Levine thought he could assist Cari's private equity firm, which was attempting to obtain money from an Illinois State pension fund and other funds." When Cari was not successful in causing the firm attempting to obtain a TRS allocation to act as Levine wanted, Levine told Cari that it "would be a reflection on Cari if this did not get done, and Levine would remember it." In response to Levine's comments, Cari promised to stay on top of the situation and commenced his barrage of extortionate calls.

Cari pled guilty to attempted extortion and had a guideline sentencing range of 70 to 87 months of imprisonment. The government recommended a sentence of approximately 25 months of imprisonment. The Court declined to follow that recommendation and instead sentenced Cari to nine months of home confinement and three years of probation. Admittedly, Cari is distinguishable from Mr. Cellini in that Cari pled guilty and cooperated with the government. But Cari was significantly more culpable that Mr. Cellini and his personal circumstances were also far less compelling. He could not claim anything resembling Mr. Cellini's lifetime of charitable and civic contributions. At age 58 at the time of his sentencing, Cari was a comparatively much younger man than Mr. Cellini. In addition, it appears that Mr. Cari was in fine health and thus far more capable than Mr. Cellini of withstanding a prison

sentence. Considerations of specific deterrence are obviously more significant in the case of a defendant such as Mr. Cari, who has ample time to rebuild a successful life (which appears to be what Mr. Cari has, in fact, done). At nearly 80 years of age and in seriously failing health, Mr. Cellini has no such luxury. Thus, comparison to Cari's sentence provides further argument that Mr. Cellini should receive a probationary sentence.

### D. Steve Loren

Also informative is the case of Steve Loren. Loren was external counsel to TRS from approximately the early 1990s until August 2004. Through that position, he formed a close friendship and criminal partnership with Levine and facilitated a number of Levine's fraudulent schemes and corruption of TRS. In particular, at Levine's behest, in 2003 and 2004, Loren drafted various sham contracts providing for the disposition of fees paid by TRS to Levine's associates, illicitly met with and advised certain associates of Levine as to how they could obtain allocations from TRS, and also plotted with Levine as to how Levine could set up an asset management company to do business with TRS while concealing Levine's interest in that company. Loren ultimately was charged with and pled guilty to corruptly obstructing the administration of the IRS in connection with a scheme whereby Loren drafted a sham "consulting agreement" providing for a Levine associate to split a "finder's fee" earned on a TRS allocation with another individual selected by Levine. Loren intentionally doctored the agreement so as to conceal the fraudulent nature of the transaction and to withstand scrutiny by a third party, such as the U.S. Attorney's office.

As a part of his guilty plea, Loren cooperated with the government and testified at the trials of Rezko and Mr. Cellini. Loren's crime carried a guideline sentencing range of 12 to 18 months in prison. The government agreed to a downward departure "without a floor" and made no recommendation concerning the imposition of a term of incarceration. Judge St. Eve

sentenced Loren to two years of probation.   In passing sentence, Judge St. Eve specifically remarked on the fact that unlike many other defendants involved in Levine's corrupt acts – but like Mr. Cellini – Loren did not personally profit from the illegal behavior to which he pled guilty.   However, unlike Mr. Cellini, Loren did, in fact, personally profit from his corrupt relationship with Levine.   In particular, after their corrupt relationship was established, Levine hired Loren to perform certain very minor work for the Tannenbaum estate that required Loren to make a single phone call.   Levine instructed Loren to bill the estate $10,000, which Loren did. After receiving the $10,000 from the estate, Loren had someone at his law firm generate a series of fictitious bills reflecting work for the estate that was not actually done.   Further, Levine referred significant additional legal work to Loren and Loren's firm, including work for RFU and Mercy Hospital, which contributed to Loren earning approximately $1,000,000 in 2004.   As a part of his plea, Loren was not made to repay any money whatsoever in restitution for the profit earned through his corrupt relationship with Levine.

Like Cari, Loren's probationary sentence strongly argues for a similar sentence for Mr. Cellini.   In total contrast to Mr. Cellini, Loren directly participated in and enabled Levine's fraudulent schemes on more than one occasion and earned a great deal of money as a result. Similar to Cari, Loren is a comparatively young man with many years ahead of him with which to rebuild a successful life, and considerations of deterrence in the case or Loren were far more compelling than they are here.   For these additional reasons, and to avoid unwarranted sentencing disparities, Mr. Cellini deserves probation.

### E.    Lon Monk

Contrary to the Government's Sentencing Memorandum, Lon Monk's actions in actively and routinely assisting a sitting Illinois Governor in various forms of corruption of that office – including extorting campaign contributions by improperly connecting legislative action with

fundraising commitments – do not bear any honest similarity to the this case. As the Court is aware, Monk was Governor Blagojevich's chief of staff and was convicted of attempted extortion and sentenced to two years in prison under a plea deal, and as a part of that deal, Monk admitted to a litany of serious political crimes that began even before Blagojevich was elected, crystallized while Monk was serving in the administration, and continued even after he had left for the private sector to become a lobbyist and profit from his political connections – criminality spanning from approximately 2002 to 2008. Monk admitted he spent at least two years (prior to and during the time he held a public position) engaged in various illicit discussions with Blagojevich, Chris Kelly, and Rezko about how they could personally profit from various forms of corrupt control over state government. Between 2004 and 2005, Monk received $10,000 in corrupt payments from Rezko on between seven and nine occasions. This long-standing, pervasive misconduct by Monk directly undermined the office of governor and the confidence of the people of this state. This was not a week of telephone conversations, but rather years of rampant corruption at the highest levels of office in the state.

The government claims that in regards to the conduct for which he pled guilty, Monk's "role was limited to simply delivering the extortionate message," and thus similar to Cellini. (Government Sentencing Memo at 22.) But that is untrue. Monk specifically admitted to strategizing with Blagojevich about how to exert more pressure on the extortion victim to make a campaign contribution.

For all of those reasons, Monk's conduct is in no way comparable to that of Mr. Cellini. In addition, Monk was neither elderly nor seriously ill. And while it is true that Monk cooperated, he initially withheld information from the government's investigators.

Thus, the fact that Monk was sentenced to only two years in prison confirms that Bill Cellini should receive a sentence of probation.

## CONCLUSION

Mr. Cellini stands before this Court in a proceeding that has the potential of dictating the manner in which he will spend the final years of his life. When all of the facts and circumstances of this case are considered against the backdrop of a life of kindness and generosity that can only be described as extraordinary, it is clear that a sentence of probation is just and appropriate in this case. Mr. Cellini's history and characteristics, the nature and circumstances of the offense, the need for a sentence that will promote respect for the law, considerations of general and specific deterrence, and the need to avoid unwarranted sentencing disparities among similarly situated defendants all point to a sentence of probation in this case. Mr. Cellini's only statements about this case have been that he believes in the judicial system and in the possibility of justice. For Mr. Cellini, justice can only be achieved by allowing him to spend his last years with the family and community he has consistently cherished and served.

Dated: September 27, 2012

Respectfully submitted,

/s/ Thomas L. Kirsch

Dan K. Webb
Thomas L. Kirsch
Winston & Strawn LLP
35 West Wacker Drive
Chicago, Illinois 60601
(312) 558-5600
(312) 558-5700 (facsimile)

**CERTIFICATE OF SERVICE**

The undersigned attorney hereby certifies that the following document:

**DEFENDANT'S SUBMISSION WITH RESPECT TO SENTENCING FACTORS SET FORTH IN 18 U.S.C. § 3553**

was served on September 27, 2012, in accordance with FED. R. CRIM. P. 49, FED. R. CIV. P. 5, L.R. 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system as to ECF filers.

/s/ Thomas L. Kirsch_____
Thomas L. Kirsch